UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

BENNIE GIBSON,

                                   Plaintiff,

                                                          9:10-CV-0968
v.                                                        (LEK/TWD)

BRIAN FISCHER, Commissioner, *et. al.*,

                                   Defendants.

_____

APPEARANCES:                          OF COUNSEL:

BENNIE GIBSON
441-13-09730
Plaintiff *pro se*
RNDC
11-11 Hazen Street
East Elmhurst, New York 11370

HON. ERIC T. SCHNEIDERMAN            KEITH J. STARLIN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

 *Pro se* Plaintiff Bennie Gibson, formerly an inmate under the custody of the New York

Department of Corrections and Community Supervision ("DOCCS"), filed an Amended

Complaint in this 42 U.S.C. § 1983 civil rights action against twenty-one named Defendants, two

Jane Does, and ten John Does.[1]  (Dkt. No. 50.)  A number of the Defendants moved for partial

dismissal of Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure

12(b)(6).  (Dkt. No. 121.)  The motion was granted in part and denied in part by the Hon.

Lawrence E. Kahn.  (Dkt. No. 176.)  Judge Kahn also conducted an initial review under 28

U.S.C. 1915A of claims in Plaintiff's Amended Complaint which were not included in the

motion to dismiss.[2]  *Id.*

Plaintiff's Amended Complaint was dismissed, in most instances with leave to amend,

against all of the Defendants except for David Allen ("Allen"), Donald Maher ("Maher"), Albert

Bushane, Jr. ("Bushane"), Scott Schreurs ("Schreurs"), sued as "Schurr or Schremp," Ingraham,

and Young, spelled "Yung" in Defendants' motion papers.  Plaintiff did not file a second

amended complaint following Judge Kahn's dismissal of the majority of his claims.  The

remaining Defendants filed an Answer to Plaintiff's Amended Complaint (Dkt. No. 185), and

Defendants Allen, Maher, Bushane, and Schreurs have now moved for summary judgment

pursuant to Federal Rule of Civil Procedure 56.[3]  (Dkt. No. 218.)  Plaintiff has filed papers in

opposition to the motion (Dkt. No. 223), the moving Defendants have filed reply papers (Dkt.

No. 224), and Plaintiff has filed sur-reply papers.  (Dkt. Nos. 229 and 230).  The Court has

---

[1]  Plaintiff's Amended Complaint was designated as the operative pleading in the action on January 6, 2012.  (Dkt. No. 72 at 3.)

[2]  Plaintiff was incarcerated at the time this action was commenced.  (Dkt. No. 218-7 at 10.)  He was released from DOCCS custody in or about August of 2012.  *Id.* at 18.

[3]  Defendants Ingraham and Young (Yung) have not moved for summary judgment.

considered all of the parties' submissions, and for the reasons that follow, recommends that Defendants' summary judgment be granted.

## I. BACKGROUND

### A. Eighth Amendment Claim for Excessive Force Against Allen and Maher

According to the allegations in Plaintiff's Amended Complaint, on August 10, 2010, when Plaintiff went into the Adirondack law library, Defendant Maher called him an asshole for filing so many grievances. (Dkt. No. 50 at 20.) As Plaintiff was typing up copies of an order to show cause for an Article 78 proceeding, Maher asked him what he was working on. *Id*. Maher continued to call Plaintiff an asshole. Plaintiff politely told Maher to move out of his way, at which point Maher slapped Plaintiff's paperwork stating that he did not to take "sh_ _" from inmates and called for back-up. *Id*. at 21.

Defendants Maher and Allen, along with five or six unidentified corrections officers, grabbed Plaintiff, shoved him into the hallway, pushed his head repeatedly into the wall, and kicked his legs open several times. Allen handcuffed Plaintiff and hit him on the back and shoulders while Maher punched Plaintiff in the presence of four or five correction officers. *Id*

After the incident with Defendants Maher and Allen, Plaintiff was taken to the infirmary where he was forced to sign a document stating he was not hurt, even though his back was hurt. *Id*. According to Plaintiff, he was surrounded by corrections officers at the time and felt that if he did not play along he would be killed. *Id.* Plaintiff was then placed in the Special Housing Unit ("SHU") and taken to Upstate Correctional Facility ("Upstate") the following day. *Id*.

At his deposition in this case, Plaintiff testified that on August 10, 2010, while he was in the library typing an order to show cause, Maher looked at him and said he wanted to explain to Plaintiff what the library was for. (Dkt. No. 218-7 at 141-144.) Plaintiff responded something to the effect, "you want to what?" *Id*. Maher then punched Plaintiff in the jaw and took his papers and threw them on the ground and started yelling at Plaintiff. *Id*. at 144, 146.

After waiting until everyone had left the library so there would be no witnesses, Maher and Allen took Plaintiff into the hallway, pushed his forehead against the wall three or four times, handcuffed him, kicked his legs apart, and started punching him in his sides using handcuffs like brass knuckles. *Id*. at 144-151, 164-65. According to Plaintiff, Maher and Allen held back a bit, not punching him too hard. *Id*. at 149. There was a third male officer involved in punching Plaintiff and a woman officer was also present. *Id.* at 158. Five or six other officers and an individual from Grievance at Adirondack stood by and watched. *Id*. at 146, 148. Plaintiff denies having resisted the corrections officers. *Id*. at 159-60.

Plaintiff was found guilty on the misbehavior charges filed by Maher and Allen regarding the August 10, 2010, incident and believes he appealed. *Id*. at 171-72.

**B.    Retaliation Claim Against Bushane**

1.    <u>Allegations in Plaintiff's Amended Complaint</u>

In his Amended Complaint, Plaintiff alleged that because he was not given a proper orientation when he was moved to Coxsackie Correctional Facility ("Coxsackie"), he was unfamiliar with the odd to even mess hall line formation. (Dkt. No. 50 at 25.) When Defendant Bushane told Plaintiff he had switched line formation on December 3, 2010, Plaintiff had no idea

what Bushane was talking about.  *Id*.  Plaintiff, who was then placed in keeplock by Bushane for switching lines, asked for food and a grievance form.  *Id*.  Bushane allegedly said "I'm gonna get Nigger before he gets me."  *Id*.  A misbehavior report was filed accusing Plaintiff of having said "I don't want to eat.  I feel I might hurt someone," and "I just sued some punkass police like you. I'll get my Jew attorney after you."  *Id*.  Plaintiff alleged that what he actually said was "Can I have a grievance form, I don't mind writing, filing a Order to Show Cause, filing a lawsuit, getting a Jewish attorney."  *Id*.

2.      Plaintiff's Deposition Testimony and Bushane's December 3, 2010, Misbehavior Report

At his deposition, Plaintiff testified that he had just come out of reception at Coxsackie and inmates were lining up to go eat.  (Dkt. No. 218-7 at 61.)  Having come to Coxsackie from a DOCCS camp, Plaintiff was unaware that there were odd and even lines, and when Plaintiff switched lines, Bushane told him he couldn't eat because he had switched lines and instructed him to go back to his cell.  *Id*. at 62.

Bushane filed a misbehavior report charging Plaintiff with making threats; creating a disturbance; interference with an employee; refusing a direct order; and a movement regulation violation on December 3, 2010.  (Dkt. No. 218-11.)  According to the report, when Bushane noticed Plaintiff cross from the even side of the line to the odd side, he counseled him on proper movement and control within the facility.  *Id*. at 1.  Plaintiff then said he did not want to eat because he was afraid of what he would do to someone if he stayed out.  *Id*.  Bushane took it as a threat, and Plaintiff was escorted back to his cell.  *Id*.  At that point, Plaintiff stated "I will get my Jew lawyer on this shit, I just received a eighteen thousand dollar settlement from some punk ass

police like you." *Id*. Plaintiff was found guilty of creating a disturbance, interference with an employee, and making threats. He was found not guilty of refusing a direct order and movement regulation violation. *Id*. at 2. Plaintiff was placed on keep lock status per the area sergeant. *Id.*

Plaintiff disputed Bushane's misbehavior report in his deposition testimony, denying he had said he did not want to eat or that he felt like he wanted to hurt someone. *Id.* at 105. Plaintiff acknowledged that he had never filed a grievance against Bushane prior to the incident and did not even know him since it was his first day at Coxsackie, and he had just left reception. *Id.* Plaintiff also denied telling Bushane about the Jewish lawyer who had represented Plaintiff in the settlement of a lawsuit and claims Bushane made up the whole thing about the Jewish lawyer. *Id.* at 107. According to Plaintiff, he only discussed his lawyer with an inmate who was talking about a lawsuit when Plaintiff was preparing for a shower. *Id*. at 107. Plaintiff had recommended his lawyer to the inmate. *Id*. at 108. Plaintiff testified at his deposition that he only told Bushane he had someone he could complain to about mistreatment, so he didn't want to get into anything with him. *Id*.

During the course of his deposition testimony, Plaintiff contradicted himself concerning the exchange he had with Bushane with regard with his request to file a grievance. Initially, Plaintiff testified that it was during the line incident that he told Bushane he wanted to have a grievance. He also testified it was at that point that Bushane said he was going to get that nigger before he gets me and wrote a misbehavior report concerning the line switching incident. *Id*. at 62.

6

Plaintiff's later testimony was somewhat more in line with the allegations in his Amended Complaint. (*see* Dkt. No. 50 at 25.) According to Plaintiff, he asked Bushane for a grievance form when Bushane came back to the cell block after the meal Plaintiff had missed and thereafter heard Bushane tell the sergeant he was "going to get nigger before he gets me." *Id.* at 110-11. Plaintiff testified that he thought Bushane was in the process of writing the misbehavior report when Plaintiff asked for a grievance form, but then backtracked, stating he could not truthfully answer when Bushane began writing the misbehavior report. *Id.* at 110-11.

        3.      <u>December 3, 2010, Grievance Against Bushane</u>

Plaintiff filed a grievance dated December 3, 2010, against Bushane regarding the line incident. (Dkt. No. 218-12.) The grievance was stamped received on December 6, 2010. *Id.* at 1. The grievance stated that Plaintiff was transferred from reception at Coxsackie with no problem other than being denied breakfast and lunch because he did not step out for breakfast quickly enough. *Id.* at 3. Plaintiff entered block F1 with no problem. *Id.* Bushane, whose name Plaintiff did not know until he saw it on the misbehavior report Bushane filed, began talking about him. *Id.* According to Plaintiff, corrections officers thought he was a grievance agent. *Id.* Bushane indicated that someone wanted to take Plaintiff outside and beat the shit out of him. *Id.* Prior to the line incident, Bushane told a "white shirt" that Plaintiff was causing him problems. *Id.* Plaintiff paid no attention and asked to take a shower. An officer, presumably Bushane, said he had opened Plaintiff's door so he could take a shower but did not actually open the door. *Id.*

Bushane then opened the cells for chow. *Id.* According to Plaintiff, there was no odd or even line for reception, that the lines merged into one line. *Id.* Plaintiff was not sure if he

switched lines because he was not paying attention.  *Id.*  Bushane told Plaintiff he did not know

what was going on, that he could not eat, and to go with Bushane.  *Id.*  Bushane took Plaintiff to

his cell, and Plaintiff asked for a grievance form.  *Id.*  When an officer told Plaintiff to get with

the program, Plaintiff responded he did not mind writing and was willing to take the beat down

and his Jewish attorney had just won a settlement.  *Id.*  Plaintiff also complained in the grievance

about being required to participate in ART.[4]  *Id.* at 1.

The investigation report on Plaintiff's grievance by Lieutenant Meigs indicated that when

he interviewed Plaintiff, Plaintiff told him that the only times he missed meals and a shower were

when he was in Reception on November 24, 2010.  *Id.* at 8.  Upon review of the log books,

Meigs learned that no one had refused any meals that day and all inmates ate, and that those who

asked for showers received them.  *Id.*  According to Meigs, during the interview Plaintiff seemed

more concerned about his counselor making him participate in ART than his grievance regarding

Bushane.  *Id.*  A memo from Bushane to Meigs denied unprofessional conduct and expressed the

belief that the grievance was filed in retaliation for the misbehavior report Plaintiff received on

December 3, 2010.  *Id.* at 8, 10.  Meigs stated that he had found no evidence supporting

Plaintiff's grievance and believed that the grievance was filed in retaliation for the misbehavior

report.  *Id.*  The grievance was denied by the superintendent, or his designee, and the denial was

upheld by CORC.  *Id.* at 4-5.  Nowhere in his grievance did Plaintiff mention any comment by

Bushane to the effect that he was "going to get nigger before he gets me," (Dkt. Nos. 218-7 at

---

[4]  ART is a DOCCS program "designed to assist inmates in identifying and controlling
their aggressive behavior."  *See* http://www.doccs.ny.gov/ProgramServices/transitional.html (last
checked on October 8, 2014).

110-11), and in his opposition papers, Plaintiff appears to concede that his grievance did not include a complaint regarding Bushane's alleged retaliatory filing of a false misbehavior report.[5] (Dkt. No. 223 at 3.)

### C.    Retaliation Claim Against Schreurs

#### 1.    Allegations in Plaintiff's Amended Complaint

In his Amended Complaint, Plaintiff alleged that while he was at Coxsackie, Defendant Schreurs called the count ten minutes early at 10:20 a.m. one day.  (Dkt. No. 50 at 28.)  Plaintiff claims he did not see or hear Schreurs call the count and left his cube and started toward the front area.  He was ten to fifteen feet from his cube when inmate Ortiz mouthed "count," at which point Plaintiff turned around and saw Schreurs watching television and not doing the count.  *Id*. Plaintiff then heard Schreurs say "that's it!  I'm locking your crazy ass up.  You always <u>fucked</u> with me." *Id*.  Plaintiff said nothing and started to pack.  He went to keeplock because Schreurs filed a misbehavior report stating that Plaintiff had said "I cleared the count myself I have something to do.["]  *Id; see also* Dkt. No. 218-14 at 4.  According to Plaintiff, Schreurs filed the misbehavior report in retaliation for a letter Plaintiff had previously written to the Inspector General complaining he had been erroneously confined in his cube by Schreurs.  (Dkt. No. 50 at 28.)

---

[5]  Inasmuch as Bushane has not raised failure to exhaust with regard to Plaintiff's retaliation claim against him as a ground for summary judgment, the Court has not considered it.

2.     Plaintiff's Grievance, Deposition Testimony, and Affidavit in Opposition

At his deposition, Plaintiff was shown his March 22, 2011, grievance against Schreurs, received by the IGP supervisor on March 28, 2011. (Dkt. Nos. 218-7 at 39; 218-13.) The grievance contained two separate complaints. The first involved a March 15, 2011, incident where Gibson had been cube restricted for not signing the call-out sheet. (Dkt. No. 218-13 at 2.) Plaintiff testified that he was supposed to have a call-out for the gym, but there was no recreation sheet posted, and Plaintiff was restricted to his cube by Schreurs because he and another inmate said they were going to complain about not being able to go to the gym. (Dkt. No. 218-17 at 242-43.)

The second complaint in the grievance involved the March 22, 2011, incident where Schreurs claimed Plaintiff failed to remain in his cube while Schreurs called the count. (Dkt. No. 218-13 at 3.) According to Plaintiff, he was on the way to put some food in the microwave when he heard someone say it was count time. He then turned around and was around twenty feet from his cube when he was told to "pack up." *Id*.

At his deposition, Plaintiff testified that when he left his cube for the microwave, Schreurs was watching TV and as far as Plaintiff knew, never called the count. (Dkt. No. 218-7 at 45-46. ) An inmate mouthed that the count was being called, and when Plaintiff turned around to go back to his cube Schreurs began screaming at him about it. *Id*. at 46-48. Plaintiff believed that Schreurs gave him a hard time because Plaintiff had written a grievance about the earlier cube restriction. *Id*. at 48. Plaintiff testified that he did not say anything to Schreurs about

calling his own count, and that Schreurs' misbehavior report stating that Plaintiff did is completely inaccurate. *Id*. at 49-50.

### 3.     Defendants Schreurs' Declaration Regarding the Count Incident

In his Declaration, Schreurs reaffirmed the truth and accuracy of his misbehavior report involving the March 22, 2011, count incident and denied that the misbehavior report was filed to retaliate against Plaintiff for anything. (Dkt. No. 218-17 at ¶¶ 4-5.) Schreurs explained that the inmate count procedure is absolutely vital to ensure that all inmates are present and accounted for, and disruptions in the count could potentially result in failing to detect a missing inmate or one in distress. *Id*. at ¶ 6. Schreurs explained that before he starts the count he yells "count," and once he starts the count, every inmate must return immediately to his cube and remain there throughout the count. *Id*. at ¶¶ 7-8. When the count is finished, Schreurs yells "clear." *Id.*

An inmate leaving his cube during the count is in violation of DOCCS prison rule 112.21 (Count Procedure Violation) and possibly other rules. *Id*. at ¶ 8. Prior to March 22, 2011, Schreurs had verbally warned Plaintiff on two or three occasions not to leave his cell during count and by March 22, 2011, Plaintiff had been in Dorm I long enough to be familiar with the procedure. *Id*. at ¶ 10.

On March 22, 2011, Schreurs yelled "count" loudly enough for all inmates in Dorm I to hear. Inmates out of their cubes immediately began returning to them and Plaintiff began walking through the dorm. Plaintiff was in his cube when Schreurs walked by and saw Schreurs doing the count. *Id*. at ¶ 11. When Schreurs finished the count and began to return to the podium to compare the inmates he had counted with the list of those who should be present, he

observed Plaintiff leave his cube and walk towards the day room. *Id*. at ¶ 10.  Schreurs

interrupted his count procedure and asked Plaintiff what he was doing during the count.  Plaintiff

said he had cleared the count himself and had things to do. *Id*. at ¶ 11.  Plaintiff stopped walking

and stared at Schreurs and when again ordered back to his cube became argumentative with

Schreurs. *Id*.

     As an experienced DOCCS corrections officer familiar with the DOCCS prison rules and

proper inmate conduct, Schreurs determined that Plaintiff's actions were in violation of DOCCS

rules 104.13 (creating a disturbance);112.21 (failure to comply with inmate count

procedures);112.20 (delaying an inmate count); and 106.10 (refusing a direct order). *Id*. at ¶ 13

and p. 11.  Schreurs drafted and filed a misbehavior report on the date of the incident. *Id*.

Schreurs claims that he had no knowledge of Plaintiff having written any letter or otherwise

complained about him to the DOCCS Inspector General prior to filing the misbehavior report.

*Id*. at ¶ 14.  Plaintiff was found guilty of refusing a direct order, delaying the count, and a count

procedure violation, and not guilty of creating a disturbance. *Id*. at p. 8.

## II.   APPLICABLE LEGAL STANDARDS

     Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[6] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball*

---

[6] Plaintiff's Amended Complaint (Dkt. No. 50) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[7] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

Where, as in this case, Plaintiff has failed to respond to the movant's statement of material facts as required under L.R. 7.1(a)(3), *see* Dkt. No. 223, the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[8] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible

---

[7] Copies of unpublished decisions cited herein will be provided to Plaintiff by the Clerk in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

[8] L.R. 7.1(a)(3) provides that "The opposing party shall file a response to the Statement of Material Facts [submitted by the movant]. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises . . . The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met [his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

consequences of failing to respond to the motion.[9]  *See Champion, v. Artuz*, 76 F.3d 483, 486 (2d

Cir. 1996.)

## III.    ANALYSIS

### A.    Failure to Exhaust Administrative Remedies with Regard to Plaintiff's Eighth Amendment Excessive Force Claim Against Maher and Allen

Defendants Maher and Allen seek summary judgment dismissing Plaintiffs' Eighth

Amendment excessive force claim solely on the ground that Plaintiff failed to exhaust his

administrative remedies.[10]  (Dkt. No. 53-3 and 53-4.)  The Prison Litigation Reform Act of 1996

("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996) imposes several restrictions on the ability

of prisoners to maintain federal civil rights actions, and expressly requires that no action shall be

brought with respect to prison conditions under section 1983 of this title, or any other Federal

law, by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted.  "[T]he PLRA's exhaustion requirement

applies to all inmate suits about prison life, whether they involve general circumstances or

particular episodes, and whether they allege excessive force or some other wrong."  *Porter v.*

*Nussle*, 534 U.S. 516, 532 (2002).  In order to properly exhaust administrative remedies under

the PLRA, inmates are required to complete the administrative review process in accordance

_____

[9]  Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to the summary judgment motion.  (Dkt. No. 218 at 4.)

[10]  Defendants included failure to exhaust administrative remedies as an affirmative defense in their Answer.  (Dkt. No. 218-6 at ¶ 49.)

with the rules applicable to the particular institution in which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

1.    DOCCS Internal Grievance Program

In New York State prisons, DOCCS has a well-established three-step Internal Grievance Program ("IGP"). *See* N.Y. Comp. Codes R. & Regs. tit. 7, Part 701. (2013). The first step requires an inmate to file a grievance complaint with the facility's IGP clerk. *Id.* at § 701.5(a). If there is no informal resolution, the Inmate Grievance Resolution Committee ("IGRC") holds a hearing. *Id*. at § 701.5(b)(2). If the grievance is denied by written decision of the IGRC, *id.* at § 701.5(b)(3), the grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at 701.5(c)(1). The appeal of a grievance involving an institutional issue is decided by the superintendent of the facility. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i). The third step is an appeal to CORC, *id.* at 701.5(d)(1)(i), which issues a written decision. *Id.* at 701.5(d)(3)(ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar. 31, 2010); *Bailey v.*

*Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6, 2012 U.S. Dist. LEXIS 185178, at *14-15 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

<div align="center">

2.    Evidence Regarding Exhaustion under the DOCCS IGP

</div>

In their Statement of Material Facts, Defendants state that Plaintiff did not file a grievance regarding the alleged use of excessive force by Maher or Allen (Dkt. No. 218-1 at ¶ 5), and that Plaintiff did not appeal to CORC with regard to any grievance regarding the alleged use of excessive force by Maher and Allen. *Id.* at ¶ 6. Those factual statements are supported by evidence in the summary judgment record and therefore are deemed admitted in light of Plaintiff's failure to comply with L.R. 7.1(a)(3), despite his *pro se* status. *See Kidkarndee v. Koenigsmann*, 9:12-CV-0502 (GTS/CFH), 2014 WL 1239319, at *4, 2012 U.S. Dist. LEXIS 38939, at *14 (N.D.N.Y. Mar. 25, 2014) (citing *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 427 & n.6 (citing cases)).

Richard P. Donaldson ("Donaldson"), the IGP supervisor at Adirondack from August 2009, through the present, explained in his Declaration that when an inmate sends a written complaint to the grievance office at Adirondack, Donaldson generally meets with the inmate to determine the nature of the grievance, and the grievance is logged in. (Dkt. No. 218-15 at ¶¶ 1,3-4.) Grievances regarding staff conduct are sent directly to the superintendent for investigation. *Id.* at ¶ 4. After investigation, the superintendent renders a response, sending the grieving inmate two copies    one for the inmate's records and one for the inmate to send back if he wishes to appeal to CORC. *Id.* at ¶¶ 4-5.

According to Donaldson, all documents, or copies thereof, related to a grievance, including investigations and appeals, are maintained in the Adirondack grievance office in the ordinary course of business. *Id*. at ¶ 6. The grievance office keeps the documents for the current year as well as the previous four years, and documents dating back to January 1, 2010, are presently on file. *Id.* Thus, documents regarding any grievances filed by Plaintiff at Adirondack from January 1, 2010, through the present, including any grievance filed with regard to the alleged use of excessive force by Defendants Maher and Allen on August 10, 2010, would, in the ordinary course of Adirondack's business, presently be maintained in the Adirondack grievance office. *Id*. A search of the Adirondack grievance files by Donaldson revealed that Plaintiff did not file any grievances while confined at Adirondack. *Id*. at ¶¶ 7-8.

Plaintiff was transferred to Upstate the day after the incident with Maher and Allen. The list of grievances filed by Plaintiff at Upstate does not include a grievance related to the alleged use of excessive force by Maher and Allen. (Dkt. No. 218-7 at 35.)

As Assistant Director of the DOCCS Inmate Grievance Program, Jeffrey Hale's ("Hale") duties and responsibilities include maintaining records of all appeals of inmate grievances to CORC. (Dkt. No. 218-16 at ¶¶ 1-2.) According to Hale, DOCCS Directive #4040 requires that grievance files and logs be maintained for at least the current year plus the previous four calendar years. *Id*. at ¶ 8. Hale serves as custodian of the records maintained by CORC. *Id*. at ¶ 7. In his Declaration, Hale states that he conducted a thorough search of the CORC databases created and maintained in the ordinary course of DOCCS business, for records of an appeal to CORC of any grievance filed by Plaintiff concerning allegations of excessive force by DOCCS personnel, or

failure to intervene on the part of DOCCS personnel, at Adirondack. *Id*. at ¶ 10. Hale's search revealed that no such grievance was ever appealed to CORC by Plaintiff. *Id.* at ¶ 10 and pp. 5-6.

Even if the Court were to exercise its discretion to overlook Plaintiff's failure to comply with L.R. 7(a)(3) in light of his *pro se* status, *see Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001), Plaintiff has failed submit evidence raising a material issue of fact on whether he filed an excessive force grievance against Maher or Allen and properly followed through on all of the steps required to exhaust under DOCCS IGP. *See Woodford*, 548 U.S. at 93.

Plaintiff has conceded that there was a grievance system and an IGRC in place at Adirondack and testified at his deposition that he had met with them while at Adirondack. (Dkt. No. 218-7 at 32.) In his Affidavit in opposition, Plaintiff has stated that "Gibson was placed in Box at Adirondack after Maher incident (Maher - Allen) and maintain writing grievances to both Adirondack and Coxsackie from Upstate and from Coxsackie (transfer to Upstate box where ticket hearing was held) . . . Gibson also did appeal upon belief issues.)" (Dkt. No. 223 at 3.) Plaintiff also stated:

> Plaintiff did file grievance and states concerning use of force at Adirondack AND Coxsackie and maintains grievance for some reason unexplained kept acting as if letters written to them should not be stated (accepted) and were actually Harassment complaints besides fact Warden ans Captains were aware of force against plaintiff and (were) were (grievance) while in box sent to both Adirondack and Upstate Box and Coxsackie as to wit Plaintiff was given complete runaround.
>
> 2) Plaintiff has all these documents at 70 west 115 street Apt 13c except problem is (this is going to be hard to believe) somehow a Muslim-Dominican Reality company located on 125th St (moved since) (NYNY) directed me to this location and the guy is a police

19

> agent besides fact he lives in Projects and should not be renting
> rooms out in the first place.

*Id*. at 4.  When shown a list of grievances he had filed at Upstate, where he was transferred the

day after the incident with Maher and Allen, Plaintiff acknowledged that none related to the

alleged use of excessive force by Maher and Allen at Adirondack.  (Dkt. No. 218-7 at 35.)

Although Plaintiff claimed the list was incomplete, he did not elaborate.  *Id*. at 35-36.

Plaintiff has offered no evidence supporting his bald assertion that he attempted to file a

grievance at Upstate and no evidence showing that he followed all of the steps of the IGP

through an appeal to CORC.  Therefore, based on the record, the Court concludes that

Defendants Maher and Allen have established by a preponderance of the evidence that Plaintiff

failed to exhaust his administrative remedies with regard to his excessive force claim against

Defendants Maher and Allen, and that no reasonable jury could find otherwise.

### 3.      *Hemphill* Inquiry

An exhaustion review does not end when defendants are found to have met the burden of

establishing a plaintiff's failure to exhaust.  "Once a defendant has adduced reliable evidence that

administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to

exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by

showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State*

*of New York*, 380 F.3d 680, 686 (2d Cir. 2004)]."  *Murray,* 2010 WL 1235591, at *4*.  *Hemphill*

sets forth a three-part inquiry for district courts.  First, courts must determine if administrative

remedies were in fact available to plaintiff.  The evidence establishes that administrative

remedies were available to Plaintiff.  The DOCCS IGP is well established.  According to

Donaldson, the IGP and Directive # 4040 are both available in the Adirondack Library, and every inmate who transfers into Adirondack goes through an orientation that includes how to file and appeal grievances. (Dkt. No. 218-15 at ¶ 2.) Plaintiff's deposition testimony reveals that he was aware of the IGP and knew that there was a grievance system and an IGRC in place at Adirondack. (Dkt. No. 218-7 at 32.) While Plaintiff contends that there were no grievance forms available at Adirondack, he was aware that it was not necessary to use a specific form to submit a written grievance. (Dkt. Nos. 218-7 at 36; 223 at 4.) Moreover, Plaintiff admittedly filed a number of grievances at Upstate. (Dkt. No. 218-7 at 35.)

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by "beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility." *Hemphill*, 380 F.3d at 688 (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray*, 2010 WL 1235591, at *5 & n.26 (collecting cases).

In his deposition, Plaintiff complained that Maher did not allow grievance forms in the library at Adirondack. (Dkt. No. 218-7 at 155.) However, Plaintiff was aware that it was not necessary to use a specific form to submit a grievance; he acknowledged that he was allowed to write grievances in his cell; and he was in SHU from the time of the incident with Maher and Allen until he was transferred to Upstate the following day. *Id*. at 155; Dkt. No. 50 at 21.

Therefore, the evidence does not support an estoppel against Maher.[11]  Whether or not Maher

allowed inmates to work on grievances in the library is not relevant to the exhaustion issue in this

case.

In his Affidavit in opposition, Plaintiff claims that he sent a grievance to Adirondack

from Upstate and the law clerks were threatened by Maher not to handle it.  (Dkt. No. 223 at 3.)

Again, Plaintiff has submitted no evidence in support of his claim and was not at Adirondack

when the alleged threat would have been made.  Plaintiff's conclusory assertion, unsupported by

evidence, is not enough to support an estoppel against Maher.  *See Cole*, 1999 WL 983876, at *3

(bald assertions unsupported by evidence cannot defeat summary judgment motion).

Third, the Second Circuit explained in *Hemphill* that there are certain "special

circumstances" in which even though administrative remedies may have been available and the

defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to

exhaust may be justified.[12]  *Hemphill*, 380 F.3d at 686.  "Special circumstances" have been found

---

[11]  There is no evidence that Corrections Officers Maher and Allen were involved in the decision to transfer Plaintiff from Adirondack to Upstate.

[12]  Subsequent to *Hemphill*, the Supreme Court decided *Woodford v. Ngo*, 548 U.S. 81 (2006).  The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id*. at 83-84.  The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion"  "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)."  *Id*. at 90 (citation omitted).  Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford*, the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases*.  See, e.g., Amador v. Andrews*, 655 F.3d 89, 102-03 (2d Cir. 2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an

22

to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

Plaintiff testified at his deposition that when he attempted to file a grievance with regard to the incident with Maher and Allen after his transfer to Upstate, he was told by grievance personnel at Upstate that since the alleged excessive force took place at Adirondack, he would have to send his grievance to Adirondack. (Dkt. No. 218-7 at 153.) According to Plaintiff, when he wrote to Adirondack, he was told that since he was no longer at Adirondack, he had to report grievances where he was presently incarcerated. *Id*.

Plaintiff has admitted he did not write to the grievance clerk to let him or her know that his grievance against Maher and Allen was not being handled and he was going to take an appeal. *Id*. at 154. Furthermore, Plaintiff testified at his deposition that he didn't think he had taken an appeal, and as previously noted, there is no record of an appeal to CORC. *Id*; Dkt. No. 218-16 at ¶ 10.

In order to prevail on an argument that the grievance procedure was not available to him, or that there were special circumstances because the officials did not file the grievances, Plaintiff must show that he nonetheless followed the grievance procedure through all of the steps in the DOCCS regulations. *See, e.g., Belile v. Griffin*, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *3-4, 7, 2013 U.S. Dist. LEXIS 47137, at *10, 22-23 (N.D.N.Y. Feb. 12, 2013)

affirmative defense).

(plaintiff failed to exhaust his administrative remedies because he had not followed through on all of the steps, *i.e.*, he did not appeal to the superintendent of the facility or appeal any unfavorable decision of the superintendent to CORC; plaintiff alleged he had filed two grievances by placing the grievances in his meal slot to be filed by corrections officers, but claimed they were intercepted or discarded, and never received a determination on the grievances); *Veloz v. New York*, 339 F. Supp.2d 505, 516 (S.D.N.Y. 2004) ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming."), *aff'd*, 178 F. App'x 39 (2d Cir. 2006); *Atkins v. Menard*, No. 9:11-CV-0366 (GTS/DEP), 2012 WL 4026840, at *4, 2012 U.S. Dist. LEXIS 130059, *13 (N.D.N.Y. Sept. 12, 2012) (finding that plaintiff failed to exhaust where he had the "ability, and indeed the duty, to appeal the IGRC's nonresponse (to his grievance) to the next level, including CORC, to complete the grievance process."); *Murray v. Palmer*, No. 03-CV-1010, (DNH/GLS), 2008 WL 2522324, at *16, 18, 2008 U.S. Dist. LEXIS 47933 (N.D.N.Y. June 20, 2008) (finding that in order to exhaust available administrative remedies with regard to his grievance, plaintiff had to file an appeal with the superintendent from the IGRC's nonresponse, which included a failure to acknowledge the receipt of a grievance and assign it a number); *Midalgo v. Bass*, No. 03-CV-1128 (NAM/RFT), 2006 WL 2795332, at *7, 2006 U.S. Dist. LEXIS 98871, at *16-17 (N.D.N.Y. Sept. 26, 2006) (observing that plaintiff was required to seek an appeal to the superintendent, even though he never received a response to his grievance and was not assigned a grievance number); *Gill v. Frawley*, No. 02-CV-1380, 2006

WL 1742738, at *11 & n. 77, 2006 U.S. Dist. LEXIS 41984 (N.D.N.Y. June 22, 2006) (Lowe, M.J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Waters v. Schneider*, No. 01 Civ 5217(SHS), 2002 WL 727025, at *2, 2002 U.S. Dist. LEXIS 7166, at *4-5 (S.D.N.Y. Apr. 23, 2002) (finding that in order to exhaust administrative remedies, plaintiff had to file an appeal with the superintendent from IGRC's non-response to his grievance, of which no record existed). Plaintiff has failed to make that showing.

Inasmuch as Defendants Maher and Allen have satisfied their burden of establishing that a grievance procedure was available to Plaintiff and he did not exhaust his administrative remedies under that procedure, and Plaintiff has failed to submit evidence showing that exhaustion was unavailable under the *Hemphill* inquiry, the Court recommends that Defendants Maher and Allen be granted summary judgment dismissing Plaintiff's Amended Complaint.

**B.     Retaliation Claim Against Bushane**

        1.     Law Regarding Retaliation Claims

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak*, 389 F.3d at 381-83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983),

25

*overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  As the Second

Circuit has noted,

> [t]his is true for several reasons.  First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated.  Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.  This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other*

*grounds, Swierkiewicz,* 534 U.S. 506.

        To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly

suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took

"adverse action" against the plaintiff    namely, action that would deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was

a causal connection between the protected speech and the adverse action    in other words, that

the protected conduct was a "substantial or motivating factor" in the defendants' decision to take

action against the plaintiff.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287

(1977); *Pidlypchak*, 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).  If a plaintiff carries this

burden, the defendant must show, by a preponderance of the evidence, that he would have taken

the action against the Plaintiff "even in the absence of unprotected conduct."  *Mt. Healthy*, 429

U.S. at 287.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

2.    Plaintiff's Retaliation Claim

Plaintiff claims that Bushane issued a false misbehavior report in retaliation for his exercise of a protected First Amendment right. Bushane seeks summary judgment dismissing Plaintiff's retaliation claim against him on the grounds that a threat to hire an attorney or file a grievance is not protected First Amendment conduct for purposes of a retaliation claim, and that the evidence establishes it was Bushane's action in beginning to discipline Plaintiff which led to Plaintiff's threats to file a grievance, not the other way around.[13]  (Dkt. Nos. 218-2 at 10-14; 224 at 10.)

Bushane has relied primarily on the district court decision in *Henry v. Dinelle*, No. 10-CV-0456 (GTS/DEP), 2011 WL 5975027, at *7, 2011 U.S. Dist. LEXIS 136583, at *21-23 (N.D.N.Y. Nov. 29, 2011) for the proposition that threatening to retain counsel and/or expressing an intent to

---

[13]  Bushane does not dispute that filing a false misbehavior report can constitute "adverse action" for purposes of a retaliation claim. *See Pidlypchak*, 389 F.3d at 384.

file a grievance are not protected First Amendment activity for purposes of a retaliation claim.[14]

In *Henry*, the district court did not come down on the side of a bright-line rule that threats to hire an attorney or file a grievance cannot constitute protected First Amendment conduct for purpose of a retaliation claim. Rather, the court based its conclusion that the plaintiff's statement was not protected on the specific facts of the case, including the fact that, unlike this case, the inmate in *Henry* made no mention of an intent to file a grievance. *Id*. (questioning whether "an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be 'contacting [his] attorney,' or 'calling a lawyer' at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment especially where, as here, the inmate did not reference the prison grievance process in his statement.") Moreover, the court in *Henry* concluded that even assuming, for the sake of argument, that the plaintiff's statement was constitutionally protected, he had failed to show that the statement was a motivating factor for the issuance of the misbehavior report. *Id*.

The district court did note in *Henry*, and this Court acknowledges, that "numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitute protected activity." (emphasis in original) (citing, *e.g., Bridges v. Gilbert*, 557 F.3d 541, 554-55 (7th Cir. 2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment protected grievance.") (emphasis in original); *Ingram v. SCI Camp Hill*, No. 08-

---

[14] Defendants cite *Henry*, 2011 WL 5975027, as having been affirmed by the Second Circuit at 557 F. App'x 20 (2d Cir. 2014). However, that appeal was from the denial of a post-trial motion by the plaintiff for judgment nothwithstanding the verdict, or for a new trial in the action, *see* 929 F. Supp. 2d 107 (N.D.N.Y. 2013), and the question of whether threats to contact counsel or file a grievance are protected conduct was not in issue.

CV-0023, 2010 WL 4973302, at *15, 2010 U.S. Dist. LEXIS 127124, at *44 (M.D. Pa. Dec. 1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity"), *aff'd*, 448 F. App'x 275 (3d Cir. 2011); *McKinnie v. Heisz*, No. 09-CV-0188, 2009 WL 1455489, at *11, 2009 U.S. Dist. LEXIS 39821, at *30 (W.D. Wis.  May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity.  At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.")). *Id*. at *7 n.12 & 13.

However, there are also a numerous decisions in which a threat to file a grievance or lawsuit has been found to be constitutionally protected speech for purposes of a retaliation claim. *See, e.g., Sprau v. Coughlin*, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding that "plaintiff's conduct in threatening to file a complaint was protected by the First Amendment's guarantee of the right to petition the government for redress of grievance."); *Garcia v. Strayhorn*, No. 13-CV-807-BEN (KSC), 2014 WL 4385410, at *6, 2014 U.S. Dist. LEXIS 123660, at *15 (S.D. Cal. Sept. 3, 2014) ("Review of current caselaw indicates that an inmate's threat to file a prison grievance constitutes protected speech.") (collecting cases); *Pasley v. Conerly*, No. 2:08-cv-13185, 2010 WL 3906120, at *9, 2010 U.S. Dist. LEXIS104763, at *30-31 (E.D. Mich. Sept. 10, 2010) (guided in part by the Sixth Circuit decision in *Pasley v. Conerly*, 345 F. App'x 981, 984 (6th Cir. 2009), finding that a threat to file a grievance arguably constituted constitutionally protected conduct, the court concluded that plaintiff's threat to file a grievance constituted constitutionally protected conduct); *Carter v. Dolce*, 647 F. Supp. 2d 826, 834 (E.D. Mich. 2009) ("The Court believes that when it comes to protecting First Amendment rights, including the right

to petition the government for redress, there is little difference between retaliating against a person for filing a grievance, and retaliating for threatening to file one. . . . Once a prisoner makes clear his intention to resort to official channels to seek a remedy for ill treatment by a prison employee, retaliation against the prisoner by that employee implicates all the policies intended to protect the exercise of a constitutional right.")

The evidence in the summary judgment record is inadequate for the Court to make a determination as to whether or not Plaintiff's conduct in this case merits First Amendment protection.  Furthermore, even if the following factual statements regarding Bushane included in Defendants' Statement of Material Fact are deemed admitted, they do not establish the absence of material issues of fact in dispute on the issue of causal connection and fail to establish Bushane's entitlement to judgment as a matter of law:

> 13.    The misbehavior report in question from Defendant Bushane was filed on December 3, 2010 (Exhibit "H" to Starlin Declaration).

> 14.    Plaintiff's grievance regarding Bushane was filed on December 6, 2010.  (Exhibit "I" to Starlin Declaration).

> 15.    In his grievance regarding Bushane, Plaintiff claims that after defendant Bushane pulled him from a "chow" line (i.e. mess hall line) for an infraction, plaintiff asked defendant Bushane "[d]o you have a 4040 form " (i.e. inmate grievance form) and also said "I don't mind getting a Jewish attorney." (Exhibit "T" to Starlin Declaration at 2-3).

> 16.    Plaintiff alleges that after he asked defendant Bushane if the latter had a grievance form, and said he didn't mind getting a Jewish attorney, that defendant Bushane wrote the misbehavior report in question.  (Exhibit "I" to Starlin Declaration at 2-3; Exhibit "A" to Starlin Declaration at 25).

17.    Plaintiff did not file a grievance or lawsuit against
defendant Bushane before defendant Bushane filed the misbehavior
report in question.  (Exhibit "H" to Starlin Declaration; Exhibit "I"
to Starlin Declaration).

18.    At his deposition, plaintiff stated in his sworn
testimony that he did not say anything to Bushane about getting an
attorney in regard to this mess hall line incident.  (Exhibit "D" to
Starlin Declaration at 111-113).

The allegations in Plaintiff's Amended Complaint and his deposition testimony

concerning his request for a grievance form and Bushane's comment to the effect he was going to

get nigger before nigger got him leave some question as to when and where the statements were

made   at the time of the line incident, (Dkt. No. 218-7 at 62), or after Plaintiff had been returned

to his cell when Bushane had already made the decision to file a misbehavior report.  *Id*. at 110-

11; Dkt. No. 50 at 25.  The inconsistencies in Plaintiff's evidence, which go to causal connection,

do not allow the Court to judge Plaintiff's credibility under *Jeffreys v. City of New York*, 426

F.3d 549, 555 (2d Cir. 2005) in this case both because they are relatively minor and they are not

directly contradicted by other admissible evidence in the record.[15]  *Id.*

Bushane has not submitted a declaration or affidavit in support of his motion.  Nor has

Bushane submitted any other admissible evidence addressing Plaintiff's claim that Bushane said

---

[15]  In *Jeffreys*, the Second Circuit made it clear that it is only "in the rare circumstance
where the plaintiff relied almost exclusively on his own testimony, much of which is
contradictory and incomplete," that the court may conclude that no reasonable jury would credit
his testimony.  426 F.3d at 554.  "To qualify for application of the *Jeffreys* exception, a defendant
must meet each of the following three requirements: 1) the plaintiff must rely almost exclusively
on his own testimony; 2) the plaintiff's testimony must be contradictory or incomplete; and 3) the
plaintiff's testimony must be contradicted by evidence produced by the defense."  *Kilmartin v.
Schaffer*, No. 9:12-CV-1167 (FJS/CFH), 2013 WL 5929447, at *6, 2013 U.S. Dist. LEXIS
156688, at *15 (N.D.N.Y. Nov. 1, 2013) (citation and internal quotation marks omitted).

he "was going to get nigger before he gets me" after Plaintiff asked for a grievance form. (Dkt. No. 218-7 at 62.) Furthermore, the file on Plaintiff's grievance against Bushane, submitted in support of Bushane's motion, consists of unsworn documents which are inadmissible on summary judgment.[16] (Dkt. No. 218-12.) *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir. 2006) (movant bears the initial burden of showing through production of admissible evidence that he is entitled to judgment as a matter of law); *see also Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986) (an unsworn letter does not constitute admissible evidence on a summary judgment motion).

Given the foregoing, the Court concludes that there are questions of material fact with regard to whether Plaintiff's threat to file a grievance and possible reference to retaining an attorney constitute protected First Amendment conduct and whether the filing of the misbehavior report by Bushane is causally connected to Plaintiff's conduct. Therefore, the Court recommends that Defendant Bushane's request for summary judgment on the merits be denied.

### 3. Qualified Immunity

Bushane has moved in the alternative for summary judgment on qualified immunity grounds. (Dkt. No. 218-2 at 17-20.) Public officials sued in their individual capacity who are performing discretionary functions are entitled to qualified immunity so long as "their conduct

---

[16] Bushane submitted an unsworn, handwritten memorandum as a part of the investigation of Plaintiff's grievance against him. The statement, which does not constitute admissible evidence, states only that "[a]t no time did I acted (sic) in a unproffesianl (sic) manner. This grievance is in direct retaliation for the misbehavior report inmate Gibson received on 12/3/10." (Dkt. No. 218-12 at 10.)

does not violate clearly established . . . rights of which a reasonable person would have known." *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). The qualified immunity inquiry "turns primarily on objective factors." *Id.* (citation and internal punctuation omitted.) "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). Qualified immunity is an affirmative defense on which defendants bear the burden of proof. *Vincent*, 718 F.3d at 166.

Even assuming that Plaintiff's threat to file a grievance against Bushane and/or retain counsel constitutes protected First Amendment conduct, and assuming further that Bushane filed the misbehavior report in response to Plaintiff's threats, the Court concludes that Bushane is entitled to qualified immunity. The question of whether a threat to file a grievance or retain counsel is protected by the First Amendment does not appear to have been squarely addressed by either the Supreme Court or the Second Circuit. As discussed above, the right to threaten to file a grievance or to retain counsel without experiencing any adverse action remains unsettled in several circuits. Therefore, based upon a review of relevant case law, the Court finds that the right was not clearly established at the time of the incident in question and recommends that Bushane be granted summary judgment on Plaintiff's retaliation claim on the alternative ground of qualified immunity. *See Henry*, 2011 WL 5975027, at *10 (right to make a statement of intent to contact an attorney without adverse action not clearly established at the time in question); *Dawson v. Audet*, No. 12-cv-00901-MSK-BNB, 2014 WL 4947315, at *5, 2014 U.S. Dist. LEXIS 139381, at *12-13 (D. Colo. Sept, 30, 2014) ("Because [plaintiff] has not shown, and

33

apparently cannot show, that the law 'clearly establishes' that an inmate's threat to file a grievance against a prison official enjoys First Amendment protection, [defendant] is entitled to qualified immunity on [plaintiff's] retaliation claim.").

### C. Retaliation Claim Against Schreurs

Plaintiff claims that Defendant Schreurs filed a misbehavior report against him on March 22, 2011, in retaliation for a letter Plaintiff had written to the DOCCS Inspector General complaining about Schreurs confining him to his cube instead of allowing him to attend a call-out in the gym. (Dkt. No. 50 at 28.) Defendant Schreurs seeks summary judgment on Plaintiff's retaliation claim against him on the grounds that he was unaware that Plaintiff had submitted a complaint letter concerning him to the Inspector General at the time he filed the misbehavior report, and that the Inspector General never received a letter from Plaintiff regarding the March 15, 2011, incident Plaintiff allegedly wrote him about. (Dkt. No. 218-2 at 16.)

Defendants' Material Statement of Facts includes the following:

> 24. On March 22, 2011 (the same day as this inmate count incident), defendant Schreurs wrote up and filed an Inmate Misbehavior Report against Plaintiff in regard to this inmate count incident. (Schreurs Declaration at ¶ 13; Exhibits "A" to Schreurs Declaration at 4).

> 25. Prior to writing and filing that March 22, 2011 Inmate Misbehavior Report, defendant Schreurs had no knowledge that plaintiff had allegedly written a letter about him to the DOCCS Inspector General and was unaware of any official complaints lodged against him by plaintiff. (Schreurs Declaration at paragraphs 4, 14).

> 26. Plaintiff did not write any letter to the DOCCS Inspector General regarding defendant Schreurs prior to March 22, 2011. (Quackenbush Declaration ¶¶ 5-6).

34

27.     The only letter the DOCCS Inspector General received from inmate Bennie Gibson about defendant Schreurs is dated April 18, 2011. (Quackenbush Declaration ¶ 7).

Each of the foregoing statements is supported by record evidence submitted by Defendants.  As previously noted, Schreurs stated in his Declaration that he had no knowledge of Plaintiff sending a letter complaining about him to the Inspector General when he filed the misbehavior report.  (Dkt. No. 218-17 at ¶ 14.)  Furthermore, Charles Quackenbush ("Quackenbush"), Associate Attorney with the Office of Counsel for DOCCS, explained that letters sent by inmates to the DOCCS Inspector General are reviewed for appropriate action and kept in an inmate correspondence file until the inmates incarceration, after which they are archived and eventually destroyed.  (Dkt. No. 218-18 at ¶¶ 1, 4.)   Quackenbush examined DOCCS Central file on Plaintiff in connection with this lawsuit and although he found four letters Plaintiff had sent to the Inspector General prior to March 22, 2011, none of the four mentioned or dealt with Schreurs.  *Id*. at ¶¶ 5-6.  The only letter in the DOCCS Central file from Plaintiff with any mention of Schreurs was dated April 18, 2011, subsequent to the March 22, 2011, incident.  *Id*. at  ¶ 7.  Statements 24-27 are therefore deemed admitted by virtue of Plaintiff's failure to respond in compliance with L.R. 7.1(a)(3), *see Kidkarndee*, 2014 WL 1239319 at * 4; and these statements, along with the evidence supporting them, establish Schreurs' entitlement to summary judgment dismissing Plaintiff's retaliation claim.

As with Plaintiff's excessive force claims against Maher and Allen, even if the Court were to exercise its discretion to overlook Plaintiff's failure to comply with L.R. 7(a)(3), Plaintiff has failed to submit evidence raising a material issue of fact as to whether Schreurs' filing of the

misbehavior report was done in retaliation for the exercise of a protected First Amendment right by Plaintiff.  Plaintiff's bald assertion that he wrote to the Inspector General concerning Schreurs prior to the time he filed the misbehavior report is not supported by evidence, and is, therefore, not sufficient to overcome a motion for summary judgment.  *Cole*, 1999 WL 983876 at *3.  The Court finds that given the absence of evidence of protected conduct, no rational factfinder could conclude that Schreurs retaliated against Plaintiff and recommends that Defendant Schreurs' motion for summary judgment be granted.[17]

**ACCORDINGLY**, it is hereby

**RECOMMENDED**, that Defendants Maher, Allen, Bushane, and Schreurs' motion for summary judgment be **GRANTED**;[18] and it is hereby

**ORDERED** that in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*), the Clerks Office provide Plaintiff with copies of the following unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

---

[17]  Inasmuch as the Court is recommending that Schreurs be granted summary judgment on the merits, it has not addressed his alternative request for summary judgment on qualified immunity grounds.

[18]  Plaintiff's excessive force claims against Defendants Ingraham and Young (Yung), on which summary judgment was not sought, are still pending.

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: October 23, 2014
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge







Page 1

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry; F. Englese; Sergeant Edwards; K. Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
March 31, 2010.

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

### I. RELEVANT LEGAL STANDARD

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal court." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court," and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[FN1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[FN2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

FN1. *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN2. The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[FN3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respec-

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

tively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[FN4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[FN5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[FN6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

FN3. *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

FN4. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

FN5. *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

FN6. *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned

a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

§ 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available

and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[FN7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[FN8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[FN9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[FN10] (b) the inmate was specifically informed that the claim in question was grievable,[FN11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[FN12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[FN13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[FN14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[FN15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[FN16]

FN7. The Court recognizes that the Supreme

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

FN8. *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

FN9. *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internal-

ly"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

FN10. *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

FN11. *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

F.Supp.2d at 75-76.

FN12. *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

FN13. *See, e.g., Petrusch v. Olilioushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

FN14. *See, e.g., Benjamin v. Comm'r N.Y.*

*State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

FN15. *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

FN16. *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

*4 Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [FN17]

FN17. *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v.*

*Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[FN18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[FN19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[FN20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [FN21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Pos-

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

ner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied, --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009).* The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[FN22]

FN18. *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

FN19. *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that

"[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326741, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

FN20. *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326741, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639,

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

FN21. *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the ad-

ministrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

FN22. *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

*7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007)

(internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [FN23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [FN24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [FN25]

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

FN23. The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

FN24. In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of

books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

FN25. For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

**B. Estoppel**

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administra-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

tive remedies based on the actions (or inactions) of other individuals.[FN26]

FN26. *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16

(N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

own.").

**C. Special Circumstances**

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's

cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations,[FN27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order.[FN28]

FN27. *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

FN28. The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

> such an appeal would have been filed two
> days too late under DOCS Directive 4040,
> which requires that appeal to be filed within
> four working days of the IGRC's failure to
> decide his grievance (i.e., by September 11,
> 2000). (*See* Hearing Tr. 127-34; Hearing Ex.
> P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS
> Directive 4040, dated 6/8/98].)

**\*7** For all these reasons, the Court finds that
Plaintiff's proffered excuse does not constitute a spe-
cial circumstance justifying his failure to exhaust his
available administrative remedies before filing this
action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended
Complaint (Dkt. No. 10) is ***DISMISSED* in its en-
tirety without prejudice** for failure to exhaust his
available administrative remedies before filing this
action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter
judgment for Defendants and close the file in this
action.

N.D.N.Y.,2010.
Murray v. Palmer
Not Reported in F.Supp.2d, 2010 WL 1235591
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
Oct. 4, 2012.

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this Bivens[FN1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

> FN1. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his complaint be dismissed on this procedural basis, without addressing its merits.

*I. BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[FN2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

> FN2. The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[FN3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

> FN3. According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint.[FN4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances.[FN5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

> FN4. Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

> FN5. Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for com-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

mencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor.[FN6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

> [FN6]. Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was

required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No."[FN7] *Id.*

> [FN7]. During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Of-

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

ficer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties.[FN8][FN9],

FN8. The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

FN9. Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

III. *DISCUSSION*

A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at *4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the

plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements.[FN10,FN11] *Id.*

> **FN10.** In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantively exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

FN11. In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for exam-

ple—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

**\*6** Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

C. *Application of Governing Legal Principles*

1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

2. *Presentation of Defense/Estoppel*

*7 The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at *3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at *5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at *4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and co-operate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at * 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at *6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing

Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)
**(Cite as: 2012 WL 6935254 (N.D.N.Y.))**

report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS RE-PORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2012.
Bailey v. Fortier
Not Reported in F.Supp.2d, 2012 WL 6935254 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Joseph J. BELILE, Plaintiff,
v.
C.O. GRIFFIN, et al., Defendants.

Civ. Action No. 9:11–CV–0092 (TJM/DEP).
Feb. 12, 2013.

Joseph J. Belile, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, James Seaman, Esq., Assistant Attorney General, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Joseph J. Belile, a New York State prison inmate, has commenced this action against several corrections employees stationed at the facility in which he was housed at the relevant times, including its superintendent, pursuant to 42 U.S.C. § 1983, complaining of multiple violations of his civil rights. In his amended complaint, plaintiff alleges that, as a result of being denied his request for placement into protective custody, he was attacked by a fellow inmate. Belile also alleges that some of the named-defendants encouraged other inmates to attack him, and that he was assaulted by other named-defendants on two separate occasions.

Currently pending before the court in connection with this action is a motion by the defendants for the entry of summary judgment dismissing plaintiff's amended complaint. Defendants base their motion on

(1) plaintiff's alleged failure to exhaust his administrative remedies before commencing suit, (2) their contention that plaintiff's claims fail on the merits, and (3) in the alternative, their claim of entitlement to qualified immunity. For the reasons set forth below, I recommend that plaintiff's amended complaint be dismissed for failure to exhaust available administrative remedies.

*I. BACKGROUND*[FN1]

> FN1. Although plaintiff opposed defendants' motion for summary judgment, he did not file an opposition to defendants' Local Rule 7.1 statement of material facts that complies with Local Rule 7.1(a) (3). Specifically, defendants filed an eleven-page statement of material facts that contains eighty-two paragraphs and complies with the citation requirements of Local Rule 7.1(a)(3). Defs.' L.R. 7.1 Statement (Dkt. No. 55, Attach.18). In response, plaintiff filed a two-page statement of material facts that contains only five paragraphs, neither admits nor denies any of the paragraphs contained in defendants' statement of material facts, and fails to cite to any record evidence. Dkt. No. 57 at 6–7. Plaintiff was warned of the consequences of failing to properly respond to defendants' statement of material facts. Dkt. No. 56, Attach. 1. The court therefore accepts defendants' facts to the extent that they are supported by accurate citations to the record. *See* N.D .N.Y. L.R. 7.1(a)(3) (*"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* (emphasis in original)); *see also, e.g., El-gamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22,

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
(Cite as: 2013 WL 1776086 (N.D.N.Y.))

2010) (McCurn, J.) (listing cases and deeming all of the facts asserted in the defendant's statement of material facts as admitted where the plaintiff did not specifically admit or deny any of the assertions and "failed to contain a single citation to the record").

Plaintiff Joseph Belile is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Am. Compl. (Dkt. No. 37) at 1. Although now confined elsewhere, at the times relevant to this action, plaintiff was held in keeplock confinement at the Great Meadow Correctional Facility ("Great Meadow"), a maximum security prison located in Comstock, New York.[FN2] Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 18; Kelly Decl. (Dkt. No. 55, Attach.9) at ¶ 1. Upon his arrival at Great Meadow, plaintiff was assigned to a cell located on the fourth tier of the B-block, a housing unit comprised of four floors of cells, all of which are oriented in the same direction and face an open area. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 18.

FN2. "Keeplock" is a form of confinement through which an "inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989), *accord, Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, J., adopting report and recommendation by Homer, M.J.) (citing *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). "The most significant difference between keeplock and general population inmates is that the former do not leave their cells for out-of-cell programs unless they are a part of mandatory educational programs and general population inmates spend more time out of their cells on weekends." *Lee v. Coughlin,* 26

F.Supp.2d 615, 628 (S.D.N.Y.1998). Although, as a keeplocked inmate, plaintiff was entitled to leave his cell for one hour each day for the purpose of exercise, *Lee,* F.Supp.2d at 628, he did not avail himself of that opportunity. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 51–52.

On or about April 23 or 24, 2009, while in his cell on B-block, Belile overheard two inmates yelling that he would be killed if he came out of his cell. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 19–20. Although plaintiff was not able to identify any of the inmates involved because of the orientation of the cells in B-block, he believes that the threats came from one floor below his cell. *Id.* at 19, 85–86. The next day, plaintiff wrote letters to defendant Charles F. Kelly, Jr., the Deputy Superintendent of Security at Great Meadow, and the B-block sergeant, requesting that he be placed in protective custody ("PC"). *Id.* at 16, 19; Am. Compl. (Dkt. No. 37) at 9; Kelly Decl. (Dkt. No. 55, Attach.9) at ¶ 8; Kelly Decl. Exh. A (Dkt. No. 55, Attach.10). That same day, defendant Kelly assigned defendant Donald Maguire, a corrections sergeant at the facility, to investigate the matter. Kelly Decl. (Dkt. No. 55, Attach.9) at ¶ 9.

**\*2** After receiving the assignment to review plaintiff's PC request and obtaining relevant background information, defendant Maguire interviewed Belile on the evening of April 27, 2009. Maguire Decl. (Dkt. No. 55, Attach.12) at ¶¶ 5, 8. During that interview, plaintiff was unable to provide specific information to support his belief that he was in danger, or to identify any inmate at Great Meadow that might want to harm him.[FN3] *Id.* at ¶¶ 9–10; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 23–25. Finding no basis to conclude that plaintiff faced a credible threat to his safety, defendant Maguire denied plaintiff's request for PC, had him returned to his keeplock cell, and prepared a report to defendant Kelly concerning the results of his investigation. Maguire Decl. (Dkt. No. 55, Attach.12) at 2; Kelly Decl. (Dkt. No. 55, Attach.9) at ¶ 10; Kelly

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

Decl. Exh. B (Dkt. No. 55, Attach.11); Plaintiff's Dep. Tr. (Dkt. No. 55, Attach.2) at 26, 29.

> FN3. Although Belile named two inmates, defendant Maguire determined that neither was presently confined at Great Meadow. Maguire Decl. (Dkt. No. 55, Attach.12) at ¶ 9.

Upon completion of the interview by defendant Maguire, plaintiff was escorted back to his B-block cell by a corrections officer identified by him as defendant Griffin, a corrections officer at Great Meadow. Am. Compl. (Dkt. No. 37) at 10; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 29. When plaintiff arrived at the foot of the stairs leading to his fourth-floor cell, he dropped the bags that he was carrying "to catch [his] breath." Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 31. At that moment, defendant Griffin asked plaintiff what he was convicted of that resulted in his incarceration, and, when plaintiff answered him, defendant Griffin kicked plaintiff in the left thigh area and told him to move up the stairs. *Id.* at 31. Plaintiff felt what he describes as a sharp pain for a few moments after being kicked by the corrections officer, but the pain subsided by later that night, and he never sought medical treatment for the injury. *Id.* at 33.

On or about April 27, 2009, the day after plaintiff's interview with defendant Maguire, defendant Murphy, a corrections officer assigned to supervise B-block inmates' transit to the Great Meadow mess hall for breakfast, stated to his accompanying officer, defendant John Doe # 1, when reaching plaintiff's cell for escort, "Belile B–4–29 is a rapo and he tried to sign into PC last night." Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 33–34; Am. Compl. (Dkt. No. 37) at 10. Plaintiff claims that, while defendant Murphy pretended to direct that statement to defendant John Doe # 1 standing next to him, he actually said it loud enough so that other inmates could hear him as well. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 34–35. Later on April 28, 2009, after the evening meal, an unknown

inmate screamed out "29 Cell tried to sign into PC. He's a rat. We'll get him when he comes out." *Id.* at 21–22.

On May 1, 2009, while plaintiff was watching television, another inmate splashed a hot liquid into his cell, causing him to suffer burns that required medical treatment. Am. Compl. (Dkt. No. 37) at 10; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 44–47. After receiving treatment for his injuries, plaintiff was escorted to PC, which is located on the D-block of Great Meadow. Am. Compl. (Dkt. No. 37) at 10; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 53–55.

**\*3** Following his arrival in PC, plaintiff received four bags of personal property from defendants Dimick and Brockley, two other corrections officers at the facility, both of whom were known to plaintiff from an earlier period in 2006 when plaintiff was confined in a Behavioral Health Unit program at Great Meadow. Am. Compl. (Dkt. No. 37) at 10–11; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 56–59. After delivering plaintiff's property, defendants Dimick and Brockley kicked plaintiff in the genitals and punched him in the head. Am. Compl. (Dkt. No. 37) at 11; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 61. The officers then threw the four property bags at plaintiff and left his cell. Am. Compl. (Dkt. No. 37) at 11; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 62. Plaintiff did not seek medical treatment for the injuries resulting from the actions of defendants Dimick and Brockley. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 62.

Within a couple of days of arriving in PC, plaintiff wrote a grievance and placed it in the meal slot of his cell gate to be picked up by a corrections officer. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 64, 66. The grievance was, in fact, picked up, but plaintiff does not know precisely who retrieved it. *Id.* at 66, 67. On or about May 20, 2009, after plaintiff did not receive a response to his first grievance, he wrote a second grievance, which again was picked up from his meal slot by an unknown individual. *Id.* at 66, 67. Plaintiff

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

did not receive a response to the second grievance. *Id.*
at 66. Other mail that plaintiff placed in his meal slot
to be sent out while he was in PC did reach its desti-
nation. *Id.* at 69–70. There is no DOCCS record of
plaintiff filing these two grievances, nor is there a
record that plaintiff appealed any grievance relating to
the matters now in issue to the relevant appellate entity
within DOCCS. Hoagland Decl. (Dkt. No. 55, At-
tach.15) at ¶ 8; Hale Decl. (Dkt. No. 55, Attach.14) at
¶ 9.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 26,
2011. Complaint (Dkt. No. 1). Following a period of
pretrial discovery, during which plaintiff attempted to
identify the defendants previously sued only as "Doe"
defendants, he filed an amended complaint on No-
vember 8, 2011. Am. Compl. (Dkt. No. 37). Plaintiff's
amended complaint names, as defendants, Great
Meadow Superintendent Bezio; [FN4] Great Meadow
Deputy Superintendent of Security Kelly; Corrections
Sergeant Maguire; and Corrections Officers Griffin,
Murphy, Dimick, Brockley, and defendant "John Doe
# 1." *Id.* at 2–3. Construed with the utmost liberality,
plaintiff's amended complaint asserts a due process
claim under the Fourteenth Amendment, and exces-
sive force, failure to protect, and deliberate indiffer-
ence claims under the Eighth Amendment, all pursu-
ant to 42 U .S.C. § 1983. *Id.* at 12–13.

> FN4. While Norman Bezio is named by
> Belile as a defendant, and is identified as the
> superintendent at the facility in issue, during
> his deposition, Belile acknowledged that
> Bezio was not in fact the superintendent at
> any time relevant to the events giving rise to
> this action. Plf.'s Dep. Tr. (Dkt. No. 55, At-
> tach.2) at 90.

On May 31, 2012, following the completion of
discovery, defendants filed a motion for summary
judgment seeking dismissal of plaintiff's amended
complaint based on several grounds, generally arguing

that plaintiff failed to exhaust his administrative
remedies, that plaintiff's amended complaint fails on
the merits, and, alternatively, that all defendants are
entitled to qualified immunity. Defs.' Memo. of Law
(Dkt. No. 55, Attach.19) at 4–17. On June 7, 2012,
plaintiff filed his opposition to that motion, Plf.'s
Resp. (Dkt. No. 56), and defendants subsequently
filed their reply on June 14, 2012, Defs.' Reply (Dkt.
No. 58).

**\*4** Defendants' motion, which is now fully briefed
and ripe for determination, has been referred to me for
the issuance of a report and recommendation, pursuant
to 28 U.S.C. § 636(b)(1)(B) and Northern District of
New York Local 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by
Rule 56 of the Federal Rules of Civil Procedure. Un-
der that provision, the entry of summary judgment is
warranted "if the movant shows that there is no gen-
uine dispute as to any material facts and the movant is
entitled to judgment as a matter of law." Fed.R.Civ.P.
56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322
(1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion
Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004).
A fact is "material" for purposes of this inquiry, if it
"might affect the outcome of the suit under the gov-
erning law." *Anderson,* 477 U.S. at 248; *see also Jef-
freys v. City of New York,* 426 F.3d 549, 553 (2d
Cir.2005) (citing *Anderson* ). A material fact is gen-
uinely in dispute "if the evidence is such that a rea-
sonable jury could return a verdict for the nonmoving
party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an
initial burden of demonstrating that there is no genuine
dispute of material fact to be decided with respect to

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

**B. *Failure to Exhaust***

Defendants argue that plaintiff is precluded from pursuing his claims in this action as a result of his failure to exhaust available administrative remedies before filing suit. Defs.' Memo. of Law (Dkt. No. 55, Attach.19) at 4–5. In support, defendants offer declarations from Jeffrey Hale, Assistant Director of the DOCCS Inmate Grievance Program ("IGP"), and Jason Hoagland, Acting IGP Supervisor at Great Meadow. Dkt. No. 55, Attachs. 14, 15. Hale avers that, based upon a search of available DOCCS records, plaintiff did not, in accordance with the available grievance procedures in place at Great Meadow while plaintiff confined there, pursue an appeal to the DOCCS Central Office Review Committee ("CORC") related to the denial of plaintiff's request to be placed in PC. Hale Decl. (Dkt. No. 55, Attach.14) at ¶ 9. Similarly, Hoagland avers that a search of the grievance records at Great Meadow does not reveal any grievance filed by plaintiff "at any time." Hoa-

gland Decl. (Dkt. No. 55, Attach.15) at ¶ 8. In response, plaintiff argues that "there is not any available administrative remedie[s] when an assault and harm have already occurred," and that the exhaustion requirement only applies to " 'prison conditions' under the P.L.R.A.," which plaintiff is not challenging. Plf. Resp. (Dkt. No. 57) at ¶ 2.

1. *Legal Principles Governing Exhaustion*

**\*5** The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]" (internal citations omitted)); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").[FN5] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).[FN6]

FN5. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

FN6. In this case, the Supreme Court's decision in *Porter* effectively forecloses plaintiff's argument that claims of the past-use of excessive force are not subject to the ex-

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

haustion requirement. *Porter,* 534 U.S. at 532.

In the event the defendant establishes that the inmate-plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [FN7] *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).

> FN7. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " in order to satisfy the PLRA, an inmate-plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies by complying with the grievance procedures in place at the relevant correctional facility. *Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

In accordance with the PLRA, the DOCCS has made the IGP available to inmates, which is comprised of a three-step procedure that inmates must use when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 234898, at *4 (S.D.N.Y. Feb. 20, 2004). The IGP procedure is accurately described in Hale's declaration, Dkt. No. 55, Attach. 14, and embodied in 7 N.Y.C.R.R. § 701. Under the IGP, an inmate must first file a complaint with the facility's IGP clerk within twenty-one days of the alleged oc-

currence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee ("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days of receipt of the grievant's appeal.[FN8] *Id.* at § 701.5(c)(i), (ii).

> FN8. Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c) (i), (ii).

**\*6** The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be entered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J. adopting report and recommendation by Lowe, M.J.) (citing, *inter alia,* 7 N.Y.C.R .R. § 701.6(g)(2)).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

Generally speaking, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (internal quotation marks omitted)).

2. *Application of Legal Principles*

Initially, the court notes that plaintiff alleges that he only filed two grievances on or about May 2, 2009, and May 20, 2009, both of which, when liberally construed, complain that, as a result of denials by defendants Maguire and Kelly of his request to be placed in PC, he was assaulted by another inmate. Am. Compl. (Dkt. No. 37) at 5–6. The grievances also complain that defendants Murphy and Doe improperly disclosed to other inmates that plaintiff was convicted of rape in the third degree, and allege that defendants Dimick and Brockley assaulted plaintiff immediately after arriving in PC. *Id.* Because these two grievances do not include any complaints about defendant Griffin's assault on plaintiff when he escorted plaintiff back from defendant Maguire's office, and because there is no record evidence that plaintiff ever filed a grievance as it relates to this allegation, I find that plaintiff failed to exhaust his available administrative remedies regarding any excessive force claim against defendant Griffin, in violation of the Eighth Amendment. However, because each of the other named-defendants are implicated in plaintiff's grievances, the court proceeds to discuss whether plaintiff exhausted available administrative remedies as it relates to the claims asserted against the remaining named-defendants.

After carefully reviewing the record evidence, I find that there is a dispute of fact as to whether plaintiff actually filed a grievance with the IGP clerk that relates to any of the allegations giving rise to this action.[FN9] Specifically, plaintiff's amended complaint alleges that, while he filed two grievances, both were intercepted by correctional officers at Great Meadow. Am. Compl. (Dkt. No. 37) at 3. Similarly, at his deposition, plaintiff testified that he placed two written grievances in his meal slot to be filed by corrections officers. Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 66–67. According to plaintiff, after a corrections officer retrieves a grievance from an inmate, the grievance is supposed to be forwarded to the appropriate officials. Am. Compl. (Dkt. No. 37) at 3. However, Hoagland, the Acting IGP Supervisor at Great Meadow, avers that a search of the grievance records at Great Meadow does not reveal any grievance filed by plaintiff "at any time." Hoagland Decl. (Dkt. No. 55, Attach.15) at ¶ 8. Moreover, Hale, the DOCCS IGP Assistant Director, states that a search of the relevant DOCCS records shows that plaintiff did not file an appeal to CORC arising from any incident while at Great Meadow. Hale Decl. (Dkt. No. 55, Attach.14) at ¶ 9. These conflicting pieces of evidence demonstrate that there is a dispute of fact as to whether plaintiff initiated the IGP process at Great Meadow by filing a grievance relating to the allegations giving rise to this action.

> FN9. As will be discussed more completely below, however, because Belile failed to pursue the alleged grievance to completion, this fact is not material in that it does not preclude the entry of summary judgment against him on this issue.

*7 Whether or not plaintiff did attempt to lodge grievances in accordance with the IGP, however, is immaterial because there is no dispute that he failed to "properly exhaust" his administrative remedies by complying with the IGP's requirement that he appeal any denial to the superintendent of the facility, and then appeal any unfavorable decision from the superintendent to CORC. *Woodford,* 548 U.S. at 95; *Ruggerio,* 467 F.3d at 176. Plaintiff does not argue, nor does he offer any proof in his amended complaint,

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

at his deposition, or in opposition to defendants' motion for summary judgment, that he pursued his grievances to completion. For this reason, I find that no reasonable factfinder could conclude that plaintiff exhausted available administrative remedies as it relates to any of the allegations giving rise to this action. *See Goodson v. Silver,* No. 09–CV–0494, 2012 WL 4449937, at *4 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.) ("[I]f a prisoner has failed to follow each of the required ... steps for the ... grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies.").

Despite finding that plaintiff did not file and pursue to completion a grievance regarding the claims he now raises in this action, the exhaustion inquiry is not ended. In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[FN10] *Macias,* 495 F.3d at 41; *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the Second Circuit's test, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such remedies were available to the plaintiff, the court must next examine "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust defense." *Hemphill,* 380 F.3d at 686, *accord, Macias,* 495 F.3d at 41. Finally, in the event the proffered defense survives these first two levels of scrutiny, the court must examine whether special circumstances "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements. [FN11] *Id.*

FN10. Whether the Second Circuit's test in

*Hemphill* survives following the Supreme Court's decision in *Woodford* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* No. 04–CV–0395, 2007 WL 2847304, at *2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, J., adopting report and recommendation by Homer, M.J.).

FN11. Though distinct in theory, in practice, the application of the three prongs of the prescribed test admit of overlap. *Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004); *see also Hargrove v.. Riley,* No. CV–04–4587, 2007 WL 389003, at *8 n. 14 (E.D.N.Y. Jan. 31, 2007) ("Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies 'unavailable' to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.").

a. *Availability of Remedy*

As was discussed above, in New York, the DOCCS has implemented the three-step IGP in accordance with the requirements under the PLRA. 7 N.Y.C.R.R. § 701.5. Despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances in which the grievance procedure nonetheless is deemed unavailable to an inmateplaintiff. *Hemphill,* 380 F.3d at 686. For example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove,* 2007 WL 389003, at *8 (internal citation omitted); *see also Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (holding that, where a prisoner's favorable decision is not properly implemented, and the time to appeal the decision has expired, the prisoner's available admin-

istrative remedies had been exhausted).

**\*8** Here, plaintiff does not argue that he was "unaware of the grievance procedures or did not understand it." *Hargrove,* 2007 WL 389003, at \*8. *See* Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 72 ("Q: So you're familiar with the Inmate Grievance Program; right? A: Yes."). Rather, he alleges that the grievance procedure was unavailable to him because corrections officers intercepted and discarded the two grievances that he left in his meal slot shortly after arriving in PC. Am. Compl. (Dkt. No. 37) at 3–4; Plf.'s Dep. Tr. (Dkt. No. 55, Attach.2) at 64–68. Plaintiff admitted at his deposition, however, that he is only speculating when he alleges that the officers who picked up his mail discarded those grievances. *Id.* at 70–71. Similarly, plaintiff admitted that he does not know who retrieved his grievances, which means he does not know whether any of the named-defendants were responsible for, or aware of, the alleged interception of his grievances. *Id.* at 68. Plaintiff also acknowledged that other mail that he sent from PC did reach the intended addressees. *Id.* at 69–70.

Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the IGP. *See Butler v. Martin,* No. 07–CV–0521, 2010 WL 980421, at \*5 (N.D.N.Y. Mar. 15, 2010) (Scullin, J.) (finding that the plaintiff was not excused from failing to avail himself of the administrative procedures where he alleged that his grievances were discarded but did not offer any evidence "that a particular officer discarded the[m]"); *Winston v. Woodward,* No. 05–CV–3385, 2008 WL 2263191, at \*10 (S.D.N.Y. May 30, 2008) ("In light of Plaintiff's failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered ... mail tampering, ... the Court finds, even taking the evidence in the light most favorable to Plaintiff, that

he has not put forth sufficient evidence to sustain his burden [.]"); *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.2004) ("Even assuming [the plaintiff] did submit grievances, he offers no evidence that any particular officer thwarted his attempts to file[.]"); *Nunez v. Goord,* 172 F.Supp.2d 417, 429 (S.D.N.Y.2001) (finding the plaintiff's allegation that his failure to file grievances was due to " 'the practice of certain officers' " to destroy them "stand[s] alone and unsupported").

In any event, there is no dispute that, even assuming that any of the defendants did, in fact, intercept and discard plaintiff's grievances, there were other avenues available to plaintiff for pursuing his grievances. For example, in his declaration, Hoagland notes that, at least weekly, either the IGP supervisor or the sergeant assigned to the grievance office at Great Meadow makes rounds through the entire facility, including in D-block, where PC inmates are confined, to address grievance-related questions or issues. Hoagland Decl. (Dkt. No. 55, Attach.15) at ¶ 5. During those rounds inmates may hand grievances directly to the person making the rounds.[FN12] *Id.* at ¶ 6. Accordingly, even assuming that plaintiff's grievances were intercepted, there was an available, alternative avenue for submitting those grievances directly to the IGP supervisor.

> FN12. Again, because plaintiff has not disputed defendants' Local Rule 7.1 statement of material facts, which is, in part, supported by Hoagland's declaration, the court assumes the truth of the statements made in Hoagland's declaration.

**\*9** Finally, under the IGP, even if plaintiff's grievances were intercepted and not filed with the IGP clerk, "he had the ability—and the duty to—file an appeal regarding the non-processing of th[ose] grievance[s]." *Sidney,* 2012 WL 1380392, at \*5 (collecting cases and finding that the plaintiff failed to exhaust available administrative remedies where he

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

argued that a second grievance was " 'pilfered by theivery hands' "); *Butler,* 2010 WL 980421, at *6 ("Plaintiff was obligated to appeal to the next administrative level once it became clear to him that a response to his grievances was not forthcoming." (citing, *inter alia,* 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."))); *Veloz,* 339 F.Supp.2d at 516 ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

For all of these reasons, I conclude that the grievance process was available to plaintiff.

b. *Estoppel*

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted). Exhaustion of remedies is an affirmative defense that must be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 216 (2007). Here, defendants have properly preserved the exhaustion defense by asserting it as an affirmative defense in their answers. Answer (Dkt. No. 39) at ¶ 15; Answer (Dkt. No. 45) at ¶ 15. Turning to estoppel, I find no basis in the record to support a finding that defendants should be precluded from relying upon the defense. "Estoppel will be found where an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or

impossible." *Winston,* 2008 WL 2263191, at *9 (internal quotation marks omitted) (collecting cases). "[A] plaintiff's failure to exhaust all administrative remedies may be excused on the grounds of estoppel where the plaintiff was misled, threatened, or otherwise deterred from fulfilling the requisite procedures." *Id.* (citing, *inter alia, Hemphill,* 380 F.3d at 688–89).

As was discussed above, although plaintiff argues that the two grievances he left in his meal slot were discarded by corrections officers, for all of the same reasons that this argument fails when analyzing whether administrative remedies were "available" to plaintiff, it similarly falls short in establishing that defendants should be estopped from asserting the exhaustion defense. *See Giano,* 380 F.3d at 677 n. 6 ("We note that the case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, [and] (b) situations in which administrative remedies are not 'available' to the plaintiff[.]"); *see also Hargrove,* 2007 WL 389003, at *8 n. 14. The court would only add that, because plaintiff does not allege, or provide any evidence that, a named-defendant acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense, he has failed to establish a dispute of material fact as to whether any of defendants are estopped from asserting the exhaustion defense. *See Atkins v. Menard,* No. 11–CV–9366, 2012 WL 4026840, at *3 (N .D.N.Y. Sept. 12, 2012) (Suddaby, J.) ("Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.").

c. *Special Circumstances*

**\*10** The third, catchall factor to be considered under the Second Circuit's exhaustion test focuses upon whether special circumstances exist to justify excusing a plaintiff's failure to exhaust available administrative remedies, notwithstanding the fact that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

the administrative remedies were available, and the defendants are not estopped from asserting the defense. *Hemphill,* 380 F.3d at 689; *Giano,* 380 F.3d at 676–77. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials, and leads the plaintiff to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77, *accord, Hargrove,* 2007 WL 389003, at *10.

Here, there is no allegation that special circumstances exist to excuse plaintiff's failure to exhaust available administrative remedies, nor does plaintiff offer any evidence of potentially applicable special circumstances. As a result, I find that plaintiff is not excused from his failure to exhaust administrative remedies before commencing this action, and I recommend that his amended complaint be dismissed on this procedural basis alone.[FN13]

> FN13. In recommending dismissal of plaintiff's amended complaint in its entirety, I include the defendant identified as "John Doe # 1" who has neither been identified nor appeared in the action. Because that defendant is not specifically alleged to have been, nor is there record evidence to establish that he was, involved in the interception and discarding of plaintiff's grievances, I find he would not be estopped from asserting the exhaustion defense and thus, like the named-defendants, would be entitled to dismissal on the basis of plaintiff's failure to exhaust. Alternatively, I recommend dismissal of all claims against defendant Doe, *sua sponte,* based upon plaintiff's failure to properly identify and serve him, as required under both Federal Rules of Civil Procedure and this court's local rules, despite the fact that this case has been pending for more than two years, and based on plaintiff's failure,

prior to the close of discovery, to ascertain the identity of that individual. Fed.R.Civ.P. 41(b),(m); *see also Butler,* 2010 WL 980421, at *6–7.

IV. *SUMMARY AND RECOMMENDATION*

It is undisputed that, prior to commencing this action, plaintiff failed to exhaust his administrative remedies by pursuing to completion any grievance related to the events giving rise to this action. In light of this failure, and finding no basis to conclude that plaintiff's compliance with the IGP should be excused, I recommend dismissal of plaintiff's amended complaint in its entirety on this basis alone, without addressing either the merits of his claims, or the qualified immunity argument advanced by defendants in support of their motion for summary judgment. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 55) be GRANTED, and that plaintiff's amended complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2013.
Belile v. Griffin
Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1776086 (N.D.N.Y.)
**(Cite as: 2013 WL 1776086 (N.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green Haven
Correctional Facility, R. Pflueger, A. Glemmon, Sgt.
Stevens, Lt. Haubert, Capt. W.M. Watford, Capt. T.
Healey, and John Doe # 1–5, all as individuals, De-
fendants.

No. 93 Civ. 5981(WHP) JCF.
Oct. 28, 1999.

Mr. Craig Cole, Bare Hill Correctional Facility,
Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, New York, for Defendant.

### MEMORANDUM & ORDER
PAULEY, J.

**\*1** The remaining defendant in this action, Cor-
rection Officer Richard Pflueger, having moved for an
order, pursuant to Fed.R.Civ.P. 56, granting him
summary judgment and dismissing the amended
complaint, and United States Magistrate Judge James
C. Francis IV having issued a report and recommen-
dation, dated August 20, 1999, recommending that the
motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff
does "not contest the dismissal of this action", it is

ORDERED that the attached report and recom-
mendation of United States Magistrate Judge James C.

Francis IV, dated August 20, 1999, is adopted in its
entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

### REPORT AND RECOMMENDATION
FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green
Haven Correctional Facility, brings this action pur-
suant to 42 U.S.C. § 1983. Mr. Cole alleges that the
defendant Richard Pflueger, a corrections officer,
violated his First Amendment rights by refusing to
allow him to attend religious services. The defendant
now moves for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the de-
fendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at
the Green Haven Correctional Facility. (First
Amended Complaint ("Am.Compl.") ¶ 3). From June
21, 1993 to July 15, 1993, the plaintiff was in keeplock
because of an altercation with prison guards.
(Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony An-
nucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS
policy, inmates in keeplock must apply for written
permission to attend regularly scheduled religious
services. (Reply Affidavit of George Schneider in
Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.")

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

*2 On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Or-

der dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International,*

*Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se's*] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

## B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[FN1]

FN1. In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*
For the reasons set forth above, I recommend that

the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

S.D.N.Y.,1999.
Cole v. Artuz
Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)

END OF DOCUMENT



Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)
**(Cite as: 2014 WL 4947315 (D.Colo.))**

Only the Westlaw citation is currently available.

United States District Court, D. Colorado.
James Ralph Dawson, Jr., Plaintiff,
v.
Paul Audet; Donald Brightwell; and Angel Medina,
Defendants.

Civil Action No. 12–cv–00901–MSK–BNB
1:12-cv-00901Signed September 30, 2014

James Ralph Dawson, Jr., Canon City, CO, pro se.

Jacquelynn Nichole Rich Fredericks, Colorado Attorney General's Office, Denver, CO, for Defendants.

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS SUMMARY JUDGMENT

Marcia S. Krieger, Chief United States District Judge

**\*1 THIS MATTER** comes before the Court on motions from both parties. Mr. Dawson filed a Motion for Partial Summary Judgment **(# 84)** and supporting Brief **(# 85),** the Defendants' responded **(# 91),** and Mr. Dawson replied (# 94). Defendants' also filed a Motion for Summary Judgment **(# 86).**

### I. ISSUES PRESENTED

Mr. Dawson, a prisoner in the custody of the Colorado Department of Corrections ("CDOC"), brings this *pro se* action pursuant to 42 U.S.C. § 1983.[FN1] The Defendants are CDOC employees, and all of Mr. Dawson's claims against Defendants relate to his incarceration at the Limon Correctional Facility (LCF). Specifically, Mr. Dawson asserts that: (1) Mr. Audet terminated Mr. Dawson from his prison job in retaliation for Mr. Dawson's threat to file a grievance; (2) Mr. Brightwell retaliated against Mr. Dawson for

filing a grievance against Mr. Audet; and (3) Mr. Medina impeded Mr. Dawson's access to the courts.

> FN1. The Court is mindful of Mr. Dawsons's *pro se* status, and accordingly, reads his pleadings and filings liberally. *See Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594 (1972); *see also Trackwell v. United States Govt,* 472 F.3d 1242, 1243 (10th Cir. 2007). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *See Gallagher v. Shelton,* 587 F.3d 1063, 1067 (10th Cir. 2009).

Mr. Dawson and the Defendants each move for summary judgment on all of Mr. Dawson's claims.

### II. MATERIAL FACTS

Based upon the evidence submitted by the parties,[FN2] the material facts are rather straight forward. The Court views the submissions in the light most favorable to the non-moving party. Although both sides seek summary judgment here, for purposes of expediency, the Court generally construes the facts in the light most favorable to Mr. Dawson, unless otherwise noted.

> FN2. The Defendants argue that the Court should disregard the affidavit which Mr. Dawson filed in conjunction with his Motion for Partial Summary Judgment (# 84) because it is "not notarized and is more akin to a declaration" and it presents "self-serving and

Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)
**(Cite as: 2014 WL 4947315 (D.Colo.))**

conclusory statements, insufficient to survive summary judgment." The document states that Mr. Dawson makes the representations "under ... the penalty of perjury" and is signed by him and thus, the document is treated as an affidavit pursuant to 28 U.S.C. § 1746.

Mr. Dawson's retaliation claims against Mr. Audet and Mr. Brightwell relate to his termination from his prison job in the LCF recreation department. While working in the LCF recreation department on September 30, 2011, Mr. Dawson approached Mr. Audet, who was supervising the recreation staff and offenders, and requested to return to his living unit to make a legal phone call. Mr. Audet refused Mr. Dawson's request because his scheduled shift was not complete. In response, Mr. Dawson told Mr. Audet that he was going to file a grievance against him. Mr. Audet then directed Mr. Dawson to return to his living unit and stated that he would be released from his recreation department job. Mr. Audet filed an incident report stating that "[Mr.] Dawson refused to work in Recreation." On the same day, Mr. Dawson completed a Step One Grievance Form ("the grievance") complaining about Mr. Audet's conduct. He submitted the grievance to Mr. Brightwell that same day.[FN3]

> FN3. This fact is disputed. Although Mr. Dawson asserts that he submitted the form on September 30, 2011, the "date received" noted on the form is October 5, 2011. For purposes of Mr. Brightwell's motion, the Court gives Mr. Dawson the benefit of the September 30 date; when considering Mr. Dawson's motion, the Court assumes Mr. Brightwell received the grievance on October 5.

**\*2** Mr. Brightwell was responsible for making a computer entry reflecting Mr. Dawson's termination from his job. Mr. Dawson has submitted evidence indicating that Mr. Brightwell made that entry on or about October 1, 2011. (Mr. Brightwell's affidavit regarding the matter does not recite a particular date.) Mr. Brightwell initially classified Mr. Dawson as "Unassigned–Complete," a status that generally does not result in any loss of inmate privileges. However, Mr. Brightwell contends that he later realized that this was a "typographical error" and corrected Mr. Dawson's status to "Unassigned–30," a code used by CDOC to designate offenders who have been terminated from a job and, as a result, are required to remain unassigned for thirty days before becoming eligible for a new job. Inmates classified as "Unassigned–30" also lose a variety of privileges including single-cell status, additional time outside their cells, etc.

Mr. Dawson's claim against Mr. Medina relates to a scheduling policy implemented by Mr. Medina as the Warden of LCF. The scheduling policy limited the amount of time unassigned offenders could spend outside of their cells on a daily basis. From October 15, 2011 to November 16, 2011, Mr. Dawson was allowed out of his cell for 30 minutes daily, Monday through Friday after 6:00 p.m. but was often unable to reach his lawyer during this time because he had to spend his time standing in line to either shower, access legal help or material from fellow inmates, access the unit office to obtain legal access kites, cleaning supplies, and communicate with staff. Mr. Dawson argues that this limited time impeded his ability to successfully pursue an appeal to Colorado Supreme Court by precluding him from learning about additional arguments he could have raised.

Both sides now seek summary judgment on all claims by/against them. The Court addresses their specific arguments in its discussion. Mr. Dawson did not respond to the Defendants' summary judgment motion, but the Court treats Mr. Dawson's reply in support of his own motion as his response to the Defendants' motion as well.

### III. STANDARD OF REVIEW
Rule 56 of the Federal Rules of Civil Procedure

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)
**(Cite as: 2014 WL 4947315 (D.Colo.))**

facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.,* 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Kaiser–Francis Oil Co. v. Producer's Gas Co.,* 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson,* 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed.R.Civ.P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward,* 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

**\*3** If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respond-

ent comes forward with sufficient competent evidence to establish a prima facie claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

### IV. ANALYSIS

This case involves cross-motions for summary judgment. Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently. *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.,* 209 F.Supp.2d 1106, 1112 (D.Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000). Here the Court begins with the Defendants' Motion.

### A. Claim Against Mr. Audet

Mr. Dawson asserts that Mr. Audet terminated him from his prison job in retaliation for his threat to file a grievance against Mr. Audet. In addition, read liberally, he also contends that once the grievance was filed, his status was changed from being "released" from his job to being "fired" from it. Mr. Audet seeks summary judgment on this claim, contending that Mr. Dawson cannot establish a *prima facie* case of retaliation, and, even if he can, that Mr. Audet is entitled to qualified immunity.

The doctrine of qualified immunity protects government officials who perform discretionary government functions from liability for civil damages and the obligation to defend the action. *See Johnson v. Fankell,* 520 U.S. 911, 914 (1997); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity requires a "two-step sequence." *Pearson v. Callahan,* 555 U.S. 223 (2009). "When a defendant asserts

Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)
**(Cite as: 2014 WL 4947315 (D.Colo.))**

qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009).

The first prong of the qualified immunity analysis requires a plaintiff to show that the defendant's actions deprived him or her of a constitutional or statutory right. *See Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir. 1995). A plaintiff must precisely articulate the right that was allegedly violated and specifically identify the defendant's conduct that violated the right. *See Green,* 574 F.3d at 1300. At the summary judgment stage, this prong requires a plaintiff to present sufficient competent evidence to establish a *prima facie* claim. The second prong of the qualified immunity analysis requires a plaintiff to show that the identified right was clearly established based on the specific facts of the case. *See Brosseau v. Haugen,* 543 U.S. 194, 199–200 (2004). The inquiry focuses on whether prior case law from the Supreme Court or Tenth Circuit put the defendants on notice that the alleged conduct would be unconstitutional, or, in the absence of such controlling authority, a clear pattern in decisions from other Circuit Courts recognizing the right. *See Gomes v. Wood,* 451 F.3d 1122, 1134 (10th Cir. 2006); *see also Clark v. Wilson,* 625 F.3d 686, 690 (10th Cir. 2010). Only if the plaintiff satisfies both steps is qualified immunity defeated. The Court has discretion begin its analysis with either prong. *See Pearson,* 555 U.S. at 223; *Green,* 574 F.3d at 1299.

**\*4** It is undisputed that prison officials may not retaliate against a prisoner for exercising of his or her constitutional rights. *Smith v. Maschner,* 899 F.2d 940, 947 (10th Cir. 1990); *see also Fogle v. Pierson,* 435 F.3d 1252, 1264 (10th Cir. 2006). To establish retaliation claim under § 1983, a plaintiff must show that (1) he was engaged in constitutionally protected activity, (2) the defendant's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the de-

fendant's actions were substantially motivated as a response to his constitutionally protected conduct. *Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.,* 582 F.3d 1155, 1165 (10th Cir. 2009). To satisfy the third element a plaintiff must establish "that the defendants' alleged retaliatory motives were the 'but for' cause of the defendants' actions." *Peterson v. Shanks,* 149 F.3d 1140, 1144 (10th Cir. 1998). To do so, the plaintiff "must allege *specific facts* showing retaliation because of the exercise of [his] constitutional rights." *Id.* (emphasis added).

The Court first turns to the "clearly established" prong of the qualified immunity examination, particularly with regard to the first element of a retaliation claim. Taken in the light most favorable to Mr. Dawson, the record reflects that Mr. Dawson stated to Mr. Audet: "you are refusing me legal access, I'm going to grieve you." The question of whether a threat to file a grievance against a prison official constitutes conduct protected by the First Amendment does not appear to have been squarely addressed by either the Supreme Court or Tenth Circuit.[FN4] (At the very least, neither Mr. Dawson nor the Defendants have pointed the Court to controlling authority, and the Court's own research has not revealed any.) That question is unsettled in several other circuits. In *Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir. 2009), the court expressed doubt as to whether a threat to file a grievance would constituted First Amendment activity, stating "it seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance," but ultimately resolved the matter on different grounds. *See also Brown v. Darnold,* 505 Fed.Appx. 584, 587–88 (7th Cir. 2013) ("we have not decided whether a threat to grieve is a protected activity"). Similarly, the question is an open one in the Sixth Circuit. *Pasley v. Conerly,* 345 Fed.Appx. 981, 984–85 (6th Cir. 2009) (unpublished) ("This circuit appears not to have determined conclusively whether merely threatening to file a grievance constitutes protected activity"). The Fifth Circuit adheres to a more complicated formulation, arguably granting

Page 5

Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)
**(Cite as: 2014 WL 4947315 (D.Colo.))**

threats to file a colorable grievance First Amendment protection but holding that threats to file frivolous grievances are not protected conduct.[FN5] *Compare Ford v. Jones,* 149 Fed.Appx. 316, 317 (5th Cir. 2005) (unpublished) (First Amendment retaliation claim by inmate who was forced to stand outside without a jacket after threatening to file a grievance stated a cognizable claim) *with Brown v. Craven,* 106 Fed.Appx. 257, 258 (5th Cir. 2004) ("Because Brown's threatened grievance would have been frivolous, it may not be the basis of a retaliation claim").

> **FN4.** A number of circuits, including the Tenth Circuit, have held that a prisoner's First Amendment right to petition the government for redress for grievances encompasses the filing of inmate administrative grievances or appeals. *Fogle,* 435 F.3d at 1252. But those cases do not address whether *threats* to do so enjoy the same protection.

> **FN5.** Were this Court to apply the Fifth Circuit's standard, it would be inclined to find that Mr. Dawson's threat to grieve Mr. Audet for refusing to allow Mr. Dawson to make a phone call to his lawyer was frivolous, given that Mr. Dawson acknowledges that he had not arranged that call in advance, as required by prison regulations.

**\*5** As noted above, to overcome an officer's qualified immunity, an inmate must demonstrate that a particular legal right is "clearly established" by pointing to binding Supreme Court or Tenth Circuit authority recognizing that right, or by showing that the weight of Circuit Court authority recognizes that right. *See P.J. ex rel. Jensen v. Wagner,* 603 F.3d 1182, 1196–97 (10th Cir. 2010). Because Mr. Dawson has not shown, and apparently cannot show, that the law "clearly establishes" that an inmate's threat to file a grievance against a prison official enjoys First Amendment protection, Mr. Audet is entitled to qualified immunity on Mr. Dawson's retaliation claim.[FN6]

> **FN6.** The Court has also considered whether Mr. Dawson can allege an additional retaliation claim against Mr. Audet relating to Mr. Brightwell's decision to classify, and then subsequently re-classify, Mr. Dawson based on Mr. Audet's incident report. Because Mr. Dawson alleges no facts showing that Mr. Audet took any additional actions beyond writing up the initial incident report that Mr. Brightwell relied upon, such a claim would not survive.

**B. Claim Against Mr. Brightwell**

Mr. Dawson asserts that, after receiving Mr. Audet's incident report, Mr. Britghtwell initially classified Mr. Dawson as "Unassigned-complete," but, upon learning that Mr. Dawson had filed a grievance against Mr. Audet, Mr. Brightwell changed that status to "Unassigned–30." in retaliation for the grievance he filed against Mr. Audet. The same standards discussed above govern Mr. Dawson's First Amendment retaliation claim against Mr. Brightwell.

Mr. Brightwell contends that Mr. Dawson cannot show that he engaged in constitutionally-protected activity–at least, protected activity that preceded Mr. Brightwell's actions. It is undisputed that Mr. Dawson did complete a grievance against Mr. Audet and that he provided that grievance to Mr. Brightwell, and there can be no dispute that Mr. Dawson's actual filing of a grievance is clearly established as constitutionally-protected conduct. However, there is a genuine factual dispute between the parties as to when Mr. Dawson provided the grievance to Mr. Brightwell, as well as some degree of factual dispute as to when Mr. Brightwell re-classified Mr. Dawson. Mr. Dawson contends that his presents a question of timing that is disputed by the parties. Mr. Dawson contends that he submitted the grievance against Mr. Audet to Mr. Brightwell on September 30, 2011; Mr. Brightwell signed the grievance acknowledging his receipt of it on October 5, 2011. The record is somewhat unclear

Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)
(Cite as: 2014 WL 4947315 (D.Colo.))

as to precisely when Mr. Brightwell classified Mr. Dawson–Mr. Brightwell's affidavit describing his actions does not specify a date–but Mr. Dawson has provided a printout of prison records that show him classified as "Unassigned" (it is not clear which sub-type of "Unassigned") effective October 1, 2011. Taking this evidence in the light most favorable to Mr. Dawson, as the Court must for purposes of Mr. Brightwell's motion, the Court finds that there is a genuine dispute of fact as to whether Mr. Brightwell had knowledge of Mr. Dawson's grievance against Mr. Audet at the time he classified Mr. Dawson. (Similarly, taking the facts in the light most favorable to Mr. Brightwell for purposes of Mr. Dawson's summary judgment motion, there is a genuine issue of fact as to timing, requiring the denial of Mr. Dawson's motion.)

The Court turns to the second element: whether Mr. Brightwell's re-classification of Mr. Dawson to "Unassigned–30" and the concomitant loss of privileges was sufficiently adverse to chill an inmate's First Amendment activities. Mr. Brightwell's argument on this point is somewhat opaque. He argues that his "only involvement was to input Dawson's job termination into the computer" and that classification of Mr. Dawson as "Unassigned–30" was required by prison regulations in such circumstances. But these arguments do not address the question of whether Mr. Brightwell's actions were of sufficiently serious consequence to have the requisite chilling effect. Although the Court has some doubts as to the sufficiency of Mr. Dawson's evidence on this point, *see Rocha v. Zavaras,* 443 Fed.Appx. 316, 317–19 (10th Cir. 2011) (unpublished) (inmate placed on "restricted privilege" status that limited his access to recreation activities, caused him to be assigned to segregated housing, delayed his calls to the mess hall, restricted his canteen purchases, and prevented him from contacting other inmates was not conduct having a sufficient chilling effect to support a First Amendment retaliation claim), Mr. Brightwell has not offered a sufficiently detailed argument in this regard, and the Court declines to make it for him.

**\*6** The Court then proceeds to the third element: whether Mr. Brightwell's decision to classify Mr. Dawson as "Unassigned–30," instead of "Unassigned-complete" as Mr. Brightwell initially classified him, was motivated by Mr. Dawson's grievance against Mr. Audet. Taking Mr. Dawson's version of events in his summary judgment motion as true, Mr. Dawson states that he presented his grievance against Mr. Audet to Mr. Brightwell on September 30, 2011, and that Mr. Brightwell "was offended by the grievance, turned red in the face, and snatched the grievance from [Mr. Dawson's] hand." The record appears to reflect that Mr. Brightwell classified Mr. Dawson as "Unassigned-complete" on or about October 1, 2011, and changed that assignment to "Unassigned–30" the following day.

Assuming that Mr. Brightwell did indeed intend to unfavorably classify Mr. Dawson from the outset, the question remains whether Mr. Dawson can show that the decision was motivated by Mr. Dawson's grievance. It is undisputed that Mr. Audet completed an incident report stating that "I told Dawson ... he would be released from Recreation to find employment that was more suited to his needs." Mr. Brigtwell contends, without contradiction, that Mr. Audet also telephoned him on September 30 and reported that Mr. Dawson was "terminated from his job." There is at least a conceivable conceptual difference between an inmate being "released" from a job "to find employment more suited to his needs" and an inmate who is "terminated" from his job. The former conveys a good-faith disagreement between employer and employee without necessarily casting aspersions on the employee's performance, whereas the latter necessarily implies the employee's poor performance or misconduct. Mr. Brightwell's affidavit states, without apparent contradiction from Mr. Dawson, that "Unassigned-complete" status is appropriate "to identify offenders who successfully complete a program or work assignment," whereas "Unassigned–30" status is appropriate for "an offender terminated from his job

Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)
**(Cite as: 2014 WL 4947315 (D.Colo.))**

for cause." Arguably, Mr. Audet's use of the word "released" in the Incident Report is more indicative of job completion than termination, and thus, arguably, Mr. Brightwell was required by Mr. Audet's Incident Report to classify Mr. Dawson as "Unassigned-complete," not "Unassigned–30." Thus, a fact finder could reasonably infer that Mr. Brightwell's decision to change Mr. Dawson's status to a more unfavorable one was not justified by Mr. Audet's Incident Report and was motivated by retaliation.

The Court need not belabor the second prong of the qualified immunity analysis. As noted above, it is axiomatic that prison officials cannot retaliate against inmates simply because the inmate elected to file a grievance. *Fogle,* 435 F.3d at 1252. Accordingly, the Court finds that Mr. Brightwell's retaliation against Mr. Dawson, if proven, violated a clearly established right.

Accordingly, Mr. Brightwell's motion for summary judgment is denied. Turning to Mr. Dawson's motion for summary judgment on this claim, the facts taken in the light most favorable to Mr. Brightwell indicate that he did not receive Mr. Dawson's grievance until October 5, 2011, after he had made the adverse classification decision, and thus, there is a genuine dispute as to the element of causation. Accordingly, both sides' motions for summary judgment are denied and the claim against Mr. Brightwell will proceed to trial.

**C. Claim Against Mr. Medina**

Mr. Dawson asserts that Mr. Medina implemented scheduling policies that resulted in Mr. Dawson being denied access to the courts. Specifically, he argues that the policies restricted his ability to consult with his attorney and fellow prisoners, which prevented him from learning of a potentially-meritorious legal argument that he did not present, which resulted in the Colorado Supreme Court's denial of his petition for writ of certiorari.

**\*7** Mr. Medina asserts that summary judgment is appropriate in his favor because Mr. Dawson cannot establish a *prima facie* case that he was denied access to the courts and, even Mr. Dawson establishes a *prima facie* case, that the Mr. Medina is entitled to qualified immunity.

As discussed above, the Court has discretion to begin its qualified immunity analysis with either prong. *See Pearson v. Callahan,* 555 U.S. 223 (2009); *Green,* 574 F.3d at 1299. Here, the Court begins with the first prong and considers whether Mr. Dawson can establish a *prima facie* case against Mr. Medina.

Prisoners have a right to obtain access to the courts to pursue legitimate legal claims. *See Lewis v. Casey,* 518 U.S. 343, 351 (1996). To establish a claim of denial of access to the courts, a plaintiff must plead and prove that he actually was impeded in his ability to pursue a nonfrivolous claim. *Id.* at 353; *see also Trujillo v. Williams,* 465 F.3d 1210, 1226 (10th Cir. 2006) (plaintiff "must show that any denial or delay of access to the court prejudiced him in pursuing litigation").

Here, Mr. Medina argues that there is insufficient evidence to establish that Mr. Dawson was impeded in filing a petition to the Colorado Supreme Court or to show that his petition was not frivolous. Even assuming that his petition was not frivolous, the Court concludes that Mr. Dawson has failed to demonstrate that he was actually impeded in pursuing his claim. Mr. Dawson was able to file a petition for writ of certiorari to the Colorado Supreme Court. In fact, he filed his petition nearly two weeks before the filing deadline. There is also evidence that, during the relevant time period, he received four appointments with the LCF law library. He also received a number of copies from the law library, as well as envelopes, paper, and court captions. Even when viewed in the light most favorable to Mr. Dawson, the evidence

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)
**(Cite as: 2014 WL 4947315 (D.Colo.))**

submitted shows that he had significant access to the LCF law library and was able to obtain supplies upon request, despite the contested scheduling policy. Thus, the evidence does not support a conclusion that Mr. Dawson was impeded in filing his petition for writ of certiorari.

Mr. Dawson argues that, due to competing demands on his limited time, he "did not have time or access to his attorney or fellow inmates to articulate a comprehensive argument." A month after submitting his petition, "a fellow inmate informed [Mr. Dawson] that he should research *ex post facto* violations," and Mr. Dawson states that his attorney later confirmed to him that "he should have raised his claim as an *ex post facto* judicial decision." In *Shaw v. Murphy,* 532 U.S. 223, 230 (2001), the Supreme Court rejected the notion that inmate-to-inmate legal communications enjoyed some heightened constitutional protection; the Supreme Court held that such discussions could be regulated in the same manner as any other prison conduct, subject only to the requirement that the regulation meet the four-part *Turner* standard.[FN7] Mr. Dawson has not come forward with any evidence that would suggest that Mr. Medina's policy, to the extent it inhibited Mr. Dawson's ability to timely confer with his fellow inmates to plot a legal strategy, ran afoul of the *Turner* standard.

> FN7. Specifically, the restriction must: (i) advance a legitimate governmental interest; (ii) should allow appropriate alternative means of exercising the right; (ii) should consider the impact on prison administration of accommodating the right claimed by the inmate; and (iv) should consider the absence of ready alternatives. *Id.*

**\*8** Moreover, contrary to Mr. Dawson's contentions, the record reflects that accessing his fellow inmates was one of the tasks he pursued with the limited time made available to him. He states that he "used his time out of his cell choosing between wait-

ing in line to shower, access legal help or legal materials from fellow inmates, access the unit office to communicate with prison staff and obtain legal supplies, access the telephones, or walk around the pod as exercise." The fact that Mr. Dawson may have allocated his time unwisely, or failed to confer with the wisest of his fellow inmates is a matter of his own choosing. Because Mr. Dawson has not shown that the policies enacted by Mr. Medina prevented him from having the ability to present his petition, summary judgment is appropriate in Mr. Medina's favor.

## V. CONCLUSION

For the foregoing reasons

(1) Mr. Dawson's Motion for Partial Summary Judgment (**# 84**) is **DENIED**.

(2) Defendants' Motion for Summary Judgment (**# 86**) is **GRANTED in part**, as to the claims against Mr. Audet and Mr. Medina, and **DENIED in part**, as to the claim against Mr. Brightwell. Judgment against those Defendants shall enter at the conclusion of proceedings in this action.

(3) Only the § 1983 claim against Mr. Brightwell will proceed. The caption of the case is **AMENDED** to omit all Defendants except Mr. Brightwell. Consistent with Mr. Dawson's express request in his Complaint (**# 1**), a bench trial will be conducted.

(4) The parties shall promptly begin preparation of a Proposed Pretrial Order consistent with the January 31, 2013 Trial Preparation Order (**# 50**) and shall make arrangements to jointly contact chambers to schedule a Pretrial Conference.

D.Colo., 2014
Dawson v. Audet
Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4947315 (D.Colo.)
**(Cite as: 2014 WL 4947315 (D.Colo.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 4385410 (S.D.Cal.)
**(Cite as: 2014 WL 4385410 (S.D.Cal.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. California.
Ruben GARCIA, Plaintiff,
v.
D. STRAYHORN, et al., Defendants.

No. 13–CV–807–BEN (KSC).
Signed Sept. 3, 2014.

Ruben Dario Garcia, Jr., Corcoran, CA, pro se.

Stephen A. Aronis, Office of the Attorney General, San Diego, CA, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

ROGER T. BENITEZ, District Judge.

**\*1** Ruben Garcia, a state prisoner proceeding *pro se*, filed a civil rights Complaint pursuant to Title 42, United States Code, Section 1983, on April 3, 2013. [Doc. No. 1.] Plaintiff then filed a First Amended Complaint on May 13, 2013. [Doc. No. 3.] On June 6, 2013, this Court dismissed Plaintiff's First Amended Complaint *sua sponte* pursuant to Title 28, United States Code, Sections 1915(e) (2) and 1915A(b). Plaintiff was granted leave to amend in order to correct all of the deficiencies identified by the Court in his pleading. [Doc. No. 5, at pp. 6–7.] Plaintiff then filed a Second Amended Complaint on July 16, 2013. [Doc. No. 6.]

On September 23, 2013, this Court issued a second Order pursuant to Title 28, United States Code, Sections 1915(e)(2) and 1915A(b), dismissing some

but not all of the claims in the Second Amended Complaint. [Doc. No. 7.] In this Order, the Court dismissed Plaintiff's claims that Defendants conspired to violate his constitutional rights and violated his constitutional rights under the Equal Protection Clause of the Fourteenth Amendment. [Doc. No. 7, at pp. 3–4.] In addition, the District Court dismissed all of Plaintiffs claims based on supervisory liability against Defendants Franco, Reid, Hernandez, and Seibel for failure to state a claim. [Doc. No. 7, at p. 5.] The District Court also concluded Plaintiff failed to state a claim for retaliation against Defendant Stricklin. [Doc. No. 7, at p. 5.] These defendants were all terminated from the Court's docket. [Doc. No. 7, at p. 6.] However, the District Court concluded that Plaintiff sufficiently pled claims for retaliation against Defendants Strayhorn and Luna and ordered them to respond to the Second Amended Complaint. [Doc. No. 7, at p. 6–7.]

Currently before the Court is Defendants' Motion to Dismiss the Second Amended Complaint pursuant to Federal Rule 12(b)(6) for failure to state a claim. [Doc. No. 15.] In their Motion to Dismiss, Defendants seek an order dismissing Plaintiff's retaliation claims against remaining defendants Strayhorn and Luna for failure to state a claim, without leave to amend. [Doc. No. 15, at p. 10.] Plaintiff has filed an Opposition to the Motion [Doc. No. 19] and Defendants filed a Reply [Doc. No. 20]. For the reasons outlined below, the Court finds that Defendants' Motion to Dismiss for failure to state a claim must be **GRANTED** in part and **DENIED** in part.

#### I. Background

Plaintiff is housed at the Richard J. Donovan Correctional Facility in San Diego (RJDCF). [Doc. No. 6, at p. 1; Doc. No. 19, at p. 1.] In the operative Second Amended Complaint, Plaintiff describes two separate incidents on October 24, 2011 and April 26,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4385410 (S.D.Cal.)
**(Cite as: 2014 WL 4385410 (S.D.Cal.))**

2012 that serve as the basis for his retaliation claims against Strayhorn and Luna. [Doc. No. 6, at pp. 5–19.] The following facts are drawn from Plaintiff's allegations in the Second Amended Complaint. The Court makes no findings of fact.

### A. October 24, 2011 Incident

**\*2** Plaintiff alleges that on October 24, 2011, he had authority and a written pass to attend a pre-scheduled appointment with an optometry specialist at RJDCF. After the appointment, he was escorted by security personnel back to his housing unit and then released to return to his cell. [Doc. No. 6, at p. 5.] While he was on his way, Plaintiff told another inmate: "[D]on't worry. I just came from TTA and [another inmate named Jimenez] just finished a[n] interview regarding a six-o-two against Strayhorn ... all this stuff is catching up with him...." [Doc. No. 6, at p. 5.] [FN1] Strayhorn, who was standing nearby, stated: "[You're] p.c. so ain't nobody worry about you!" [Doc. No. 6, at p. 5.] Plaintiff claims that "p.c." is "prison lingo" and is used by inmates and prison staff to identify an inmate as a "jail house informant." [Doc. No. 6, at p. 6 n. 3.] Plaintiff alleges that "a large number of inmates" overheard this remark. [Doc. No. 6, at p. 5.] According to Plaintiff, this remark threatened his safety and security because inmates identified as a "jail house informant" are targeted by other inmates for "assault, systematic abuse, or even death." [Doc. No. 6, at p. 6 n. 3.]

> FN1. "Six-o-two" is allegedly "prison lingo" used to refer to an inmate-generated grievance filed using a CDC–602 Inmate Appeal/Grievance Form. [Doc. No. 6, at p. 5, n. 2.]

In response to Strayhorn's "p.c." remark, Plaintiff said, "If you want to give me a direct order ... I will gladly follow such orders ... other than that we don't need to speak to each other, this is why you get six-o-two ..." [Doc. No. 6, at p. 6.] Plaintiff stated that, "I'm six-o-twoing you." [Doc. No. 6, at p. 6.] Stray-

horn ordered Plaintiff to return to his housing unit, and Plaintiff complied, but Strayhorn proceeded to "direct a [barrage] of derogatory verbal obscenities at the plaintiff." [Doc. No. 6, at pp. 6–7.] Specifically, Plaintiff alleges that Strayhorn stated: "You punk bitch don't get it ... you six-o-two me and you gonna make me fuck you-up! ... I'm not like others you six-o-two ... you hear!! ... coward, p.c, scary bird ... Try me bitch, Try me bitch!!, Try me bitch!!! ... I know you hear me!!! ... Try me bitch!! !" [FN2] [Doc. No. 6, at p. 7.] Plaintiff further alleges that Strayhorn left his post to make these remarks and that his conduct could not have had any legitimate penological interest. [Doc. No. 6, at p. 7 n. 4.]

> FN2. The Court notes that "verbal harassment" and "vulgar language" directed at an inmate by prison staff is generally not a constitutional violation. *Keenan v. Hall,* 83 F.3d 1083, 1092 (9th Cir.1996).

Next, Plaintiff alleges that Strayhorn walked fast to catch up to him as he continued on his way toward his housing unit. Strayhorn then stepped in front of Plaintiff, stopped him, and continued to "vent his anger" at Plaintiff with offensive remarks. [Doc. No. 6, at p. 7.] During this time, Luna arrived in the area, and Plaintiff "verbally expressed" to Luna his intent to file "a grievance with the CDCR to report defendant D. Strayhon [sic] illegal acts and violation of his civil rights." [Doc. No. 6, at p. 7.] In response, Luna allegedly said: "[Y]ou file against my officer and I'll lock you up in Administrative Segregation...." [Doc. No. 6, at p. 8.] Plaintiff said he intended to file a grievance to report "their serious acts of misconduct" regardless of any retaliatory or punitive acts which Luna and Strayhorn had already taken or planned to take against him. [Doc. No. 6, at p. 8.]

**\*3** After these events, Plaintiff alleges that Strayhorn filed retaliatory disciplinary charges against him. [Doc. No. 6, at p. 8.] In these disciplinary charges, Strayhorn said that Plaintiff verbally threat-

Slip Copy, 2014 WL 4385410 (S.D.Cal.)
**(Cite as: 2014 WL 4385410 (S.D.Cal.))**

ened his safety and, as a result, he had to be placed in handcuffs. Strayhorn also claimed that Plaintiff stated that he was going to report him for use of excessive force. [Doc. No. 6, at p. 8.] Plaintiff further alleges that Luna filed a "retaliatory" Incident Report to support Strayhorn's retaliatory disciplinary charges and to provide a "cover" for Strayhorn's "illegal acts." [Doc. No. 6, at p. 8.] Plaintiff then filed a Form 602 to report the violation of his civil rights by Strayhorn and Luna. [Doc. No. 6, at p. 9.]

### B. April 26, 2012 Incident

Plaintiff alleges that on April 26, 2012, he went to the medical clinic for a doctor's appointment and waited "outside" the inmate waiting area to be called in for his appointment. A short time after he arrived, Strayhorn approached him and instructed him to "turn around." [Doc. No. 6, at p. 9.] Plaintiff complied by turning around to face the wall behind him. He was then handcuffed by Strayhorn. [Doc. No. 6, at p. 9.] Plaintiff stood silently without moving, then was escorted by two other staff members to a gymnasium, where he was locked up "inside a cage." [Doc. No. 6, at p. 9–]

After this incident, Plaintiff alleges that Strayhorn generated and filed more retaliatory disciplinary charges against him. In part, a "Misconduct Report" charges that Plaintiff had "displayed a disregard to Title 15 Policy § 3005(a)" which requires inmates to refrain from behavior that might lead to violence or disorder, or which otherwise endangers the facility, and that he called Strayhorn a "child molester in green." [Doc. No. 6, at p. 10.] In response, Plaintiff filed a grievance (Form 602) claiming a violation of his civil rights. [Doc. No. 6, at p. 10.]

The Second Amended Complaint also generally alleges that Defendants had no legitimate penological interest for their conduct and that Defendants' conduct was the actual or proximate case of the deprivation of Plaintiff s constitutional rights. [Doc. No. 6, at p. 16.] As a result of Defendants' alleged misconduct, Plain-

tiff seeks both monetary and injunctive relief. [Doc. No. 6, at p. 20.] Plaintiff apparently believes the misconduct charges made by Strayhorn and Luna could be used against him in the future, as he seeks an injunction to prevent Strayhorn from using fabricated charges to have him placed in Administrative Segregation. [Doc. No. 6, at p. 20.]

### C. Exhibits Attached to the Second Amended Complaint

Plaintiff has incorporated by reference all exhibits attached to the Second Amended Complaint. [Doc. No. 6, at pp. 16, 18.] Listed in chronological order, these exhibits include copies of the following documents that are relevant to the allegations in the Second Amended Complaint:

*March 16, 2012* [Doc. No. 6, at pp. 43–44] (grievance on Form 602 by Plaintiff complaining that: (1) Strayhorn harassed him during a medical appointment on March 14, 2012; (2) Strayhorn has a "long history" of abusive treatment of Plaintiff and other inmates during medical appointments; (3) Strayhorn targets inmates because they file grievances against him; and (4) he was "currently awaiting a 3rd level response on a [Form] 602 to include c/o Strayhorn");

**\*4** *April 15, 2012* [Doc. No. 6, at p. 45] (Inmate Request (Form CDCR 22) inquiring about status of Form 602 submitted by Plaintiff on March 16, 2012 in which he reported "serious misconduct" by Strayhorn that occurred on March 14, 2012);

*April 29, 2012* [Doc. No. 6, at p. 48] (Inmate Request (Form CDCR 22) stating that Plaintiff filed two Form 602s reporting Strayhorn for harassment and that in retaliation Strayhorn cancelled two of Plaintiff's medical appointments and worked with other staff to perpetrate "lies, fabrications & false reports" seeking to have him placed in Administrative Segregation);

Slip Copy, 2014 WL 4385410 (S.D.Cal.)
**(Cite as: 2014 WL 4385410 (S.D.Cal.))**

*May 1.2012* [Doc. No. 6, at p. 50] (Inmate Request (Form CDCR 22) repeating statements made on Form CDCR 22 dated April 29, 2012, described above);

*May 4, 2012* [Doc. No. 6, at p. 46] (Inmate Request (Form CDCR 22) requesting status of Form 602 submitted on March 16, 2012 in which he reported "serious acts of misconduct" by Strayhorn);

*August 2, 2012* [Doc. No. 6, at pp. 61–62] (Inmate Request (Form CDCR 22) reporting that on July 25, 2012, he went to the medical clinic for an appointment and handed his appointment form to Strayhorn, but Strayhorn acted unethically by cancelling his appointment and noting that Strayhorn "has a history of retaliating against inmates that submit grievances");

Exhibits attached to the Second Amended Complaint also include a letter from Plaintiff to the Office of Inspector General dated May 15, 2012 making a formal complaint against Strayhorn. [Doc. No. 6, at pp. 52–54.] In the letter, Plaintiff complains that Strayhorn "has been using his position and authority to systematically abuse inmates ... when they come into contact with him as they attend medical appointments at the facilities Medical Clinic." [Doc. No. 6, at p. 52.] The letter includes a number of examples of alleged abusive treatment of Plaintiff and other inmates by Strayhorn. [Doc. No. 6, at pp. 52–54.]

### D. Similar Grievances Against Strayhorn by Other Inmates

The Second Amended Complaint also alleges that Strayhorn's retaliatory conduct against Plaintiff is part of a larger pattern of retaliatory conduct by Strayhorn against a number of other inmates during the years he has worked as a security officer at the medical clinic. When inmates report to the medical clinic for services, Plaintiff alleges that Strayhorn routinely engages in retaliatory acts to punish inmates for filing grievances

against him to report his behavior. These alleged retaliatory acts include "physical altercations" or assaults, "false cancellations of inmate medical appointments," harassment, and threats. [Doc. No. 6, at p. 12–13.] According to Plaintiff, Strayhorn also routinely fabricates allegations to support disciplinary charges that he uses as a "calculated tactic" to "cover up" his illegal acts against inmates. [Doc. No. 6, at p, 13.] In support of these allegations, Plaintiff attached copies of other inmates' grievances about Strayhorn to the Second Amended Complaint. [Doc. No. 6, at pp. 21–41; 63–84.] He alleges that there are an unusually large number of disciplinary charges and misconduct reports generated by Strayhorn. [Doc. No. 6, at p. 14.] Plaintiff believes the exhibits and other prison records will support his claims against Strayhorn, because they will show an unusually "large volume" of inmate grievances, disciplinary charges, misconduct reports, incident reports, and altercations involving Strayhorn. [Doc. No. 6, at p. 14 .]

### II. Discussion

**\*5** In their Motion to Dismiss, Defendants seek dismissal of Plaintiff's retaliation allegations on the ground that Plaintiff has not pled sufficient facts against them based on the incidents from October 24, 2011 and April 26, 2012 to state viable claims for retaliation. Citing the sovereign immunity doctrine and the Eleventh Amendment, Defendants also seek dismissal of Plaintiff's claims for monetary damages to the extent they are being sought against them in their official capacity.

### A. Motion to Dismiss Standards.

A plaintiff's complaint must provide a "short and plain statement of the claim showing that [he] is entitled to relief." *Johnson v. Riverside Healthcare Sys., LP,* 534 F.3d 1116, 1122 (9th Cir.2008) [hereinafter *Riverside* ] (citing FED. R. CIV. P. 8(a)(2)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what ... the claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4385410 (S.D.Cal.)
**(Cite as: 2014 WL 4385410 (S.D.Cal.))**

(2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

A motion to dismiss under Federal Rule 12(b)(6) may be based on either a " 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.' " *Riverside,* 534 F.3d at 1121–22 (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990)). A motion to dismiss should be granted if the plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson,* 551 U.S. at 94. However, it is not necessary for the Court "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.

On the other hand, "[a] document filed *pro se* is 'to be liberally construed,' [citation omitted] and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers....' " *Erickson,* 551 U.S. at 94. Particularly in civil rights cases, courts have an obligation to construe the pleadings liberally and to afford the plaintiff the benefit of any doubt. *Bretz v. Kelman,* 773 F.2d 1026, 1027 n. 1 (9th Cir.1985).

**B. First Amendment Retaliation Claims Under Section 1983.**

**\*6** Section 1983 does not create any substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by governmental officials." *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir.2002). "To prove a case under section 1983, the plaintiff must demonstrate that (1) the action occurred 'under color of state law' and (2) the action resulted in the deprivation of a constitutional right or federal statutory right." *Id.*

Although incarceration results in the "necessary withdrawal or limitation of many privileges and rights, ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson,* 408 F.3d 559, 567–568 (9th Cir.2005). "[P]risoners have a First Amendment right to file prison grievances. [Citations omitted.] Retaliation against prisoners for their exercise of this right is itself a constitutional violation, and prohibited as a matter of 'clearly established law.' " *Brodheim v. Cry,* 584 F.3d 1262, 1269 (9th Cir.2009).

*1. Protected Speech.*

Defendants contend that Plaintiff has failed to state a claim against them for retaliation based on the incidents that allegedly took place on October 24, 2011, because he has not identified any protected speech that could have resulted in retaliation against him. Defendants also argue that Plaintiff's verbal threats or promises on October 24, 2011 indicating he intended to file a prison grievance or a "six-o-two" do not constitute speech that is protected by the First

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4385410 (S.D.Cal.)
**(Cite as: 2014 WL 4385410 (S.D.Cal.))**

Amendment. [Doc. No. 15–1, at pp. 7, 9.] This Court disagrees.

Review of current caselaw indicates that an inmate's threat to file a prison grievance constitutes protected speech. In *Gifford v. Atchison, Topeka and Santa Fe Ry. Co.,* 685 F.2d 1149 (9th Cir.1982), in the context of an employee's claim of discrimination in retaliation for the employee's participation in First Amendment activity, the Ninth Circuit stated as follows in a footnote: "We see no legal distinction to be made between the filing of a charge which is clearly protected, [citation omitted], and threatening to file a charge." *Id.* at 1156 n. 3. More recently, in the context of prisoner civil rights actions under Section 1983, a number of courts have concluded that verbal statements made by an inmate that essentially constitute a grievance, or that indicate an intent to file a formal written grievance, are protected by the First Amendment. *See, e.g., Pearson v. Welborn,* 471 F.3d 732, 741 (7th Cir.2006) (declining to hold that "legitimate complaints by a prisoner lose their protected status simply because they are spoken"); *West v. Dizon,* No. 2:12–cv–1293, 2014 WL 794335, at *5–6 (E.D.Cal. Feb.27, 2014) (stating that protected speech includes an inmate's verbal expression of an intent to submit a formal written grievance); *Hackworth v. Torres,* No. 1:06–cv–773, 2011 WL 1811035, at *1, 6 (E.D.Cal. May 12, 2011) (rejecting defendant's argument that an inmate's verbal objections to a prison policy during a housing classification committee meeting with prison staff was not protected by the First Amendment because the inmate had not filed a written grievance prior to the meeting); *Conkleton v. Muro,* No. 08–cv–2612, 2011 WL 1119869, at *3 (D.Colo. Mar.28, 2011) (finding that the inmate's "verbal articulation" of "an intent to file a grievance" is protected activity); *Uribe v. McKesson,* No. 08–cv–1285, 2011 WL 9640, at *12 (E.D.Cal. Jan.3, 2011) (concluding that an inmate's attempt to report a prison official's misconduct, either "verbally or in writing, constitutes speech or conduct entitled to First Amendment protection"); *Carter v. Dolce,* 647

F.Supp.2d 826, 834 (E.D.Mich. Aug.19, 2009) (concluding that an inmate's statement of intent to file a written grievance is protected by the First Amendment and stating that "[o]nce a prisoner makes clear his intention to resort to official channels to seek a remedy for ill treatment by a prison employee, retaliation against the prisoner by that employee implicates all the policies intended to protect the exercise of a constitutional right").

**\*7** On the other hand, a number of district courts have found that verbal challenges to prison officials that are argumentative, confrontational, and disrespectful are not protected by the First Amendment. *See Johnson v. Carroll,* No. 2:08–cv–1494, 2012 WL 2069561 at *33–34 (E.D.Cal. June 7, 2012) (citing cases). In *Johnson v. Carroll,* the District Court rejected the inmate's argument that his verbal statements made to correctional officers incident to a strip search were protected speech, because the statements were argumentative, confrontational, disrespectful, and "laced with expletives." *Id.* at *34. According to the District Court, the inmate's "protected recourse for challenging [the strip search] ... was to file an administrative grievance." *Id.* The District Court therefore concluded that the plaintiff failed to state a First Amendment retaliation claim based on conduct by prison officials immediately after the search.

Here, Plaintiff alleges that on October 24, 2011, he told Strayhorn and Luna that he intended to file a formal written grievance to report Strayhorn's conduct. As alleged by Plaintiff, these statements were not argumentative, confrontational, or disrespectful. This Court finds persuasive the reasoning of the courts which have concluded that similar statements are protected by the First Amendment. Accordingly, the Court concludes that Plaintiff has sufficiently alleged that he engaged in protected speech on October 24, 2011 to survive a motion to dismiss.

With respect to the incident on April 26, 2012, Defendants argue that Plaintiff failed to identify or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4385410 (S.D.Cal.)
**(Cite as: 2014 WL 4385410 (S.D.Cal.))**

allege any act of protected speech that could have triggered Strayhorn to act in a retaliatory manner towards Plaintiff while he waited for his appointment at the medical clinic. [Doc. No. 15–1, at p. 9.] However, when the Second Amended Complaint is read liberally and as a whole, Plaintiff's allegations sufficiently identify protected speech that took place prior to the incident on April 26, 2012 that could have resulted in retaliatory acts by Strayhorn.

First, during the prior incident on October 24, 2011, Plaintiff told Strayhorn he intended to file a written grievance against him and, as outlined more fully above, this statement qualifies as protected speech. [Doc. No. 6, at p. 6.] Second, by the time of the incident on April 26, 2012, the Second Amended Complaint alleges that Plaintiff had filed a formal, written grievance against Strayhorn about the incident on October 24, 2011. [Doc. No. 6, at p. 9.] In addition, exhibits [FN3] attached to the Second Amended Complaint indicate that Plaintiff filed another grievance against Strayhorn on March 16, 2012, alleging he had been harassed during a different medical appointment on March 14, 2012. At this time, Plaintiff also alleged that Strayhorn has a "long history" of abusive treatment of Plaintiff and other inmates during medical appointments. [Doc. No. 6, at p. 44.] In short, the Second Amended Complaint includes allegations from which it could be inferred that Plaintiff engaged in protected speech prior to the alleged retaliatory acts that resulted from the incident on April 26, 2012.

> FN3. The Federal Rules of Civil Procedure provide as follows: "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed.R.Civ.P. 10(c). If the plaintiff has attached documents to a complaint, the District Court in considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim "is not limited by the allegations contained in the complaint. *Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th

Cir.1987). Exhibits attached to a complaint "may be considered" in determining the sufficiency of the pleading. *Id.*

**\*8** Based on the foregoing, Court finds that Plaintiff has sufficiently alleged he engaged in protected speech on or before October 24, 2011 and April 26, 2012 that could have triggered the alleged retaliatory acts by Defendants. Therefore, the Court finds that Defendants' Motion to Dismiss must be DENIED to the extent it seeks dismissal of Plaintiffs retaliation claims on the ground that Plaintiff did not allege he engaged in protected speech that could have resulted in retaliatory acts by Defendants.

**2. Adverse Action.**

Defendants argue that Plaintiff has failed to state a retaliation cause of action against them because he has not alleged any actions by Defendants that are adverse enough to support the finding of a constitutional violation. According to Defendants, Plaintiff's allegations are insufficient because he has not claimed that any rules violation report was issued against him, that he suffered any loss of privileges or discipline, or that he was ever placed in administrative segregation. [Doc. No. 15–1, at pp. 7–8, 9.]

"The adverse action need not be an independent constitutional violation." *Watison v. Carter,* 668 F.3d 1108, 1114 (9th Cir.2012). For example, an allegation by an inmate that he was transferred to another prison or placement because he engaged in protected conduct may state a cause of action for retaliation, even though the prisoner has no constitutionally-protected liberty interest in being held at or remaining at a particular facility. *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir.1995). Other actions that may be sufficiently adverse to state a cause of action for retaliation because of protected conduct include: arbitrarily confiscating and destroying an inmate's property and initiating a transfer to another prison ( *Rhodes,* 408 F.3d at 568)); placing an inmate in administrative segregation on false charges ( *Austin v. Terhune,* 367 F.3d 1167, 1171

Slip Copy, 2014 WL 4385410 (S.D.Cal.)
**(Cite as: 2014 WL 4385410 (S.D.Cal.))**

(9th Cir.2004)); validating an inmate as a gang member based on evidence previously deemed insufficient ( *Bruce v. Ylst,* 351 F.3d 1283, 1287–88 (9th Cir.2003)); filing a false disciplinary report ( *Hines v. Gomez,* 108 F.3d 265, 267–268 (9th Cir.1997)); and labeling an inmate a "snitch" in order to subject him to retribution by other inmates ( *Valandingham v. Bojorquez,* 866 F.2d 1135, 1138 (9th Cir.1989)).

Without more, a "mere threat" made to convince an inmate "to *refrain* from pursuing legal redress" is not enough to state a cause of action for retaliation. *Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir.1987) (emphasis added). On the other hand, a "mere *threat* " if made in retaliation for the filing of a prison grievance, "can be an adverse action, regardless of whether it is carried out" because "the threat itself can have a chilling effect ." *Brodheim,* 584 F.3d at 1270 (emphasis in original). The threat need not be explicit or specific. *Id.* In *Brodheim v. Cry,* for example, the inmate frequently filed prison grievances and a prison official responded to the inmate's formal, post-grievance request for an interview with a note stating that the inmate " 'should be 'careful' what he writes and requests in his administrative grievances." *Id.* at 1264. Although the prison official made no specific or explicit threat, the Ninth Circuit concluded that a reasonable fact finder could interpret the warning to imply that some form of punishment or adverse regulatory actions would follow if the inmate failed to comply. *Id.* at 1270. Based on the warning and other circumstantial evidence indicating the warning was indeed a threat, the Ninth Circuit reversed a factual finding that the inmate produced inadequate evidence of an adverse action. *Id.* at 1271.

**\*9** With respect to the incident on October 24, 2011, Plaintiff alleges he told Luna that he intended to report Strayhorn's conduct in a formal, written grievance. As outlined above, Plaintiff's verbal threat to file a written grievance constitutes protected speech. In response to this protected speech, Luna allegedly threatened to place Plaintiff in Administrative Segre-

gation if he filed a grievance against Strayhorn. [Doc. No. 6, at pp. 7–8.] Despite Defendants' argument to the contrary, it is not legally significant that Plaintiff failed to allege that Luna actually carried out the threat to place him in Administrative Segregation. Therefore, Plaintiff has sufficiently alleged that Luna took an adverse action against him.

Plaintiff's allegations that Strayhorn twice filed "retaliatory disciplinary charges against him" in connection with the incidents on October 24, 2011 and April 26, 2012 [Doc. No. 6, at pp. 8, 10] are also sufficient to constitute adverse actions. In *Nines v. Gomez,* the Ninth Circuit upheld a jury's verdict that a prison official retaliated against an inmate by filing a "false" disciplinary report. *Hines,* 108 F.3d at 267–268. From Plaintiff's allegation that the disciplinary charges filed against him by Strayhorn were "retaliatory," [Doc. No. 6, at pp. 8, 10], and that Strayhorn routinely fabricates allegations to support disciplinary charges that he uses as a "calculated tactic" to "cover up" his illegal acts against inmates, [Doc. No. 6, at p. 13], it can reasonably be inferred that Plaintiff contends the charges were false. Therefore, the Court finds that Plaintiff's allegations are sufficient. Defendants' Motion to Dismiss is **DENIED** to the extent it seeks dismissal of Plaintiff's retaliation claims on the ground that Plaintiff failed to sufficiently allege that Defendants took adverse actions against him.

### 3. Causation.
In their Motion to Dismiss, Defendants contend that Plaintiff failed to plead any facts to satisfy the element of causation. According to Defendants, Plaintiff has not alleged any facts that could show that his protected conduct was the motivation underlying Defendants' alleged acts of filing "retaliatory" disciplinary reports against him. For example, Defendants argue that Plaintiff did not allege that Strayhorn "ever learned that [Plaintiff] actually submitted an administrative grievance...." [Doc. No. 15–1, at p. 9–10.]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4385410 (S.D.Cal.)
(Cite as: 2014 WL 4385410 (S.D.Cal.))

The causation element of a First Amendment retaliation claim requires the inmate plaintiff to show that protected conduct was the substantial or motivating factor underlying the defendant's adverse action. *Brodheim,* 584 F.3d at 1271. "Recognizing that the ultimate fact of retaliation for the exercise of a constitutionally protected right rarely can be supported with direct evidence of intent that can be pleaded in a complaint, [citation omitted], courts have found sufficient complaints that allege a chronology of events from which retaliation may be inferred." *Murphy v. Lane,* 833 F.2d 106, 108 (7th Cir.1987) (quoting *Benson v. Cady,* 761 F.2d 335, 342 (7th Cir.1985)). "[T]iming can properly be considered as circumstantial evidence of retaliatory intent." *Pratt,* 65 F.3d at 808. On the other hand, timing alone is generally not enough to support an inference that prison officials took an adverse action against a prisoner in retaliation for the prisoner's participation in protected conduct. *See id.* In *Pratt v. Rowland,* for example, the Ninth Circuit concluded that suspicious timing of an adverse action was not enough to establish causation, because there was nothing to indicate the defendant was "actually aware" of the prisoner's protected conduct. *Id.*

**\*10** By contrast, the Ninth Circuit in *Hines v. Gomez* agreed there was an evidentiary basis for the jury to find that a prison official filed a disciplinary report with a retaliatory motive. *Hines,* 108 F.3d at 267. The defendant contended that there was no proof that the defendant knew that the inmate had used the prison grievance system. *Id.* at 267–68. The Ninth Circuit noted that prison officials were aware of the inmate's reputation for "complaining" or "whining," and that the defendant had been told by the inmate on the morning of the incident giving rise to the Section 1983 action that the inmate intended to file a grievance. *Id.* at 268. The *Hines* Court concluded that the evidence "amply support[ed]" the inference that the defendant knew, at least to some extent, of the inmate's use of the grievance system. *Id.*

Although Plaintiff does not specifically allege a causal connection between his protected conduct and the alleged adverse actions, he has pled a chronology of events from which a reasonable trier of fact could infer that Defendants' actions against him were retaliatory. First, the timing of the alleged adverse actions qualify as suspicious because they either took place a short time after protected conduct, or as part of a larger pattern of similar conduct that took place over time. Second, Plaintiff alleges he told both Strayhorn and Luna that he intended to file a formal, written grievance reporting Strayhorn's "serious acts of misconduct ." [Doc. No. 6, at p. 7–8.] Because of the timing of the alleged events and because Plaintiff claims that he told both defendants he intended to file prison grievances, a reasonable trier of fact could conclude there is circumstantial evidence to show Defendants were aware of Plaintiff's use of the prison grievance system and were therefore motivated to retaliate.

In addition, Plaintiff has alleged that Strayhorn routinely engages in retaliatory acts to punish inmates for filing grievances to report his behavior. He has attached similar claims as exhibits to the Second Amended Complaint, and has alleged that prison records will show an unusually "large volume" of inmate grievances, disciplinary charges, misconduct reports, incident reports, and altercations involving Strayhorn. [Doc. No. 6, at p. 14.] These allegations, if proven, would further support an inference that Plaintiff's protected conduct was the substantial or motivating factor underlying adverse actions taken by Strayhorn against Plaintiff.

Based on the foregoing, the Court finds that Plaintiff's causation allegations are sufficient when the Second Amended Complaint is read liberally and as a whole. Therefore, Defendants' Motion to Dismiss must be DENIED to the extent it seeks dismissal of Plaintiff's retaliation claims on the ground that Plaintiff failed to plead facts to show that his protected conduct was the substantial or motivating factor underlying adverse actions taken against him by De-

Slip Copy, 2014 WL 4385410 (S.D.Cal.)
**(Cite as: 2014 WL 4385410 (S.D.Cal.))**

fendants.

#### 4. Chilling Effect or Other Harm.

**\*11** Defendants' Motion to Dismiss argues that Plaintiff has failed to allege that any actions by them had any harmful or chilling effect on his protected conduct. As examples, Defendants argue that Plaintiff has not alleged that he was deterred in any way from filing grievances or that he suffered any other harm or adverse consequences, such as discipline or placement in administrative segregation, as a result of the misconduct reports filed against him by Defendants.

[A]n objective standard governs the chilling inquiry; a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill *or* silence a person of ordinary firmness from future First Amendment activities.' [Citations omitted.] To hold otherwise 'would be unjust' as it would 'allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.' [Citation omitted.]

*Brodheim,* 584 F.3d at 1271. " '[S]ince harm that is more than minimal will almost always have a chilling effect[, a]lleging harm *and* alleging the chilling effect would seem under the circumstances to be no more than a nicety." *Id.* at 1270 (quoting *Rhodes v. Robinson,* 408 F.3d at 568 n. 11).

Here, Plaintiff's allegations are sufficient because it can be inferred that having a false misconduct report placed in the prison's records and the accompanying threat of future consequences would discourage an ordinary person from filing any further grievances. The Court therefore finds that Plaintiff sufficiently pled a "chilling effect." As a result, Defendants' Motion to Dismiss must be **DENIED** to the extent it seeks dismissal of Plaintiff's retaliation claims for failure to plead facts to establish that Defendants' action chilled

the exercise of his First Amendment rights.

#### 5. Legitimate Penological Interest.

"[A] successful retaliation claim requires a finding that 'the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals.' [citation omitted.]" *Pratt,* 65 F.3d at 806. "The plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Id.* At the pleading stage, it is sufficient for an inmate to allege that a prison official's actions were retaliatory and were "arbitrary and capricious" or "that they were 'unnecessary to the maintenance of order in the institution.' " *Watison,* 668 F.3d at 1114–15. In *Watison v. Carter,* the Ninth Circuit concluded the inmate implicitly pled the absence of a legitimate penological reason for the alleged adverse actions by claiming that, in retaliation for his filing of prison grievances, the defendant prison officials filed a "*false* disciplinary complaint;" made "*false* statements to the parole board;" and threatened to punch the inmate. *Id.* at 1115–1116 (emphasis in original).

**\*12** Defendants do not argue that Plaintiff's retaliation claims should be dismissed because he failed to allege that Defendants' action did not advance legitimate correctional goals. The Court notes that Plaintiff has only alleged in summary fashion that Defendants' retaliatory actions did not serve legitimate penological goals. However, Plaintiff has implicitly pled this element. From the allegations in the Second Amended Complaint, it can be inferred that Plaintiff contends that Defendants filed "false" misconduct charges against him which could not serve any legitimate penological goal. [Doc. No. 6, at pp. 8, 10, 13.]

#### C. Sovereign Immunity.

Defendants contend that Plaintiff has sued them for monetary damages in their official capacities but the Eleventh Amendment does not permit damages

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

claims against state officers in their official capacities. As a result, they seek dismissal of these claims under the Eleventh Amendment. A review of the Second Amended Complaint reveals that Strayhorn and Luna were sued in their individual capacities and in their official capacities. [Doc. No. 6, at p. 2.] Plaintiff seeks $250,000 in damages and $250,000 in punitive damages. [Doc. No. 6, at p. 20.]

The Eleventh Amendment prohibits damage actions against state officials acting in their official capacities. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 & n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Pena v. Gardner,* 976 F.2d 469, 472 (9th Cir.1992). However, the Eleventh Amendment does not bar actions against state officers in their personal capacities. *Pena,* 976 F.2d at 472–473.

Based on the foregoing, the Eleventh Amendment bars Plaintiff from seeking money damages against Defendants in their official capacities. In addition, there is no possibility that Plaintiff could can amend his Second Amended Complaint to plead facts sufficient to overcome the Eleventh Amendment bar to a suit for money damages against a state actor in his official capacity. *See Silva v. Di Vittorio,* 658 F.3d 1090, 1105 (9th Cir.2011) (stating that a district court should grant a pro se plaintiff leave to amend "even if no request to amend the pleading was made, unless it determines that the pleading could not possible be cured by the allegation of other facts"). Accordingly, the Court finds that Plaintiff's claims for money damages against Defendants in their official capacities must be **DISMISSED** with prejudice and without leave to amend.

### III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Complaint is **GRANTED** in part and **DENIED** in part as follows:

1. Defendants' Motion to Dismiss is **GRANTED**

to the extent it seeks dismissal of Plaintiff's claims for monetary damages based on the Eleventh Amendment. Plaintiff's claims against Defendants for monetary damages in their official capacities are **DISMISSED** with prejudice and without leave to amend.

2. Defendants' Motion to Dismiss is **DENIED** to the extent it seeks dismissal of Plaintiff's retaliation claims against Strayhorn and Luna.

**\*13 IT IS SO ORDERED.**

S.D.Cal.,2014.
Garcia v. Strayhorn
Slip Copy, 2014 WL 4385410 (S.D.Cal.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony G. GILL, Plaintiff,
v.
Kathleen FRAWLEY, R.N., Elmira C.F.; Charlie
Peet, Correction Officer, Elmira C.F.; and S. Grau-
bard, Inmate Grievance Program Supervisor, Elmira
C.F., Defendants.

No. 9:02-CV-1380.
June 22, 2006.

Anthony G. Gill, Comstock, NY, Plaintiff, Pro Se.

Eliot L. Spitzer, Attorney General for the State of New
York, Senta B. Siuda, Esq., Assistant Attorney Gen-
eral, Syracuse, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** This *pro se* civil rights complaint pursuant to
42 U.S.C. § 1983 was referred to the Honorable
George H. Lowe, United States Magistrate Judge, for
a Report-Recommendation pursuant to 28 U.S.C. §
636(b) and Local Rule N.D.N.Y. 72.3(c).

The Report-Recommendation dated May 9, 2006
recommended that Defendants' motion for summary
judgment be granted. The Plaintiff filed objections to
the Report-Recommendation, essentially raising the
same arguments presented to the Magistrate Judge.

When objections to a magistrate judge's Re-
port-Recommendation are lodged, the Court makes a
"*de novo* determination of those portions of the report

or specified proposed findings or recommendations to
which objection is made." *See* 28 U.S.C. § 636(b)(1).
After such a review, the Court may "accept, reject, or
modify, in whole or in part, the findings or recom-
mendations made by the magistrate judge. The judge
may also receive further evidence or recommit the
matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in Plaintiff's objections,
this Court has determined to accept and adopt the
recommendation of Magistrate Judge Lowe for the
reasons stated in the Report-Recommendation.

It is therefore

**ORDERED** that Defendants' motion for sum-
mary judgment is **GRANTED** and Plaintiff's com-
plaint is **DISMISSED** in its entirety. The Clerk of the
Court shall close the file in this matter.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter has been referred to me for Report
and Recommendation by the Honorable Thomas J.
McAvoy, Senior United States District Judge, pursu-
ant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y.
72.3(c). In this *pro se* civil rights complaint brought
under 42 U.S.C. § 1983, Inmate Anthony G. Gill
("Plaintiff") alleges that Elmira Correctional Facility
("Elmira C.F.") Nurse Kathleen Frawley, Elmira C.F.
Correction Officer ("C.O.") Charlie Peet, and Elmira
C.F. Inmate Grievance Program Supervisor Sheryl
Graubard (collectively "Defendants") violated his
rights under the First, Eighth, and Fourteenth
Amendments when (1) on April 23, 2002, Defendants
Frawley and Peet recklessly and without cause con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

fiscated Plaintiff's medically authorized custom-made arch supports with metal inserts, and subsequently lost or destroyed those arch supports, and (2) at some point between April 29, 2002, and July 12, 2002, Defendant Graubard failed to file, process and hold a hearing on Plaintiff's April 29, 2002, grievance against Defendants Frawley and Peet regarding those arch supports. (Dkt. No. 1.)

Currently before the Court is Defendants' motion for summary judgment. (Dkt. No. 55.) Generally, Defendants' motion raises the following four issues: (1) whether Plaintiff has failed to establish (or even state) a claim against Defendant Graubard under the First and/or Fourteenth Amendments for improperly handling his grievance; (2) whether Plaintiff has failed to establish (or even state) a claim against Defendants Frawley and Peet under the Eighth Amendment for deliberate indifference to a serious medical need; (3) whether Plaintiff has failed to exhaust his administrative remedies with regard to his claim under the Eighth Amendment that Defendants Frawley and Peet improperly confiscated his arch supports; and (4) whether Defendants are entitled to qualified immunity. (Dkt. No. 55, Part 6 [Defs.' Mem. of Law].)

**\*2** For the reasons discussed below, I answer the first two questions in the affirmative (and thus do not have to reach the second two questions). As a result, I recommend that Defendants' motion for summary judgment be granted.

## I. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,*

118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00 Civ. 0275, 2004 WL 1125177, \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings and papers, and a civil rights plaintiff's pleadings and papers. *See Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision). For example, where a civil rights plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted].

Moreover, "there are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded such special solicitude." *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at \*19 & n. 10 (N.D.N.Y. March 31, 2005) (Treece, M.J.) (plaintiff had filed 20 lawsuits in the Northern District alone); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at \*7 & n. 3 (N.D.N.Y. March 31, 2005) (Treece, M.J.) (plaintiff had filed 20 lawsuits in Northern District alone).[FN2] I note that, in such cases, the overly litigious inmate is not subjected to a heightened pleading requirement, only denied the leniency normally afforded to *pro se* litigants and civil rights litigants.

FN2. *See also Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (declining to afford a *pro se*

civil rights inmate the sort of lenient treatment normally afforded *pro se* civil rights litigants, because the inmate was "an extremely litigious inmate who is quite familiar with the legal system and with pleading requirements," who at one point had at least 30 simultaneously pending lawsuits); *Johnson v. Eggersdorf,* 97-CV-0938, Report-Recommendation, at 1, n. 1 (N.D.N.Y. Apr. 28, 1999) (Smith, M.J.) (denying leniency to *pro se* civil rights inmate who at one point had 12 simultaneously pending lawsuits in Northern District), *adopted,* 97-CV-0938, Decision and Order (N.D.N.Y. May 28, 1999) (Kahn, J.), *aff'd,* 8 Fed. Appx. 140 (2d Cir. May 17, 2001) (unpublished opinion); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000) (applying *Davidson* to *pro se* civil rights inmate who had 10 suits pending in district); *Brown v. Selsky,* 93-CV-0268, 1995 U.S. Dist. LEXIS 213, at \*2, n. 1 (W.D.N.Y. Jan. 10, 1995) (denying leniency to *pro se* civil rights inmate who had seven cases pending in district); *but see McFadden v. Goord,* 04-CV-0799, 2006 WL 681237, at \*1, n. 3 (N.D.N.Y. March 14, 2006) (Kahn. J.) (refusing to deny leniency to *pro se* civil rights inmate, despite fact that he had seven cases pending in other districts in mid-1990s).

Here, the circumstances warrant denying Plaintiff the leniency normally afforded to *pro se* civil rights litigants, for the reasons stated by Defendants in their Memorandum of Law. (Dkt. No. 55, Part 6, at 2-4 [Defs.' Mem. of Law].) Most notably, the Second Circuit has recognized Plaintiff as "no stranger either to the grievance system or to the federal courts." *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). Furthermore, this Court recently denied Plaintiff the leniency normally afforded to *pro se* civil rights litigants. *Gill v. Riddick,* 03-CV-1436, 2005 U.S. Dist. LEXIS 5374, at \*7 & note 3 (N.D.N.Y. March 31,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
(Cite as: 2006 WL 1742738 (N.D.N.Y.))

2005) (Treece, M.J.) (listing 20 cases filed by Mr. Gill in this District alone). I would add only that, in addition to the 20 or more cases that Plaintiff has filed in this District, Plaintiff has filed at least five other cases in the Southern District of New York.[FN3]

> FN3. See Gill v. DeFrank, No. 00-0235, 2001 U.S.App. LEXIS 7103 (2d Cir. Apr. 16, 2001) (affirming order of U.S. District Court for Southern District of New York granting summary judgment to defendants); Gill v. Jones, 95-CV-9031, 2001 U.S. Dist. LEXIS 17674 (S.D.N.Y. Oct. 31, 2001) (granting defendants' motion for summary judgment); Gill v. Bracey, 99-CV-10429, 2001 U.S. Dist. LEXIS 9875 (S.D.N.Y. July 11, 2001) (granting defendants' motion for summary judgment); Gill v. PACT Org., 95-CV-4510, 1997 U.S. Dist. LEXIS 13063 (S.D.N.Y. Aug. 28, 1997) (granting defendants' motion for summary judgment); Gill v. Gilder, 95-CV-7933, 1997 U.S. Dist. LEXIS 1236 (S.D.N.Y. Feb. 10, 1997) (granting defendants' motion for summary judgment).

Based on a cursory review of these cases, it appears that Plaintiff currently has two "strikes" pending against him for purposes of 28 U.S.C. § 1915(g)'s "three strikes rule." See Gill v. DeFrank, 8 Fed. Appx. 35 (2d Cir.2001) (affirming district court's grant of summary judgment to defendants); Gill v. Pflueger, 02-CV-0130, Report-Recommendation (N.D.N.Y. Nov. 14, 2002) (DiBianco, M.J.) (recommending that district judge grant defendants' motion to dismiss for failure to state a claim), adopted by Order (N.D.N.Y. Jan. 30, 2003) (Hurd, J.).

## II. STATEMENT OF MATERIAL FACTS

**\*4** The facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [FN4] and are not specifically controverted by the non-movant.[FN5] A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN6] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN7]

> FN4. See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; see, e.g ., Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the properly supported facts contained in the defendants' 7.1 statement.") [emphasis added].

> FN5. See Local Rule 7.1(a)(3) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.").

> FN6. See Amnesty Am. v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); accord, Lee v. Alfonso, No. 04-1921, 2004

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN7. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." FN8 An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.FN9 In addition, such an affidavit (or verified complaint) must not be conclusory.FN10 An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general.FN11 Moreover, "[a]n affidavit must not present legal arguments." FN12

FN8. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom., Ferrante v. U.S.,* 516 U.S. 806 (1995).

FN9. *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. N.D.N.Y. L.R. 7.1(a)(2).

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN13]

FN13. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

While I apply these legal principles below in the Analysis section of this Report-Recommendation (to the extent necessary), I pause to make three general observations. First, Defendants' Rule 7.1 Statement is very brief. (Dkt. No. 55, Part 3.) Second, Plaintiff's Rule 7.1 Response violates Local Rule 7.1(a)(3) by not mirroring Defendants' Rule 7.1 Statement in matching numbered paragraphs, and by often not setting forth a specific citation to the record where an (alleged) factual issue arises. (Dkt. No. 58 [attaching document entitled "Plaintiff's Affirmation / 7.1(e) Statement"].) Third, although Plaintiff's Complaint is verified, several paragraphs of that Verified Complaint are made on "information and belief." (Dkt. No. 1, Attached "Statement of Facts," ¶¶ 4, 5, 21, 27, & n. 1, 3.)

### III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a Claim Against Defendant Graubard Under the First and/or Fourteenth Amendments for Improperly Handling His Grievance

Plaintiff asserts the following allegations against Defendant Graubard: (1) that, during the days and weeks following the filing of Plaintiff's grievance against Defendants Frawley and Peet on April 29, 2002 (regarding their confiscation of Plaintiff's arch supports on April 23, 2002), Defendant Graubard

failed to "process," and hold a hearing on, that grievance, and (2) that, at some point, between April 29, 2002, and July 12, 2002 (when Defendant Graubard wrote a memorandum to Plaintiff stating that she could find no such grievance at Elmira C.F.), Defendant Graubard destroyed or lost that grievance, claiming on July 12, 2002 that it had never been filed.[FN14] Plaintiff alleges that, through these actions, Defendant Graubard "violated plaintiff ['s] [rights under the] 1st and 14th Amendment of the U.S. Constitution [and] DOCS' Directive 4040." [FN15]

> **FN14.** (Dkt. No. 1, Attached "Statement of Facts," ¶¶ 19, 26, 30, 31, n. 4, & Exs. G, H [Plf.'s Compl.].)

> **FN15.** (Dkt. No. 1, Attached "Statement of Facts," ¶ 31 [Plf.'s Compl.].)

**\*5** Defendants argue that Plaintiff has failed to establish (or even state) a claim against Defendant Graubard under the First or Fourteenth Amendments with regard to the handling of Plaintiff's (alleged) April 23, 2002 grievance, because, even if Defendant Graubard failed to comply with New York State grievance procedures (as set forth in DOCS Directive No. 4040), such a failure would not constitute a violation of the First or Fourteenth Amendments. [FN16]

> **FN16.** (Dkt. No. 55, Part 6 at 6-7 [Def.'s Mem. of Law].)

Plaintiff fails to respond to this argument.[FN17] Defendants are correct to the extent that they argue that, by failing to respond to Defendants' argument, Plaintiff may be deemed to have "consented" to that argument under Local Rule of Practice 7.1(b)(3).[FN18] However, Defendants are incorrect to the extent they argue that this failure by Plaintiff *automatically* results in the dismissal of Plaintiff's First and Fourteenth Amendment claims against Defendant Graubard with regard to the handling of Plaintiff's (alleged) April 23,

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

2002 grievance.[FN19] As a threshold matter, of course, the Court must always determine whether a movant's legal argument has merit.[FN20] As a result, I must pass on the merits of Defendants' argument.

FN17. (Dkt. No. 58 [Plf.'s Response Papers].)

FN18. *See Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

FN19. (Dkt. No. 59, Part 1, ¶ 12 [Defs.' Reply

Affirm.].)

FN20. *See* Fed.R.Civ.P. 56(e) ("If the adverse party does not ... respond [with affidavits or other papers setting forth specific facts showing that there is a genuine issue for trial], summary judgment, *if appropriate,* shall be entered against the adverse party."); N.D.N.Y. L.R. 7.1(b)(3) (providing that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where* the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically.").

I agree with Defendants that the manner and timing in which grievances are *investigated* and *decided* (e.g., as set forth in DOCS Directive No. 4040) do not create a protected liberty interest.[FN21] (Indeed, I would add that the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation;[FN22] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive.[FN23]) Clearly, however, the right to *file* a prison grievance is protected by the First and Fourteenth Amendments .[FN24] Here, part of Plaintiff's claim against Defendant Graubard is that she interfered with Plaintiff's properly filed grievance, losing or destroying that grievance (and, in effect, rendering that grievance "not filed").

FN21. *See, e.g., Odom v. Poirier,* 99-CV-4933, 2004 U.S. Dist. LEXIS 25059,

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

at *35-38 (S.D.N.Y. Dec. 10, 2004) ("[T]he manner in which grievance investigations are conducted [as set forth in DOCS Directive No. 4040] do not create a protected liberty interest."); *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) ("The corrections officers' failure to properly address [plaintiff's] grievance by conducting a thorough investigation to his satisfaction does not create a cause of action for denial of due process because [plaintiff] was not deprived of a protected liberty interest."); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389, n. 3 (W.D.N.Y.1998) (dismissing claim in which inmate alleged that director of inmate grievance program "violated his 14th Amendment rights by lying and forging documents and by failing to conduct a fair and impartial investigation into grievances that [the inmate] filed against certain correction officers"); *Harris v. Keane,* 962 F.Supp. 397, 406 (S.D.N.Y.1997) ("[T]he prison regulations requiring that a grievance disposition be returned with 15 days does not create an interest to which due process rights attach.").

FN22. *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

FN23. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

FN24. *See United Mine Workers v. Illinois State Bar Ass'n,* 389 U . S. 217, 222 (1967) ("[T]he right[ ] to ... petition for a redress of grievances [is] among the most precious of the liberties safeguarded by the Bill of Rights."); *Morales v. Mackalm,* 278 F .3d 126, 131 (2d Cir.2002) ("Filing a grievance is protected activity."); *Graham v. Hender-*

*son,* 89 F.3d 75, 80 (2d Cir.1996) ("[Plaintiff's] filing of a grievance ... is constitutionally protected.... Retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); *Odom v. Poirier,* 99-CV-4933, 2004 U.S. Dist. LEXIS 25059, at *37 (S.D.N.Y. Dec. 10, 2004) ("[T]he filing of grievances is constitutionally protected...."); *Salahuddin v. Mead,* 95-CV-8581, 2002 U.S. Dist. LEXIS 15827, at *9 (S.D.N.Y. Aug. 26, 2002) ("Filing a grievance against a prison officer is protected by the First and Fourteenth Amendments of the U.S. Constitution.... Because filing a grievance is constitutionally protected, retaliation against prisoners who file grievances is actionable under § 1983."); *Walker v. Pataro,* 99-CV-4607, 2002 U.S. Dist. LEXIS 7067, at *60 (S.D.N.Y. Apr. 23, 2002) ("The law is clear that prison officials may not retaliate against an inmate for exercising his constitutional rights, including the right to file a prison grievance.").

However, Plaintiff's claim against Defendant Graubard for interfering with Plaintiff's right to file a grievance still fails because, to succeed on such a claim (whether it is asserted under the First or Fourteenth Amendments), Plaintiff must allege and establish that Defendant Graubard acted intentionally or deliberately; [FN25] and, here, no such allegation or evidence exists. Rather, *at most,* the evidence might indicate some neglect on the part of Defendant Graubard. However, negligence is not enough to give

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

rise to an action under Section 1983.[FN26]

> FN25. *See, e.g., Graham,* 89 F.3d at 80
> ("Intentional obstruction of a prisoner's right
> to seek redress of grievances is precisely the
> sort of oppression that section 1983 is in-
> tended to remedy.") [internal quotation
> marks, ellipses and citations omitted]. For
> example, to the extent that Plaintiff is alleg-
> ing that Defendant Graubard *retaliated*
> against Plaintiff (by losing or destroying
> Plaintiff's grievance) for Plaintiff having ex-
> ercised his First Amendment right to file a
> grievance, if Plaintiff does not allege and
> establish that Defendant Graubard was acting
> intentionally, he cannot meet the *causation*
> element of the three-part retaliation test, i.e.,
> that it was the filing of the grievance (and
> not, say, simple neglect or an excusable
> mistake) that *caused* Defendant Graubard to
> lose or destroy Plaintiff's grievance.

> FN26. *See Herrera v. Scully,* 815 F.Supp.
> 713, 726 (S.D.N.Y.1998) ("[E]ven if [the
> inmate's] allegations are held to support the
> claim that the Defendants acted negligently
> in violating the Directives [including DOCS
> Directive No. 4040], such negligent viola-
> tions of [that Directive] still does not give
> rise to a § 1983 cause of action] ).

For example, noticeably absent from this case is
any evidence (or even an allegation) that, during the
expiration of the 14-day time period in which Plaintiff
had to file his grievance, (1) Defendant Graubard
instructed Inmate Grievance Sergeant Volker or an
Inmate Grievance Clerk to represent to Plaintiff that
his grievance had been received and filed, and that a
hearing was imminent, or (2) Defendant Graubard
even knew that those two individuals had (allegedly)
been making such representations. Plaintiff does not
even expressly and non-conclusively allege that De-
fendant Graubard was *aware* that Plaintiff had filed a

grievance on April 29, 2002.

**\*6** The closest Plaintiff comes to alleging any
personal involvement of Defendant Graubard in the
apparent misunderstanding or mistake following the
apparent filing of Plaintiff's grievance on April 29,
2002 is when Plaintiff alleges, in an attachment to his
Complaint, that (1) Defendant Grabaurd "regularly
sent" the Inmate Grievance Clerk in question to
Plaintiff's cell for an "interview," and (2) on May 28,
2002, Plaintiff wrote to Defendant Graubard inquiring
about the status of his grievance.[FN27] However, these
allegations are not verified. I am not inclined to treat
them as verified by deeming them incorporated by
reference in the Verified Complaint, given Plaintiff's
loss of special status as a *pro se* civil rights litigant
(due to his litigiousness). Even if I were so inclined,
the allegations would not create an issue of fact.
Plaintiff does not allege that the reason Defendant
Graubard (allegedly) "regularly sent" the Inmate
Grievance Clerk in question to Plaintiff's cell to in-
terview, or be interviewed by, Plaintiff was to talk to
Plaintiff *about Plaintiff's April 29, 2002 grievance* (as
opposed to some other subject).[FN28] Furthermore,
Plaintiff does not attach a copy of his alleged May 28,
2002 letter to Defendant Graubard, or even allege that
Defendant Graubard even read the letter (indeed,
Plaintiff admits that Defendant Graubard did not re-
spond to the letter).[FN29]

> FN27. (Dkt. No. 1, Ex. H [Plf.'s Grievance
> No. MHK-6858-02].)

> FN28. (*Id.*)

> FN29. (*Id.*)

As a result, I recommend that the Court dismiss
Plaintiff's First Amendment claim and Fourteenth
Amendment claim against Defendant Graubard.

**B. Whether Plaintiff Has Failed to Establish (or**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
(Cite as: 2006 WL 1742738 (N.D.N.Y.))

**Even State) a Claim Against Defendants Frawley and Peet under the Eighth Amendment for Deliberate Indifference to a Serious Medical Need**

Defendants correctly recite the legal standard that governs Plaintiff's claim of inadequate medical care under the Eighth Amendment. Generally, to prevail on such a claim, Plaintiff must show two things: (1) that Plaintiff had a *sufficiently serious* medical need; and (2) that Defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that Plaintiff's claim for deliberate indifference to his "deformity in both feet" should be dismissed because Plaintiff has failed to establish either that (1) his deformity constituted a *sufficiently serious* medical condition for purposes of the Eighth Amendment, or (2) any Defendant exhibited the sort of reckless disregard necessary to show *deliberate indifference* to that serious medical condition for purposes of the Eighth Amendment.[FN30]

FN30. (Dkt. No. 55, Part 6 at 8-17 [Def.'s Mem. of Law].)

**1. Serious Medical Need**

I agree with Defendants that Plaintiff's medical condition does not constitute a serious medical need for purposes of the Eighth Amendment, although I reach this conclusion based on somewhat different reasons than those offered by Defendants.

Plaintiff alleges (and the evidence indicates) that, at the time of the alleged deprivation in question, he had (1) a birth defect consisting of "deformity in both feet" which resulted in, at various times, prescriptions for orthopedic footwear (e.g., custom-made arch supports, a/k/a "orthoses" or "orthotics," with extra-deep boots), and (2) a bulging disc in his spine ("spondylosis"), arthritis in both knees, and lower back pain.[FN31]

FN31. (Dkt. No. 1, Attached "Statement of Facts," ¶¶ 1, 3, 7, 10, 11, 23, 29 & Exs. A, B, D, E, F [Plf.'s Verified Compl., often associating his foot condition with his knee condition and back pain, and attaching his medical records]; Dkt. No. 55, Parts 3-4, ¶¶ 8-10 & Exs. E-G [Defs.' Rule 7.1 Statement, attaching Plf.'s medical records]; Dkt. No. 58, Exs. A-E [Plf.'s Rule 7.1 Response, attaching Plf.'s medical records]; Dkt. No. 55, Part 4, at 22, 29-30 [Ex. C to Defs.' Rule 7.1 Statement, attaching Plf.'s June 3, 2003 deposition testimony from *Gill v. Steinberg,* 02-CV-0082, N.D.N.Y .]; Dkt. No. 55, Part 4, at 65 [Ex. D to Defs.' Rule 7.1 Statement, attaching Apr. 29, 2003 trial testimony of Plaintiff from *Gill v. Butero,* 01-CV-0082, N.D.N.Y.) ]; *see also* Dkt. No. 26 at 1 [Order of Judge McAvoy, dated 9/26/03, including Plf.'s spondylosis, knee arthritis, and lower back pain among facts material to motion to dismiss].)

**\*7** After carefully considering the relevant case law, I conclude that Plaintiff's medical conditions, even when considered together, do not constitute a sufficiently serious medical condition for purposes of the Eighth Amendment because they do not constitute a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996). Specifically, in reaching my conclusion, I rely on numerous cases that are factually analogous to the present case.[FN32] Plaintiff does not, in his response papers, offer any case law or evidence that leads me to another conclusion.[FN33]

FN32. *See, e.g., Veloz v. State of New York,* 339 F.Supp.2d 505, 511, 522-527 (S.D.N.Y.2004) (painful and degenerative spondylosis was not serious medical need, but physical ailments resulting from botched surgery to alleviate that back problem, which

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

ailments included loss of feeling from waist down and severe bladder problems, was serious medical need); *McKinnis v. Williams,* 00-CV-8357, 2001 U.S. Dist. LEXIS 10979, at *2, 9-10 (S.D.N.Y. Aug. 7, 2001) (prisoner's foot problem, which required "medical shoes" that were flat, was not sufficiently serious); *Chatin v. Artuz,* 95-CV-7994, 1999 U.S. Dist. LEXIS 11918, at *4-6, 11 & n. 5 (S.D.N.Y. Aug. 4, 1999) (prisoner's foot condition, which involved pain and swelling and required "orthotic" arch supports, was not sufficiently serious), *aff'd,* No. 99-0266, 2002 U.S. Dist. LEXIS 86 (2d Cir. Jan. 3, 2002) (unpublished opinion); *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, and which required "a better shoe and sneaker with a built-in arch support" was not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1038-1040 (S.D.N.Y.1996) (prisoner's ankle condition, which caused pain in ankle and foot, and which caused Plaintiff to receive a prescription for orthopedic boots, was not sufficiently serious); *Cole v. Scully,* 93-CV-2066, 1998 U.S. Dist. LEXIS 5127, at *3-7, 12-20 (S.D.N.Y. Apr. 18, 1995) (prisoner's foot problem, and resulting pain, which required him to wear special footwear, including extra-wide boots and sneakers, was not sufficiently serious), *aff'd,* No. 95-2274, 1995 U.S.App. LEXIS 39859 (2d Cir. Nov. 21, 1995) (unpublished opinion); *see also Dixon v. Nusholtz,* No. 98-1637, 1999 U.S.App. LEXIS 13318, at *1, 5 (6th Cir.1999) (prisoner's need for orthopedic shoes was not a "grave medical need" under Eighth Amendment); *Jackson v. O'Leary,* 89-CV-7139, 1990 U.S. Dist. LEXIS 17249, at *2, 4 (1990) (N.D.Ill.Dec. 17, 1990) (prisoner's foot problem requiring him to wear only soft gym shoes was not one of

"especially grave concern" for purposes of Eighth Amendment).

FN33. (Dkt. No. 58, ¶¶ 31-38 & Ex. A [Plf.'s Rule 7.1 Response].)

I note that my conclusion that Plaintiff's medical condition is not sufficiently serious for purposes of the Eighth Amendment is further supported by certain of Plaintiff's deposition and trial testimony submitted by Defendants-specifically, that (1) on June 4, 2003, Plaintiff testified that he "never" uses a wheelchair,[FN34] and (2) on April 29, 2003, and June 4, 2003, Plaintiff testified that he walks on a treadmill and does squats (among other things) for exercise.[FN35]

FN34. (Dkt. No. 55, Part 4, at 29-30, 67-68 [Ex. C to Defs.' Rule 7.1 Statement, attaching Plf.'s June 3, 2003 deposition testimony from *Gill v. Steinberg,* 02-CV-0082, N.D.N.Y.].)

FN35. (Dkt. No. 55, Part 4, at 65-66, 71 [Ex. D to Defs.' Rule 7.1 Statement, attaching Apr. 29, 2003 trial testimony of Plaintiff from *Gill v. Butero,* 01-CV-0082, N.D.N.Y.] .)

However, I also note that I do not rely on certain other deposition testimony offered by Defendants, in which (1) Plaintiff admits that he played football, tennis and baseball in high school,[FN36] and (2) in listing his physical disabilities on June 4, 2003, he included several conditions (e.g., a bulging disc or spondylosis) but not any condition regarding his feet.[FN37] The materiality of the first piece of testimony appears suspect, in my opinion, given that Plaintiff was 47 years of age at the time of the alleged deprivation-presumably about 30 years after he apparently played sports in high school. Also appearing suspect, in my opinion, is the materiality of the second piece of testimony.[FN38] The proffered materiality of this testimony appears to be that it supports the conclusion

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

that Plaintiff's foot condition was not a "disabling medical condition."[FN39] However, I do not understand how that issue (regarding whether Plaintiff's foot condition was "disabling") relates to the issue at hand in this litigation (regarding whether Plaintiff's condition was "sufficiently serious" for purposes of the Eighth Amendment). In any event, it appears beyond reasonable dispute that Plaintiff has adduced at least *some* evidence that he had a foot deformity at the time in question (although that deformity does not rise to the level of a sufficiently serious medical condition for purposes of the Eighth Amendment).

> FN36. (Dkt. No. 55, Part 4, at 53 [Ex. B to Defs.' Rule 7.1 Statement, attaching Plf.'s Feb. 6, 2002 deposition testimony from *Gill v. Calscibetta,* 00-CV-1553, N.D.N.Y.].)

> FN37. (Dkt. No. 55, Part 4, at 22 [Ex. C to Defs.' Rule 7.1 Statement, attaching Plf.'s June 3, 2003 deposition testimony from *Gill v. Steinberg,* 02-CV-0082, N.D.N.Y.].)

> FN38. I will assume, for the sake of argument, that this testimony is consistent with Plaintiff's prior and subsequent testimony at his June 4, 2003 deposition (only page 22 of this testimony is included, not the pages immediately before and after that page), and that Plaintiff did not (when offering this testimony) intend to imply that his bulging disc problem somehow included his foot deformity.

> FN39. (Dkt. No. 55, Part 6, at 9 [Defs.' Mem. of Law].)

Because I find that Plaintiff's medical condition is not sufficiently serious for purposes of the Eighth Amendment, I need not reach Defendants' alternative argument that Plaintiff has failed to establish deliberate indifference. However, for the sake of thorough-

ness, I will briefly address that argument.

**2. Deliberate Indifference**

I find that, even if Plaintiff's medical condition were sufficiently serious, Plaintiff has adduced no evidence establishing that Defendants Frawley or Peet acted with deliberate indifference when, on April 23, 2002, they confiscated Plaintiff's arch supports and subsequently refused to return them.[FN40] I reach this conclusion for the same reasons as advanced by Defendants in their motion papers.[FN41]

> FN40. (*See, e.g.,* Dkt. No. 58, ¶¶ 14-16, 31-38 & Exs. A-D [Plf.'s Rule 7.1 Response].)

> FN41. (Dkt. No. 55, Part 6, at 12-17 [Defs.' Mem. of Law].)

**\*8** In particular, I note three facts. First, the confiscation of Plaintiff's arch supports by Defendants Frawley and Peet was not wholly arbitrary but apparently premised on a legitimate security concern-(1) the arch supports, which contained metal inserts, could be used to manufacture a shank or weapon,[FN42] (2) Defendant Peet had come to understand that, while incarcerated, Plaintiff had been convicted of possessing a weapon and/or committing an assault,[FN43] and (3) Defendant Frawley could find no indication in Plaintiff's medical records that he needed arch supports with *metal* inserts (as opposed to arch supports with plastic inserts).[FN44] Second, Plaintiff was seen by medical professionals for various reasons at least eight times over the six weeks following the confiscation.[FN45] For example, on June 3, 2002, when Plaintiff complained to medical professionals of pain, he was excused from school and work, was allowed to eat in his cell, and was permitted to walk with a cane.[FN46] Third, by at least May 21, 2002, Plaintiff was permitted to use another pair of custom-made arch supports, which were already in his possession (i.e., ones with plastic inserts);[FN47] and by July 1, 2002, Plaintiff

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

was provided over-the-counter arch supports (as opposed to custom-made arch supports).[FN48]

FN42. (Dkt. No. 1, Attached "Statement of Facts," ¶ 15 [Plf.'s Verified Compl.]; Dkt. No. 55, Part 4, at Ex. E-2 [Defs.' exhibits, attaching Plf.'s medical record dated 4/23/02, by Nurse Frawley, concerning security concerns from Plf.'s metal arch supports].)

FN43. (Dkt. No. 1, Attached "Statement of Facts," ¶¶ 15-16 [Plf.'s Verified Compl.].)

FN44. (Dkt. No. 1, Attached "Statement of Facts," ¶ 16 [Plf.'s Verified Compl.]; Dkt. No. 1, Ex. A [Plf.'s Verified Compl., attaching medical record dated 11/3/93, regarding prescription of "custom-made Aliplast/plastazote laminate orthoses"]; Dkt. No. 1, Ex. B [Plf.'s Verified Compl., attaching medical records date 2/8/01, indicating that he was prescribed "a pair of new boots," not specifying that they were to contain *metal* inserts]; Dkt. No. 55, Part 4, at Ex. E-1 [Defs.' exhibits, attaching Plf.'s medical record dated 4/9/02, indicating merely that Plaintiff had received a prescription for "arch supports ... for size 9 boots," not for arch supports with metal inserts, as opposed to plastic inserts]; Dkt. No. 55, Part 4, at Ex. E-2 [Defs.' exhibits, attaching Plf.'s medical record dated 4/18/02, indicating that Plaintiff had requested permit for "metal braces & metal arch supports," apparently acknowledging need for such a permit].)

FN45. (Dkt. No. 55, Part 4, at Exs. E-2, E-3 [Defs.' exhibits, attaching Plf.'s medical records dated 5/14/02, 5/17/02, 5/21/02, 5/30/02, 5/31/02, 6/3/02, 6/7/02, and 6/10/02]; Dkt. No. 1, ¶¶ 20-21 & Ex. F [Plf.'s Verified Compl.].)

FN46. (Dkt. No. 55, Part 4, at E-5 [Ex. E to Def.'s Mem. of Law, attaching Plf.'s medical record dated 6/3/02].)

FN47. (Dkt. No. 55, Part 4, at Ex. E-3 [Defs.' exhibits, attaching Plf.'s medical record dated 5/21/02]; Dkt. No. 1, Ex. A [Plf.'s Verified Compl., attaching medical record dated 11/3/93, regarding prescription of "custom-made Aliplast/plastazote laminate orthoses"]; Dkt. No. 1, Ex. B [Plf.'s Verified Compl., attaching medical records date 2/8/01, indicating that he was prescribed the new arch supports, i.e., the ones with metal inserts, because the former arch supports, i.e., the ones with plastic inserts, had "worn out" on or before 2/8/01]; Dkt. No. 1, ¶¶ 20-21 & Ex. F [Plf.'s Verified Compl., asserting occurrence of medical visit on 5/21/02 regarding arch supports].)

FN48. (Dkt. No. 55, Part 4, at F-2, F-3 [Defs.' Rule 7.1 Statement, attaching Plf.'s medical records dated 6/21/02, 6/24/02 and 7/1/02]; Dkt. No. 58, ¶ 7 [Plf.'s Supp. Opp. to Defs.' Motion].)

Under the circumstances, *at most,* the evidence indicates that there may have been a hint of negligence on the part of Defendants Frawley and/or Peet. However, even if true, such negligence would not be enough to make Defendants Frawley or Peet liable to Plaintiff under the Eighth Amendment.[FN49]

FN49. *Farmer,* 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim against Defend-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

ants Frawley and Peet.

## C. Whether Plaintiff Has Failed to Exhaust His Administrative Remedies with Regard to His Claim that Defendants Frawley and Peet Improperly Confiscated His Arch Supports

In the alternative, Defendants argue that Plaintiff's claim against Defendants Frawley and Peet should be dismissed because Plaintiff did not exhaust his available administrative remedies with regard to his claim that Defendants Frawley and Peet improperly confiscated his arch supports.[FN50] Because I have already concluded that the Court should dismiss Plaintiff's claim against Defendants Frawley and Peet (*see, supra,* Part III.B.), I need not reach this argument. However, in the interest of thoroughness, I will do so.

> FN50. (Dkt. No. 55, Part 6 at 5 [Defs.' Mem. of Law].)

Defendants contend that Plaintiff never filed a grievance with regard to this claim. In support of this argument, they offer an unlabelled, unsigned two-page document (presumably a computer print out) listing 26 grievances filed by Plaintiff between March 11, 2002, and November 21, 2002, but listing no grievance filed by Plaintiff regarding any confiscation of his arch supports.[FN51] Defendants further argue that Plaintiff has adduced no evidence (only an "unsupported allegation") that he filed a grievance with regard to that improper confiscation.[FN52]

> FN51. (*See* Dkt. No. 55, Part 3, ¶ 4 [Defs.' Rule 7.1 Statement, citing to "Exhibit A," attached at Dkt. No. 55, Part 4] .)

> FN52. (Dkt. No. 55, Part 6 at 5 [Defs.' Mem. of Law].)

**\*9** With some reluctance, I must disagree with Defendants. It is true that Plaintiff's opposition papers

are woefully inadequate, as Defendants point out in their reply papers.[FN53] It is further true that the Court has no duty to conduct an independent review of the record to find proof of a factual dispute. However, the Court certainly retains the discretion to conduct such an independent review. I believe that this discretion is no more appropriately exercised than when, as here, the factual dispute is rather glaring.

> FN53. (Dkt. No. 59, Part 1 [Defs.' Reply Affirm.].)

Specifically, I cannot help but notice that Plaintiff's *Verified* Complaint specifically alleges that (1) "[o]n or about April 29, 2002, plaintiff filed an institutional grievance for the return of his medical arch supports," (2) "[u]pon filing this grievance against defendants Frawley and Peet, plaintiff inquired countless times [of Inmate Grievance Sergeant Volker and an Inmate Grievance Clerk regarding] the status of this grievance, wherein plaintiff was informed by both [the Sergeant and the Clerk that] the grievance was received, filed and an upcoming hearing would be held," and (3) "on or about July 12, 2002, ... defendant [Graubard] informed plaintiff she was unable to find plaintiff's grievance regarding Nurse Frawley['s] confiscation of plaintiff's arch supports." [FN54]

> FN54. (Dkt. No. 1, Attached "Statement of Facts," ¶¶ 19, 26 & n. 4 [Plf.'s Verified Compl.].)

Verified allegations such as these constitute *sworn assertions* (much like those contained in an affidavit), and may be used to defeat a motion for summary judgment.[FN55] Here, the sworn assertions in question appear to be based on personal knowledge, and are sufficiently specific-providing dates, identities of persons, and subject matter of conversations.[FN56] I note that the representations allegedly made to Plaintiff about the status of his grievance (i.e., that the grievance had been received and filed, and that an

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

upcoming hearing would be held) would not be hearsay to the extent they were offered for a purpose other than to show the truth of the matters asserted (e.g., to show the reasonableness of Plaintiff's reliance on those representations, or to explain why he did not attempt to file another grievance within the 14-day deadline for such grievances).

> FN55. *See, e.g., Patterson,* 375 F.3d at 229-230 (partially vacating and remanding decision issued by Northern District of New York because the plaintiff's verified allegation that a lieutenant engaged in intimidating behavior that was "notoriously racist," together with other evidence, created an issue of material fact as to plaintiff's hostile work environment claim under 42 U.S.C. § 1983-specifically, with respect to whether the lieutenant's conduct was sufficiently humiliating to alter the conditions of the plaintiff's employment); *Fitzgerald,* 251 F.3d at 362-363 (partially vacating and remanding decision issued by Northern District of New York because the plaintiff's verified allegations of a defendant's "constant stream of unjustified criticisms of her work described specific, related instances of harassment" were sufficient to create an issue of material fact as to the plaintiff's hostile work environment claim under 42 U.S.C. § 1983), *cert. denied,* 536 U.S. 922 (2002); *Colon,* 58 F.3d at 872 (partially vacating and remanding decision issued by Northern District of New York because the plaintiff's verified allegations regarding the temporal proximity between the filing of disciplinary charges against the plaintiff and the filing of two lawsuits by the plaintiff were sufficient to create an issue of material fact as to the plaintiff's retaliation claim under 42 U.S.C. § 1983).

> FN56. (Dkt. No. 1, Attached "Statement of

Facts," ¶¶ 19, 26 & n. 4 [Plf.'s Verified Compl.].)

Furthermore, Plaintiff attached to his Verified Complaint (1) a copy of a July 12, 2002, communication from Defendant Graubard, stating, "[w]e have been unable to find any grievance from you concerning Nurse Frawley confiscating your arch supports," and (2) a copy of what Plaintiff claims is the grievance he filed on April 29, 2002.[FN57] I note that Plaintiff offered duplicate copies of these two documents in his papers in opposition to Defendants' motion.[FN58] Under the circumstances, I simply cannot find that Plaintiff has adduced no evidence that he exhausted his administrative remedies with respect to his grievance that Defendants Frawley and Peet improperly confiscated his arch supports.

> FN57. (Dkt. No. 1, Exhibits G, H at 2 [Plf.'s Verified Compl.].)

> FN58. (Dkt. No. 58, at Exhibits F, G at 2 [Plf.'s Response Papers].)

This finding of a factual dispute is not inconsistent with Local Rule 7.1(a)(3), which states that facts set forth in a defendant's Rule 7.1 Statement "shall be deemed admitted" unless specifically controverted by the opposing party. That Local Rule does not require an opposing party to "specifically controvert" defendant's factual assertions *through the use of a Rule 7.1 Response.* Such an approach is, without doubt, the preferred method of creating a factual dispute; and (as indicated above) the Court has no *duty* to go beyond an opposing party's Rule 7.1 Response to find proof of a factual dispute. However, the Court has the *discretion* to go beyond an opposing party's Rule 7.1 Response to find proof of a factual dispute; and Local Rule 7.1 does not deprive the Court of that discretion.[FN59] I am mindful that Rule 56(e) expressly provides that, "[i]f the adverse party does not ... respond [with affidavits or other papers setting forth

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

specific facts showing that there is a genuine issue for trial], summary judgment, *if appropriate,* shall be entered against the adverse party." [FN60] I simply cannot find it *appropriate* to grant summary judgment to Defendants on the basis of a failure to exhaust, where conspicuous evidence exists sufficient to create a factual dispute on the issue. [FN61]

> FN59. *See Monahan v. N.Y.C. Dept. of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (holding that similar local rule in Southern and Eastern Districts of New York, i.e., "Local Rule 56.1," did not deprive district court of discretion to *sua sponte* "conduct an assiduous review of the record"). For example, Local Rule 7.1(b)(3) provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where* the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein." N.D.N.Y. L.R. 7.1(b)(3).

> FN60. Fed.R.Civ.P. 56(e) [emphasis added].

> FN61. As the Second Circuit has held, "[t]he fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). "Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that ... the moving party is entitled to a judgment as a matter of law.' " *Champion,* 76 F.3d at 486.

**\*10** Furthermore, my treatment of Plaintiff's verified allegations as sworn assertions is not inconsistent with my finding that Plaintiff, due to his litigiousness, does not deserve the special solicitude normally afforded to *pro se* civil rights litigants. The rule that verified complaints shall be treated as affidavits for purposes of summary judgment motions has nothing to do with a non-movant's status as a *pro se* litigant or as a civil rights litigant. [FN62]

> FN62. *See, e.g., Robinson v. Gov't of Malaysia,* 269 F.3d 133, 144, 147, n. 14 (2d Cir.2001) (applying rule in non-civil rights case in which the plaintiff had been represented by counsel during district court's decision on defendants' motion to dismiss under Rule 12[b][1] ); *Adirondack Cycle & Marine, Inc. v. Am. Honda,* 00-CV-1619, 2002 WL 449757, at \* 1 (N.D.N.Y. March 18, 2002) (McAvoy, J.) (applying rule in non-civil rights case in which the plaintiff had been represented by counsel during decision on defendant's motion for summary judgment); *cf. Patterson,* 375 F.3d at 229-230 (applying rule in civil rights case in which the plaintiff had been represented by counsel during decision on defendants' motion for summary judgment, *see* 00-CV-1940, 2002 WL 31677033 [N.D.N.Y. Oct. 30, 2002] ); *Fitzgerald,* 251 F.3d at 362-363 (applying rule in civil rights case in which the plaintiff had been represented by counsel during decision on defendants' motion for summary judgment, *see* 36 F.Supp.2d 490 [N.D.N.Y.1998] ).

Finally, I will analyze Defendants' lack-of-evidence argument in the context of the Second Circuit's three-part test for exhaustion. The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

administrative remedies as are available are exhaust-ed." [FN63] The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> FN63. 42 U.S.C. § 1997e.

First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the su-perintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.
*White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN64]

> FN64. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a de-fendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omit-ted). Second, if those remedies were available, "the

court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or pre-serve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (cita-tions omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion de-fense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**1. Availability of Administrative Remedies**

**\*11** "When an inmate's reasonable attempts to exhaust available administrative remedies are im-peded by a correctional officer, the remedy may be deemed unavailable, thereby excusing the inmate from technically exhausting his remedies." *Veloz v. New York,* 339 F.Supp.2d 505, 515-516 (S.D.N.Y.2004) [citations omitted].[FN65] Some courts have suggested that an inmate has exercised a *rea-sonable* effort to exhaust his administrative remedies when he has tried to properly file a grievance and that grievance has been lost or destroyed by a prison offi-cial.[FN66] However, other courts have indicated that an inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a *reasonable* effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance.[FN67]

> FN65. *See also Thomas v. N.Y.S. Dep't of Corr. Servs.,* 00-CV-7163, 2002 WL 31164546, at *3 (S.D.N.Y. Sept. 30, 2002) ("[W]here a prisoner has made a 'reasonable attempt' to file a grievance, and prison offi-cials have prevented the prisoner from filing that grievance, the grievance procedures are not 'available' to the prisoner...."); *O'Connor*

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

*v. Featherstone,* 01-CV-3251, 2002 U.S. Dist. LEXIS, at *5 (S.D.N.Y. Apr. 29, 2002) ("[A]n inmate may ... defeat a motion to dismiss even when the requirements of administrative remedies have not technically been exhausted where ... an inmate has makes a 'reasonable attempt' to exhaust his administrative remedies...."); *Rodriguez v. Hahn,* 99-CV-11663, 2000 U.S. Dist. LEXIS 16956, at *4 (S.D.N.Y. Nov. 22, 2000) (denying defendants' motion to dismiss for failure to exhaust administrative remedies where inmate's efforts "evidence[d] a reasonable attempt to exhaust [his administrative remedies]"); *Baughman v. Harless,* 142 Fed. Appx. 354, 359 (10th Cir.2005) ("If prison officials prevent a prisoner from proceeding with exhaustion of administrative remedies, prison officials render that remedy unavailable such that a court will deem the procedure exhausted."); *Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002) (because "[prison] officials thwarted [plaintiff's] efforts to exhaust his administrative remedies ... the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]"), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004); *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("[A] remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]."), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA.").

FN66. *See, e.g., Thomas v. N.Y.S. Dep't of Corr. Servs.,* 00-CV-7163, 2002 WL 31164546, at *2-3 (S.D.N.Y. Sept. 30, 2002)

(genuine issue of material fact existed about whether prisoner made "reasonable attempt" to file a grievance, where prisoner adduced some evidence that he had filled out grievance, had attempted to file it, but had been denied a pass enabling him to file it); *O'Connor v. Featherstone,* 01-CV-3251, 2002 U.S. Dist. LEXIS, at *5 (S.D.N.Y. Apr. 29, 2002) ("[A]n inmate may ... defeat a motion to dismiss even when the requirements of administrative remedies have not technically been exhausted where ... an inmate has made a 'reasonable attempt' to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts."); *Dole v. Chandler,* 438 F.3d 804, 809 (7th Cir.2006) ("[A] remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting.") [citations omitted]; *Baughman,* 142 Fed. Appx. at 359 ("[A]dministrative remedies may be found unavailable ... where the prisoner supports his allegations that he placed his grievances in the mail, but they were lost or destroyed and therefore his efforts to exhaust available administrative remedies were impeded by correctional officers.").

FN67. I note that all of these decisions were issued by the Southern District, and all but one were issued before the creation of Second Circuit's three-part exhaustion analysis in August of 2004. *See Veloz,* 339 F.Supp.2d at 515-516 (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because "there was no evidence whatsoever that any of [plaintiff's] griev-

ances were filed with a grievance clerk," there was "no evidence that any particular officer thwarted his attempts to file," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *Nunez v. Goord,* 172 F.Supp.2d 417, 428-429 (S.D.N.Y.2001) (rejecting inmate's argument that the prison's grievance procedure had been rendered ineffective by the practice of prison officials' losing or destroying grievances, because, instead of filing a grievance with respect to his failure-to-protect claim, inmate wrote a letter to superintendent and did not follow up when he received no response); *cf. Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (inmate who received no response to grievance "could have and should have appealed grievance in accord with grievance procedure"), *accord, Waters v. Schneider,* 01-CV5217, 2002 WL 727025, at *1-2 (S.D.N.Y. Apr. 23, 2002).

Of course, here, Plaintiff alleges (and introduces at least some evidence indicating) that he made *more* than simply an initial effort to file a grievance about the (alleged) confiscation of his arch supports by Defendants Frawley and Peet. For example, he also alleges (and introduces at least some evidence indicating) that (1) in the days and weeks following April 29, 2002, he sought and received assurances from two corrections officers (other than Defendant Graubard) that his grievance had been received and filed, and that a hearing was imminent, (2) after being transferred to another prison, he twice wrote to Defendant Graubard regarding the issue, and was advised (more than two months after the events in question) that Defendant Graubard was unable to find Plaintiff's grievance, and (3) on August 6, 2002, Plaintiff filed a grievance containing an implicit request for an exception to the 14-day filing requirement, which request was subsequently either denied or not addressed by the Mohawk

C.F. Superintendent and CORC.[FN68]

FN68. Defendants argue that Plaintiff's efforts to grieve the confiscation of his arch supports did not include his filing of an August 6, 2002, grievance at Mohawk C.F. (Dkt. No. 59, Part 1, ¶ 10 [Defs.' Reply Affirm.]; Dkt. No. 1, Ex. H at 1 [Plf.'s Verified Compl., attaching the August 6, 2002, grievance]; Dkt. No. 58, Ex. G at 1 [Plf.'s Response Papers, attaching the August 6, 2002, grievance].) I agree with Defendants that, rather than focusing mainly on the confiscation of his arch supports, Plaintiff's August 6, 2002, grievance focused mainly on Defendant Graubard's (alleged) malfeasance with regard to the loss or destruction of Plaintiff's (allegedly) properly filed April 29, 2002, grievance. (*Id.*) However, Plaintiff's August 6, 2002, grievance (1) attached a copy of his April 29, 2002, grievance, and (2) implicitly but intelligibly requested, in the "Action Requested" portion of the grievance, an exception to the normal 14-day filing deadline (for that April 29, 2002, grievance) imposed by 7 N.Y.C.R.R. § 701.7(a)(1). (*Id.* [erroneously citing this regulation as "7 N.Y.C.R.R. § 707.7(a)(1)."].) *See Brownell v. Krom,* 04-CV-6364, 2006 WL 1174080, at *4 (2d. Cir. May 3, 2006) (requiring merely "notice pleading" for exhaustion to be achieved; adding that "[a]ll the grievance need do is object intelligibly to some asserted shortcoming."). Subsequently, both the Mohawk C.F. Superintendent and CORC either failed to address or implicitly denied this request for an extension of the 14-day filing deadline. (Dkt. No. 1, Ex. H-3; Dkt. No. 58, Exs. G-3, G-4.) *See Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001) (remedies not "available" to prisoner where officials failed to respond to his grievance), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

Cir.2004).

Under the circumstances, I find that Plaintiff has exercised a reasonable effort to exhaust his administrative remedies, and that at least a question of fact exists about whether those efforts were impeded by correctional officers (other than Defendant Graubard) sufficient to render Plaintiff's administrative remedies unavailable under the circumstances. I believe that my finding is supported by this Court's recent decision in *Hoover v. Hardman,* 99-CV-1855, 2005 WL 1949890 (N.D.N.Y. Aug. 15, 2005) (Scullin, C.J.).

In *Hoover,* this Court held that an inmate had created an issue of fact on the issue of availability of administrative remedies when he argued that his grievances had been "lost in the system," and he supported that argument by adducing (1) sworn testimony that the prison's Inmate Grievance Review Committee had not been operating adequately at the time in question, and (2) evidence that he had submitted a September 27, 1999, grievance for filing but that the grievance had never in fact been filed or investigated. *Hoover v. Hardman,* 99-CV-1855, Report-Recommendation, at 10-13 (N.D.N.Y. Nov. 11, 2004) (Lowe, M.J.), *adopted,* 2005 WL 1949890, at *3 (N.D.N.Y. Aug. 15, 2005) (Scullin, C.J.).[FN69]

> FN69. I believe that my finding is also supported by other district court decisions in this Circuit. *See, e.g., Rodriguez v. Hahn,* 99-CV-11663, 2000 U.S. Dist. LEXIS 16956, at *3-5 (S.D.N.Y. Nov. 22, 2000) (inmate made reasonable attempt to exhaust his administrative remedies where he sent various letters regarding his complaint, and corrections officers never filed some of the inmate's grievances).

**\*12** In reaching my conclusion, I respectfully reject Defendants' argument that "Plaintiff [has] admit[ted] the availability of an administrative grievance

process in his Complaint."[FN70] Defendants are correct insofar as they point out that, in his Verified Complaint, Plaintiff answered "Yes" to the questions "Is there a prisoner grievance procedure at this facility?" and "[D]id you present the facts relating to your complaint in this grievance program."[FN71] However, I do not see how these two verified allegations are inconsistent with Plaintiff's other verified allegations that (1) he filed a grievance on or about April 29, 2002, (2) he was subsequently assured that grievance had been filed, and (3) he was subsequently informed that no record existed of the grievance having been filed.[FN72] In any event, even if Plaintiff's two verified allegations in Paragraph 4 were inconsistent with his other verified allegations, that inconsistency, under the circumstances, would merely create an issue of fact for a jury.

> FN70. (Dkt. No. 55, Part 6 at 5 [Defs.' Mem. of Law, citing Paragraph 4 of Plaintiff's Complaint].)

> FN71. (Dkt. No. 1, ¶¶ 4.a., 4.b. [Plf.'s Compl.].)

> FN72. (Dkt. No. 1, Attached "Statement of Facts," ¶¶ 19, 26 & n. 4, Exhibits G, H at 1 [Plf.'s Compl.].)

For these reasons, I would find that Plaintiff has created an issue of fact with regard to whether the administrative remedies (allegedly) not pursued by him were in fact "available" to him.

**2. Estoppel**

Because of my finding above in Part III. C.1., I need not reach the issue of whether Defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether Defendants' own actions inhibiting Plaintiff's exhaustion of remedies may estop one or more of the Defendants from raising Plaintiff's failure to exhaust

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

as a defense. However, I note that, if I were to reach this issue, I would find that Defendants Frawley and Peet would not be estopped from asserting this defense.

Specifically, Defendants Frawley and Peet have preserved their affirmative defense of non-exhaustion by raising it in their Answer.[FN73] Moreover, no evidence exists that either Defendant Frawley or Defendant Peet is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies. Indeed, it was Inmate Grievance Sergeant Volker and an Inmate Grievance Clerk (and not either Defendant Frawley or Defendant Peet) who allegedly represented to Plaintiff that the grievance had been filed; it was Defendant Graubard (and not either Defendant Frawley or Defendant Peet) who allegedly failed to process (or lost) the grievance.

> FN73. (Dkt. No. 29, Part 1, ¶ 14 [Defs.' Answer].)

**3. "Special Circumstances" Justifying Failure to Exhaust**

Again, because of my finding above in Part III.C.1., I need not reach the issue of whether "special circumstances" have been plausibly alleged that justify Plaintiff's failure to comply with the administrative procedural requirements. However, I note that, if I were to reach this issue, I would find that such special circumstances have been plausibly alleged (and supported).

Specifically, Plaintiff has alleged (and adduced at least some evidence indicating the existence of) the following facts: (1) he filed a grievance at Elmira C.F. regarding the confiscation of his arch supports on April 29, 2002; (2) in the days and weeks following April 29, 2002 (during the period in which he had to grieve the confiscation), he sought and received assurances from two corrections officers (other than Defendant Graubard) that his grievance had been

received and filed, and that a hearing was imminent; (3) on or about June 10, 2002, he was transferred to the Walsh Regional Medical Unit at Mohawk C.F.; and (4) before and after his transfer, he more than once wrote to Defendant Graubard regarding the issue, and was finally informed, on July 12, 2002, that Defendant Graubard was unable to find Plaintiff's grievance. As a result, by the time he learned that his grievance had been lost, he was many miles removed from the location of the confiscation at issue (having been transferred to a different correctional facility), and was some 80 days removed from the date of the confiscation at issue-all apparently due to events that were mostly outside his control.

*13 Under the circumstances, I would find that a question of fact has been created about whether special circumstances exist justifying Plaintiff's failure to exhaust his administrative remedies. Again, I believe that my finding would be supported by this Court's recent decision in *Hoover,* which held that, even if an inmate's administrative remedies had been available to him at the time in question, the inmate had created an issue of fact on the issue of whether special circumstances existed excusing his failure to exhaust those remedies when he argued (and adduced evidence indicating) that his grievances had been "lost in the system." [FN74] In addition, I believe that my finding would be supported by this Second Circuit's recent decision in *Brownell v. Krom,* 04-CV-6364, 2006 WL 1174080 (2d. Cir. May 3, 2006), which appears to suggest that, under the circumstances, Plaintiff did not even have a duty to request an exception to the usual 14-day deadline for the filing of such grievances, as authorized by 7 N.Y.C.R.R. § 701.7(a)(1).[FN75]

> FN74. *Hoover,* 99-CV-1855, Report-Recommendation, at 10-13, *adopted,* 2005 WL 1949890, at *3.

> FN75. In *Brownell,* a prisoner claimed that prison officials had lost his property (including legal materials) during a prison

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
(Cite as: 2006 WL 1742738 (N.D.N.Y.))

transfer. Subsequent actions by prison officials delayed the date on which the prisoner obtained reason to believe that the loss of his property was intentional. By the time he discovered the evidence, it was several months after his property had disappeared, which placed him outside of the 14-day time limit for filing a grievance. The Second Circuit held that, although the prisoner could have, at that point, sought an exception to the 14-day time limit but did not do so, "[n]onetheless, we conclude that [the prisoner's] failure to seek the further administrative remedies that were available to him were reasonable." *Brownell v. Krom,* 04-CV-6364, 2006 WL 1174080, at *6 (2d. Cir. May 3, 2006).

Although I do not believe that my finding needs any further factual support, I believe that my finding is further supported by the fact that, on or about August 6, 2002, Plaintiff did in fact request an exception to the usual 14-day grievance-filing deadline, as authorized by 7 N.Y.C.R.R. § 701.7(a)(1).[FN76] Specifically, at the end of his August 6, 2002, grievance, he stated: "Action Requested: [S]ince mitigating circumstances exist[ ], that the attached grievance originally filed April 29, 2000, which has not been resolved, be filed accordingly and resolved appropriately ... pursuant to DOCS' Directive 4040. *See,* 7 N.Y.C.R.R. § 707.7(a)(1) [sic]."[FN77] Given the Second Circuit's recent pronouncements in *Brownell v. Krom,*[FN78] I believe that this request was sufficiently intelligible to deserve an explicit response from the Mohawk C.F. Superintendent and CORC. However, that request either was not addressed or was implicitly denied by the Mohawk C.F. Superintendent and CORC.[FN79] I believe that this a failure to explicitly decide the issue is an additional "special circumstance" excusing Plaintiff's failure to exhaust.[FN80]

FN76. (Dkt. No. 1, Ex. H-1 [Plf.'s Compl., attaching Grievance No. MHK-6858-02];

Dkt. No. 58, Ex. G-1 [Plf.'s Response Papers, attaching Grievance No. MHK-6858-02].)

FN77. (*Id.* [erroneously citing pertinent regulation as "7 N.Y.C .R.R. § 707.7(a)(1)" which should have been 7 N.Y.C.R.R. § 701.7(a)(1) ].)

FN78. *See Brownell v. Krom,* 04-CV-6364, 2006 WL 1174080, at *4 (2d. Cir. May 3, 2006) ("All the grievance need do is object intelligibly to some asserted shortcoming.").

FN79. (Dkt. No. 1, Ex. H-3; Dkt. No. 58, Exs. G-3, G-4.)

FN80. *See Brownell v. Krom,* 04-CV-6364, 2006 WL 1174080, at *6-7 (2d. Cir. May 3, 2006) (concluding that "special circumstances" existed based, in part, on the fact that prison officials erroneously decided that the grievance the plaintiff filed "deserved no consideration").

Because I reject Defendants' failure-to-exhaust argument, I need not, and do not, analyze their additional argument that Plaintiff's exhausted claim should be dismissed along with his unexhausted claim (*see* Dkt. No. 55, Part 6, at 6), except to emphasize the existence of binding Second Circuit precedent rejecting such an argument. *See Oritz v. McBride,* 380 F.3d 649, 656, 663 (2d. Cir.2004) ("The question, then, is whether the district court was therefore required, under a so-called 'total exhaustion' rule, to dismiss the action in its entirety despite the presence of an otherwise viable, fully exhausted claim. We think not."), *cert. denied,* 125 S.Ct. 1398 (2005).

**D. Whether Defendants Are Entitled to Qualified Immunity**

In the alternative, Defendants argue that Plaintiff's claim against all three Defendants should be

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)
**(Cite as: 2006 WL 1742738 (N.D.N.Y.))**

dismissed because they are entitled to qualified immunity. [FN81] Because I have already concluded that the Court should dismiss Plaintiff's claims against all three Defendants (*see, supra,* Parts III.A., III.B.), I need not, and do not, reach this argument, except to make three points.

> FN81. (Dkt. No. 55, Part 6 at 17-20 [Defs.' Mem. of Law].)

**\*14** First, Defendants correctly recite the general law regarding qualified immunity. Second, although I disagree with Defendants to the extent they argue that an inmate's right to *file* a grievance is not clearly established constitutional right, I agree with Defendants to the extent they argue that, at the very least, corrections officers of reasonable competence could have concluded that Defendant Graubard was not, at any time, violating that right. Third, I agree with Defendants to the extent they argue that, at the very least, corrections officers of reasonable competence could have concluded that Defendants Frawley and Peet did not violate any of Plaintiff's clearly established rights.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 55) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.
Gill v. Frawley

Not Reported in F.Supp.2d, 2006 WL 1742738 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**


Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell E.
Duckett, Corrections Officer; Alfred J. Deluca, Cor-
rections Officer; Donald L. Broekema, Sergeant; and
Jean Norton, Nurse, Defendants.

No. 9:10–CV–0456 (GTS/DEP).
Nov. 29, 2011.

Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel,
New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Timothy P. Mulvey, Esq., Assis-
tant Attorney General, of Counsel, Albany, NY, for
Defendants.

***MEMORANDUM–DECISION and ORDER***
Hon. GLENN T. SUDDABY, District Judge.

*\*1* Currently before the Court, in this prisoner
civil rights action filed by Jonathan Henry ("Plain-
tiff") against the five above-captioned employees of
the New York State Department of Corrections and
Community Supervision ("Defendants"), is Defend-
ants' motion for partial summary judgment. (Dkt. No.
24.) For the reasons set forth below, Defendants' mo-
tion is granted in part and denied in part.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**

Generally, liberally construed, Plaintiff's Com-
plaint alleges that, between approximately January 29,
2009, and January 31, 2009, at Ulster Correctional
Facility in Napanoch, New York, Defendants violated
Plaintiff's following rights in the following manner:
(1) Defendants Nurse Jean Norton, Corrections Of-
ficer James F. Dinelle, Corrections Officer Russell E.
Duckett and Corrections Officer Alfred J. DeLuca
violated Plaintiff's rights under the First Amendment
by filing retaliatory false misbehavior reports against
him, and subsequently providing false testimony
against him at administrative disciplinary hearings,
which resulted in his spending time in the Special
Housing Unit ("SHU"); (2) Defendant Dinelle vio-
lated Plaintiff's rights under the Eighth Amendment by
assaulting him on two occasions, and Defendants
DeLuca and Duckett violated Plaintiff's rights under
the Eighth Amendment by assaulting him once; (3)
Defendant Sergeant Donald L. Broekema violated
Plaintiff's rights under the Eighth Amendment by
failing to intervene to prevent one of these assaults
from occurring; (4) Defendant Norton violated Plain-
tiff's rights under the Eighth Amendment by harassing
him almost immediately before he was subjected to
the above-described assaults; and (5) Defendants
Norton, Dinelle, Duckett and DeLuca violated Plain-
tiff's rights under the Fourteenth Amendment by per-
forming the aforementioned acts, which constituted
atypical and significant hardships in relation to the
ordinary incidents of prison life. (*See generally* Dkt.
No. 1 [Plf.'s Compl.].) Familiarity with the factual
allegations supporting these claims in Plaintiff's
Complaint is assumed in this Decision and Order,
which is intended primarily for review by the parties.
(*Id.*)

**B. Undisputed Material Facts**

At all times relevant to Plaintiff's Complaint,
Plaintiff was an inmate and Defendants were em-

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

ployees of the New York Department of Corrections and Community Supervision at Ulster Correctional Facility. On January 30, 2009, Defendant Dinelle took Plaintiff to the medical ward, because Plaintiff was experiencing a foul odor and oozing from a wound on his leg. After Defendant Norton treated Plaintiff, she filed an inmate misbehavior report against Plaintiff based on (1) Plaintiff's harassing behavior toward Defendant Norton and Defendant Dinelle, and (2) Plaintiff's disobedience of a direct order to be quiet. The misbehavior report was signed by Defendant Dinelle as an employee witness.

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [FN1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton).[FN2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

FN1. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at

100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

FN2. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

**C. Defendants' Motion**

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)[FN3]

> [FN3.] In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [FN4]

> [FN4.] Plaintiff does not oppose Defendants'

arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

#### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

13 (2d Cir.1983). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*4** In determining whether an inmate has estab-

lished a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002). Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Jordan v. Garvin,* 01–CV–4393, 2004 WL 302361, at \*6 (S.D.N.Y. Feb.17, 2004).

**2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene**

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at *8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

**3. Fourteenth Amendment Substantive Due Process Claims**

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec.14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65).[FN5]

> FN5. Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

**4. Qualified Immunity Defenses**

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional

law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[FN6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007).[FN7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[FN8] As the Supreme Court has explained,

> FN6. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN7. *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

tional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN8. *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized. *Malley,* 475 U.S. at 341.[FN9]

FN9. *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

## III. ANALYSIS

## A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible rec-

ord evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.)[FN10]

FN10. Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

*7 After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity.[FN11]

> FN11. *See Wade–Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at *6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected.[FN12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity."[FN13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus

reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

> FN12. The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at *4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at *3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at *15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at *3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1354368, at *6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

FN13. *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to ad-

duce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. [FN14] Furthermore, those convictions were never subsequently reversed on administrative appeal.[FN15] As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

FN14. *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

FN15. For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
(Cite as: 2011 WL 5975027 (N.D.N.Y.))

reports issued against him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

**B. Plaintiff's Claims Under the Eighth Amendment**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational

factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v. S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011) (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or

Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced.[FN16]

> FN16. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack

[that ends] in a matter of seconds"); *see also Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims,[FN17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff.[FN18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

> FN17. (Dkt. No. 27, Attach. 2, at 19–20.)

> FN18. (Dkt. No. 27, Attach. 2, at 10, 14.)

**C. Plaintiff's Claim Under the Fourteenth Amendment**

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at \*11.

After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this

150–day period were more severe than normal SHU conditions.[FN19] As a result, Plaintiff's substantive due process claim is dismissed.

> FN19. *See Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at \*3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at \*4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at \*4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that were more restrictive than those in general population).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

**D. Defendants' Defense of Qualified Immunity**

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

**1. Retaliation**

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

**2. Excessive Force**

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and con-

trasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999).[FN20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

> FN20. *See also Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds

Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)
**(Cite as: 2011 WL 5975027 (N.D.N.Y.))**

that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is *GRANTED* in part and *DENIED* in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is *GRANTED;*

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is *GRANTED;*

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is *GRANTED;*

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is *GRANTED;* and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is *DENIED;* and it is further

**ORDERED** that the following claims are *DISMISSED* **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are *DISMISSED* from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

N.D.N.Y.,2011.
Henry v. Dinelle
Not Reported in F.Supp.2d, 2011 WL 5975027 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**



Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Kai Dwayne INGRAM, Plaintiff,
v.
SCI CAMP HILL, et al., Defendants.

Civil No. 3:08–CV–0023.
Dec. 1, 2010.

Kai Dwayne Ingram, Marienville, PA, pro se.

Robert B. MacIntyre, Vincent R. Mazeski, Chief Counsel's Office, Mechanicsburg, PA, for Defendants.

*MEMORANDUM*
JOHN E. JONES III, District Judge.
**\*1 THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

This *pro se* civil rights action was initiated by Plaintiff Kai Dwayne Ingram ("Plaintiff" or "Ingram"), an inmate presently confined at the State Correctional Institution Forest ("SCI Forest") in Marienville, Pennsylvania.

Presently before the Court are a Motion for Summary Judgment filed on behalf of remaining Defendants (Doc. 62) and a Motion for Leave to File an Amended Complaint (Doc. 72) filed by Plaintiff. For the reasons set forth herein, the Motion for Summary Judgment will be granted, and the Motion for Leave to File an Amended Complaint will be denied.

**PROCEDURAL BACKGROUND**

Plaintiff initiated this action on January 4, 2008 by filing a Complaint under the provisions of 42 U.S.C. § 1983 in which he raises claims stemming from events that occurred in August 2007 while he was incarcerated at the State Correctional Institution Camp Hill ("SCI Camp Hill") in Camp Hill, Pennsylvania. (*See* Doc. 1.) On March 4, 2008, he filed an Amended Complaint on which this case is proceeding. (Doc. 9.) The Defendants remaining in this action all were employed at SCI Camp Hill at the time of filing of the Amended Complaint. These Defendants, and their job titles at the relevant time, are Greg Chiles, Lieutenant; Chris Chambers, Unit Manager for the Restricted Housing Unit ("RHU") and Grievance Officer; Ian Taggart, Facility Grievance Coordinator; Reginald Brown, Correctional Officer; and Teresa Law, Medical Administrator.

In a Report and Recommendation dated April 4, 2008, Magistrate Judge J. Andrew Smyser recommended that the claims asserted by Plaintiff in his Amended Complaint against Defendants Moslak, SCI Camp Hill, and the State Correctional Institution Greene ("SCI Greene") be dismissed, and that Plaintiff's Eighth Amendment claim concerning a denial of hygiene products also be dismissed. (Doc. 10 .) By Order dated May 29, 2008, the Honorable Thomas I. Vanaskie, to whom this case then was assigned, adopted the Report and Recommendation of Judge Smyser. (Doc. 16.)

The following claims asserted by in Plaintiff in his Amended Complaint remain: **(1)** Defendant Brown issued Plaintiff two institutional misconduct charges on August 16, 2007 out of retaliation following Plaintiff's statement that he was going to file a grievance; **(2)** Defendants Chiles, Chambers, and Taggart denied Plaintiff's right of access to the courts by failing to take action when he informed them that he was unjustly being denied the ability to communicate with

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

the courts; and **(3)** Defendant Law was deliberately indifferent to Plaintiff's serious medical needs because she "did nothing" after he submitted a grievance to her explaining that he was being forced to take medication that he did not want or need, and he was continuously forced to take the medication after his transfer on September 19, 2007 to the State Correctional Institution Greene ("SCI Greene"). (*See* Doc. 9.)

**\*2** Defendants filed an Answer to the Amended Complaint on May 20, 2008. (Doc. 14.) Pursuant to a case management order issued on May 29, 2008, discovery closed on November 28, 2008, and dispositive motions were due on or before January 30, 2009. (Doc. 17.) On January 30, 2009, a motion for summary judgment was filed on behalf of Defendants arguing that they were entitled to judgment as a matter of law because Plaintiff failed to fully exhaust his administrative remedies as to his remaining claims. (Doc. 22.) In a Report and Recommendation dated April 17, 2009, Magistrate Judge Smyser concluded that Defendants had not met their burden of establishing Plaintiff's failure to exhaust administrative remedies and therefore recommended that the motion be denied. (Doc. 30.) Specifically, the Report and Recommendation observed that, as to Plaintiff's claim concerning the allegedly retaliatory misconducts issued by Defendant Brown, Plaintiff had presented evidence that DC–ADM 804, the Pennsylvania Department of Corrections ("DOC") policy providing procedures for the review of inmate grievances, was inapplicable. (*See id.* at 10.) This evidence consisted of a copy of Plaintiff's grievance regarding the allegedly retaliatory misconduct charges that he had submitted pursuant to the procedures provided by DC–ADM 804, and a copy of the response to the grievance indicating that the grievance was rejected because Plaintiff should pursue the issue under DC–ADM 801, the DOC policy providing procedures for the review of inmate misconduct appeals. (*See id.* (citing Doc. 28, Pltf. Exs., at 1, 8).) The Report and Recommendation concluded that, because Defendant Brown did not contend or present evidence to establish

that Plaintiff had failed to exhaust his administrative remedies under DC–ADM 801, Brown was not entitled to summary judgment as to Plaintiff's retaliation claim against him. (*See id.*)

The Report and Recommendation also concluded that, although DC–ADM 804 was applicable to Plaintiff's Eighth Amendment claim against Defendant Law concerning her alleged failure to act after she was informed that Plaintiff was being forced to take medication, Law had failed to establish that Plaintiff failed to exhaust available administrative remedies as to that claim. (*See id.* at 11.) The conclusion was based on Plaintiff's contention that he had not received a response to the grievance he submitted to Defendant Law about this claim, and thus was unable to appeal further in order to exhaust his administrative remedies. (*See id.*) Because Law had not submitted any evidence that Plaintiff received a response, the Court concluded that she failed to establish that Plaintiff failed to exhaust his administrative remedies as to his claim against her. (*See id.* at 11–12.)

Similarly, the Report and Recommendation concluded that, although DC–ADM 804 was applicable to Plaintiff's claims against Defendants Chiles, Chambers, and Taggart, Plaintiff again contended that he did not receive a response to his August 27, 2007 grievance concerning his access to the courts claim against them, and because these defendants did not present evidence that Plaintiff received a response, they failed to establish that Plaintiff failed to exhaust his administrative remedies as to his access to the courts claim. (*See id.* at 12–14.) Based on his conclusions, Magistrate Judge Smyser recommended that Defendants' motion for summary judgment be denied and the case listed for trial. (*See id.* at 14.) The parties did not file any objections, and by Order dated July 30, 2009, Judge Vanaskie adopted the Report and Recommendation of Magistrate Judge Smyser. (Doc. 33.)

**\*3** Thereafter, on August 14, 2009, Judge Vanaskie conducted a telephonic scheduling confer-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

ence during which Plaintiff indicated that he had mailed a motion to appoint counsel to the Court. Several days later, on August 17, 2009, Plaintiff's motion to appoint counsel was docketed. (Doc. 35.) By Order dated August 24, 2009, Judge Vanaskie granted the motion to the extent that a request was submitted to the Pro Bono Chair of the Federal Bar Association to attempt to secure counsel for Plaintiff. (Doc. 36.) After updating the Court in letter dated December 16, 2009 that efforts to secure counsel were ongoing (*see* Doc. 38), by letter dated February 9, 2010, the Pro Bono Chair informed the Court that the efforts to secure counsel for Plaintiff were unsuccessful. (Doc. 40 .) Consequently, by Order of the same date, the Court set a telephonic scheduling conference for March 8, 2010. (Doc. 41.) During that conference, trial was set for June 21, 2010. (Doc. 43.)

On June 4, 2010, following Judge Vanaskie's elevation to the Third Circuit Court of Appeals, this case was verbally reassigned to this Member of the Court. Due to a scheduling conflict, by Order dated June 15, 2010, the trial was re-scheduled to August 3, 2010, and a pre-trial conference was set for July 9, 2010. (Doc. 49.) Thereafter, both parties filed pre-trial memoranda. (Docs.50, 54.) Following review of those memoranda in preparation for the pre-trial conference scheduled on July 9, 2010, we issued an Order on July 8, 2010 canceling all pre-trial deadlines and directing Defendants within fourteen (14) days to file a renewed motion for summary judgment and supporting brief setting forth the arguments in their pre-trial memorandum. (Doc. 60.) On July 16, 2010, Defendants complied with the Order by filing the Motion for Summary Judgment that presently is before the Court (Doc. 62), along with a supporting brief (Doc. 63), an Appendix (Doc. 64), and a Statement of Facts (Doc. 65.)

On July 29, 2010, a letter from Plaintiff was docketed in which he stated that Defendants had failed to comply with our Order directing them to file a Motion for Summary Judgment. (Doc. 68.) Because it

appeared that Plaintiff had not been served with Defendants' Motion as a result of his transfer between institutions, by Order dated August 2, 2010, we directed Defendants to re-serve their Motion and accompanying materials on Plaintiff at SCI Greene, where he then was confined. (Doc. 69.) Our Order also specifically directed Plaintiff to file his opposition, including an opposing brief as required by Middle District of Pennsylvania Local Rule ("LR") 7.6, and a separate concise statement of material facts responding to the numbered paragraphs of Defendants' statement, as required by LR 56. 1, to Defendants' Motion on or before August 25, 2010. (*Id.*)

On August 23, 2010, Plaintiff filed an opposition brief (Doc. 74) and a document entitled "Plaintiff's Concise Statement of Material Facts" (Doc. 75). On August 30, 2010, Defendants filed a reply brief (Doc. 78) and a supplemental appendix [FN1] (Doc. 77). Accordingly, the Motion is fully briefed and ripe for review.

> FN1. Defendants' supplemental appendix consists solely of the executed declaration of Defendant Reginald Brown. (*See* Doc. 77.) In the reply brief filed on behalf of Defendants, counsel explained that, due to time constraints in timely securing an executed declaration, an unexecuted declaration (Doc. 164 at 189–191) had been submitted with the Motion for Summary Judgment. (*See* Doc. 78 at 2 n. 2.)

**\*4** In addition, on August 3, 2010, Plaintiff filed a Motion for Leave to File an Amended Complaint. (Doc. 72.) We will consider Defendants' Motion for Summary Judgment before turning to a discussion of Plaintiff's Motion.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

## I. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e) (2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.,* 214 F.3d 402, 407 (3d Cir.2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey,* 772 F.2d 1103, 1109–10 (3d Cir.1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.,* 442 F.3d 848, 852 (3d Cir.2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48.

## II. DISCUSSION

### A. Exhaustion Requirement

The Prison Litigation Reform Act ("PLRA") requires inmates to present their claims through an administrative grievance process before filing suit in federal court. Specifically, section 1997e(a) of Title 42 of the United States Code provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). " '[I]t is beyond the power of this court- or any other- to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.' " *Nyhuis v. Reno,* 204 F.3d 65, 73 (3d Cir.2000) (quoting *Beeson v. Fishkill Corr. Facility,* 28 F.Supp.2d 884, 894–95 (S.D.N.Y.1998) (citing *Weinberger v. Salfi,* 422 U.S. 749, 766, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)). The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement." *Nyhuis,* 204 F.3d at 71. The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court.[FN2] *Woodford v. Ngo,* 548 U.S. 81, 92, 126 S.Ct. 2378,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

165 L.Ed.2d 368 (2006).

> FN2. Because a plaintiff's failure to exhaust is an affirmative defense, a plaintiff is not required to allege in his complaint that he has exhausted administrative remedies. *Ray v. Kertes,* 285 F.3d 287, 295 (3d Cir.2002). Rather, failure to exhaust must be pleaded and proven by the Defendants. *Brown v. Croak,* 312 F.3d 109, 111 (3d Cir.2002).

**\*5** "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek [ ] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Id.* at 93 (quoting *Porter,* 534 U.S. at 525)). Failure to comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. *Spruill v. Gillis,* 372 F.3d 218, 227–32 (3d Cir.2004) ("[P]rison grievance procedures supply the yardstick for measuring procedural default.") A procedural default, "either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim." *Gallego v. United States,* Civil No. 1:02–CV–1157, 2005 WL 1653166, at \*2 (M.D.Pa. July 8, 2005).

**B. Undisputed Facts**

The requirements for filing and opposing a motion for summary judgment in this Court are set forth as follows in LR 56.1:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, **responding to the numbered paragraphs set forth in the [moving party's] statement,** as to which it is contended there is a genuine issue to be tried.

> Statements of material fact in support of, or in opposition to a motion, **shall include references to the parts of the record** that support the statements.

> All material facts set forth in the statement required to be served by the moving party will be **deemed to be admitted** unless controverted by the statement required to be served by the opposing party.

LR 56.1 (emphasis added). Defendants filed a Statement of Material Facts as required by LR 56.1. (Doc. 65.) Our August 2, 2010 Order specifically directed Ingram to file his opposition to Defendants' Motion in accordance with LR 56.1.[FN3] (*See* Doc. 69.) Although Ingram filed a separate statement of material facts (Doc. 75), his statements do not correspond to the numbered paragraphs set forth in Defendants' Statement. In addition, Ingram fails to cite to the parts of the record that support his statements, and instead he either cites to his Amended Complaint, or fails to provide any references to the record to support his statements. (*See* Doc. 75.) Because a party responding to a motion for summary judgment may not rest on the allegations of his complaint, but rather must point to specific facts showing there is a genuine issue for trial, *see Jones, supra,* 214 F.3d at 407, Ingram's citations to the Complaint to support his statements are insufficient to controvert Defendants' facts. Because Ingram has failed to controvert the statements of fact submitted by Defendants, all material facts set forth in De-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

fendants' Statement (Doc. 65) will be deemed admitted. *See* LR 56.1. Defendants' Statement (Doc. 65) and supporting exhibits (Doc. 64) [FN4] establish the following undisputed facts material to the instant Motion:

> [FN3]. In addition to being reminded of the requirements of LR 56.1 in our August 2, 2010 Order, Ingram was provided with a copy of LR 56.1 along with the Standing Practice Order issued at the outset of this action (*see* Doc. 5).

> [FN4]. In support of the instant Motion, Defendants have submitted the following Exhibits: **Ex. A:** Pennsylvania DOC Policy DC–ADM 801 (Doc. 64 at 7–53); **Ex. B:** the Declaration of John Andrade, a Hearing Examiner Supervisor and employee of the PA DOC Office of Chief Counsel and its Office of Chief Hearing Examiner (Doc. 64 at 57–59); **Ex. C:** DOC Records of Plaintiff's Misconducts (Doc. 64 at 63–77); **Ex. D:** PA DOC Policy DC–ADM 804 (Doc. 64 at 81–111); **Ex. E:** the Declaration of Defendant Ian Taggart (Doc. 64 at 115–127); **Ex. F:** the Declaration of Michael Bell, an Administrative Officer in the Secretary's Office of Inmate Grievances and Appeals (Doc. 64 at 131–137); **Ex. G:** DOC Records of Plaintiff's Grievances (Doc. 64 at 141–185); **Ex. H:** Declaration of Defendant Reginald Brown (Doc. 64 at 189–191); **Ex. I:** DOC Records for Plaintiff, including a report of transfers between institutions, a daily log for 8/17/07–9/18/07, and Notices of PRC Determinations (Doc. 64 at 195–217); **Ex. J:** a copy of the Docket and Entries for *Ingram v. Hamovitch, et al.,* Civil No. 3:07–CV–1383–TIV–JAS (Doc. 64 at 221–263); **Ex. K:** a copy of the Docket and Entries for *Ingram v. Heider, et al.,* Civil No. 3:06–CV–2021–TIV (Doc. 64 at 267–299);

and **Ex. L:** copies of Plaintiff's DOC Medical Records (Doc. 64 at 303–331).

**\*6** Plaintiff was at all relevant times an inmate incarcerated at SCI Camp Hill. (Doc. 65, Dfts.' Statement of Material Facts ("SMF"), ¶ 1.) Defendants are present or former employees of the Pennsylvania DOC. (*Id.*)

Remaining in this action are three (3) claims involving five (5) defendants. (*Id.* ¶ 2.) The remaining claims are a retaliation claim against Defendant Brown for issuing a misconduct; an access to the court claim against Defendants Chiles, Chambers and Taggart for the dismissal of his civil action; and a cruel and unusual punishment claim against Defendant Law for alleged forced medication. (*Id.*)

**1. Facts Regarding Retaliation Claim Stemming from 8/17/07 Misconduct**

Defendant Brown issued a misconduct against Ingram on August 17, 2007. (*Id.* ¶ 3; Doc. 64, Dfts. Exs., at 63, Misconduct A833128 .) The misconduct, which charges Ingram with refusing to obey an order and threatening an employee or their family with bodily harm, was issued due to Ingram's refusal, despite several orders, to lock up and subsequent verbal threats by Ingram to Brown. (Doc. 65 ¶ 3; Doc. 64 at 63.) Ingram contends that the misconduct was issued in retaliation for his stated intention to file a grievance. (Doc. 65 ¶ 4.)

**2. Facts Regarding Access to the Courts Claim**

Ingram had two (2) other civil actions pending during the relevant time period. In the first civil action, which was initiated by Ingram on July 30, 2007 against Nurse Hamovitch, he claimed that he was forced to take medication. (*Id.* ¶ 5 (citing *Ingram v. Hamovitch,* Civil No. 3:07–CV–1383–TIV–JAS, Doc. 64 at 221–263 [FN5] (Docket Entries).) On September 6, 2007, the action was dismissed without prejudice as a result of Ingram's failure to comply with the Court's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

Administrative Order directing him either to pay the required filing fee or submit an application to proceed *in forma pauperis.* (*Id.*) The second civil action pending during this same time period was *Ingram v. Heider,* Civil No. 3:06–CV–2021–TIV. (*Id.* ¶ 7 (citing Doc. 64 at 267–299 (Docket Entries & Correspondence).)

> FN5. For the sake of uniformity, citations to page numbers throughout this Memorandum refer to the page numbers generated by the CM/ECF System.

On August 17, 2007, Ingram was placed in the RHU. (*Id.* ¶ 8 .) He legal property on August 22, 2007. (*Id.*) Ingram also received his legal mail during this time period. (*Id.*) On August 31, 2007, he was transferred to the Luzerne County Prison, and returned to SCI Camp Hill on September 11, 2007. (*Id.*) Ingram was able to mail and file documents with the federal court during this time period. (*Id.* (citing Doc. 64 at 141–185, Grievance Documents; Doc. 64 at 195–217, Inmate Records; Doc. 64 at 221–263, Docket and Entries for Civil No. 3:07–CV–1383–TIV–JAS; Doc. 64 at 267–299, Docket and Entries for Civil No. 3:06–CV–2021–TIV).) Ingram contends that he was denied access to the court because Defendants failed to provide him with the materials necessary to timely file an application to proceed *in forma pauperis.* (*Id.* ¶ 9 (citing Doc. 9, Amended Complaint).)

**3. Facts Regarding Deliberate Indifference Claim**
**\*7** Ingram arrived at SCI Camp Hill on June 26, 2007. (*Id.* ¶ 10.) He was prescribed vitamin B6 and INH for tuberculosis on July 10, 2007. (*Id.*) He filed a grievance on August 26, 2007 stating that he did not want or need the medication. (*Id.*) He was transferred to SCI Greene on September 19, 2007. (*Id.*) On September 20, 2007, Defendant Law issued a response to Ingram's grievance agreeing that he did not have to take the medication even though it was deemed necessary and had been prescribed for him. (*Id.* (citing Doc. 64 at 195–217, Inmate Records; Doc. 64 at

141–185, Grievance Documents; Doc 64 at 303–331, Medical Records).) Law's response also explained that Ingram had the option of signing a refusal form if he did not wish to take the medication. (*Id.*) Ingram contends that Defendant Law failed to take action to stop the alleged forced medication. (*Id.* (citing Doc. 9, Amended Complaint).)

**4. Facts Regarding PA DOC Grievance and Administrative Remedy Procedures**
The Pennsylvania DOC has three (3) different grievance or administrative remedy processes which collectively provide an inmate a forum to challenge every aspect of confinement. (*Id.* ¶ 12 (citing Doc. 64 at 115, Taggart Decl., ¶ 2).) Those policies are as follows: (1) the Inmate Discipline Policy, DC–ADM 801; (2) the Inmate Grievance Policy, DC–ADM 804; and (3) the Administrative Custody Policy, DC–ADM 802. (*Id.* ¶ 13 (citing Doc. 64 at 7–53, PA DOC Policy DC–ADM 801; Doc. 64 at 81–111, PA DOC Policy DC–ADM 804).) The three (3) programs each are designed to address specific issues which may arise within the prison. (*Id.* ¶ 14.) One administrative remedy may not be substituted for another. (*Id.*) Each policy clearly spells out any mandates, or exceptions, with respect to issues that must be addressed, or conversely, excluded from consideration, under the policy. (*Id.*)

Inmates challenging their initial or continued confinement in any one of the DOC's level 5 housing units (i.e., RHU, Special Management Unit ("SMU"), or Long Term Segregation Unit), are required to challenge their placement either through DC–ADM 801 or DC–ADM 802, depending upon whether their placement is a form of Administrative Custody ("AC") or Disciplinary Custody ("DC"). (*Id.* ¶ 15) Inmates are not permitted to challenge their AC or DC placement through DC–ADM 804, the Inmate Grievance Policy. (*Id* . ¶ 16.) That prohibition derives from the fact that the level 5 housing units are the most secure and controlled areas within the institution, designed to house inmates posing problematic safety

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

and security concerns, and requiring their segregation from general population. (*Id.*) Decisions related to the management of these units are primarily committed to the Program Review Committee ("PRC"), which consists of the prison officials most familiar with these inmates and the unit. (*Id.*)

An RHU inmate's challenge to his initial or continued confinement in AC is only properly exhausted for purposes of the PLRA when the inmate complies with the administrative remedy process set forth in DC–ADM 802, rather than DC–ADM 804. (*Id.*) However, RHU inmates are **not** precluded from filing grievances pursuant to DC–ADM 804 relating to issues impacting their quality of life other than the reasons for their confinement in the RHU. (*Id.* ¶ 17.)

**\*8** Within the DC–ADM 804, the PA DOC established a three (3) step Inmate Grievance system to provide inmates with an avenue to resolve specific problems. (*Id.* ¶ 18.) Pursuant to DC–ADM 804, which, in its relevant form, took effect on January 3, 2005, all inmates under the jurisdiction of the DOC shall have access to a formal procedure through which the resolution of problems or other issues of concern arising during the course of confinement may be sought. (*Id.* ¶ 19; Doc. 64 at 81–111, DC–ADM 804.)

An inmate may seek initial review by filing a grievance within fifteen (15) working days after the events upon which the claims are based. (*Id.*) After receipt of the initial review decision, an inmate may file an appeal from that decision to the facility manager within ten (10) working days of the date of the decision. (*Id.* ¶ 20.) After receipt of the facility manager's decision, an inmate may file a final appeal of that decision to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen (15) working days. (*Id.* ¶ 21.)

If a grievance is determined to be improperly submitted, it is assigned a grievance number and re-

turned to the inmate unprocessed. (*Id.* ¶ 22.) A rejected grievance, if resubmitted, must be resubmitted under the same grievance number within five (5) working days. (*Id.* ¶ 23.) An appeal to final review cannot be completed unless an inmate complies with all established procedures. (*Id.* ¶ 24.)

PA–DCM 801 provides an administrative procedure to operate a disciplinary process that provides clear notice of prohibited behavior, outlines a fundamentally fair hearing process, and establishes consistent sanctions for violations of Department rules and regulations. (*Id.* ¶ 25; Doc. 64 at 7–53, DC–ADM 801.) DC–ADM 801 provides a process for resolution of alleged inmate violations. (*Id.* ¶ 26.) If a violation is determined to need formal resolution, the initial misconduct is heard by a hearing examiner. (*Id.*)

Within seven (7) days of conducting a hearing, a hearing examiner is required to determine whether the inmate is guilty of the misconduct charge based on the preponderance of the evidence that the inmate committed the misconduct. (Doc. 64 at 27, DC–ADM 801, § I.) After the hearing has concluded, the hearing record is forwarded to the Facility Manager/designee for review to ensure that the hearing was conducted in accordance with procedures and that the action taken conformed to facility regulations. (*Id.* at 33 § K.)

Where an inmate is found guilty of misconduct charges, a three (3) step appeal process is available. (Doc. 65, Dfts.' SMF, ¶ 27.) First, an inmate may appeal from the hearing examiner's decision to the PRC within fifteen (15) working days of the hearing. (*Id.*) Next, within seven (7) days from the date of the PRC's decision, an inmate may file an appeal from that decision to the Superintendent. (*Id.*) Finally, within seven (7) days from the date of the Superintendent's decision, an inmate may appeal that decision to the Chief Hearing Examiner. (*Id.*)

**5. Facts Regarding Plaintiff's Grievances from**

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

**6/26/07–10/31/07**

**\*9** Ian Taggart previously was employed as the Assistant to the Superintendent at SCI Camp Hill. (*Id.* ¶ 28.) In that capacity, he was responsible for reviewing, tracking, and referring all grievances filed at that institution to an appropriate grievance officer. (*Id.*) He also has access to and can review inmate files and the tracking system for misconduct information. (*Id.*) Taggart has submitted a Declaration verifying that he has reviewed the grievance records for those grievances filed by Plaintiff during the time period from June 26, 2007 through October 31, 2007, and has determined that Plaintiff filed ten (10) grievances during that time period. (*Id.* ¶ 30; Doc. 64 at 123, Taggart Decl., ¶ 20.)

Taggart also has declared that, upon review of these records, he has determined that none of these ten (10) grievances were appealed by Ingram to the final stage of review, which is the final appeal to the SOIGA. (Doc. 64 at 123–127 ¶¶ 20–30.)

The DOC employs Michael Bell as an Administrative Officer 2 in the SOIGA. (Doc. 65 ¶ 41.) Bell, who is a records custodian for all grievances submitted to the SOIGA, has submitted a Declaration stating that he reviewed the grievance appeal records for the grievances filed by Ingram during the time period from June 26, 2007 through October 31, 2007, and he also has determined that Ingram did not appeal any grievance to the final stage, which is the final appeal to the SOIGA. (Doc. 64 at 131–137, Bell Decl., ¶ 9.)

The details as to the ten (10) grievances filed by Ingram from June 26, 2007 through October 31, 2007 are as follows:

Grievance No. 198034, dated August 20, 2007, was filed on August 23, 2007. (Doc. 65, Dfts. SMF, ¶ 31; Doc. 64 at 145, Grievance No. 198034.) In this grievance, Ingram complained that, despite his requests, he was not being given his legal and religious

materials that he is entitled to have in his possession in the RHU. (*Id.*) On August 30, 2007, Defendant Unit Manager Chambers provided a response indicating that Ingram had received his property on August 22, 2007 per his request. (Doc. 65 ¶ 31; Doc. 64 at 147, 8/30/07 Response.) The grievance was deemed resolved. (*Id.*) Ingram did not file an appeal. (*Id.;* Doc. 64 at 123, Taggart Decl., ¶ 21; Doc. 64 at 135, Bell Decl., ¶ 9.)

Grievance No. 198205, dated August 21, 2007, was filed on August 24, 2007. (*Id.* ¶ 32; Doc. 64 at 149, Grievance No. 198205.) In this grievance, Ingram explains that he is grieving the fact that Defendant Correctional Officer Brown filed a misconduct report against him on August 17, 2007 in retaliation for Ingram having informed Brown that he was going to submit a grievance form. (Doc. 64 at 149.) He also states that he wants to file a grievance against a correctional officer who denied him access to the commissary for no reason. (*Id.*) On August 24, 2007, Defendant Grievance Coordinator Taggart provided a response explaining that the grievance was being returned as improperly submitted because grievances relating to inmate disciplinary issues are to be submitted under the procedures set forth in DC–ADM 801, and also because grievances based upon separate events must be presented separately. (Doc. 64 at 151, 8/24/07 Response.) Ingram did not file an appeal. (Doc. 65 ¶ 32; Doc. 64 at 123, 125, Taggart Decl., ¶ 22; Doc. 64 at 135, Bell Decl., ¶ 9.)

**\*10** Grievance No. 198547, dated August 26, 2007, was filed on August 28, 2007. (Doc. 65 ¶ 33; Doc. 64 at 153, Grievance No. 198547.) In the grievance, Ingram complains that the medical department was requiring him to take medication that he does not want or need on the basis that he was required by state law to take it, but he disputed that such a law exists. (Doc. 64 at 153.) After a ten (10) day extension was granted to provide a response to the grievance (*see* Doc. 64 at 155), on September 20, 2007, Defendant Medical Administrator Teresa Law provided a

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

response explaining that Plaintiff is not required to take the medication, but that his desire not to take a medication does not indicate that the medication is not necessary or result in the cancellation of the prescription. (Doc. 64 at 157, 9/20/07 Response.) Law further explained that when an inmate refuses medication, a Medical Refusal form is completed and signed by an inmate indicating that he understands the potential adverse consequences to his health as a result of his refusal of medication. (*Id.*) Ingram did not file an appeal. (Doc. 65 ¶ 33; Doc. 64 at 125, Taggart Decl., ¶ 23; Doc. 64 at 135, Bell Decl., ¶ 9.)

Grievance No. 198550, dated August 27, 2007, was filed on August 28, 2007. (Doc. 65 ¶ 34; Doc. 64 at 159, Grievance No. 198550.) In this grievance, Plaintiff again complained about the issuance of a misconduct report against him on August 17, 2007 by Defendant Brown. (Doc. 64 at 159.) On August 28, 2007, Defendant Taggart again issued a response to Plaintiff explaining that the grievance was being returned as improperly submitted because grievances relating to inmate disciplinary issues are to be submitted under the procedures set forth in DC–ADM 801. (*Id.* at 161, 8/28/07 Response.) Ingram did not file an appeal. (Doc. 65 ¶ 34; Doc. 64 at 125, Taggart Decl., ¶ 24; Doc. 64 at 135, Bell Decl., ¶ 9.)

Grievance No. 198698, dated August 28, 2007, was filed on August 29, 2007. (Doc. 65 ¶ 35; Doc. 64 at 163, Grievance No. 198698.) In this grievance, Ingram complained that a correctional officer "blatantly refused" to take his mail on August 27, 2007. (Doc. 64 at 163.) On September 5, 2007, a response was issued dismissing the grievance as frivolous and suggesting that, in future, Plaintiff refer to the RHU block rules or speak to an RHU staff member if he had a question regarding operating procedures such as mail pick up. (Doc. 64 at 165, 9/5/07 Response.) Ingram did not file an appeal. (Doc. 65 ¶ 35; Doc. 64 at 125, Taggart Decl., ¶ 25; Doc. 64 at 135, Bell Decl., ¶ 9.)

Grievance No. 199016, dated August 29, 2007, was filed on September 4, 2007. (Doc. 65 ¶ 36; Doc. 64 at 167, Grievance No. 199016.) In this grievance, for a third time, Ingram voiced his complaint about the issuance of a misconduct report against him on August 17 by Defendant Brown.[FN6] (Doc. 64 at 167.) On September 4, 2007, Defendant Taggart again issued a response to Plaintiff explaining that the grievance was being returned as improperly submitted because grievances relating to inmate disciplinary issues are to be submitted under the procedures set forth in DC–ADM 801. (*Id.* at 169, 9/4/07 Response.) Ingram did not file an appeal. (Doc. 65 ¶ 36; Doc. 64 at 125, Taggart Decl., ¶ 26; Doc. 64 at 135, Bell Decl., ¶ 9.)

[FN6]. In this grievance, Ingram states that he had received the "D.O . C. written response in denial of my appeal." (*See* Doc. 64 at 167.) It appears that Ingram was referring to the denial of his appeal from his misconduct by the PRC on August 28, 2007. (*See* Doc. 64 at 71, PRC Action.) Ingram properly appealed the PRC's decision through the procedures set forth in DC–ADM 801 by filing an appeal to the Superintendent on August 29, 2007. (*See* Doc. 64 at 73, 75.)

*\*11* Grievance No. 200450, dated September 13, 2007, was filed on September 14, 2007. (Doc. 65 ¶ 37; Doc. 64 at 171, Grievance No. 200450.) In this grievance, Ingram complained that Defendant Chambers' response to his first grievance (Grievance No. 198034) contained "false information" and he stated, "I would appreciate it if he is stopped from handling my grievances." (Doc. 64 at 171.) On September 27, 2007, a response was issued by Rick Southers, Major of Unit Management, denying Ingram's grievance as frivolous. (Doc. 64 at 173, 9/27/07 Response.) The Response indicated that Chambers had provided proof that what he reported in his response to the first grievance was factual. (*Id.*) The Response also stated that it was apparent that Ingram had not attempted to resolve his issue before filing a

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
(Cite as: 2010 WL 4973302 (M.D.Pa.))

grievance, and therefore Ingram clearly was misusing the grievance system. (*Id.*) Ingram did not file an appeal. (Doc. 65 ¶ 37; Doc. 64 at 127, Taggart Decl., ¶ 27; Doc. 64 at 135, Bell Decl., ¶ 9.)

Grievance No. 203813, dated October 11, 2007, was filed on October 16, 2007. (Doc. 65 ¶ 38; Doc. 64 at 175, Grievance No. 203813.) In this grievance, which was filed after Ingram's transfer to SCI Greene on September 19, 2007, Ingram complained that he mistakenly was being informed that he had exceeded his time allowance for use of the telephone. (Doc. 64 at 175.) In a response dated October 16, 2007, Superintendent Assistant Dan Davis informed Ingram that no mistake had been made because telephone records verified that Ingram had indeed exceeded his telephone usage limit. (Doc. 64 at 177, 10/16/07 Response.) Ingram did not file an appeal. (Doc. 65 ¶ 38; Doc. 64 at 127, Taggart Decl., 28; Doc. 64 at 135, Bell Decl., ¶ 9.)

Grievance No. 203814 [FN7], dated October 15, 2007, was filed on October 16, 2007. (Doc. 65 ¶ 39; Doc. 64 at 179, Grievance No. 203814.) In this grievance, Ingram complained that his legal mail was improperly opened outside of his presence. (Doc. 64 at 179.) In a response dated October 17, 2007, Business Manager Jean W. Scott denied the grievance and explained that the mail Ingram was referring to was not properly identified as legal mail, and therefore, the fact that it was opened outside of his presence did not violate DC–ADM 803, which sets forth procedures for the handling of inmate mail. (*Id.* at 181, 10/17/07 Response.) Ingram did not file an appeal. (Doc. 65 ¶ 39; Doc. 64 at 127, Taggart Decl., ¶ 29; Doc. 64 at 135, Bell Decl., ¶ 9.)

> FN7. In their Statement of Material Facts, Defendants refer to Grievance No. 200814; however, it is clear from the copy of the grievance that the correct identification is Grievance No. 203814. (*See* Doc. 64 at 179.)

Grievance No. 205693, dated October 30, 2007, was filed on October 31, 2007. (Doc. 65 ¶ 40; Doc. 64 at 183, Grievance No. 205693.) In this grievance, Ingram reiterated his complaint previously set forth in Grievance No. 198547 that he was being forced to take medication that he did not want or need. (Doc. 64 at 183.) Ingram also requested a chest x-ray. (*Id.*) On October 31, 2007, Superintendent Assistant Dan Davis issued a response rejecting the grievance because grievances based upon different events must be presented separately, and because the grievance was not submitted within fifteen (15) working days after the events upon which it was based, as required by DC–ADM 804. (Doc. 64 at 185, 10/31/07 Response; Doc. 64 at 81–111, DC–ADM 804.) Ingram did not file an appeal. (Doc. 65 ¶ 40; Doc. 64 at 127, Taggart Decl., ¶ 30; Doc. 64 at 135, Bell Decl., ¶ 9.)

**6. Facts Regarding 8/17/07 Misconduct Report**

**\*12** John Andrade is the Hearing Examiner Supervisor and an employee of the PA DOC Office of Chief Counsel and its Office of Chief Hearing Examiner. (Doc. 65 43.) Andrade has submitted a Declaration in which he verifies that he has researched and reviewed, through the Office of Chief Hearing Examiner files and PA DOC records, the misconduct records involving Plaintiff, and specifically the records pertaining to Misconduct A833128, which was issued to Plaintiff on August 17, 2007, to determine if Plaintiff properly appealed this misconduct to final review. (Doc. 64 at 57–59, Andrade Decl.; Doc. 64 at 63, Misconduct A833128.)

Andrade declares that Plaintiff did not appeal this misconduct to final review. (*Id.* at 57 ¶ 2.) Specifically, Andrade indicates that, after the issuance of the misconduct on August 17, 2007, a hearing was held on August 20, 2007, after which Ingram was found guilty of one of the charges, namely refusing an order. (*Id* . ¶ 3; Doc. 64 at 67, Disciplinary Hearing Report.) On August 20, 2007, Ingram filed an appeal to the PRC, which was received on August 24, 2007. (Doc. 64 at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

59 ¶ 3; Doc. 64 at 69, Misconduct Hearing Appeal.) The guilty finding was upheld by the PRC on August 28, 2007. (Doc. 64 at 59 ¶ 3; Doc. 64 at 71, PRC Action.) On August 29, 2007, Ingram filed an appeal to the Superintendent, which was received on September 4, 2007. (Doc. 64 at 59 ¶ 3; Doc. 64 at 73, 75, Appeal to Superintendent.) The PRC finding was upheld by the Superintendent on September 4, 2007. (Doc. 64 at 59 ¶ 3; Doc. 64 at 77, PA DOC Records of Misconducts for Plaintiff.) As verified by Andrade, Ingram did not appeal the Superintendent's decision to the Office of Chief Hearing Examiner, the final stage of appeal. (Doc. 64 at 58–59 ¶¶ 2–3; Doc. 64 at 77.)

## C. Analysis

Defendants have demonstrated that Ingram failed to exhaust his administrative remedies as to any of his remaining claims in this action. Specifically, on the record before the Court developed through the instant Motion, Defendants have established that Plaintiff failed to exhaust his administrative remedies under DC–ADM 801 as to his retaliation claim against Brown. Although Plaintiff filed an appeal to the PRC from the Disciplinary Hearing Report finding him guilty of refusing to obey an order (*see* Doc. 64 at 69), and an appeal from the PRC's decision to the Superintendent (*see id.* at 73, 75), he failed to file an appeal to the Office of Chief Hearing Examiner, the final required step to exhaust his administrative remedies under DC–ADM 801 (*see* Doc. 64 at 58–59 ¶¶ 2–3; Doc. 64 at 77.) In opposing the instant Motion, Plaintiff has failed to submit any evidence to dispute that he failed to exhaust his administrative remedies with respect to his retaliation claim against Brown.

On the record presently before the Court, Defendants also have established that Plaintiff failed to exhaust his administrative remedies under the procedures provided through DC–ADM 804 as to his access to the courts claim against Defendants Chiles, Chambers, and Taggart. Plaintiff has failed to submit any evidence to refute that Defendant Chambers responded to Grievance No. 198034, filed on August 23,

2007, in which Plaintiff complained about not being given access to his legal and religious materials during his confinement in the RHU, by observing that Plaintiff had in fact received his property pursuant to his request. (*See* Doc. 64 at 145, Grievance No. 198034; Doc. 64 at 147, 8/30/07 Response.) Significantly, Plaintiff also has not disputed that he did not file an appeal from Chambers' response to his grievance. (*See* Doc. 65 ¶ 31; Doc. 64 at 123, Taggart Decl., ¶ 21; Doc. 64 at 135, Bell Decl.,¶ 9.) In addition, Plaintiff has not submitted any evidence to controvert the record showing that he did not file an appeal from the denial of his grievance filed at Grievance No. 200450 in which he complained about Defendant Chambers' response to Grievance No. 198034. (*See* Doc. 65 ¶ 37; Doc. 64 at 127, Taggart Decl., ¶ 27; Doc. 64 at 135, Bell Decl., ¶ 9.)

**\*13** Finally, on the record developed through the instant Motion, Defendants have met their burden of establishing that Plaintiff failed to exhaust his administrative remedies under the procedures provided through DC–ADM 804 as to his deliberate indifference claim against Defendant Law. It is undisputed that the grievance at issue is Grievance No. 198547, dated August 26, 2007, and filed on August 28, 2007. (*See* Doc. 65 ¶ 33; Doc. 64 at 153, Grievance No. 198547.) In this grievance, Ingram complains that the Medical Department was requiring him to take medication that he did not want or need on the basis that he was required by state law to take it, but he disputed that such a law exists. (Doc. 64 at 153.) Plaintiff has failed to present any evidence on the instant record that, after an extension of time was granted to respond to his grievance, on September 20, 2007, Defendant Law provided a response explaining that Plaintiff is not required to take the medication, but that his desire not to take a medication does not indicate that the medication is not necessary or result in the cancellation of the prescription. (Doc. 64 at 157, 9/20/07 Response.) Plaintiff also has failed to refute that, as explained by Law in her response, if he chose to exercise his option to refuse medication, he could do so and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

would simply need to participate in the completion of a Medical Refusal Form indicating that he understands the potential adverse consequences to his health as a result of his refusal of medication. (*Id.*) Ingram also has failed to present any evidence to show that there is a genuine issue of material fact as to his failure to file an appeal after Law provided her response. (*See* Doc. 65 ¶ 33; Doc. 64 at 125, Taggart Decl., ¶ 23; Doc. 64 at 135, Bell Decl., ¶ 9.)

In his brief in opposition to the instant Motion for Summary Judgment, Ingram argues that Defendants cannot be granted judgment as a matter of law on the basis of his failure to exhaust administrative remedies because the Court previously made a finding on this issue. (*See* Doc. 74, Opposition Brief, at 7.) Specifically, Ingram claims that, in his April 17, 2009 Report and Recommendation recommending the denial of the previous motion for summary judgment filed on behalf of Defendants, Magistrate Judge Smyser found that each of the Defendants had failed to present evidence to establish that Plaintiff failed to exhaust his administrative remedies. (*See id.*) Ingram then observes that Judge Vanaskie adopted the Report and Recommendation, and in doing so, noted the failure of Defendants to object to the Recommendation. (*See id.* at 7–8.) In addition, Ingram notes that Judge Vanaskie denied a verbal request made by counsel for Defendants during a telephonic scheduling conference on March 10, 2010 to file a renewed motion for summary judgment. (*See id.* at 8.)

In arguing that this Court is bound by the finding made on the record developed in a previous motion for summary judgment that Defendants failed to meet their burden to show that Plaintiff failed to exhaust his administrative remedies, Ingram appears to be invoking the law of the case doctrine. The Third Circuit recently summarized this doctrine as follows:

**\*14** The 'law of the case ... doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in sub-

sequent stages in the same case.' *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). The 'doctrine does not restrict a court's power but rather governs its exercise of discretion.' *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron,* 123 F.3d 111, 116 (3d Cir.1997) (citations omitted). 'A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice.' *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (citing *Arizona,* 460 U.S. at 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318).

*Feesers, Inc. v. Michael Foods, Inc.,* 591 F.3d 191, 207 (3d Cir.2010). In denying Defendants' previous motion for summary judgment, the Court was not deciding on a rule of law. Rather, the Court determined that, on the record before it at that time, Defendants had not met their burden of showing that there was no genuine issue of material fact as to whether Plaintiff exhausted his administrative remedies. Importantly, in disposing of that motion, the Court did not make a finding that Plaintiff fully exhausted the administrative remedies that were available to him; rather, it only decided that Defendants had not proven that Plaintiff had failed to properly exhaust. Therefore, when Defendants submitted a pretrial memorandum in preparation for the July 9, 2010 Pretrial Conference in which they advanced potentially meritorious arguments concerning both Plaintiff's failure to exhaust his claims and the claims themselves (*see* Doc. 54), there was no previous finding of law in this case that precluded this Court's determination that it was in the interest of judicial economy to allow Defendants to submit their arguments in a renewed motion for summary judgment before we conducted any further proceedings in this case.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

Ingram also points out that a verbal request by counsel for Defendants during a March 8, 2010 telephonic scheduling conference to re-open the dispositive motion deadline was denied. (*See* Doc. 74 at 8.) To the extent that Plaintiff argues that, but for the opportunity Defendants have been given to submit the instant Motion for Summary Judgment, they would have been precluded from making any further attempt to prove that Plaintiff failed to exhaust his administrative remedies, the Third Circuit has denied to read a strict timing requirement into the PLRA for the prosecution of the affirmative defense of failure to exhaust. *See Drippe v. Tobelinski,* 604 F.3d 778, 781 (3d Cir.2010). Therefore, Defendants still would have been permitted to submit the evidence that they have advanced in connection with the instant Motion at trial, and the burden still would have shifted to Plaintiff to refute it.

**\*15** Because Ingram has failed to dispute the facts and evidence submitted by Defendants showing that he failed to exhaust his administrative remedies with regard to any of his claims, Defendants are entitled to judgment as a matter of law. However, we observe that, even if Plaintiff had exhausted his administrative remedies, for the reasons that follow, he has failed to submit any evidence showing that there is a genuine issue for trial as to any of his claims.

Ingram's claim that Defendant Brown filed the August 17, 2007 Misconduct Report against him out of retaliation would fail on the merits. In order to state a retaliation claim, a plaintiff must satisfy three elements. First, a plaintiff must prove that he was engaged in a constitutionally protected activity. *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir.2001). Second, an inmate plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling,* 228 F.3d 220, 225 (3d Cir.2000)). This requirement is satisfied by showing adverse action " 'sufficient to deter a person of ordinary firmness from exercising his First Amendment

rights.' " *Id.* (quoting *Allah,* 229 F.3d at 225). Third, a prisoner plaintiff must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." *Id.* (quoting *Mount Healthy Bd. Of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *Suppan v. Dadonna,* 203 F.3d 228. 235 (3d Cir.2000).

Plaintiff's retaliation claim would fail on the first element. He claims that Brown issued the misconduct because Plaintiff stated his intention to submit a grievance. Stating an intention to file a grievance is not a constitutionally protected activity. Therefore, Plaintiff cannot satisfy the first prong to state a retaliation claim.

However, even if the stating of an intention was a constitutionally protected activity, Plaintiff would not be able to show that his stating of an intention to file a grievance was a "substantial or motivating factor" in the issuance of a misconduct because he was found guilty of the charge of refusal to obey an order that was set forth in the misconduct report. The Third Circuit has held that an inmate does not state a retaliation claim based on the issuance of a misconduct where the inmate is found guilty of the charge set forth in the misconduct report. *See Romansky v. Stickman,* 147 Fed. Appx. 310, 312 (3d Cir.2005) (citing *Henderson v. Baird,* 29 F.3d 464, 469 (8th Cir.1994) (stating that a finding that a prisoner violated the rules checkmates his retaliation claim)). Therefore, even if Plaintiff exhausted his administrative remedies with regard to his retaliation claim, the claim would fail on the merits.

With respect to Ingram's access to the courts claim, he has failed to submit any evidence to refute the factual record showing that, following his placement in the RHU on August 17, 2007, he received his legal property on August 22, 2007. (*See* Doc. 65 ¶¶ 8, 31; Doc. 64 at 147, 8/30/07 Response to Grievance No. 198034.) Further, it is undisputed that Ingram received his legal mail during this time period. (*See*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
**(Cite as: 2010 WL 4973302 (M.D.Pa.))**

Doc. 65 ¶¶ 8, 31.) In addition, the undisputed factual record establishes that, even though Ingram was transferred to the Luzerne County Prison on August 31, 2007, and remained there until his return to SCI Camp Hill on September 11, 2007, he was able to mail and file documents with the federal court during that time period. (*See id.* ¶ 8.)

**\*16** Moreover, to prevail on an access to the courts claim, an inmate must allege an "actual injury" to his litigation efforts; to establish actual injury, an inmate plaintiff must demonstrate that a non-frivolous legal claim was frustrated or was being impeded. *Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also O'Connell v. Williams,* 241 Fed. Appx. 55, 57 (3d Cir.2007). Also, in *Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), the Supreme Court held that, in order to state a claim for denial of access to courts, a party must identify all of the following in the complaint: 1) a non-frivolous, underlying claim: 2) the official acts frustrating the litigation; and 3) a remedy that may be awarded as recompense that is not otherwise available in a future action. 536 U.S. at 415.

As observed by Defendants in their reply brief, to the extent that Plaintiff is arguing that his "actual injury" was the dismissal of his civil action against Hamovitch as a result of his failure to either pay the filing fee or submit a request to proceed *in forma pauperis,* Plaintiff cannot state a claim of denial of access to the courts under the three (3) factors set forth in *Christopher.* First, the undisputed factual record, and in particular the response to Grievance No. 198547, in which Plaintiff complains that he was forced to take medication, confirms that he was **not** forced to take medication, and therefore, his underlying claim is frivolous. Next, the undisputed factual record establishes that there were no official acts frustrating the litigation, but rather, Plaintiff received his legal property within one (1) week after his placement in the RHU and was able to mail and file documents with the court even when he was tempo-

rarily transferred to the Luzerne County Prison from August 31, 2007 through September 11, 2007. (*See* Doc. 65 8, 31; Doc. 64 at 147, 8/30/07 Response to Grievance No. 198034.) As to the third *Christopher* factor, the dismissal of Plaintiff's action against Hamovitch was *without prejudice.* Therefore, his claim was not lost because he either could have filed his application for leave to proceed *in forma pauperis* along with a motion requesting the re-opening of the case, or, he could have asserted his claim against Hamovitch in the instant action.

Finally, as to Plaintiff's claim against Defendant Law, as observed by Defendants, Plaintiff does not claim that Defendant Law forced him to take medication. Rather, he alleges that her deliberate indifference stems from her alleged failure to take action after the grievance in which he complained about being forced to take medication was referred to her. Notwithstanding the fact that Law could not be held personally liable merely based upon the fact that Plaintiff's grievance was referred to her, the undisputed factual record establishes that Law promptly responded to the grievance and informed Plaintiff that he was **not** required to take medication. Because it is undisputed that Plaintiff was not forced to take medication, even if Plaintiff had exhausted this claim, there would be no basis for his claim against Defendant Law, and she therefore would be entitled to judgment as a matter of law.

**\*17** For the foregoing reasons, Defendants are entitled to judgment as a matter of law. We now turn to a discussion of Plaintiff's Motion for Leave to File an Amended Complaint.

**PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT**
On August 3, 2010, before his opposition to Defendants' Motion for Summary Judgment was due to be filed, Plaintiff filed a Motion for Leave to File an Amended Complaint. (Doc. 72.) In his Motion, Plaintiff states that he seeks to amend by adding an

Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)
(Cite as: 2010 WL 4973302 (M.D.Pa.))

Eighth Amendment claim against Defendant Taggart because Taggart, in his capacity as Grievance Coordinator, also was aware that Plaintiff was forced to take medication that he did not want or need and failed to take any action to prevent Plaintiff from being forced to take that medication. (*Id.* at 3 ¶¶ 7–8.) In addition, Plaintiff seeks to amend by adding a Fourteenth Amendment claim against Defendants Taggart, Law, and "the SCI Camp Hill medical care provider" on the basis that they violated his liberty interest under the Fourteenth Amendment in failing to take him off the medication. (*Id.* ¶¶ 9–10.)

In considering the instant request by Plaintiff, we are mindful of the fact that *pro se* pleadings are to be construed liberally, *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), and *pro se* litigants are to be granted leave to file a curative amended complaint "even when a plaintiff does not seek leave to amend ... unless such an amendment would be inequitable or futile." *Alston v. Parker,* 363 F.3d 229, 235 (3d Cir.2004). However, a complaint that sets forth facts which affirmatively demonstrate that the plaintiff has no right to recover is properly dismissed without leave to amend. *Grayson v. Mayview State Hospital,* 293 F.3d 103, 108 (3d Cir.2002).

Plaintiff has not submitted a brief in support of his Motion as required by LR 7.5. Accordingly, it is appropriate to deem Plaintiff's Motion to be withdrawn. [FN8] However, we observe that, even if Plaintiff had filed a brief in support of his Motion, allowing him to amend would be futile because it is apparent from the undisputed factual record developed through Defendants' Motion for Summary Judgment that Plaintiff has not exhausted his administrative remedies with respect to the Eighth and Fourteenth Amendment claims he seeks to add to this action, and therefore, he would be unable to recover on these claims. *See Alston,* 363 F.3d at 235; *Grayson,* 293 F.3d at 108. Moreover, amendment also would be futile because it is apparent from the undisputed factual record Plain-

tiff was **not** required to take medication, and thus, no factual basis exists for the Eighth and Fourteenth Amendment claims he seeks to add to this action. (*See* Doc. 64 at 157, 9/20/07 Response to Grievance No. 198547.) Accordingly, Plaintiff's Motion for Leave to Amend will be denied.

> FN8. L R 7.5 requires that, within fourteen (14) days of filing of any motion, the party filing the motion file a supporting brief. The rule further provides that if a supporting brief is not filed within the required time, the motion shall be deemed withdrawn.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 62) will be granted, and judgment will be entered in favor of Defendants. In addition, Plaintiff's Motion for Leave to Amend (Doc. 72) will be denied. An appropriate Order will enter.

M.D.Pa.,2010.
Ingram v. SCI Camp Hill
Not Reported in F.Supp.2d, 2010 WL 4973302 (M.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Srisdi KIDKARNDEE, Plaintiff,
v.
Carl J. KOENIGSMANN, Chief Med. Dir., Doccs;
M.D. Pang Kooi, Facility Health Servs. Dir., Auburn
Corr. Facility; and Nancy Ryerson, Nurse Practitioner,
Auburn Corr. Facility, Defendants.

No. 9:12–CV–0502 (GTS/CFH).
Signed March 25, 2014.

Srisdi Kidkarndee, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Kevin B. Hickey, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for De-
fendants.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se*
prisoner civil rights action filed by Srisdi Kidkarndee
("Plaintiff") against the three above-captioned New
York State correctional employees ("Defendants"),
are (1) Defendants' motion for summary judgment, (2)
United States Magistrate Judge Christian F. Hummel's
Report–Recommendation recommending that De-
fendants' motion be granted, and (3) Plaintiff's Ob-
jections to the Report–Recommendation.
(Dkt.Nos.32, 41, 44.) For the reasons set forth below,
Magistrate Judge Hummel's ReportRecommendation
is accepted, Defendants' motion is granted, and Plain-
tiff's Complaint is dismissed.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Generally, construed with the utmost of special
liberality, Plaintiff's Complaint asserts the following
four claims against Defendants: (1) a claim that De-
fendants were deliberately indifferent to Plaintiff's
serious medical needs in violation of the Eighth
Amendment; (2) a claim that Defendants denied
Plaintiff due process in violation of the Fourteenth
Amendment; (3) a claim that Defendants infringed on
Plaintiff's right of free speech and/or freedom of reli-
gion in violation of the First Amendment; and (4) a
claim that Defendants denied Plaintiff access to
counsel in violation of the Sixth Amendment. (*See
generally* Dkt. No. 1.)

Because this Decision and Order is intended
primarily for the review of the parties, the Court will
not recite the factual allegations supporting these
claims in Plaintiff's Complaint. Rather, the Court will
merely note that, in its memorandum of law, De-
fendants have accurately summarized those factual
allegations. (Dkt. No. 32, Attach. 3, at 3–5 [attaching
pages "1" through "3" of Defs.' Memo. of Law].)

### B. Parties' Briefing on Defendants' Motion

Generally, in their memorandum of law in chief,
Defendants assert the following two arguments: (1)
based on the current record, Plaintiff cannot adduce
admissible record evidence in support of either the
objective prong or the subjective prong of his claim of
deliberate indifference to a serious medical need under
the Eighth Amendment; and (2) his remaining claims
fail to allege facts plausibly suggesting, and/or are
unsupported by admissible record evidence estab-
lishing, a violation of the First, Sixth or Fourteenth
Amendment, particularly due to the lack of injury, the
lack of personal involvement, the lack of racial ani-
mus, and the fact that the claims were asserted not by

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

Plaintiff but by the inmate who assisted Plaintiff in drafting his Complaint. (*See generally* Dkt. No. 32, Attach. 3.)

Generally, in his opposition memorandum of law, Plaintiff asserts the following two arguments: (1) based on the current record, there is (at least) a genuine dispute of material fact regarding whether Plaintiff possessed a serious medical need during the time in question, and whether Defendants acted with deliberate indifference to that serious medical need; and (2) the factual allegations of Plaintiff's Complaint, and the record evidence on Defendants' motion, should be viewed even more strongly than usual in favor of Plaintiff, given that he is proceeding *pro se,* he has a limited grasp of the English language, he made numerous requests for the appointment of counsel, and much of his own deposition is non-responsive and thus incomplete. (Dkt. No. 39.)

**\*2** Generally, in their reply letter-brief, Defendants assert the following three arguments: (1) despite the fact that both Defendants and the Court served Plaintiff with a notice of the consequences of failing to properly respond to Defendants' motion, Plaintiff failed to file a Response to Defendants' Statement of Material Facts (or even an affidavit), effectively admitting all of the properly supported factual assertions contained in that Statement; (2) even setting aside these admissions, no admissible record evidence exists from which a rational fact finder could conclude that (a) Plaintiff suffered a heart attack in 2011 (as opposed to some less-severe condition), (b) Defendants acted with a sufficiently culpable mental state with regard to Plaintiff's health condition; and (3) at the very least, Plaintiff has conceded that summary judgment should be granted in favor of Defendant Koenigsman. (Dkt. No. 40.)

**C.    Magistrate   Judge   Hummel's   Report–Recommendation**

Generally, in his Report–Recommendation, Magistrate Judge Hummel concluded that Plaintiff's

Complaint should be dismissed in its entirety for each of the reasons stated by Defendants in their memoranda of law. (*See generally* Dkt. No. 41.) In so doing, Magistrate Judge Hummel rejected the arguments asserted by Plaintiff in his opposition memorandum of law. (*Id.*) For example, in response to Plaintiff's argument that many of his deposition responses were unresponsive, Magistrate Judge Hummel stated as follows:

> [Plaintiff] does not point to specific deposition statements that are unresponsive. Conversely, a review of the record shows that the interpreter provided coherent answers that are supported by other record evidence. Further, [Plaintiff] had ample opportunity during his deposition to object to the interpreter's competency and qualifications. Furthermore, [Plaintiff] acknowledged he was provided an opportunity to make corrections to the deposition transcript, yet he failed to take advantage of that opportunity. Despite [Plaintiff's] *pro se* status and limited English proficiency, [Plaintiff] could have employed 'Inmate O's' assistance to make such corrections, which he failed to do. Given the above, [Plaintiff's] objection to the deposition is without merit. *See Risch v. Hulihan,* No. 09–CV–330, 2010 WL 5463339, at \*2–3 (N.D.N.Y. Dec. 29, 2010) (denying plaintiff's request to strike his deposition from the record based on similar reasoning).

(Dkt. No. 39, at 2–3, n. 3.)

**D. Plaintiff's Objections**

Generally, in his Objections, Plaintiff asserts the following six arguments: (1) Plaintiff is entitled to a *de novo* review of the entire Report–Recommendation because of his status as a *pro se* litigant, and because he "objects to the Magistrate's Report and Recommendation ... in its entirety"; (2) Magistrate Judge Hummel erred by not striking Plaintiff's deposition transcript, as requested by Plaintiff, because "*none* of the questions regarding plaintiff's claims and or medical condition [was] answered with any specificity";

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

(3) Magistrate Judge Hummel erred by not appointing Plaintiff counsel to assist him, and his interpreter, during the deposition; (4) Magistrate Judge Hummel erred by interpreting Plaintiff's 2011 Upstate Medical Center discharge summary as indicating that Plaintiff "had [suffered] two heart attacks in the past, the last one occurring four years prior"; (5) Magistrate Judge Hummel erred by failing to *sua sponte* review 134 pages of documents adduced by Plaintiff (without a Responsive Statement of Material Facts or even an affidavit) for evidence explaining *why* Plaintiff had three heart stents inserted (i.e., because Defendants' misdiagnosis and failure to treat caused Plaintiff's heart condition to worsen); and (6) Magistrate Judge Hummel erred by failing to recognize that factual issues exist regarding whether Defendants Kooi and Ryerson were personally involved in the constitutional violations asserted. (Dkt. No. 44.)

## II. GOVERNING LEGAL STANDARDS

### A. Standard Governing Review of a Report–Recommendation

**\*3** When a *specific* objection is made to a portion of a magistrate judge's reportrecommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c).FN1 When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.FN2 Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance.FN3

FN1. *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

FN2. *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the dis-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

trict courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

FN3. *See Zhao v. State Univ. of N.Y.,* 04–CV–0210, 2011 WL 3610717, at * 1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley,* 752 F.Supp.2d 311, 312–13 (W.D.N.Y.2009) ( "In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted).

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition.[FN4] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[FN5] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[FN6]

FN4. *See also* Brown v. Peters, 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

FN5. *See* Mario, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

FN6. *See also* Batista v. Walker, 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

**B. Standard Governing a Motion for Summary Judgment**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed.R.Civ.P. 56(a),(c),(e).

**\*4** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]. As the Supreme Court has famously explained, "[The non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.*[FN7] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received not ice of the consequences of failing to properly respond to the motion for summary judgment.)[FN8] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[FN9] For this reason, this Court has often enforced Local Rule 7.1(a) (3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement[FN10]—even where the nonmoving party was proceeding *pro se* in a civil rights case.[FN11]

FN7. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.209) (Suddaby, J.) (citing cases).

FN8. *Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases).

FN9. *Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

FN10. Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

FN11. *Cusamano,* 604 F.Supp.2d at 427 & n. 6 (citing cases).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

### III. ANALYSIS

Even when construed with the utmost of special liberality, Plaintiff's Objections specifically challenge only five portions of Magistrate Judge Hummel's ReportRecommendation. *See, supra,* Part I.D. of this Decision and Order. As explained above in Part II .A. of this Decision and Order, each of those portions must be subjected to a *de novo* review. After carefully reviewing the relevant filings in this action, the Court can find no error in those portions of the Report–Recommendation: Magistrate Judge Hummel employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (*See generally* Dkt. No. 41.) The Court rejects each of Plaintiff's specific objections as unsupported by the record, immaterial to the motion, and/or contrary to the law.

The remaining portions of Magistrate Judge Hummel's Report–Recommendation are entitled to only a clear-error review. *See, supra,* Part II.A. of this Decision and Order.[FN12] After carefully reviewing the relevant filings in this action, the Court can find no clear error in the remaining portions of the Report–Recommendation. (*Id.*)

FN12. The Court notes that Plaintiff's attempt to obtain a *de novo* review of the entire Report–Recommendation merely by relying on his *pro se* status and conclusorily objecting to the Magistrate's Report and Recommendation "in its entirety" is without avail. *See, supra,* Part II.A. of this Decision and Order.

**\*5** As a result, the Court accepts and adopts the Report–Recommendation in its entirety for the reasons stated therein. (Dkt. No. 41.) The Court would add only three brief points.

First, to the extent Plaintiff's First, Sixth and Fourteenth Amendment claims are dismissed on the alternative ground that are unsupported by factual allegations plausibly suggesting a claim, such a dismissal is permissible under the circumstances. To the extent that an argument in a motion for summary judgment is based exclusively on the factual allegations of a complaint, a dismissal under Fed.R.Civ.P. 12(b)(6) is permissible. *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) ("Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment.").[FN13] Moreover, it is not necessary to afford a *pro se* plaintiff an opportunity to amend his complaint before dismissal where the defects in his claims are substantive rather than merely formal, such that any amendment would be futile. *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000); *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990); *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). Here, the Court finds that the defects in Plaintiff's First, Sixth and Fourteenth Amendment claims are substantive rather than merely formal. Finally, Plaintiff's First, Sixth and Fourteenth Amendment claims are dismissed primarily on a lack of supporting record evidence.

FN13. In such a circumstance, the Court need not give prior notice to the party whose pleading is being analyzed. *See Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

Second, each of the factual assertions contained in Defendants' Statement of Material Facts is sup-

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

ported by an accurate record citation. (Dkt. No. 32, Attach.2.) Moreover, Plaintiff was provided with two notices of the consequences of failing to properly oppose Defendants' motion. (Dkt. No. 32, Attach. 1; Dkt. No. 34.) Indeed, he was given an extension of the deadline by which to file his papers in opposition to Defendants' motion. (Dkt. No. 37.) Despite these facts, Plaintiff failed to file a Response to Defendants' Statement of Material Facts. (*See generally* Dkt. No. 39.) As a result, the facts asserted in Defendants' Statement of Material Facts are deemed admitted. The Court notes that it has no duty to *sua sponte* sift through the record on a summary judgment motion in search of a factual dispute, even for a *pro se* litigant. *See, supra,* note 7 of this Decision and Order. Finally, such a *sua sponte* review would not save Plaintiff's Complaint from dismissal.

Third, the most prominent defect in Plaintiff's Eighth Amendment claim is the lack of admissible record evidence from which a rational fact finder could conclude that Defendants acted with a sufficiently culpable mental state in treating Plaintiff's heart condition in 2011 and 2012. Deliberate indifference describes a state of mind more blameworthy than negligence; deliberate indifference is a state of mind akin to *criminal recklessness. Cusamano v. Sobek,* 604 F.Supp.2d 416, 494 & nn. 176, 177 (N.D.N.Y. 209) (Suddaby, J.) (citing cases). While Plaintiff might disagree with the medical care he was provided, such disagreement does not give rise to a claim under the Eighth Amendment. As the Second Circuit once observed,

**\*6** It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom

or on parole enjoy the excellence in [medical] care which plaintiff [ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Hummel's Report–Recommendation (Dkt. No. 41) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 32) is *GRANTED* in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED.*

**REPORT–RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

**CHRISTIAN F. HUMMEL**, United States Magistrate Judge.

Plaintiff *pro se* Srisdi Kidkarndee ("Kidkarndee"), an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

defendants, three DOCCS medical personnel, violated his constitutional rights under the Eighth Amendment. Compl. (Dkt. No. 1). [FN2] Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 32. Kidkarndee opposes this motion. Dkt. No. 39. Defendants filed a reply. Dkt. No. 40. For the following reasons, it is recommended that defendants' motion be granted.

> FN2. Kidkarndee testified that "Inmate O" had drafted this complaint as well as several grievances on behalf of Kidkarndee because Kidkarndee's English is poor. Kidkarndee Dep. (Dkt. No. 32–6) at 41:6–43:1. While "Inmate O" does not speak Thai, Kidkarndee testified that "Inmate O" understood some of his English and ailments. *Id.* at 41:22–23. Federal courts have recognized *pro se* inmate complaints that are drafted with other inmates' assistance. *Levan v. Thomas,* No. CV–10–2278–PHX–GMS (LOA), 2011 WL 285843, at *2 n. 2 (D.Ariz. Jan. 27, 2011); *Soto v.. Olukunle Obadina,* No. 10–CV–260–MJR, 2010 WL 4103354, at *1 (S.D.Ill. Oct. 18, 2010) (all unpublished opinions are attached to this Report–Recommendation as exhibits).

**I. Background**

The facts are related in the light most favorable to Kidkarndee as the non-moving party. [FN3] *See* subsection II(A) *infra*. At all relevant times, Kidkarndee was incarcerated at Auburn Correctional Facility ("Auburn").

> FN3. In his response to defendants' motion, Kidkarndee asserts that his deposition testimony should be stricken because the Thai interpreter employed for the deposition failed to provide responsive answers to defendants' questions. Kidkarndee Resp. (Dkt. No. 39) at 5. Kidkarndee does not point to specific deposition statements that are unresponsive.

Conversely, a review of the record shows that the interpreter provided coherent answers that are supported by other record evidence. Further, Kidkarndee had ample opportunity during his deposition to object to the interpreter's competency and qualifications. Furthermore, Kidkarndee acknowledged he was provided an opportunity to make corrections to the deposition transcript, yet he failed to take advantage of that opportunity. Despite Kidkarndee's *pro se* status and limited English proficiency, Kidkarndee could have employed "Inmate O's" assistance to make such corrections, which he failed to do. Given the above, Kidkarndee's objection to the deposition is without merit. *See Risch v. Hulihan,* No. 09–CV–330, 2010 WL 5463339, at *2–3 (N.D.N.Y. Dec. 29, 2010) (denying plaintiff's request to strike his deposition from the record based on similar reasoning). Accordingly, Kidkarndee's objection to the deposition is denied and the Court proceeds to consider the deposition as record evidence.

**A. Introduction**

Kidkarndee's medical record shows that on July 23, 2008 he had a heart attack, also known as a myocardial infarction. Dkt. No. 33 at 10. Since then, Auburn's cardiology department has been monitoring Kidkarndee. Kooi Decl. (Dkt. No. 32–7) ¶ 10; *see, e.g.,* Dkt. No. 33 at 10, 125–26, 133. Kidkarndee alleged that he had a heart attack on or around September 29, 2011 and some time in March 2011. Compl. at 4. The record is devoid of any evidence indicating that Kidkarndee suffered a heart attack since 2008 or in 2011. [FN4] Kooi Decl. ¶ 11; *see* Dkt. No. 33 at 16, 57.

> FN4. Kidkarndee testified that altogether, he has had three heart stents. Kidkarndee Dep. (Dkt. No. 32–6) at 6:22–24. A stent is a "slender rod- or threat-like device used to

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

provide support for tubular structures ....“ *Dorland's Illustrated Med. Dictionary* 1577 (28th ed.1994) [hereinafter “DORLAND'S”].

**\*7** Kidkarndee contends that he has several other medical issues including: high blood pressure; asthma; lower back injury; damage in the upper-spine; knee damage; and sensitive wrists and arms. Compl. at 6. Kidkarndee alleged that he incurred these injuries as a Thai soldier in the 1970s. *Id.* In 2010, Kidkarndee had X-rays taken of his lumbar spine, cervical spine, and right knee. Kooi Decl. ¶ 26; Dkt. No. 33 at 12–15. The X-rays indicated that Kidkarndee's right knee was normal and his spine showed degenerative changes; however, no treatment was required at the time. Kooi Decl. ¶ 26; Dkt. No. 33 at 12–15. Kidkarndee's medical record contains no entry indicating Kidkarndee had ever complained of wrist pain. Kooi Decl. ¶ 27. Kidkarndee's speciality care records show that he saw specialists in cardiology (Dkt. No. 33 at 125–26, 133), physical therapy (*id.* at 112), endocrinology (*id.* at 121), and optometry (*id.* at 35, 135). Kidkarndee takes twenty prescription pills daily for his medical conditions, in particular for pain relief, diarrhea, high blood pressure, and coronary artery disease (“CAD”). Kidkarndee Dep. (Dkt. No. 32–6) at 8:2–4, 22, 22, 9:2–5, 7–12, 24.

Kidkarndee further testified that Auburn was providing him an improper diet consisting of expired foods and foods that adversely affect his health such as tuna, to which he is allergic, and bologna, which increases his blood pressure. Kidkarndee Dep. at 21:1–12; 23:15–25. By letter dated February 20, 2012, Kidkarndee was advised he was terminated from the therapeutic diet meal program for accruing more than three unexcused absences from the diet within one week.[FN5] Dkt. No. 33 at 94.

FN5. Kidkarndee has attempted to allege an Eighth Amendment claim against prison officials based on being provided an improper diet. The intentional failure to provide an

inmate with a medically prescribed diet over a prolonged period of time can constitute deliberate indifference. *Davidson v. Desai,* 817 F.Supp.2d 166, 189 (W.D.N.Y.2011) (citing *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983)). Here, the record shows that Kidkarndee was terminated from the diet program because he missed a certain number of meals. While an issue of fact exists as to why Kidkarndee missed those meals and whether Kidkarndee was notified that unexcused absences may be cause for termination from the diet program, Kidkarndee does not indicate how he was adversely affected by the termination. Moreover, record evidence shows that Kidkarndee was returned to the program four days after the initial discontinuance. Dkt. No. 39–1 at 45–46. Given the lack of evidence indicating that Kidkarndee was harmed in any manner as well as the relatively short period of time that Kidkarndee was subjected to an improper diet, Kidkarndee has failed to establish this claim. Accordingly, Kidkarndee's potential Eighth Amendment claim based on the denial of a medically prescribed diet must fail.

**B. February 27, 2011–November 7, 2011**

On February 27, 2011, Kidkarndee was seen at emergency sick call for complaints of chest pain. Kooi Decl. ¶ 13; Dkt. No. 33 at 16. Kidkarndee was given nitroglycerin but because it yielded poor results, he was assessed via video at Auburn by Erie County Medical Center and then transferred to SUNY Upstate Medical Center (“Upstate Medical”). Kooi Decl. ¶ 14; Dkt. No. 33 at 16. On March 1, 2011, Kidkarndee was discharged and diagnosed with bronchitis and hypokalemia.[FN6] Dkt. No. 33 at 16. Upstate Medical's discharge summary indicated that Kidkarndee had two heart attacks in the past, the last one occurring four years prior, and recommended that Kidkarndee fol-

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

low-up with a prison facility physician within one week. *Id.* at 18–19. Kidkarndee was given an antibiotic to treat bronchitis and potassium chloride to treat hypokalemia. *Id.* at 16, 21.

> FN6. Hypokalemia refers to "abnormally low potassium concentration in the blood; it may result from excessive potassium loss by the renal or the gastrointestinal route, from decreased intake, or from transcellular shifts." DORLAND'S at 807.

On March 25, 2011, defendant Nurse Practitioner Ryerson saw Kidkarndee for complaints of chronic diarrhea and provided medication for relief. Dkt. No. 33 at 130. On May 24, 2011, Ryerson saw Kidkarndee to confirm a cardiology appointment and have Kidkarndee sign a Contract for Specialty Care Appointment form. Ryerson Decl. (Dkt. No. 32–8) ¶ 13; Dkt. No. 33 at 31.

**\*8** On June 13, 2011, non-party Cardiologist Dr. Patel followed up with Kidkarndee at Auburn. Dkt. No. 33 at 125. On July 14, 2011, Dr. Patel saw Kidkarndee and noted Kidkarndee's electrocardiogram ("EKG") was "ok." Dkt. No. 33 at 133.

On September 29, 2011, Kidkarndee was admitted to Auburn Memorial Hospital based on complaints of chest pain. Kooi Decl. ¶ 16; Dkt. No. 33 at 54. Kidkarndee was diagnosed with chest pains, CAD, hypertension, hypercholesterolemia, and adrenal insufficiency. Kooi Decl. ¶ 16; Dkt. No. 33 at 57. He was transferred to Upstate Hospital for further observation. Kooi Decl. ¶ 17; Dkt. No. 33 at 58–59. Upstate Hospital's discharge summary dated October 3, 2011 indicates that Kidkarndee was diagnosed with "atypical chest pain most likely musculoskeletal." [FN7] Kooi Decl. ¶ 17; Dkt. No. 33 at 59. Upstate Hospital directed Kidkarndee to follow up with a cardiologist at his correctional facility within two to four weeks and with his primary care provider within one week. Kooi

Decl. ¶ 18; Dkt. No. 33 at 60, 76.

> FN7. Kidkarndee's treating physician at Auburn Memorial opined, "[a]t this time, I do not feel that this is a cardiac chest pain. I would suspect more of [gastrointestinal] GI related pain." Dkt. No. 33 at 55.

Kidkarndee contends that on or around October 20, 2011, contrary to defendant Dr. Kooi's assurance, Kidkarndee was denied a recommended follow-up exam at Upstate Hospital. Compl. ¶ 5. Instead, Kidkarndee was sent to Oneida Correctional Facility ("Oneida") and seen by a nurse who failed to check his heart rate. *Id.*

On November 7, 2011, Dr. Patel saw Kidkarndee, prescribed him medication to treat his blood pressure, and directed him to follow up with cardiology in six months. Kooi Decl. ¶ 19; Dkt. No. 33 at 143. On November 8, 2011, Dr. Kooi ordered the medication that Dr. Patel prescribed. Kooi Decl. ¶ 20; Dkt. No. 33 at 89.

### C. January 9, 2012–November 7, 2012

On January 9, 2012, Kidkarndee was seen at emergency sick call with complaints of chest pain. Kooi Decl. ¶ 21; Dkt. No. 33 at 92. Kidkarndee had stopped taking his prescription medication since January 5, 2012. Kooi Decl. ¶ 21; Dkt. No. 33 at 92. An EKG was done and it showed no changes. Kooi Decl. ¶ 21; Dkt. No. 33 at 92. On January 13, 2012, Kidkarndee had a basic metabolic panel of bloodwork done as well as another EKG. Kooi Decl. ¶ 22; Dkt. No. 33 at 92.

On January 19, 2012, Ryerson saw Kidkarndee. Ryerson Decl. ¶ 14; Dkt. No. 33 at 93. Ryerson noted that an EKG conducted earlier that day indicated no changes. Ryerson Decl. ¶ 14; Dkt. No. 33 at 93. Ryerson directed Kidkarndee to have his blood pressure checked weekly and saw no need for further

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

treatment at that time. Ryerson Decl. ¶ 14; Dkt. No. 33 at 93.

On January 20, 2012, Ryerson treated Kidkarndee's complaints of night time cough, heaviness in the chest, and vomiting. Ryerson Decl. ¶ 15; Dkt. No. 33 at 93. Ryerson noted that despite claims of vomiting, Kidkarndee's mucous membranes were moist. Ryerson Decl. ¶ 15; Dkt. No. 33 at 93. Ryerson prescribed Kidkarndee a nasal decongestant for coughs but did not see any indicated need for further treatment at that time. Ryerson Decl. ¶ 15; Dkt. No. 33 at 93.

**\*9** Kidkarndee contends that by letter dated February 17, 2012, Dr. Koenigsmann denied him medical care because of his inmate status.[FN8] Compl. at 7. Kidkarndee contends that Dr. Koenigsmann should have ordered subordinates to provide him with further medical treatment such as ordering a magnetic resonance imaging ("MRI") and blood tests. Id. at 8.

> FN8. To the extent that Kidkarndee attempted to make a potential First Amendment retaliation claim or Fourteenth Amendment equal protection claim against Dr. Koenigsmann, such claims are without merit. A correspondence dated January 12, 2012 addressed to Kidkarndee from the Inmate Grievance Program Director indicates that Kidkarndee's grievance regarding medical care was pending Central Office Review Committee ("CORC") disposition. Dkt. No. 1–1 at 4. The correspondence does not suggest that the matter was referred to Dr. Koenigsmann. Another correspondence was addressed to Kidkarndee from a regional health services administrator, who advised Kidkarndee that, pursuant to Directive # 4040, they do not handle grievances. Dkt. No. 1–1 at 1. There is nothing in either letter advising Kidkarndee that he was denied medical treatment because of his inmate

status nor is such evidence contained in the record. Accordingly, Kidkarndee's potential First and Fourteenth Amendment claims must be dismissed.

On March 19, 2012, Dr. Kooi ordered that Kidkarndee be transferred to Auburn Memorial for complaints of chest pains, where his chest pains were opined to be possibly gastrointestinal-related. Dkt. No. 33 at 105. On May 14, 2012, Dr. Patel saw Kidkarndee and ordered that Kidkarndee be scheduled for a follow up appointment in one year. Kooi Decl. ¶ 25; Dkt. No. 33 at 142.

**D. Dr. Kooi**

As the Facility Health Services Director at Auburn, Dr. Kooi is responsible for determining whether an inmate requires a specialty care referral. Kooi Decl. ¶¶ 3, 8. Once an inmate is approved by DOCCS's Division of Health Services ("DHS") to see a specialist and receives treatment, Dr. Kooi defers to the treatment plan prescribed by the specialist for that specific condition. Id. ¶ 9.

Kidkarndee alleged that on multiple occasions, he sought medical attention from Dr. Kooi for the constant pain he was experiencing throughout his body. Compl. at 5. This pain was caused by the work he performed while incarcerated. Id. Kidkarndee testified that he complained to Dr. Kooi about a knee injury but Dr. Kooi opined that the knee was fine.[FN9] Kidkarndee Dep. at 26:8–27:5. Kidkarndee also had to have surgery in the region of his buttocks and Dr. Kooi performed the surgery without first administering an anesthetic. Id. at 27:23–28:10. Kidkarndee further testified that he requested a full body MRI was denied. Id. at 29:13–30:18. Kidkarndee further contends Dr. Kooi denied his request to see a specialist. Compl. at 5.

> FN9. Kidkarndee testified that he experiences knee pain when he uses stairs.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

Kidkarndee Dep. at 31:2–6.

Kidkarndee maintains that Dr. Kooi resented him because Dr. Kooi is Korean and during World War II, Kidkarndee's ancestors fought and won against Dr. Kooi's ancestors.[FN10] Compl. at 5; Kidkarndee Dep. at 32:8–33:1. Dr. Kooi attested that he is Malaysian of Chinese descent. Kooi Decl. ¶ 31. Kidkarndee also reasons that Dr. Kooi denied him certain medical treatments because they are too costly. *Id.* at 34:15–16.

FN10. Liberally construing Kidkarndee's allegations, as is required by the governing law, *see* Subsection II(A) *infra,* Kidkarndee was attempting to claim that Dr. Kooi violated his First Amendment right against retaliation when Dr. Kooi denied Kidkarndee medical treatment based on racial animus. To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Here, Kidkarndee fails to show any causal connection based on racial animus, particularly in part due to kidkarndee's mistaken belief that Dr. Kooi is of Korean descent. As such, Kidkarndee's allegations also fail to satisfy a Fourteenth Amendment equal protection claim. *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."). Accordingly,

Kidkarndee's potential First and Fourteenth Amendment claims against Dr. Kooi must fail.

**E. Nurse Ryerson**

Kidkarndee contends that Nurse Ryerson has the authority to review an inmate's medical records and prescribe certain treatments to alleviate pain until an inmate is examined by a physician. Compl. at 6–7. However, Kidkarndee contends that Ryerson denied him medical attention on multiple occasions for asthma and pain in the lower back, upper back, knees, wrists, or arms. *Id.*

As a Nurse Practitioner at Auburn, Ryerson treats inmates by appointment and on an emergency basis when there is a need for an inmate to see a nurse practitioner or a medical doctor. Ryerson Decl. ¶¶ 2, 7. Ryerson was authorized to prescribe medication, refer inmates for specialty care, and create treatment plans. *Id.* ¶ 8. If an inmate presents a need to be referred for specialty care, Ryerson makes a referral to DHS for approval. *Id.* ¶¶ 9–10. Once DHS approves a referral and the inmate receives treatment, Ryerson defers to the specialist's treatment plan and any treatment plan created by Dr. Kooi. *Id.* ¶¶ 10–11. On all occasions that Ryerson treated Kidkarndee, no complaints were made concerning his asthma, lower back, upper back, knees, wrists, or arms. *Id.* ¶ 21.

**F. Dr. Koenigsmann**

**\*10** Kidkarndee contends that defendant Dr. Koenigsmann did not provide him the best treatment available. Koenigsmann Dep. at 13:13–15:20. Specifically, Kidkarndee wanted a new form of coronary treatment involving laser for treating his CAD. *Id.* Kidkarndee contends that Dr. Koenigsmann "was formally made aware of the 'seriousness' of [his] ... medical condition(s)" by reviewing his file and determining whether to provide Kidkarndee with medical care. Compl. at 7.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

As the Deputy Commissioner and Chief Medical Officer of DOCCS, Dr. Koenigsmann is responsible for the overall medical care provided to inmates. Koenigsmann Decl. (Dkt. No. 32–9) ¶¶ 2, 4. To ensure that appropriate care is provided to inmates, Dr. Koenigsmann relies on, *inter alia,* primary care providers, regional medical directors, and regional health services administrators. *Id.* ¶ 4. Dr. Koenigsmann has never been Kidkarndee's personal physician and has never provided Kidkarndee's with medical treatment. *Id.* ¶ 5. Dr. Koenigsmann also has limited involvement in specialty care referrals. *Id.* ¶ 6. He reviews requests for certain types of medical procedures; however, decisions regarding specialty care services are made by an outside review agency, presumably DHS, and/or a regional medical director. *Id.*

When Dr. Koenigsmann's office receives an inmate correspondence, it is docketed on an internal correspondence tracking system and automatically assigned to a regional health services administrator for investigation and response. Koenigsmann Decl. ¶ 12. Generally, Dr. Koenigsmann generally does not see inmate correspondences addressed to him. *Id.* ¶ 13. Dr. Koenigsmann's office received letters sent by Kidkarndee to the New York State Attorney General and DOCCS's employees that are connected to this action. *Id.* ¶ 14. These letters were assigned to a regional health services administrator who responded to them on Dr. Koenigsmann's behalf. *Id.* ¶ 15; *see, e.g.,* Dkt. No. 1–1 at 1. Dr. Koenigsmann maintains he had no knowledge of these letters until the preparation of his declaration. Koenigsmann Decl. ¶¶ 14–15; *see, e.g.,* Dkt. No. 32–9 at 6–14. Dr. Koenigsmann is not involved in the inmate grievance process and has never been asked to respond to any inmate grievances.[FN11] Koenigsmann Decl. ¶¶ 16, 18.

FN11. The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

## II. Discussion[FN12]

FN12. Kidkarndee sues defendants under the Sixth Amendment. Compl. at 10. Kidkarndee's Sixth Amendment right to counsel claim must be dismissed because he makes no allegations in either his pleadings or deposition to support it. Such a conclusory and unsubstantiated allegation is insufficient to withstand defendants' summary judgment motion.

Kidkarndee contends that: (1) defendant Dr. Kooi was deliberately indifferent to his medical conditions by denying him treatment for bodily pain, a specialty care referral, a specialist-recommended follow-up evaluation, and medical care at Oneida; (2) defendant Ryerson was deliberately indifferent to his medical conditions by denying him care; and (3) defendant Dr. Koenigsmann was deliberately indifferent to his medical conditions by refusing to provide him the best treatment available and direct subordinates to provide him with medical attention. Defendants argue that Kidkarndee's complaint should be dismissed based on lack of personal involvement and merit. In his response to defendants' motion, Kidkarndee concedes that Dr. Koenigsmann should be dismissed from this action based on the lack of his personal involvement. Dkt. No. 39 at 12.

### A. Legal Standard

**\*11** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evi-

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

dence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by

*pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

**\*12** Pursuant to this District's Local Rule 7.1(a)(3), facts set forth in a moving party's Statement of Material Facts are deemed admitted where the nonmoving party has failed to properly respond to that statement, even if the nonmoving party is proceeding *pro se. Cusamano v. Sobek,* 604 F.Supp.2d 416, 426–27 (N.D.N.Y.2009); N .D.N.Y.L.R. 7.1(a)(3).[FN13] As such, where a nonmovant has failed to cite record evidence in support of his denials of properly supported facts provided by defendants, such facts are admitted to the extent they are not clearly in dispute.

FN13. Northern District of New York Local Rule 7.1 provides in part:

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.

...

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The nonmovant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

**B. Personal Involvement**

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN14]

FN14. Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

**1. Dr. Kooi**

Defendants argue that Dr. Kooi was not personally involved with respect to Kidkarndee's claim of denied treatment at Oneida. Kidkarndee contends that Dr. Kooi denied him a follow-up evaluation and instead sent him to Oneida where its medical personnel failed to treat him. Assuming Kidkarndee was denied medical care at Oneida, this claim does not allege that

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

Dr. Kooi directly failed to treat Kidkarndee at Oneida or was notified of Oneida's failure to treat Kidkarndee. *Colon,* 58 F.3d at 873. Kidkarndee does not allege that Dr. Kooi had created a policy that allowed for unconstitutional practices to occur at Oneida, was grossly negligent his supervision, or exhibited deliberate indifference by failing to act on information indicating that Kidkarndee was unconstitutionally denied medical care. *Id.* The record is devoid of any evidence indicating that Dr. Kooi worked at Oneida and instructed Oneida's personnel to deprive Kidkarndee of medical attention. As such, there is no genuine issue of fact showing that Dr. Kooi is personally involved in denying Kidkarndee medical care at Oneida. *Celotex,* 477 U.S. at 323.

**\*13** Accordingly, defendants' motion on this ground should be granted.

### 2. Dr. Koenigsmann

Kidkarndee argues that Dr. Koenigsmann was deliberately indifferent to his medical needs by refusing him the best available treatment and direct subordinates to provide him with medical attention. Dr. Koenigsmann attested that, as a supervisor, he relies on other healthcare providers to ensure that appropriate care is provided and has never personally treated Kidkarndee. Dr. Koenigsmann also attested that while he reviews requests for specialty care referrals, he does not ultimately decide whether to provide a referral. The gravamen of Kidkarndee's complaints against Dr. Koenigsmann is that because he was in a position of power, he was always involved with anything that occurred in conjunction with his medical care at Auburn. However, an attempt to establish personal involvement based upon the supervisory role Dr. Koenigsmann occupied is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Kidkarndee also contends that he addressed let-

ters and grievances to Dr. Koenigsmann, who responded by denying him medical care. Kidkarndee contends that these correspondences served as notice to Dr. Koenigsmann for ongoing constitutional violations. However, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

While personnel from Dr. Koenigsmann's office responded to Kidkarndee's letters, such conduct remains insufficient to establish Dr. Koenigsmann's personal involvement in the alleged constitutional violations. This is because it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz–Rodriquez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)). Furthermore, Kidkarndee does not contend that Dr. Koenigsmann created a policy or custom under which unconstitutional practices occurred. Additionally, conclusory allegations about negligent supervision and a failure to train are insufficient to establish personal involvement. Moreover, Kidkarndee concedes that Dr. Koenigsmann was not personally involved in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

the alleged violations and should be dismissed from this action.

**\*14** Accordingly, defendants' motion on this ground should be granted.

### C. Medical Indifference

The Eighth Amendment prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Since there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay of interruption in treatment, rather than the prisoner's underlying medical condition alone.

*Lewis v. Wallace,* No. 11–CV–0867 (DNH/DEP), 2013 WL 1566557, at \*6 (N.D.N.Y.) *adopted by,* No. 11–CV–0867 (DNH/DEP), 2013 WL 1566555 (N.D.N.Y. Apr. 12, 2013) (citing *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006)) (internal quotation marks omitted). In other words, the Court asks "whether, from an objective standpoint, the temporary deprivation was sufficiently harmful to establish a constitutional violation." *Frank v. Cnty. of Ontario,* 884 F.Supp.2d 11, 19 (W.D.N.Y.2012) (citing *Smith,* 316 F.3d at 186).

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

**\*15** In this case, Kidkarndee asserts that Dr.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

Koenigsmann failed to treat his CAD and Ryerson failed to treat his high blood pressure, asthma, lower back injury, damage to the upper spine and knee, as well as wrists and arms. However, Kidkarndee does not specify which physical conditions Dr. Kooi failed to treat. Assuming Kidkarndee contends that defendants failed to treat all of his medical conditions, such individual ailments do not constitute a sufficiently serious condition under the objective prong.

With regard to Kidkarndee's CAD, it is undisputed that Kidkarndee suffered a heart attack in July 2008 and continues to have a heart condition that requires ongoing monitoring and treatment. However, Kidkarndee's medical records do not indicate that he suffered another heart attack thereafter. The record shows that Kidkarndee suffered from chest pains on February 27, 2011 and September 29, 2011, both of which required hospital visitations. However, neither hospital visitation produced diagnoses of a heart attack. Rather, the February visit resulted with diagnoses of bronchitis and hypokalemia and the September visit resulted with a diagnosis of musculoskeletal-related chest pains. While a severe heart condition can be sufficiently serious for purposes of an Eighth Amendment analysis, chest pains alone are not enough. *Hutchinson v. New York State Corr. Officers,* No. 02–CV–2407 (CBM), 2003 WL 22056997, a *5 (S.D.N.Y. Sept. 4, 2003) (citations omitted) (reasoning case law instructs that defendant's failure to treat chest pains does not make out an Eighth Amendment deliberate indifference claim); *cf. Mandala v. Coughlin,* 920 F.Supp. 342, 353 (E.D.N.Y.1996) ("Ignoring a prisoner's complaints of chest pains where the prisoner later died of a heart attack" constitutes a serious medical need) (citing *Miltier v. Beorn,* 896 F.2d 848, 852–53 (4th Cir.1990)). Thus, Kidkarndee's medical conditions involving his chest pains does not meet the objective prong.

Similarly, Kidkarndee's remaining ailments do not satisfy the objective prong of the Eighth Amendment analysis. While Kidkarndee contends that he suffers from high blood pressure, asthma, and physical pain from using stairs, the record is otherwise bereft of any details describing his pain. Kidkarndee generally described that he incurred his injuries as a Thai soldier and while working in prison; however, he does not describe when each injury occurred and when the pain began. As the Second Circuit noted, "[it is] the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186–87 (2d Cir.2003) (citing *inter* alia *Chance,* 143 F.3d 698)); *see also Price v. Reilly,* 697 F.Supp.2d 344, 359–60 (E.D.N.Y.2010) (citing the same). Furthermore, Kidkarndee failed to adduce any evidence showing that denied medical attention on Dr. Kooi's part had caused him any objectively serious harm other than the conclusory allegation that he is in "constant pain." *See Smith,* 316 F.3d at 188–89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the [deprivation itself] ... resulted in permanent or on-going harm to his health...."). Therefore, Kidkarndee has failed to satisfy the objective prong of the Eighth Amendment analysis, rendering his Eighth Amendment claims meritless. Nevertheless, assuming Kidkarndee has satisfied the objective prong, his claims against defendants must also fail because of his failure to establish the subjective prong.

**1. Dr. Kooi**

**\*16** Despite his conclusory allegations, Kidkarndee has failed to establish the subjective prong of the Eighth Amendment analysis against Dr. Kooi. Kidkarndee first contends that Dr. Kooi failed to treat him on multiple occasions concerning the constant pain he experiences throughout the body. Aside from one incident where Dr. Kooi opined that there was nothing wrong with Kidkarndee's knee, Kidkarndee does not identify which specific medical conditions Dr. Kooi knew of and intentionally denied or delayed

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

him access to medical attention. *Chance,* 143 F.3d at 702; *Estelle,* 429. U.S. at 104. With respect to his knee, Kidkarndee does not substantiate claim with any other allegations such as when the incident occurred. "At most ... [Kidkarndee] has shown only his personal dissatisfaction, and disagreement, with Dr. [Kooi's] diagnosis and with the care he has received." *Boatwright v. Canfield,* 680 F.Supp.2d 468, 470 (W.D.N.Y.2010) (citations omitted). This does not amount to an Eighth Amendment violation. As such, Kidkarndee's claim based on denied treatment for his physical pain must fail.

Kidkarndee contends that Dr. Kooi denied him a specialty care referral and a MRI test in part because such care is too costly. "Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates." *Jordan v. Fischer,* 773 F.Supp.2d 255, 276 (N.D.N.Y.2011) (citing *Sonds,* 151 Supp.2d at 311). Furthermore, a prisoner "does not have the right to treatment of his choice." *Id.* (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Here, Kidkarndee fails to identify what kind of specialist he desired and when the denial occurred. Further, this claim amounts to nothing more than a disagreement over the need for specialists and diagnostic techniques, which is not an adequate ground for a § 1983 claim. *Chance,* 143 F.3d at 703; *Sonds,* 151 F.Supp.2d at 312. Moreover, the record belies the claim involving specialty care. Dr. Kooi did in fact referred Kidkarndee to specialty care. Record evidence shows that Kidkarndee had seen specialists in cardiology, physical therapy, endocrinology, and optometry. Thus, Kidkarndee's claim based on the denial of specialty care as well as an MRI test is without merit and must be dismissed.

Kidkarndee next contends that Dr. Kooi refused him a follow-up evaluation at Upstate Hospital after being discharged on October 3, 2011 and denied him treatment at Oneida. This claim cannot stand. First, Upstate Hospital recommended a follow-up at Kidkarndee's prison facility, not at Upstate Hospital.

Second, Kidkarndee's disagreement with treatment location is a mere disagreement that is not cognizable under § 1983. *Chance,* 143 F.3d at 703; *Sonds,* 151 F.Supp.2d at 312. Third, the record indicates that Kidkarndee indeed was seen by Dr. Patel in November 2011 during a follow-up evaluation. At that evaluation, Dr. Patel ordered another follow-up with the cardiology department in six months. Finally, Kidkarndee has failed to adduce record evidence indicating that Dr. Kooi had sent Kidkarndee to Oneida and with the knowledge that care would be denied. *Estelle,* 429 U.S. at 104. As such, Kidkarndee has failed to show a genuine issue of fact with respect to Dr. Kooi's alleged deliberate indifference to his medical needs. *Celotex,* 477 U.S. at 323.

**\*17** Finally, Kidkarndee contends that Dr. Kooi deprived him of an anesthetic during a surgery. However, Kidkarndee asserts this as a mere afterthought during his deposition. Further, he does not make any allegations as to whether he experienced pain or any adverse effects from going under the surgery without being administered an anesthetic. Moreover, assuming the deprivation constituted negligence or even medical malpractice, it "does not, without more, engender a constitutional claim." *Chance,* 143 F.3d at 703 (citing *Estelle,* 429 U.S. at 105–06). While medical malpractice involving a physician's conscious disregard of a substantial risk of serious harm may rise to the level of deliberate indifference, there is no such evidence in the record. *Id.* (citing *Hathaway,* 99 F.3d at 553).

Accordingly, defendants' motion on this claim should be granted.

## 2. Nurse Ryerson

Kidkarndee has failed to show that Ryerson knew of and disregarded his serious medical needs. *Chance,* 143 F.3d at 702. Kidkarndee contends that Ryerson failed to treat his medical conditions of high blood pressure, asthma, lower back injury, damage to the upper spine and knee, as well as his sensitive wrists

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1239319 (N.D.N.Y.)
**(Cite as: 2014 WL 1239319 (N.D.N.Y.))**

and arms. However, Kidkarndee does not assert when Ryerson had denied him care for these conditions. Conversely, the record shows that Ryerson saw and treated Kidkarndee on multiple occasions for various medical conditions, including diarrhea, cardiology-related issues, high blood pressure, coughs, and vomiting. Further, Ryerson attested, and the medical record indicates, that Kidkarndee never complained to Ryerson about his asthma or pain in his lower back, upper back, knees, wrists, or arms. Given that defendants' contentions are supported by record evidence and Kidkarndee has failed to cite to record evidence in support of the contrary, Kidkarndee has failed to show a genuine issue of material of fact with respect to the subjective prong for the Eighth Amendment claim against Ryerson.

Accordingly, defendants' motion on this ground should be granted.

### 3. Dr. Koenigsmann

Kidkarndee's Eighth Amendment claim against Dr. Koenigsmann must also fail on the merits. Kidkarndee specifically contends that Dr. Koenigsmann denied him new medical technology that could better treat his heart problems. As previously discussed, prison officials have wide discretion in determining the kind of medical treatment provided to an inmate and an inmate does not have a right to choose his preferred choice of treatment. *Jordan, 773 F.Supp.2d at 276* (citing *Sonds,* 151 Supp.2d at 311, *Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986)*). Here, Kidkarndee is not entitled to his choice of coronary treatment. Further, this denial is not of a course of medical treatment, but rather, a different kind of treatment. As discussed above, this amounts to nothing than a mere disagreement with treatment plans, which is not cognizable in a § 1983 action. *Chance, 143 F.3d at 703; Sonds,* 151 F.Supp.2d at 312.

**\*18** Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 32) be **GRANTED** and Kidkarndee's complaint (Dkt. No. 1) be **DISMISSED** as to all claims and all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir.1989);* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Filed Sept. 23, 2013.

N.D.N.Y.,2014.
Kidkarndee v. Koenigsmann
Slip Copy, 2014 WL 1239319 (N.D.N.Y.)

END OF DOCUMENT

Slip Copy, 2013 WL 5929447 (N.D.N.Y.)
**(Cite as: 2013 WL 5929447 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Myron J. KILMARTIN, Plaintiff,
v.
SCHAFFER, Investigator, Defendant.[FN1]

> [FN1.] By Memorandum–Decision and Order
> dated September 10, 2012, defendant Shang
> was dismissed without prejudice from this
> action. Dkt. No. 7.

No. 9:12–CV–1167 (FJS/CFH).
Nov. 1, 2013.

Myron J. Kilmartin, Alden, NY,[FN2] pro se.

> [FN2.] The Court notes that, according to
> DOCCS's online inmate information data-
> base, Plaintiff was released on parole on
> September 13, 2013. See DOCCS, Inmate
> Population Information Search, http://
> nysdoccslookup.doccs.ny.gov/GCA00P00/
> WIQ2/WINQ120 (last visited October 31,
> 2013).

Office of Theresa J. Puleo, Murray S. Brower, Esq.,
Albany, NY, for Defendant.

## ORDER

SCULLIN, Senior District Judge.

**\*1** Plaintiff, a former inmate in the custody of the
New York State Department of Correctional and
Community Supervision ("DOCCS"), brought this
action pursuant to 42 U.S.C. § 1983, alleging that
Defendant Schaffer violated his constitutional rights

under the Fourth and Fourteenth Amendments to the
United States Constitution. See Dkt. No. 1–1, Com-
plaint. Defendant Schaffer moved for summary
judgment pursuant to Rule 56 of the Federal Rules of
Civil Procedure. See Dkt. No. 18. Plaintiff did not file
any papers in opposition to that motion. In a Re-
port–Recommendation and Order dated October 9,
2013, Magistrate Judge Hummel recommended that
this Court deny Defendant's motion. See Dkt. No. 22
at 14. The parties did not file any objections to that
recommendation.

When a party does not object to a magistrate
judge's report-recommendation, the court reviews that
report-recommendation for clear error or manifest
injustice. See Linares v. Mahunik, No. 9:05–CV–625,
2009 WL 3165660, \*10 (N.D.N.Y. July 16, 2009)
(citation and footnote omitted). After conducting that
review, "the Court may 'accept, reject, or modify, in
whole or in part, the ... recommendations made by the
magistrate judge.' " Id. (quoting 28 U.S.C. §
636(b)(1)(C)).

The Court has reviewed Magistrate Judge Hum-
mel's October 9, 2013 ReportRecommendation and
Order for clear error and manifest injustice; and,
finding none, the Court hereby

**ORDERS** that Magistrate Judge Hummel's Oc-
tober 9, 2013 Report–Recommendation and Order is
**ACCEPTED in its entirety** for the reasons stated
therein; and the Court further

**ORDERS** that Defendant's motion for summary
judgment is **DENIED;** and the Court further

**ORDERS** that, if Plaintiff does not notify the
Court and opposing counsel, in writing, of his current
address within **thirty (30) days** of the date of this

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5929447 (N.D.N.Y.)
**(Cite as: 2013 WL 5929447 (N.D.N.Y.))**

Order, the Court will dismiss this case for failure to prosecute and for failure to notify the Court and opposing counsel of a change of address in accordance with L.R. 10.1(c)(2) and this Court's September 10, 2012 Memorandum–Decision and Order. *See* Dkt. No. 7, Memorandum–Decision and Order dated September 10, 2012, at 7 ("Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action."); and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND OR-DER**[FN1]

> **FN1.** This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Myron J. Kilmartin ("Kilmartin"), a former inmate [FN2] in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Schaffer violated his constitutional rights under the Fourth and Fourteenth Amendments.[FN3] Compl. (Dkt. No. 1–1).[FN4] Presently pending is Schaffer's motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 18. Kilmartin does not oppose the motion. For the following reasons, it is recommended that Schaffer's motion for summary judgment be denied.

> **FN2.** In his complaint, Kilmartin stated that

he was to be released from DOCCS's custody in September, 2013. Dkt. No. 1–1 at 1. A search of DOCCS's online inmate information database shows that Kilmartin was parole released on September 13, 2013. *See* DOCCS, INMATE POPULATION INFORMATION SEARCH, http://nysdoccslookup.doccs.ny.gov/GCA00 P00/WIQ1/WINQ000 (lasted visited Oct. 7, 2013).

> **FN3.** By Memorandum–Decision and Order dated September 10, 2012, pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court dismissed all of Kilmartin's claims except for claims against defendant Schaffer in connection with Kilmartin's arrest. Dkt. No. 7.

> **FN4.** Kilmartin's allegations are contained in exhibits attached to his complaint. Dkt. No. 1–1.

**I. Failure to Respond**

**\*2** Kilmartin did not oppose Schaffer's motion even though the Court notified him of his response deadline. Dkt. No. 19. "Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Schaffer provided notice in his motion papers as required by the Second Circuit. *Id.;* Dkt. No. 18 at 119. The deadline for Kilmartin to respond to Schaffer's motion terminated on July 9, 2013. Dkt. No. 19. On July 17, 2013, the Court *sua sponte* granted Kilmartin an extension of August 7, 2013 to file a response in opposition. Dkt. No. 21. Despite these notices and extension, Kilmartin failed to respond.

"The fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Champion,* 76

F.3d at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citations omitted); *see also Patterson v. Cnty. of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in Schaffer's Rule 7.1 Statement of Material Facts (Dkt. No. 18 at 120–23) [hereinafter "Def.'s Statement"] are accepted as true as to those facts that are not disputed in Kilmartin's complaint. N.D.N.Y.L.R. 7.1(a)(3) (*"The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert."*) (emphasis in original).

## II. Background

On September 13, 2011,[FN5] Kilmartin, a convicted sex offender, was arrested for failure to register his new address as required by his parole release conditions. Def.'s Statement ¶ 1; Schaffer Aff. (Dkt. No. 18 at 32–35) ¶¶ 4–5; J. Kilmartin Aff. (Dkt. No. 18 at 37–39) ¶¶ 1–3; Dkt. No. 18 at 50–54. Kilmartin alleged that as defendant Investigator Schaffer was hand-cuffing him from behind, Schaffer ordered Kilmartin to spread his legs then kicked him in the groin. Compl. at 1–1 at 1; Interrog. (Dkt. No. 18 at 25–20) at 28.

> FN5. Although in his response to Schaffer's written interrogatories Kilmartin referred to the date of the incident as September 30, 2012 and not September 30, 2011, the Court considers this discrepancy as a mere mistake on Kilmartin's part. *See* Interrog. at 28–30.

Schaffer and non-party Investigator J. Kilmartin attested that Kilmartin was cooperative and no use of force was necessary to effectuate the arrest. Def.'s Statement ¶ 2; Schaffer Aff. ¶ 5; J. Kilmartin Aff. ¶¶

4–5. J. Kilmartin attested that he did not assist in hand-cuffing Kilmartin because Kilmartin did not resist. J. Kilmartin Aff. ¶ 5. Following the arrest, Schaffer and J. Kilmartin transported Kilmartin to the Montgomery County Sheriff's Office and then to the Village of Fultonville Court for arraignment.[FN6] Schaffer Aff. ¶ 7; J. Kilmartin Aff. ¶ 8. Kilmartin alleged that when they arrived at the courthouse, he got out of the car, stood near the car door, and Schaffer proceeded to punch him in the mouth, knocking out three front-bottom teeth. Compl. at 1; Interrog. at 28. Kilmartin then sought medical attention from Schaffer but was denied. Compl. at 1; Interrog. at 29.

> FN6. In response to a written interrogatory, Kilmartin answered that all the alleged assaults against Schaffer occurred prior to trial. Interrog. at 26, 30.

**\*3** Schaffer maintains that when Kilmartin was processed at Montgomery County Correctional Facility ("Montgomery") following the arrest, Kilmartin did not report or complain about any injury or pain with respect to his groin or face. Def.'s Statement ¶ 4; Schaffer Aff. ¶ 11; J. Kilmartin ¶ 10. Medical records dating between September 13, 2011 and June 2012 show that Kilmartin had complained of having heartburns, dry skin, high blood pressure, and lower-back pain.[FN7] Dkt. No. 20 at 9, 49, 51, 53, 53, 57; Franko Aff. (Dkt. No. 18 at 41–42) ¶ 10. None of Kilmartin's complaints involved his groin or teeth or the use of force in effectuating his arrest. *See* Dkt. No. 20; Schaffer Aff. ¶¶ 12–13.

> FN7. Additional documents indicate that Kilmartin did not complain of physical pain shortly after the incidents of assault. For example, a progress note dated September 13, 2011, although the source is unspecified, indicates that Kilmartin was dizzy but denied any complaints of pain or numbness in his extremities. Dkt. No. 20 at 5. An admission health assessment note dated September 14,

Slip Copy, 2013 WL 5929447 (N.D.N.Y.)
**(Cite as: 2013 WL 5929447 (N.D.N.Y.))**

2011, authored at Montgomery, indicates that Kilmartin denied any distress or pain at that time. *Id.* at 10.

Before September 13, 2011, Kilmartin was housed at Montgomery some time between 1996 and 1997, in 2006, and some time between 2011 and 2012. Franko Aff. ¶¶ 6–7. Non-party Franko, Montgomery's jail administrator, attested that he was never made aware of, nor does Kilmartin's prison medical records suggest, that Kilmartin had complained about being assaulted by Schaffer or requested treatment for teeth loss or groin pain. *Id.* ¶¶ 8–10. Kilmartin states he did not see medical personnel on September 13, 2011. Interrog. at 29. He did not inform any dentist of his teeth injuries until he arrived at Elmira Correctional Facility on or about July 20, 2012. *Id.* at 29; Def.'s Statement ¶ 6. Kilmartin had complained of groin pain to staff at Wyoming Correctional Facility on an unspecified date. Interrog. at 26, 30. Kilmartin explained that he did not inform anyone that he was kicked and punched until at a later time out of fear of retaliation. *Id.* Kilmartin still experiences pain in his mouth and groin area. *Id.*

Schaffer has a different factual account of the case. Schaffer never punched Kilmartin's face or kicked Kilmartin in the groin. Def.'s Statement ¶ 3; Schaffer Aff. ¶¶ 5–6, 8–9. Schaffer attested that force was not necessary to place Kilmartin in the back fo the patrol car. Schaffer Aff. ¶ 5. Schaffer further attested that he never refused Kilmartin medical attention as Kilmartin never requested medical attention from him. *Id.* ¶ 10. Additionally, J. Kilmartin attested that he never witnessed Schaffer kicking or punching Kilmartin at any time,[FN8] Kilmartin never complained about groin or teeth pain or sought medical attention from him, and he was unaware of Kilmartin requesting medical attention from Schaffer. Def.'s Statement ¶ 8; J. Kilmartin Aff. ¶¶ 6–7, 10–11.

> [FN8]. Kilmartin also stated that no witness saw Schaffer punching his mouth or kicking

his groin. Interrog. at 26, 29–30.

### III. Discussion

Kilmartin contends that Schaffer assaulted him and refused to provide him with medical treatment after his arrest on September 13, 2011. Schaffer argues that Kilmartin's complaint should be dismissed because Kilmartin's claims are conclusory and meritless.[FN9]

> [FN9]. Schaffer reserves the right to invoke the defense of qualified immunity at a later time for the Fourth Amendment claim. Schaffer Mem. of Law (Dkt. No. 18) at 117.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*4** The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the

Slip Copy, 2013 WL 5929447 (N.D.N.Y.)
**(Cite as: 2013 WL 5929447 (N.D.N.Y.))**

non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

**B. Fourth Amendment**

The Fourth Amendment prohibits a law enforcement officer from using excessive force during the course of effecting an arrest. *Tracy v. Freshwater,*
623 F.3d 90, 96 (2d Cir.2010) (citing *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). However, in making an arrest, a law enforcement officer "necessarily carries ... the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396 (citing *Terry v. Ohio,* 392 U.S. 1, 22–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). In determining whether an officer used excessive force in executing an arrest, the Court examines whether the force used is objectively unreasonable "in light of the facts and circumstances confronting [the officer], without regard to the officer['s] underlying intent or motivation." *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (quoting *Graham,* 490 U.S. at 397). This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (internal quotation marks and citations omitted).

**\*5** To measure reasonableness, the Court "consider[s] the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Jones,* 465 F.3d at 61 (quoting *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999)). Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham,* 490 U.S. at 396) (internal quotation marks omitted).

Here, Kilmartin alleged that without provocation, Schaffer had kicked him in the groin while effecting his arrest and punched him in the mouth during transport to the courthouse. Kilmartin was arrested for failing to register his address as a convicted sex offender, the nature of which does not involve any use or threat of violence. *Jones,* 465 F.2d at 61. Schaffer does not contend that Kilmartin had resisted arrest; rather, he attested that force was not necessary to place Kilmartin in the patrol car. *Id.* Schaffer also does not

Slip Copy, 2013 WL 5929447 (N.D.N.Y.)
**(Cite as: 2013 WL 5929447 (N.D.N.Y.))**

attest that Kilmartin committed any acts during the arrest, booking, and transport that a juror could reasonably conclude had posed a threat to Schaffer or J. Kilmartin. *Id.* Assuming Kilmartin's allegations are true, Schaffer's conduct was disproportionate to what was necessary in effecting the arrest and transport. Even though Schaffer repeatedly denied using force in the manner described by Kilmartin, the determination of whether the misconduct occurred is an issue of fact reserved for a jury. For purposes of this motion, the governing law that the evidence must be viewed in the light most favorable to the non-moving party directs the Court to credit Kilmartin's account of the events. *See In re Dana Corp.,* 574 F.3d 128, 152 (2d Cir.2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

Furthermore, the force allegedly used against Kilmartin cannot be characterized as *de minimis.* *Griffin v. Crippen,* 193 F.3d 89, 91–92 (2d Cir.1999) (*"de minimis* uses of force generally do not suffice to state a constitutional claim"); *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (same). Being kicked in the groin without provocation is not, as a matter of law, a *de minimis* use of force for purposes of a Fourth Amendment excessive force claim. *Cf. Hayes v. Cnty. of Sullivan,* 853 F.Supp.2d 400, 431–32 (S.D.N.Y.2012) (concluding that a hit in the chest without provocation is not *de minimis* ); *Hodge v. Vill. of Southampton,* 838 F.Supp.2d 67, 77–79 (E.D.N.Y.2012) (denying summary judgment where plaintiff alleged defendant slammed the car door onto plaintiff's leg). In addition, the loss of a tooth is not a *de minimis* injury. *Brown v. City of Oakland,* No. C03–1141 TEH, 2006 WL 1760747, at *6–8 (N.D.Cal. June 27, 2006) (considering the gravity of the alleged injury, in that case a tooth loss, "to determine whether the use of force was reasonable *only insofar* as it is indicative of the amount of force that

was applied").[FN10] Moreover, while Kilmartin maintains that he still experiences pain but does not go into the specifics of his injuries, he does not need to show "permanent or severe" injuries to maintain this claim. *Robison v. Via,* 821 F.3d 913, 924 (2d Cir.1987). The Second Circuit has held that even minor injuries such as scrapes, bumps, and bruises sustained during an arrest can support a Fourth Amendment excessive force claim. *Maxwell v. City of New York,* 380 F.3d 106, 109 (2d Cir.2004).

> FN10. All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

**\*6** Schaffer cites *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) as authority for granting a motion for summary judgment where the plaintiff relies solely on his own contradictory and incomplete testimony. Schaffer Mem. of Law at 116. *Jeffreys* involved a plaintiff alleging that police officers threw him out of a third-story window even though shortly after the incident the plaintiff had repeatedly stated that he had jumped out the window himself. *Jeffreys,* 426 F.3d at 551–52. "To qualify for application of the *Jeffreys* exception, a defendant must meet each of the following three requirements: 1) the plaintiff must rely 'almost exclusively on his own testimony'; 2) the plaintiff's testimony must be 'contradictory or incomplete'; and 3) the plaintiff's testimony must be contradicted by evidence produced by the defense." *Caldwell v. Gettmann,* No. 09–CV–580 (DNH)(DEP), 2012 WL 1119869, at *6 (N.D.N.Y.) *report and recommendation adopted,* No. 09–CV–580, 2012 WL 1119771 (N.D.N.Y. Apr. 3, 2012) (citing *Benitez v. Ham,* No. 04–CV–1159, 2009 WL 3486379, at *20–21 (N.D.N.Y. Oct. 21, 2009) (citing and quoting *Jeffreys* )).

Here, the *Jeffreys* exception does not apply. The first factor lends favor to Schaffer because Kilmartin's evidence consists solely of his own allegations.

Slip Copy, 2013 WL 5929447 (N.D.N.Y.)
**(Cite as: 2013 WL 5929447 (N.D.N.Y.))**

However, Kilmartin's allegations are not riddled with inconsistences such that no reasonable juror could believe Kilmartin. *Moore v. Casselberry,* 584 F.Supp.2d 580, 585 (W.D.N.Y.2008) ("[J]ust because the plaintiff's claim is based solely upon his own contradictory and incomplete testimony, that does not automatically entitle the defendants to summary judgment. The evidence must be such that no reasonable juror could believe it ."). In Kilmartin's complaint and answers to Schaffer's interrogatories, Kilmartin contends that Schaffer had kicked him in the groin and punched him, knocking out his teeth. Schaffer denies such allegations and point to how Kilmartin did not proffer any evidence of the injuries other than his own allegations. However, Kilmartin offered an explanation of why he failed to notify medical personnel of his injuries as soon as possible, which is that he feared retaliation for doing so. Despite the lack of medical evidence corroborating Kilmartin's allegations, neither do the medical records submitted by Schaffer support the contention that Kilmartin did not sustain said injuries or that the assaults did not occur. Such determinations of material facts are better left for a jury to decide. *See, e.g., Brown,* 2006 WL 1760747, at *8 (denying summary judgment motion on a Fourth Amendment excessive claim involving a lost tooth and reserving factual issues for the jury where plaintiff relied solely on his own testimony and his medical records do not indicate injuries related to his teeth or a lost tooth).

Therefore, viewing the facts in the light most favorable to the plaintiff, Kilmartin has established sufficient evidence to raise genuine issues of material fact as to the Fourth Amendment excessive force claim. Accordingly, defendants' motion on this ground should be denied.

### C. Fourteenth Amendment

**\*7** As previously stated, Kilmartin was a pretrial detainee when he contends he did not receive appropriate medical treatment. Such claims must be analyzed under the Fourteenth Amendment's Due Process Clause. The Due Process Clause provides that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 535–36, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citations omitted). However, the standards when evaluating deliberate indifference to a person in custody are identical whether under the Eighth or Fourteenth Amendment. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) ("Claims should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also Shane v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... [including] food, clothing, shelter, medical care, and reasonable safety ....") (citations omitted). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment. Therefore, Kilmartin's medical indifference claim will be considered under Eighth Amendment standards.

The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This prohibition extends to the provision of medical care. *Shane,* 489 U.S. at 199–200. The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by knowing of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5929447 (N.D.N.Y.)
**(Cite as: 2013 WL 5929447 (N.D.N.Y.))**

will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*8** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Kilmartin claims that Schaffer deliberately denied him medical care after he was punched in the mouth and requested medical treatment. Schaffer argues that the lack of medical evidence to substantiate Kilmartin's medical indifference claim against him renders the claim meritless. Turning first to the objective

prong, the loss of a tooth may constitute a sufficiently serious medical condition. *See Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (refusing treatment of a degenerative condition causing tooth loss constitutes a sufficiently serious condition). In this case, Kilmartin contends he lost three teeth, specifically, teeth in the front-bottom of his mouth. Such is a sufficiently serious medical condition for purposes of the objective prong of the Eighth Amendment analysis. *Farmer,* 511 U.S. at 834. Further, as previously discussed, issues of material fact surrounds whether Kilmartin in fact sustained such injuries. As for the subjective prong, Kilmartin contends that despite his plea for medical treatment to Schaffer, Schaffer denied his request. Schaffer contends that Kilmartin never alerted him that he required medical attention. If Kilmartin's version of the events is true, then Schaffer had intentionally denied or delayed Kilmartin access to medical care. *Estelle,* 429 U.S. at 104. This competing evidence again requires a credibility determination that is better left with the jury. *In re Dana Corp.,* 574 F.3d at 152.

Accordingly, Schaffer's motion on this ground should be denied.

### IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Schaffer's motion for summary judgment (Dkt. No. 18) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5929447 (N.D.N.Y.)
**(Cite as: 2013 WL 5929447 (N.D.N.Y.))**

N.D.N.Y.,2013.
Kilmartin v. Schaffer
Slip Copy, 2013 WL 5929447 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Wisconsin.
Janari L. McKINNIE, Petitioner,
v.
Mark HEISZ; Brad Wolfgram; Alan Morris; Janel
Nickel; Anthony Ashworth; Leslie Winslow–Stanley;
Greg Grams; Dahlia Suliene: Steve Helgersen; Sandra
Sitzman; Kenneth Evans; Samuel Essex; Pete Erick-
sen; and William Pollard, Respondents.

No. 09–cv–188–bbc.
May 7, 2009.

West KeySummary**Prisons 310** 126

**310** Prisons
    **310II** Prisoners and Inmates
        **310II(B)** Care, Custody, Confinement, and
Control
           **310k126** k. Protection from Violence, As-
sault, or Abuse. Most Cited Cases

**Sentencing and Punishment 350H** 1537

**350H** Sentencing and Punishment
    **350HVII** Cruel and Unusual Punishment in Gen-
eral
        **350HVII(H)** Conditions of Confinement
        **350Hk1537** k. Protection from Violence.
Most Cited Cases

    A prisoner adequately stated an Eighth Amend-
ment failure to protect claim against a corrections
officer. The prisoner told the officer's superiors that
the officer allowed prisoners to make an illegal in-
toxicant in the housing unit. The prisoner alleged that

the officer endangered him when the officer told the
other prisoners about the prisoner's report. The pris-
oner alleged that the officer knew that two particular
prisoners wanted to harm him because of the report,
allowed those prisoners out of temporary lockup
around the same time the prisoner was allowed to
return to his room, and manned the control center from
which the prisoner's cell was visible during the sub-
sequent assault. U.S.C.A. Const.Amend. 8; 42
U.S.C.A. § 1983.

Janari McKinnie, Green Bay, WI, pro se.

Corey F. Finkelmeyer, Wisconsin Department of
Justice, Madison, WI, for Respondents.

OPINION AND ORDER
BARBARA B. CRABB, District Judge.
    **\*1** This is a proposed civil action for monetary
and injunctive relief, brought pursuant to 42 U.S.C. §
1983. Petitioner, who is presently confined at the
Green Bay Correctional Institution, alleges that re-
spondents Kenneth Evans and Samuel Essex, two
fellow inmates, assaulted him and that the remaining
respondents violated his constitutional rights in as-
sorted ways related to the alleged assault. Petitioner
has requested leave to proceed *in forma pauperis*
pursuant to 28 U.S.C. § 1915 and has paid the initial
partial filing fee.

    Because petitioner is a prisoner, the 1996 Prison
Litigation Reform Act requires the court to screen
petitioner's complaint and deny him leave to proceed
if he has had three or more lawsuits or appeals dis-
missed for lack of legal merit, or if his complaint is
legally frivolous, malicious, fails to state a claim upon
which relief may be granted or asks for money dam-
ages from a respondent who by law cannot be sued for
money damages. 28 U.S.C. § 1915(e). At the same
time, petitioner is a pro se litigant, which means his

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

complaint will be construed liberally as it is reviewed for these potential defects. *Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Petitioner asserts a whopping thirteen claims in this lawsuit. Normally, such lawsuits must be severed pursuant to Fed.R.Civ.P. 20. However, petitioner's claims all arise out of a single transaction or series of transactions related to an alleged assault he suffered at the hands of respondents Evans and Essex. Therefore, these claims may proceed together, as varied as they are. After assessing the merits of his claims, I conclude that petitioner may proceed *in forma pauperis* on six of his claims: (1) respondents Mark Heisz, Brad Wolfgram, Alan Morris, Janel Nickel and Greg Grams violated his Eighth Amendment rights by failing to protect him from a substantial risk of serious harm at the hands of other inmates; (2) respondents Dalia Suliene, Steve Helgersen and Sandra Sitzman violated his Eighth Amendment rights by failing to provide adequate medical care after petitioner was assaulted; (3) respondents Heisz and Wolfgram retaliated against him for reporting their misconduct to their superiors; (4) respondents Heisz and Wolfgram violated his free speech rights by blocking his mail to respondents Nickel, Morris and Grams; (5) respondents Anthony Ashworth and Nickel violated his free speech rights by holding his incoming and outgoing mail; and (6) respondents Ashworth, Leslie Winslow–Winslow–Stanley and Nickel violated his free speech rights by retaining grievances and documents of petitioner's that had been confiscated during a search.

As for the remaining seven claims, petitioner will be denied leave to proceed on those claims. They are as follows: (1) respondents Heisz, Morris and Wolfgram violated his Eighth Amendment rights by failing to provide him adequate medical care after he was assaulted; (2) respondent Ashworth retaliated against him for his cooperation in the prosecution of the inmates who assaulted him and refusal to lie to the disciplinary committee; (3) respondents Heisz,

Wolfgram, Ashworth, Morris, Nickel, Winslow–Stanley and Grams retaliated against him for his attempts to seek legal assistance against them or others; (4) respondents violated his free speech rights by reading his mail after it had been confiscated (5) respondents violated his right to access to the courts by interfering with his ability to file grievances and seek legal assistance; (6) respondents Kenneth Evans and Samuel Essex violated his constitutional rights by assaulting him; and (7) respondents Evans and Essex violated Wis. Stat. §§ 893.52 and 893.54 by assaulting him and damaging his property.

**\*2** In his complaint, petitioner makes the following allegations of fact.

FACTS

A. *Parties*

Petitioner is a prisoner incarcerated at the Green Bay Correctional Institution. During 2006 and 2007, he was confined at the Columbia Correctional Institution. Respondents Kenneth Evans and Samuel Essex are prisoners who were incarcerated at the Columbia Correctional Institution when petitioner was there in 2006. Respondent Pete Ericksen is a Security Director and respondent William Pollard is the warden at the Green Bay Correctional Institution. The remaining respondents are prison officials at the Columbia Correctional Institution: Mark Heisz is a Corrections Officer II, Brad Wolfgram is a Corrections Unit Sergeant, Alan Morris is a Unit Manager, Janel Nickel is a Security Director, Anthony Ashworth is an Investigations Captain, Leslie Winslow–Stanley is a Corrections Captain, Greg Grams is the warden, Dahlia Suliene is a medical doctor, Steve Helgersen is a nurse and Sandra Sitzman is the former Health Services Unit Manager.

B. *Events Leading up to the Physical Assault in Petitioner's Cell*

Sometime before November 2006, petitioner and his former cellmate reported to respondents Heisz's and Wolfgram's superiors that these respondents were

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

allowing "hooch" (an illegal intoxicant) to be made in the housing unit and were allowing inmates into unauthorized areas of the housing unit. After petitioner reported respondents Heisz and Wolfgram, these respondents told other inmates that petitioner and his former cellmate were "snitching" and that they "deserved [to have] their asses beat[en]."

Respondents Evans and Essex, who were housed on petitioner's unit, started making physical threats to petitioner. In October 2006, respondent Morris was told five times that respondents Evans and Essex were threatening petitioner. Respondent Morris told petitioner that he had heard that "a hit had been put on [petitioner]."

Respondent Nickel was also told about respondents Evans's and Essex's threats to petitioner. On October 27 and 29, 2006, respondent Nickel received letters describing the threats and on October 28, 2006, respondent Nickel had two conversations with petitioner's former cellmate regarding the threats. Petitioner's cellmate sent letters regarding Evans's and Essex's planned assault on petitioner to respondent Grams, who responded that "it was being looked into." Nonetheless, respondents Nickel, Morris and Grams "did nothing" about the threats.

### C. *The Assault*
On November 1, 2006, respondent Heisz allowed respondents Evans and Essex out of their cell between 12:25 and 12:30 p.m. for the stated reason of showering, although both were in temporary lockup and those inmates are allowed to shower only in the morning and only for ten minutes. At some point between 1:00 p.m. and 1:30 p.m., respondent Wolfgram, who was in charge of petitioner's housing unit, authorized respondent Heisz to allow petitioner to enter his cell to use the toilet. They knew that respondents Evans and Essex were in temporary lockup and wanted to harm petitioner. At the time, respondent Heisz was stationed in the unit's control center, from which petitioner's cell is visible. While petitioner was

on his break, respondents Essex and Evans entered his cell, physically assaulted him for several minutes and then exited his cell.

**\*3** After the assault, petitioner was dizzy, bleeding, in severe pain and could not see out of his right eye. Both respondents Heisz and Wolfgram were placed on administrative leave on November 1, 2006, and returned on November 9, 2006.

### D. *Medical Care Following the Assault*
After the assault, petitioner was taken to the Health Services Unit and then to a hospital in the community. The next day, petitioner returned to the Health Services Unit, this time speaking with respondent Suliene. She prescribed an extra pillow for his pain, Tylenol 3 and eye drops.

On November 7, 2006, petitioner's former cellmate helped petitioner prepare a health service request to the Health Services Unit, explaining that petitioner suffered from continuing pain, blood in his urine, inability to sleep and dizziness. Respondent Suliene's only response was that petitioner should drink more fluids to clear his urinary output.

After respondents Heisz and Wolfgram returned from administrative leave, both refused to give petitioner his prescribed pain medication on different occasions. It would be illegal for respondents Heisz and Wolfgram to dispense petitioner's medication; it was a schedule II drug (Tylenol 3 contains codeine) and they had not received proper authorization. Nonetheless, Heisz and Wolfgram had administered such drugs in the past, but refused to do so for petitioner. Petitioner told respondent Morris that respondents Heisz and Wolfgram were denying petitioner his pain medication; respondent Morris "did nothing."

On November 13, 2006, petitioner's cellmate helped petitioner prepare another health service re-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

quest, describing petitioner's continued pain and complaining that petitioner's symptoms were not improving. In response, respondent Helgersen told petitioner that he was scheduled for a follow-up with a medical doctor. On November 17, 2006, petitioner saw respondent Suliene again. Respondent Suliene told petitioner that "there was not much that she could do about [his] pain." He complained that she had not done anything for him. In response, she stared at him and then said she would see him in a month.

Two days later, petitioner asked respondent Suliene to conduct more tests or x-rays on him, but she refused. Instead, respondent Suliene renewed petitioner's Tylenol 3 prescription, wrote an instruction for amitriptyline for petitioner's rib pain and ordered an extra mattress for petitioner. Petitioner never received the amitriptyline or the extra mattress.

On November 20, 2006, petitioner sent another request to the Health Services Unit, complaining that he was still experiencing pain and that respondent Heisz was not providing petitioner his pain medication. Respondent Helgersen responded by saying, "You write every day with this information." On November 24, petitioner was still waiting for the medication ordered on November 19, 2006, so he sent another request to the Health Services Unit, asking about the medication. Health Services Unit staff responded that the medicine requested had been sent. Nothing had been sent. At some point, it was reported to respondent Suliene that respondents Wolfgram and Heisz had not been providing petitioner with his prescribed medication, but she did not follow up on this report.

**\*4** Petitioner complained to respondent Suliene about his symptoms again on November 26, 2006, in particular that he continued to suffer from throbbing pain in his eye, blurriness, dizziness and pain in his back and side. Respondent Suliene simply told him that she would recheck his healing in a month and that he would be "better then."

On January 28, 2007, petitioner asked about his follow-up appointment and complained that the pain had returned within the last three days. Respondent Helgersen responded that he had a doctor's appointment scheduled for the following week. Petitioner did not have an opportunity to see a doctor, however. On February 17, 2007, he wrote to ask about it. Respondent Helgersen responded that petitioner would see the doctor in six to eight weeks. Petitioner never received the promised follow-up appointment. Respondent Helgersen wanted petitioner to come in on "sick call" so he could collect $7.50 from petitioner "without addressing his medical concerns."

From November 21, 2006 to February 19, 2007, respondent Sitzman received at least five letters from petitioner and his former cellmate describing petitioner's ongoing problems receiving adequate treatment from respondents Suliene and Helgersen. On January 4, 2007, respondent Sitzman responded to petitioner's concerns, concluding that her review of the records showed nothing inappropriate about the treatment that respondents Suliene and Helgersen provided him. Petitioner continues to suffer from pain in his back and rib cage, headaches, blurred vision and difficulty sleeping as a result of nightmares.

### E. *Treatment by Prison Officials after the Assault*

Between November 9, 2006 to November 21, 2006, respondent Heisz slammed petitioner's cell door in the morning to wake him from his sleep at least ten times. In addition, respondent Heisz instructed kitchen workers to provide petitioner with less food than usual.

While investigating the assault on November 10, 2006, and later on November 17, 2006, respondent Ashworth accused petitioner of having a sexual relationship with his former cellmate and of being in a gang. He told petitioner to lie to the disciplinary committee regarding the identity of his assailants and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
(Cite as: 2009 WL 1455489 (W.D.Wis.))

refuse to cooperate with law enforcement officials in the criminal prosecution of respondents Evans and Essex and told petitioner that he could "make things a lot easier" if he did things "his way." After petitioner refused to lie to the committee, petitioner placed him in temporary lockup twice, on January 5, 2007, and on February 16, 2007.

On November 22, 2006, petitioner filed a grievance complaining about the assault. From November 19, 2006 to February 15, 2007, each time petitioner would ask respondents Heisz and Wolfgram for inmate grievance forms, they told him that there were no forms so he would have to use blank paper. When petitioner filed a grievance using blank paper, it was rejected for not being on a standard form. Petitioner told respondents Morris and Ashworth that respondents Heisz and Wolfgram refused to provide him with forms. Respondent Morris said that Heisz and Wolfgram would provide the forms in the future, although that never happened.

**5** In addition, any time petitioner would send mail addressed to respondents Nickel, Morris and Grams, including those grievances he managed to prepare on proper forms, respondents Heisz and Wolfgram would intercept the mail and, if the mail concerned either of them, they would not deliver the mail to its intended recipient.

On January 5, 2007, respondent Heisz lied to respondent Ashworth, telling him that he had witnessed petitioner's actions during a confrontation between petitioner and another inmate that day. Respondent Ashworth told respondent Heisz to place petitioner in temporary lockup, allegedly for his involvement in the confrontation.

A few days before January 20, 2007, respondent Heisz conducted a search of petitioner's cell. Respondent Heisz removed petitioner's and his former cellmate's sheets, stomped on them and threw maga-zines and papers on the floor. During the search, respondent Heisz read personal legal mail of petitioner's, including legal letters to attorneys, grievances and other letters complaining of Heisz's and Wolfgram's misconduct.

Around January 20, 2007, respondent Ashworth, on respondent Nickel's authorization, ordered that all petitioner's incoming and outgoing mail be held for him. On January 20, 2007, respondent Wolfgram told respondent Winslow–Stanley that petitioner and his former cellmate had threatened another inmate and his family in a personal letter. Respondent Winslow–Stanley took two "legal envelopes" from petitioner's cell. These envelopes contained legal letters to attorneys, grievances petitioner was preparing for filing, letters of complaints regarding Heisz's and Wolfgram's misconduct and personal letters from petitioner's family. (It is unclear whether the "legal envelopes" also contained the allegedly threatening letter written by petitioner's former cellmate.) Initially, respondent Winslow–Stanley said that she was taking the materials because they were contraband, but she later admitted that the real reason for taking the envelopes was because respondent Heisz was "concerned about" the materials Heisz had read earlier, particularly the letters to attorneys, grievances and other letters complaining about his and Wolfgram's alleged misconduct.

On January 31, 2007, the Program Review Committee informed petitioner that he would be transferred from the Columbia Correctional Institution to another institution because another inmate had asked to be separated from him.

Between February 1, 2007, and February 8, 2007, petitioner received four letters from law firms that had been opened outside his presence. The entire legal correspondence was missing from two of the four envelopes.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
(Cite as: 2009 WL 1455489 (W.D.Wis.))

For three weeks, respondents Ashworth, Winslow–Stanley and Nickel retained the grievances and legal documents they had obtained during the January 20 search. During that time, "all" respondents read his grievances and letters. On February 13, 2007, respondent Winslow–Stanley returned to petitioner some of the documents in his "legal envelopes." Certain copies of his legal letters, grievances and letters from his family were not returned. On February 16, 2007, respondent Winslow–Stanley placed petitioner in temporary lockup, telling him that respondent Ashworth had ordered the lockup, but "she was going to do it herself after the things that she read in [petitioner's] legal envelopes." In addition, at some point, Winslow–Stanley called petitioner a "gay gang-banger" and said that being one would cause him to "get his ass beat every time."

**\*6** Around February 21, 2007, petitioner was charged $1.03 for postage for two articles of mail sent to his former cellmate. The mail was sent through free institution mail, not through the U.S. Postal System.

On February 16, 2007, respondent Winslow–Stanley placed petitioner in a different housing unit and then placed him in temporary lockup for alleged threats to prison staff made in a letter to petitioner's former cellmate. On February 23, 2007, petitioner was transferred to the Green Bay Correctional Institution. He was given different explanations for his transfer. The Program Review Committee told him he would be transferred because another prisoner had filed a separation request; respondent Winslow–Stanley told him that his transfer was in response to threats he had made to a staff member in a letter he sent to his former cellmate; and respondent Grams told petitioner he was being transferred because of safety concerns. However, the "real reason" was that petitioner was seeking legal assistance against respondents.

Since petitioner was transferred to the Green Bay Correctional Institution, he has been threatened several times by other inmates. Several of Evans's and Essex's friends are at the Green Bay Correctional Institution. More threatening inmates have been arriving from "everywhere, except Dodge Correctional Institution."

OPINION

A. *Failure to Protect*

The Eighth Amendment gives prisoners a right to remain safe from assaults by other inmates. *Langston v. Peters,* 100 F.3d 1235, 1237 (7th Cir.1996). "[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, [and] having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer,* 511 U.S. at 833.

To state an Eighth Amendment failure to protect claim, a prisoner must allege that (1) he faced a "substantial risk of serious harm" and (2) the prison officials identified acted with "deliberate indifference" to that risk. *Id.* at 834; *Brown v. Budz,* 398 F.3d 904, 909 (7th Cir.2005). Petitioner alleges that Evans and Essex had threatened to assault him before he was assaulted, from which it is possible to infer that petitioner was at a "heightened risk" of assault from Evans and Essex. This is sufficient to satisfy the first prong of a failure to protect claim. *Brown,* 398 F.3d at 911 (citing *Weiss v. Cooley,* 230 F.3d 1032, 1033 (7th Cir.2000)) ("heightened risk" of assault from particular inmate satisfies requirement that there be "substantial risk of serious harm").

The second prong is often harder to meet. Under the deliberate indifference standard, a prison official may be held liable under the Eighth Amendment "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

reasonable measures to abate it." *Farmer,* 511 U.S. at 847. "A prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *McGill v. Duckworth,* 944 F.3d 344, 349 (7th Cir.1991).

**\*7** Petitioner alleges that respondent Heisz knew Evans and Essex wanted to harm him, allowed them out of temporary lockup around the same time he was allowed to return to his room and manned the control center from which petitioner's cell was visible during the assault. The allegations imply that respondent Heisz was aware of a specific threat and disregarded it. Respondent Wolfgram is a closer case. Although he allegedly knew that Evans and Essex wanted to harm petitioner and let petitioner return to his room, he also knew that Evans and Essex were in temporary lockup. Unlike respondent Heisz, respondent Wolfgram was not alleged to have released Evans and Essex from temporary lockup or have been in a position to watch petitioner's cell. However, it is plausible to infer that Wolfgram knew about or authorized the inmates' release from temporary lockup just as he authorized petitioner's entry into his cell, because he was in charge of the housing unit. Moreover, petitioner alleges motivation: he had reported Wolfgram's and Heisz's misconduct to their superiors before the incident and both had been telling inmates that petitioner was a "snitch" who "deserved" to be beaten.

As for respondents Morris, Nickel and Grams, petitioner alleges that all received letters describing the threats Evans and Essex were making and about their access to the general housing unit. Petitioner does not allege exactly what their threats were or what each of these respondents knew about these threats, but petitioner's alleged repeated attempts to receive attention for the threats suggest that respondents Morris, Nickel and Grams knew of the serious risk petitioner allegedly faced. Indeed, Morris allegedly knew that a "hit" had been put out against petitioner.

The last question is what each of these respondents did with the information petitioner gave them. Prison officials need not do the impossible, only "take reasonable measures to abate" a known risk. *Farmer,* 511 U.S. at 847. Respondents Heisz's and Wolfgram's failure to "take reasonable measures" is apparent; according to petitioner, they essentially sent him into the lions' den. As for respondents Morris, Nickel and Grams, petitioner alleges that they "did nothing," although he also suggests that respondent Grams at least intended to "look into" the problem. At this early stage, it is plausible to infer that each of Morris, Nickel and Grams could have done something to stop the assault once they were informed of the threat, but failed to take any steps at all.

The allegations are sufficient to allow an inference to be drawn that respondents Heisz, Wolfgram, Morris, Nickel and Grams each knew that Evans and Essex created a substantial risk of serious harm and failed to take reasonable measures to abate that risk. Therefore, I will grant petitioner leave to proceed on his failure to protect claim against these respondents. Petitioner should be aware that, come trial or motions for summary judgment, he will have to set forth evidence that each of these respondents was aware of the specific threat of assault he faced from Evans and Essex and failed to take reasonable steps to prevent the assault.

B. *Inadequate Medical Care*

**\*8** Aside from prison officials' duty to protect prisoners from serious assaults, they have a duty under the Eighth Amendment " 'to provide medical care for those whom it is punishing by incarceration .' " *Snipes v. DeTella,* 95 F.3d 586, 590 (7th Cir.1996) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). To state an Eighth Amendment medical care claim, a prisoner must allege facts from which it can be inferred that he had a "serious medical need" and that prison officials were "deliberately indifferent" to this need. *Estelle,* 429 U.S. at 104; *Gutierrez v. Peters,* 111 F.3d 1364, 1369 (7th

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

Cir.1997).

A medical need may be serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering when treatment is withheld, *Gutierrez,* 111 F.3d at 1371–73 (7th Cir.1997), "significantly affects an individual's daily activities," *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998), causes pain, *Cooper v. Casey,* 97 F.3d 914, 916–17 (7th Cir.1996), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811. "Deliberate indifference" means that the officials were aware that the prisoner needed medical treatment, but disregarded the risk by failing to take reasonable measures. *Forbes v. Edgar,* 112 F.3d 262, 266 (7th Cir.1997).

Thus, under this standard, petitioner's claim has three elements:

(1) Did petitioner need medical treatment?

(2) Did respondents know that petitioner needed treatment?

(3) Despite their awareness of the need, did respondents fail to take reasonable measures to provide the necessary treatment?

Petitioner alleges that respondent Suliene (1) was told that petitioner was suffering multiple symptoms such as pain, blood in his urine and inability to sleep, but addressed only the blood in his urine; (2) on numerous occasions, refused to provide pain medication or other treatment for petitioner's continuing pain; (3) promised to provide amitriptyline and an extra mattress for petitioner's rib pain but never executed the order; and (4) failed to follow up on reports that petitioner was not receiving his prescribed medication on his housing unit from Wolfgram and Heisz. In addition, petitioner alleges that he complained about his pain and symptoms to the Health Services Unit on several occasions and respondent Helgersen stated several times that a doctor's appointment had been scheduled but petitioner never saw a doctor. Petitioner will be granted leave to proceed on these claims against respondents Suliene and Helgersen. The allegations allow an inference to be drawn that petitioner's medical condition was serious and respondents Suliene and Helgersen failed to take reasonable measures to provide proper treatment, Suliene by failing to provide adequate treatment or insure that petitioner was receiving the prescription she had written and Helgersen by failing to insure that petitioner was provided a doctor's appointment he needed.

**\*9** In addition, petitioner will be granted leave to proceed on his claim that respondent Sitzman failed to intervene to insure petitioner was receiving proper medical care from the Health Services Unit after she received several letters describing the inadequate treatment. Although respondent Sitzman was not directly involved in petitioner's health care, she was the Health Services Unit manager. The complaint allows an inference to be drawn that respondent Sitzman knew of petitioner's need for treatment and could have intervened to insure that he received it, but failed to do so. *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995) (prison official who "know[s] about the conduct and facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye" to it may be held personally liable under § 1983); *Burks v. Raemisch,* 555 F.3d 592, 596 (7th Cir.2009) (reversing dismissal of head of medical unit).

However, petitioner will not be granted leave to proceed against respondents Heisz, Wolfgram and Morris because he has pleaded himself out of court on these claims. Petitioner alleges that respondents Heisz and Wolfgram did not provide him his pain medication and respondent Morris "did nothing" about it when he complained about it. Petitioner is not suggesting that Heisz, Wolfgram or Morris prevented him from seeking medical care from those who could

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

provide it; indeed, his allegations suggest he was doing a fine job asking the Health Services Unit for treatment. Instead, he complains that, although Heisz and Wolfgram were not legally authorized to administer his prescribed medication, they *had* administered such medicine before, but refused to give him the same illegal treatment and Morris did "nothing" to make sure they afforded him that treatment. The Eighth Amendment does not require prison officials to provide medicine in violation with the law. Therefore, I will deny petitioner leave to proceed on his Eighth Amendment medical care claims against respondents Heisz, Wolfgram and Morris.

### C. *Retaliation*

"An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter,* 224 F.3d 607, 618 (7th Cir.2000). Petitioner must plead three elements in order to state a claim for retaliation: he must (1) identify a constitutionally protected activity in which he was engaged; (2) identify one or more retaliatory actions taken by each respondent that would deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) allege sufficient facts that would make it plausible to infer that petitioner's protected activity was one of the reasons respondents took the action they did against him. *Bridges v. Gilbert,* 557 F.3d 541, 555–56 (7th Cir.2009); *Hoskins v. Lenear,* 395 F.3d 372, 375 (7th Cir.2005).

Petitioner's claims for retaliation are as follows: respondents Heisz and Wolfgram retaliated against him because he reported their misconduct to their superiors; respondent Ashworth retaliated against him because he cooperated in a criminal prosecution of Evans and Essex; and respondents Heisz, Wolfgram, Ashworth, Morris, Nickel, Winslow–Stanley and Grams retaliated against him because he intended to seek legal assistance against them or others.

### 1. *Retaliation for reporting misconduct*

*\*10* Petitioner alleges that, after he reported respondents Heisz and Wolfgram to their superiors, they told other prisoners that petitioner was a "snitch" who deserved to be physically harmed and they allowed Evans and Essex to physically harm petitioner. In addition, petitioner alleges that respondents Wolfgram and Heisz blocked his attempts to use the grievance procedure to complain about their misconduct and that respondent Heisz continued to "harass" him by slamming his cell door in the morning, lying to get petitioner in trouble, performing a disruptive search of petitioner's cell and getting another official to confiscate petitioner's legal and personal documents.

As to these respondents, petitioner has identified a constitutionally protected activity, reporting prison officials' misconduct, *Bridges,* 557 F.3d at 552 (prisoner's participation in third party's lawsuit involving prison officials' misconduct was constitutionally protected activity), has identified actions taken by respondents that, as a whole, would undeniably "deter a person of ordinary firmness" from engaging in further retaliatory acts, *id.* (retaliatory acts may be considered as a whole), and has alleged sufficient facts to make it plausible to infer that petitioner's reporting their misconduct was at least one of the reasons that respondents took those actions against him. Therefore, petitioner will be granted leave to proceed on his claim that respondents Heisz and Wolfgram retaliated against him for reporting their misconduct to their superiors.

### 2. *Retaliation for cooperating in criminal prosecution*

As for respondent Ashworth, petitioner alleges that he told petitioner to lie to the disciplinary committee and refuse to cooperate with law enforcement officials in the criminal prosecution of Evans and Essex and added that petitioner could "make things a lot easier" on himself by doing as Ashworth told him. After petitioner refused, Ashworth placed him in temporary lockup twice. These allegations are not enough to allow petitioner to proceed on this claim.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

Petitioner identifies protected activities, cooperating with law enforcement officials and defending himself before the disciplinary committee. *Walker v. Thompson,* 288 F.3d 1005, 1009 (7th Cir.2002) (right to use available grievance procedures); *Bridges,* 557 F.3d at 552 (right to participate in lawsuit against officials). Moreover, the alleged retaliatory action by Ashworth, two temporary lockups, is sufficiently adverse to "deter a person of ordinary firmness," a relatively low standard. *Bridges,* 557 F.3d at 552, 554–55 (concluding that delays in incoming and outgoing mail, harassment by guard, unjustified disciplinary charges and and improper dismissal of grievances sufficient to deter a person of ordinary firmness).

Where petitioner's claim fails is in his allegations tying the two placements in lockup to the protected activity. It is not plausible to infer that petitioner's cooperation in the prosecution of Evans and Essex or refusal to lie to the disciplinary committee was one of the reasons that respondent Ashworth put petitioner in temporary lockup. Although respondent Ashworth had asked petitioner to lie and refuse to cooperate and had told petitioner that things would be "easier" for him if he did, petitioner does not relate those statements to Ashworth's decision to put petitioner in temporary lockup, which occurred months later, at different times, in the context of allegations that petitioner misbehaved (first by participating in a "confrontation," second by threatening staff). Notably, petitioner does not suggest that he was falsely accused of misbehaving or that respondent Ashworth knew the allegations were false. (He states that respondent Heisz lied about *witnessing* the confrontation but does not deny his role in the confrontation). In this context, it would not be plausible to infer that respondent Ashworth put petitioner in temporary lockup for engaging in protected activity, which is what Rule 8 requires. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Therefore, petitioner will be denied leave to proceed on his claim that respondent Ashworth retaliated

against him for cooperating with the prosecution of Evans and Essex or refusing to lie to the disciplinary committee.

### 3. *Retaliation for attempting to seek legal assistance*

**\*11** Finally, petitioner alleges that Heisz, Wolfgram, Ashworth, Morris, Nickel, Winslow–Stanley and Grams all retaliated against him for attempting to seek legal assistance by blocking and confiscating his legal and personal mail, placing him in temporary lockup and bringing about his transfer to the Green Bay Correctional Institution. These claims must fail because petitioner has failed to identify a constitutionally protected activity.

It is true that petitioner has a constitutional right to access to the courts and to legal assistance "necessary ... for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Shaw v. Murphy,* 532 U.S. 223, 231 n. 3, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (citing *Lewis v. Casey,* 518 U.S. 343, 350–51, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). Likewise, petitioner has a constitutional right to petition the government for redress of grievances. *Walker,* 288 F.3d at 1009. However, petitioner alleges that respondents retaliated against him *before* he could do any of those things, when they discovered that he intended to use the courts to obtain legal help. The retaliation petitioner identifies allegedly relates to his having prepared letters to lawyers, letters of complaint and other "legal documents" that he apparently hoped to use to litigate a case related to prison officials' misconduct. Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a "threat" to assert his rights but that is not enough. *Bridges,* 557 F.3d at 555(noting that it "seems implausible that a *threat* to file a grievance would itself constitute a First Amendment protected grievance"). To the extent respondents injured petitioner's ability to gain access to the courts, that is a separate claim (which, as I explain below, has its own

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
(Cite as: 2009 WL 1455489 (W.D.Wis.))

problems). I will deny petitioner leave to proceed on his claim that respondents Heisz, Wolfgram, Ashworth, Morris, Nickel, Winslow–Stanley and Grams retaliated against him for seeking legal assistance because the allegations do not allow an inference that he was engaged in a constitutionally protected activity.

### D. *Free Speech*

The First Amendment's guarantee of freedom of speech provides protection from censorship of a prisoner's incoming and outgoing correspondence. *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999) (citing *Thornburgh v. Abbott,* 490 U.S. 401, 407–08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). However, "the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence." *Procunier v. Martinez,* 416 U.S. 396, 412–413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

Petitioner alleges that (1) respondents Heisz and Wolfgram blocked his mail to respondents Nickel, Morris and Grams; (2) respondents Ashworth and Nickel were involved in holding his incoming and outgoing mail; and (3) respondents Ashworth, Winslow–Stanley and Nickel retained written grievances and documents of petitioner's that had been confiscated during a search. Petitioner will be allowed to proceed on these claims. The allegations suggest that respondents may have had legitimate reasons for putting a block on petitioner's mail and interfering with at least some of his communications, but it is too early to determine whether respondents' reasons are adequate to justify their interference with the mail. Those questions will have to be addressed at a later stage, applying the standards set forth in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (outgoing mail) and *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (incoming mail).

**\*12** However, petitioner also alleges that "all respondents" read petitioner's mail when it was held by respondents Ashworth, Winslow–Stanley and Nickel. Petitioner may not proceed against respondents on such a barebones allegation. Aside from failing to provide plausible grounds for such a dubious claim, the mere reading of petitioner's already-confiscated mail does not rise to the level of a constitutional violation by itself. Therefore, I will deny petitioner leave to proceed on his claim that respondents read his mail.

### E. *Denial of Access to the Courts*

Although petitioner is less than direct about his claims, he suggests that he wishes to proceed on a claim that certain respondents violated his constitutional right to access to the courts by interfering with his attempts to seek legal assistance and file a grievance. To the extent petitioner wishes to proceed on such a claim, that request will be denied because he has not identified any injury that he has suffered from the alleged interference.

One of the elements for a claim for denial of access to the courts is an "actual injury" in the form of interference with an underlying claim. *Lewis,* 518 U.S. at 353. The only potential "underlying claims" in this case are those that petitioner is raising before this court, each of which is being addressed on the merits. To the extent petitioner was prevented from airing these issues as administrative grievances, that is unimportant; he is airing them now before this court. Because petitioner "is currently exercising his right to petition the government for redress of grievances, through this lawsuit, he has not been harmed" by the alleged interference with his ability to do so earlier. *Bridges v. Gilbert,* 557 F.3d 541, 555 (7th Cir.2009).

At any rate, petitioner is likely to find that the most effective relief from respondents' alleged interference will be that provided in the "underlying" case itself. *Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (petitioners are

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

usually better served attempting to raise access to courts concerns in the context of underlying case first). If respondents have interfered with petitioner's ability to pursue administrative remedies, that is an issue to raise in the context of a motion for summary judgment for failure to exhaust administrative remedies, where the question is whether petitioner exhausted all *available* remedies. 42 U.S.C. § 1997(e).

### F. *Claims against Evans and Essex*

Petitioner mentions in passing that he seeks to assert a § 1983 claim against respondents Evans and Essex as well, but if he is "not allow[ed]," he would like to proceed against these respondents on two state law tort claims arising under Wis. Stat. §§ 893.52 and 893.54. Petitioner's request to proceed on a claim against respondents Evans and Essex under § 1983 must be denied. Section 1983 allows suit only against persons acting "under color of state law." There is no plausible basis on which to infer that respondents Evans and Essex were acting "under color of state law" when they assaulted petitioner. The "ultimate issue in determining whether a person is subject to suit under section 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?' " *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Although the allegations allow an inference to be drawn that respondents Heisz and Wolfgram *let* respondents Evans and Essex assault him, there is nothing to suggest that these officials or any other respondents *directed* them to do so. Indeed, petitioner suggests that they had their own reasons for assaulting him.

**\*13** As for petitioner's state law claims, they must be addressed elsewhere. A federal court's authority to hear state law causes of action is limited. Under 28 U.S.C. § 1367(a), a federal district court may hear a state law claim when it is "so related" to a federal claim in the same action the two "form part of same case or controversy." Petitioner's allegations do not meet this standard. Although there is a close rela-

tionship between petitioner's claims against Evans and Essex and his claims against Heisz and Wolfgram, there is very little overlap in the facts relevant to each claim.

To prove a claim against Evans and Essex, petitioner will have to prove facts relating to Evans's, Essex's and his own actions and intentions. *E.g.,* WIS JI—Civil 2004 (assault requires intent to cause physical harm or intent to make plaintiff fear harm is imminent); WIS JI—Civil 2005(battery requires intent to cause harm to which plaintiff did not consent). *See also* WIS JI—Civil 2006 (no battery occurs if injury was inflicted in self defense). These facts are largely irrelevant to the facts petitioner will have to prove to succeed on his claim against the prison officials, which include whether those officials were aware of the risk that the alleged assault would occur and refused to take reasonable steps to prevent the assault. In other words, petitioner's claims against the prison officials are distinct from his claims against respondents Evans and Essex. He can prove an assault and battery claim in state court against Evans and Essex without even mentioning the prison officials' actions or inactions. Allowing petitioner to litigate tort claims against Evans and Essex along with his constitutional claims against the prison officials would serve only to confuse matters. Therefore, I decline to exercise supplemental jurisdiction over petitioner's state law claims against respondents Evans and Essex. If petitioner wishes, he can pursue these claims in state court.

### G. *Respondents Ericksen and Pollard*

Although petitioner names both Pete Ericksen and William Pollard in his complaint, he does not assert any claim against either of them, apparently naming them for the sole reason that he feels threatened at the Green Bay Correctional Institution and wants to be transferred to the Dodge Correctional Institution. However, petitioner does not allege any facts related to his attempts to address his safety concerns at his current institution or any constitutional

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

failings on the part of officials at that institution. Thus, there is no basis for keeping respondents Ericksen or Pollard in this complaint. To the extent petitioner wishes to address safety concerns at his current institution, he will have to do so in a separate complaint, and with enough facts to put the respondents on notice of the nature of his claim.

### H. *Other Allegations not Related to Any Claims*

Petitioner complains of other behavior by prison officials. He alleges that (1) both respondents Ashworth and Winslow–Stanley falsely accused him of being homosexual and in a gang; (2) he was charged for postage for mail that went through free mail; (3) and he had a few pieces of legal mail opened out of his presence. However, none of these allegations are related to any claims. As for respondents Ashworth's and Winslow–Stanley's offensive statements, neither occurred in the context of retaliation (Ashworth allegedly made the statements *before* he even asked petitioner to lie and refuse to cooperate and the allegations do not suggest that Winslow–Stanley made the statements for a retaliatory purpose). At most, these were mean-spirited statements, not actionable constitutional violations.

**\*14** As for the allegations related to postage and legal mail, petitioner does not allege that any of the respondents were involved in those acts; therefore, he has no claim against respondents. At any rate, it is unlikely that the alleged false postage charges or failure to open legal mail in his presence on a handful of occasions would rise to the level of a constitutional claim.

On a final note, petitioner should be aware that he has a daunting task before him. He has petitioner raised thirteen claims. In most cases, such complaints must be severed into multiple lawsuits pursuant to Fed.R.Civ.P. 20 and *George v. Smith,* 507 F.3d 605, 607 (7th Cir.2007). In this case, however, petitioner's claims were all related to the same "transaction or series of transactions": the assault he suffered at the

hands of respondents Evans and Essex.

Now, however, what may have been the advantage of lumping his claims will quickly turn into a disadvantage: that of gathering evidence to support each and every one of those claims that have survived screening, to present either in response to a motion for summary judgment or at trial. Petitioner should be aware that he should not expect extra time or special treatment simply because his case is too big or complicated; he has made it that way. If he is serious about litigating this case, he should start preparing his materials as soon as possible and work diligently to meet the deadlines he will receive at an upcoming preliminary pretrial conference, to be scheduled after respondents are given an opportunity to answer the allegations set forth in his complaint.

### ORDER

IT IS ORDERED that:

1. Petitioner Janari L. McKinnie's request for leave to proceed *in forma pauperis* is GRANTED on his claims that:

a. respondents Mark Heisz, Brad Wolfgram, Alan Morris, Janel Nickel and Greg Grams violated his Eighth Amendment rights by failing to protect him from a substantial risk of serious harm at the hands of other inmates;

b. respondents Dalia Suliene, Steve Helgersen and Sandra Sitzman violated his Eighth Amendment rights by failing to provide adequate medical care after petitioner was assaulted;

c. respondents Heisz and Wolfgram retaliated against him for reporting their misconduct to their superiors;

d. respondents Heisz and Wolfgram violated his free speech rights by blocking his mail to respond-

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

ents Nickel, Morris and Grams;

e. respondents Anthony Ashworth and Nickel violated his free speech rights by holding his incoming and outgoing mail; and

f. respondents Ashworth, Leslie Winslow–Winslow–Stanley and Nickel violated his free speech rights by retaining grievances and documents of petitioner's that had been confiscated during a search.

2. Petitioner's request for leave to proceed *in forma pauperis* is DENIED on his claims that:

a. respondents Heisz, Morris and Wolfgram violated his Eighth Amendment rights by failing to provide him adequate medical care after he was assaulted; that claim is DISMISSED with prejudice for failure to state a claim upon which relief may be granted;

**\*15** b. respondent Ashworth retaliated against him for his cooperation in the prosecution of the inmates who assaulted him and refusal to lie to the disciplinary committee; that claim is DISMISSED with prejudice for failure to state a claim upon which relief may be granted;

c. respondents Heisz, Wolfgram, Ashworth, Morris, Nickel, Winslow–Stanley and Grams retaliated against him for his attempts to seek legal assistance against them or others; that claim is DISMISSED with prejudice for failure to state a claim upon which relief may be granted;

d. respondents violated his free speech rights by reading his mail after it had been confiscated; that claim is DISMISSED with prejudice for failure to state a claim upon which relief may be granted;

e. respondents violated his right to access to the

courts by interfering with his ability to file grievances and seek legal assistance; that claim is DISMISSED as unripe;

f. respondents Kenneth Evans and Samuel Essex violated his constitutional rights by assaulting him; that claim is DISMISSED with prejudice for failure to state a claim upon which relief may be granted;

g. respondents Evans and Essex violated Wis. Stat. §§ 893.52 and 893.54 by assaulting him and damaging his property; those claims are DISMISSED without prejudice to petitioner's refiling the claims in state court;

3. Petitioner's complaint is DISMISSED as to respondents Evans, Essex, Pete Ericksen and William Pollard.

4. For the remainder of this lawsuit, petitioner must send respondents a copy of every paper or document that he files with the court. Once petitioner has learned what lawyer will be representing respondents, he should serve the lawyer directly rather than respondents. The court will disregard any documents submitted by petitioner unless petitioner shows on the court's copy that he has sent a copy to respondents or to respondents' attorney.

5. Petitioner should keep a copy of all documents for his own files. If petitioner does not have access to a photocopy machine, he may send out identical handwritten or typed copies of his documents.

6. Petitioner is obligated to pay the unpaid balance of his filing fee in monthly payments as described in 28 U.S.C. § 1915(b)(2). This court will notify the warden at the Green Bay Correctional Institution of that institution's obligation to deduct payments until the filing fee has been paid in full.

7. Pursuant to an informal service agreement

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)
**(Cite as: 2009 WL 1455489 (W.D.Wis.))**

between the Attorney General and this court, copies of petitioner's complaint and this order are being sent today to the Attorney General for service on the state respondents.

8. A strike will be recorded against petitioner pursuant to § 1915(g) because one or more claims has been dismissed for failure to state a claim upon which relief may be granted.

W.D.Wis.,2009.
McKinnie v. Heisz
Not Reported in F.Supp.2d, 2009 WL 1455489 (W.D.Wis.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gabriel MIDALGO, Plaintiff,
v.
Sgt. BASS, Spinner, C.O. Streeter, John Doe,[FN1] Head
Medical Staff, C.O. Bennet,[FN2] Sgt. Trimm, C.O.
Bouyea, Defendants.

> FN1. Defendant John Doe has not been
> identified and therefore has not been served
> with the Amended Complaint or otherwise
> appeared in this action. *See* Dkt No 12.

> FN2. Plaintiff mistakenly spells Defendant
> Bennett's name as "Bennet." *See* Dkt. No. 23,
> Answer at n. 1. The Court will refer to this
> Defendant by the proper spelling.

No. 9:03-CV-1128 (NAM/RFT).
Sept. 26, 2006.

Gabriel Midalgo, Plaintiff, Pro Se.

Eliot Spitzer, Attorney General for the State of New
York, Senta B. Siuda, Esq., Assistant Attorney Gen-
eral, Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**
NORMAN A. MORDUE, Chief U.S. District Judge.
  **\*1** Presently before this Court is defendants' mo-
tion (Dkt. No. 105) for summary judgment dismissing
the complaint in this civil rights action pursuant to 42
U.S.C. § 1983. In his amended complaint (Dkt. No. 8),
plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
alleges deliberate indifference towards his health and

safety in violation of the Eighth Amendment, inter-
ference with mail and access to the law library in
violation of the First Amendment, inadequate visita-
tion, and harassment.

  Defendants' motion was referred to United States
Magistrate Judge Randolph F. Treece for a Report and
Recommendation pursuant to 28 U.S.C. §
636(b)(1)(B) and Local Rule 72.3(c). In a thorough
Report and Recommendation (Dkt. No. 110), Magis-
trate Judge Treece recommends that the Court grant
the motion for summary judgment. Plaintiff objects
(Dkt. No. 112). After the Court extended time for
plaintiff to file additional objections to the Re-
port-Recommendation (Dkt. No. 113), plaintiff filed a
second objection (Dkt. No. 114).

  Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court
conducts a *de novo* review of those parts of a magis-
trate judge's Report and Recommendation to which a
party specifically objects. Where only general objec-
tions are filed, the Court reviews for clear error. *See
Brown v. Peters,* 1997 WL 599355,\*2-\* 3 (N.D.N.Y.),
*aff'd without op., 175 F.3d 1007 (2d Cir.1999).* Failure
to object to any portion of a Report and Recommen-
dation waives further judicial review of the matters
therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d
Cir.1993).

  Plaintiff's objections include a variety of allega-
tions. A number of them revisit issues which are the
subject of the Report and Recommendation. They do
not, however, demonstrate the existence of material
questions of fact which would warrant denial of
summary judgment. Other allegations concern events
allegedly occurring subsequent to the filing of the
amended complaint herein; these are not properly the
subject of this action. Upon thorough *de novo* review,
the Court accepts and adopts the Report and Recom-
mendation.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

It is therefore

ORDERED that the Report and Recommendation (Dkt. No. 110) is accepted and adopted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 105) is granted and the action is dismissed.

IT IS SO ORDERED.

RANDOLPH F. TREECE, Magistrate Judge.
*REPORT-RECOMMENDATION and ORDER*
Pro se Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment. Dkt. No. 8, Am. Compl. at ¶¶ 42-54. Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment. Dkt. No. 105. Plaintiff opposes the Motion. Dkt. No. 106. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted.**

### I. FACTS[FN3]

FN3. Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York. Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required. *See* N.D.N.Y.L.R. 7.1(a). Normally, if no Statement of Material Facts are filed, Defendants' Statement of

Material Facts are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits. Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available with the Original Complaint and will hereby be incorporated into the Amended Complaint. *See* Dkt. Nos. 1 & 8.

**\*2** During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility. Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3. In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant." Am. Compl. at ¶ 16. Plaintiff further alleges that a wiretap was also placed in his cell during that time. *Id.* On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were handed out by correction officers. *Id.* at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003. Plaintiff believed his subscriptions had been misplaced or delayed since January 2003. *Id.* at ¶ 22. Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs. *Id.* at ¶ 23, Ex. C, Lt. from Girdich to Midalgo, dated Feb. 5, 2003. Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions. *Id.* at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him. *Id.* at ¶ 25. Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions.[FN4] *Id.* at ¶¶ 26 & 28. On April 26, 2003, Plaintiff wrote a complaint where he grieved that an

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

officer took an excessive amount of time to read his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read. *Id.,* Ex. A, Grievance, dated Apr. 26, 2003. Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent.[FN5] *Id.,* Grievance Lt., dated May 27, 2003.

> **FN4.** Plaintiff does not provide any specific dates as to when he received rotten or spoiled food.

> **FN5.** It is unknown to this Court whether a response from the Superintendent was received.

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation. Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03. C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell. *Id.,* Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff. *Id.,* Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003, & Trimm Lt. to Sgt. King, dated July 29, 2003. Sergeant King then submitted a memo to Captain Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on the matter, he could find no evidence to support the allegations. *Id.,* Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003. Based on the above investigation, the Inmate Grievance Resolution

Committee ("IGRC") recommended that the grievance complaint pass through to the Superintendent. *Id.,* Ex. A, Case History & Record on Grievance dated June 21, 2003. Thereafter, the Superintendent found that the complaint had been investigated and that there was "no evidence to support [the] complaint[.]" *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff then appealed to the Central Office Review Committee ("CORC"). The CORC made several findings which included that the Superintendent's determination be upheld based on the same reasoning provided by the Superintendent and that there was no substantiation to the claim that Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that performance of the employees' duties should not be construed as harassment.[FN6] *Id.,* Ex. A, CORC Appeal, dated Oct. 1, 2003.

> **FN6.** The CORC also stated that no grievances were received by the IGRC in April or May 2003, as Plaintiff has alleged he filed grievances during those months. Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am. Compl., Ex. A; *see also supra* p. 3.

**\*3** On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass. Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June 27, 2003. The form had a notation stating that Midalgo purportedly was defending himself in a fight he had with his cellmate because they had been in rival gangs. *Id.* The Sergeant's assessment was that it was a real fight and they were in rival gangs. *Id.* After the fight, Midalgo and his cellmate were placed in different cells. *Id.*

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.[FN7] Defs.' 7.1 Statement, Ex. A, Pl.'s Lt., dated July 1, 2003. Captain

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised. *Id., Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003.* In Captain Bezio's letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information. *Id.* Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility. *Id.*

> FN7. It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints. *Id ., Ex. A, Grievance, dated July 10, 2003.* C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy. *Id., Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003.* The Cell Search or Inspection Notice listed the items that were removed. *Id., Ex. A, Cell Search or Inspection Notice, dated June 27, 2003.* Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing. *Id., Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003.* In addition, Trimm stated that Midalgo was not in a cell with a known enemy. *Id.* The IGRC recommended that the grievance complaint filed pass through to the Superintendent. *Id., Ex. A, Case History & Record for Grievance dated July 10, 2003.* The Superintendent found that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id., Ex. A, Superintendent's Appeal, dated July 15, 2003.* Plaintiff appealed to the CORC, which found the complaint to be without merit.[FN8] *Id., Ex. A, CORC Appeal, dated Aug. 20, 2003.*

> FN8. Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...,"* Mem. from Captain Racette, dated Aug. 5, 2003.

**\*4** On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id., Ex. D, Lt. from Litzenberger, dated July 28, 2003.* On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books were not available at the facility.[FN9] *Id., Ex. D, Lt. to Botta, dated Aug. 3, 2003.* Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the wrong books and cases from the law library.[FN10] *Id., Ex. C, Lt., dated Aug. 4, 2003.* He also noted that he did not receive a law book that was supposed to be available. *Id.* On August 5, 2003, Midalgo received a memo from Captain Racette stating that his complaints were investigated and that when Plaintiff was interviewed, he did not provide any

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

further information, which resulted in a finding that the staff acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. On August 19, 2003, Plaintiff received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was available but since it was in looseleaf and because Plaintiff was in SHU, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003.

> FN9. Jean Botta is not named as Defendant in this action.

> FN10. "D.S.G. Kiebert" is also not named as a Defendant in this action.

## II. DISCUSSION
### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.3d 10, 13 (2d Cir.1983)).

**\*5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

### B. Eleventh Amendment

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks injunctive relief as well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U .S. 58, 71 n. 10 (1989)).

### C. Exhaustion of Remedies

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the following claims: 1) medical care; [FN11] 2) mail tampering; 3) law library issues; and 4) family visitation. Dkt. No. 105, Defs.' Mem. of Law at p. 4.

> FN11. As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues. *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Grievance, dated Aug. 13, 2003.

However, since the Eighth Amendment medical indifference claim is against the John Doe Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

**\*6** The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)). Moreover, "[e]ven if a prisoner receives no reply to a grievance or appeal, he is not excused from completing the ap-

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

peals process. The rules provide that matters not decided within the prescribed time limits must be appealed to the next level of review." *Walters v. Carpenter,* 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8 FN12 & *Mendoza v. Goord,* 2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002)).

> FN12. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.8 states: "[t]ime limit extensions may be requested at any level of review, but such extensions may be granted only with the written consent of the grievant. Absent such extension, matters not decided within the time limits may be appealed to the next step."

The Second Circuit has suggested a three-step inquiry when the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d. Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d at 675 (citing *Berry v. Kerik,* 366 F.3d 85, 88

(2d Cir.2003); *Rodriguez* order).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

**\*7** Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the defense as "special circumstances may excuse a prisoner's failure to exhaust," the specific circumstances of each case must be examined. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citations omitted). Some special circumstances include, but are not limited to, occasions when prison officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676. Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003. Dkt. No. 8. Any grievances filed subsequent to that date are untimely and irrelevant to the current action.FN13 Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

> FN13. As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the filing of the Amended Complaint.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation. *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003. Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken. *Id.,* Ex. A., Grievance, dated July 10, 2003. Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted. Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint. Dkt. No. 106, Pl.'s Mem. of Law at Point Two. Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust. *Id.* Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter. *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003. Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003. Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent. Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003. No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response. *See Walters v. Carpenter,* 2004 WL 1403301, at *3; N.Y. COMP.CODES R. & REGS . tit. 7, § 701.8.

**\*8** Since Defendants put forth the affirmative

defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit. With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available." " 'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner." *Shaheen v. Hollins,* 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v.. New York,* 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also Abbas v. Senkowski,* 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005). The "proper test for determining whether ordinary grievance procedures were 'available' [is] whether 'a similarly situated individual of ordinary firmness [would] have deemed them available.' " *McCullough v. Burroughs,* 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York,* 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough,* 2005 WL 3164248, at *3 (quoting *Hemphill v. New York,* 380 F.3d at 688). Here, administrative remedies were available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill v. New York,* 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

opposing party; (2) reasonable reliance on that mis-representation; and (3) detriment." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be deemed estopped from asserting the affirmative defense of failure to exhaust. Since we are considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will be deemed exhausted.

### D. Eighth Amendment Claims

**\*9** Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell. Am. Compl. at ¶ 42. Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him spoiled food which caused him psychological harm. *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). To state a claim under § 1983, the inmate "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996).

The Supreme Court has delineated a two-part test for deliberate indifference. First, the "deprivation alleged must be, objectively, sufficiently serious," and "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (citing *United States v. Bailey,* 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). Instead, "reckless disregard of plaintiff['s]

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

right to be free from attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 221-22 (S.D.N .Y .1995) (citing *Rucco v. Howard,* 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984)) (internal quotation marks omitted) (alteration in original). Furthermore, "an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference." *Sims v. Bowen,* 1998 WL 146409, at *3 (N.D.N.Y. Mar. 23, 1998). More-over, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner is not getting along with his cellmate. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*10** Here, Plaintiff claims a known enemy was placed in his cell. Midalgo states that he filed a grievance expressing his fear that he would be placed with a "known or made for hire enemy" and that on June 27, 2003, he was bunked with a known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep. Am. Compl. at ¶¶ 27 & 31. However, Captain Bezio stated in a letter to Midalgo that "there [was] no evidence to indicate that [he] was placed in a cell with a known enemy. A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility" and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor. Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. Even the Superintendent stated that inmates were bunked based on compatibility. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his "circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy. The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]" Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8. He also stated he told his correction counselor he was in danger from "all gang members" but then stated that he did not tell his counselor anything of such nature since "there was no counselor for [him] to speak to" until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines 17-23. Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made "homosexual advances" on him. *Id.* at p. 16, line 14. After that cellmate, Plaintiff had approximately twenty (20) more cellmates because "things weren't working out" and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines 11-14 & 30, lines 21-24, & 31, lines 1-11. Plaintiff stated he had "plenty of fights" with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference. First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm. Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom "Sergeant Bass thought was a rival gang member." Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June 27, 2003. However, Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk. Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility. Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.* Moreover, Plaintiff, over time, had numerous cell-

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

mates because they were not compatible. Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell. Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

**\*11** Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety. This is evidenced by the fact that he had nearly twenty other cellmates. He was not forced to bunk with another cellmate for an extended period of time. Even with his first cellmate, he only bunked with him for a month or so. Pl.'s Dep. at pp. 16, lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell. Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him. *Id.* at pp. 30, lines 21-24, & 31, lines 1-11. Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials. Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued. *Id.* at p. 65, lines 22-23. Plaintiff seemingly would prefer to choose his own cellmate, however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September 2003, Defendants Spinner and Streeter served Midalgo "moldy cheese, bread, spoiled milk and rotten fruits ." *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Farmer v. Brennan,* 511 U.S. at 832. In that

context, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at \*6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines 1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact between an officer and the trays are limited. Pl.'s

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he "wouldn't starve or get sick" and that as a result he received psychological harm which include "anxiety, nightmares about being poisoned, delusions and dizziness." *Id.* at p. 50; Am. Compl. at ¶ 54.

**\*12** Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted.**

### E. First Amendment Claims

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* 2001 WL 303713, at \*4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Cancel v. Goord,* 2001 WL 303713, at \*5 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) & *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)). But, if an adverse judgment to an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. *Id.*

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. *Davis v. Goord,* 320 F.3d at 351 (citing, *inter alia, Heimerle v. Attorney General,* 753 F.2d 10, 12-13 (2d Cir.1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to out-

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

going mail than to incoming mail." *Id.* (citing, *inter alia, Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " *Id.* (quoting *Cancel v. Goord,* 2001 WL 303713, at *6); *see also Wolff v. McDonnell,* 418 U.S. 539, 574-76 (1974); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975); *Gill v. Riddick,* 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

**\*13** With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]' " *Cancel v. Goord,* 2001 WL 303713, at *6 (quoting *Thornburg v. Abbott,* 490 U.S. 401, 409 (1989)). "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Id.* (quoting *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986)). In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest. *Id.*

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath." Am. Compl. at ¶ 26. Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions. Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6. Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements. *Id.* at p. 40, lines 19-23. When Plaintiff was asked about the statement made in his Amended Complaint that "outgoing mail/legal mail was being read due to a fabricated penological interest" Midalgo stated that he believed his mail was read because he "agitated [the facility's]

security interest and that ... gave them a reason to read [his] mail and things [he] was writing in [his] mail." *Id.* at p. 83, lines 3-8. Another reason Plaintiff believed the mail was read was because the inmates who became his cellmates "would try to start a whole situation based on letters" that Plaintiff had written. *Id.* at p. 83, lines 9-12. Plaintiff had submitted a grievance about his legal mail and it was found to have no merit and that there was no evidence to support his complaint. Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail. Plaintiff has not alleged any deliberate and malicious interference that actually impeded his access to the courts nor prejudiced an existing action. Plaintiff also provides no proof that his mail was read except that he states Defendant Bouyea was mumbling under his breath something similar to what had been written in Plaintiff's letters. Moreover, Midalgo has not shown that Bouyea opened and read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and newspaper subscription" or providing them to other inmates. Am. Compl. at ¶ 22; Pl.'s Dep. at p. 34. Midalgo says he knew some of his magazines that were in the "rec room" were his because he saw his name on the label. Pl.'s Dep. at p. 34, lines 2-4. He also stated he wrote to the mail clerk to inquire about his mail, the mail clerk told him that magazines were given to the correction officers to be handed out, that they were not delivered to him. *Id.* at p. 34, lines 8-12. Then when Plaintiff spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

**\*14** In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord,* 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue per each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at pp. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had passed without receiving any subscriptions. Am. Compl. at ¶¶ 23 -24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that there was a practice of this by the Defendants.[FN14] Therefore, Plaintiff has failed to state a claim on his non-legal, incoming mail.

FN14. The Court also notes that the Defendants fail to address whether or not there was a penological interest in the regulations or practices that may have affected Midalgo's receipt of non-legal mail. *See* Defs.' Mem. of Law.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Even if the Court were to draw all inferences in favor of Plaintiff that a pattern and practice has been established, Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant. Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the corrections officers who may have misplaced or destroyed his magazines.

Plaintiff further makes the claim that he received the wrong books and cases from the law library or that he never received the books requested. *Id.* at ¶ 48. Midalgo also alleges that his legal documents were lost and he was unable to file court documents as a result. *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds*). However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. at 351. The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354.

**\*15** As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered. Am. Compl., Ex. D, Lt. from Litzenberger, dated July 28, 2003. Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library. *Id.,* Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003. However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003. Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index. Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3. Plaintiff alleges that every book he requested from the law library was missing and that one book that he did receive had a section ripped out that Plaintiff needed. *Id.* at p. 85, lines 1-18. However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library. *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry. *Id.* at p. 74, lines 22-23. Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases. *Id.* at pp. 74, line 24, & 75, lines 1-20. Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made. *Id.* at pp. 79, lines 16-24, & 80, lines 1-8. As a result, Plaintiff claims that this was another reason why he was unable to file the motion. *Id.* at p. 80, lines 1-5. Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures. *Id.* at p. 81, lines 18-21. Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff. *Id.* at pp. 87, lines 10-24, & 88, lines 1-4. Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings. *Id.* at p. 88, lines 7-17.

**\*16** Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents. Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit. *See Lewis v. Casey,* 518 U.S. at 354. Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

*Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

### F. Inadequate Visitation

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin,* 940 F.Supp. 639, 642 (S.D.N.Y.1996) (citing, *inter alia, Sandin v. Conner,* 515 U.S. 472, 485 (1995)). Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). However, family visitations for inmates only constitute a privilege and not a right. *See Block v. Rutherford,* 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by con-

finement is the right to freely associate with those outside the penal institution); *see also Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis,* 272 F.Supp.2d at 227.

*17 Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged. He merely states that a visit with his mother and brother was delayed by a few hours. Am. Compl. at ¶ 25. As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

### G. Harassment

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and psychological harm.[FN15] Am. Compl. at ¶ 52.

> FN15. Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment. *See* Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether a plaintiff had a legitimate expectation of privacy with respect to his conversations. To assess

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

the expectation, "the person asserting a privacy in-terest must demonstrate a subjective expectation of privacy." *George v. Carusone,* 849 F.Supp. 159, 165 (D.Conn.1994) (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)) (further citations omitted). Then "that person's subjective expectation must be one that society accepts as reasonable." *Id.* (citing *California v. Greenwood,* 486 U.S. at 39) (further citations omit-ted). The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]" *Willis v. Artuz,* 301 F.3d 65, 66, & 69 (2d Cir.2002) (citing *Hudson v. Palmer,* 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evi-dence that there was actually a wiretap placed within his cell. Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell. Pl.'s Mem. of Law at Point Eight. Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs. Pl.'s Dep. at p. 15, lines 13-17. He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed. *Id.* at p. 15, lines 18-24. Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory as to state any claim in regards to the alleged wiretap.

With regard to his claim of a confidential in-formant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Of-ficer Streeter, and others gave the cellmate extra food trays, magazines, and books. Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10. Other than supposition, Plaintiff has not provided any proof or evidence that his cell-

mate was a confidential informant. Midalgo's claims are merely conclusory and unsupported by any facts. Furthermore, the Superintendent stated that inmates are placed together based on compatibility. Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff has not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*18** Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H. John Doe Defendant

As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12. FED.R.CIV.P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]" Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1. Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dis-missed.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Sum-mary Judgment (Dkt. No. 105) be **GRANTED;** and it is further

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

    **RECOMMENDED,** that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

    **ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

    Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

N.D.N.Y.,2006.
Midalgo v. Bass
Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry, Cor-
rections Officer, Great Meadow Correctional Facility;
F. Englese, Corrections Officer, Great Meadow Cor-
rectional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.

No. 9:03-CV-1010 (DNH/GLS).
June 20, 2008.

James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the
State of New York, James Seaman, Esq., Asst. At-
torney General, of Counsel, Albany, NY, for De-
fendants.

***ORDER***

DAVID N. HURD, District Judge.

   *1 Plaintiff, James Murray, brought this civil
rights action pursuant to 42 U.S.C. § 1983. In a 51
page Report Recommendation dated February 11,
2008, the Honorable George H. Lowe, United States
Magistrate Judge, recommended that defendants' mo-
tion for summary judgment be granted in part (i.e., to
the extent that it requests the dismissal with prejudice
of plaintiff's claims against defendant Paolano and

Nesmith); and denied in part (i.e., to the extent that it
requests dismissal of plaintiff's claims against the
remaining defendants on the grounds of plaintiff's
failure to exhaust available administrative remedies)
for the reasons stated in the Report Recommendation.
Lengthy objections to the Report Recommendation
have been filed by the plaintiff.

   Based upon a de novo review of the portions of
the Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

   Accordingly, it is

   ORDERED that

   1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

   2. Plaintiff's complaint against defendants
Paolano and Nesmith is DISMISSED with prejudice;

   3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal
of plaintiff's assault claims under the Eighth
Amendment against the remaining defendants on the
grounds of plaintiff's failure to exhaust available ad-
ministrative remedies as stated in the Re-
port-Recommendation.

   IT IS SO ORDERED.

   JAMES MURRAY, Plaintiff,

   -v.-

   R. PALMER, Corrections Officer, Great Meadow

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

C.F.; S. GRIFFIN, Corrections Officer, Great Meadow C.F.; M. TERRY, Corrections Officer, Great Meadow C.F.; F. ENGLESE, Corrections Officer, Great Meadow C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K. BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH, Sergeant, Great Meadow C.F.; A. PAOLANO, Health Director, Great Meadows C.F.; TED NESMITH, Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow C.F.; S. GRIFFIN, Corrections Officer, Great Meadow C.F.; M. TERRY, Corrections Officer, Great Meadow C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

***ORDER and REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

### B. Defendants' Counterclaim

**\*2** In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.' Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

## II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

### A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the

policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

### B. Plaintiff's Response

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at *3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of sworn testimony for purposes of a summary judgment motion.

*See, infra,* notes 10-12 of this Report-Recommendation.

## III. GOVERNING LEGAL STANDARD

**\*4** Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,[FN1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[FN5]

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] plead-

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

ing, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN6] to the extent that (1) those facts are supported by the evidence in the record,[FN7] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN8]

FN6. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

FN8. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.) [FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN12]

FN9. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obliga-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

tion on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment; *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d

Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

### A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to

show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontrovered record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this factual asser-

tion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J., *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions,[FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[FN25]

FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.[FN26] However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

> FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting) [FN27] that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

> FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally**

**Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

point in time, "Downstate CF honored doctors pro-scribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual asser-tion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his pre-scriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole respon-sibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporar-ily deprive prisoners of non-life-sustaining prescrip-tion medications upon their arrival at a correctional facility, pending the review of those medical pre-scriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to per-form an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Re-port-Recommendation.

Third, Plaintiff has failed to adduce evidence es-tablishing that the policy in question is even uncon-stitutional. I note that, in his Supplemental Memo-randum of Law, Plaintiff argues that "deliberate in-difference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plain-tiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A.

Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17, 2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

**\*11** (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Affid. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at \*4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm*-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

**\*12** Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid [enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff). FN31 Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17, 2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.FN32 For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at \*27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at *24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command

that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

**C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law**

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

**\*14** (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.[FN34]

FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

FN35. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.[FN37]

FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." [FN38]

FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury to his wrist.* (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

(based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

### D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correc-

tional facility until such administrative remedies as are available are exhausted."[FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

> FN42. 42 U.S.C. § 1997e.

> FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

*next level, including CORC, to complete the grievance process.*[FN46]

FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies.[FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available adminis-

trative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."[FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."[FN51]

FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

FN50. *Id.* [citations omitted].

FN51. *Id.* [citations and internal quotations omitted].

**\*16** Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal argu-

ments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86, at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

***17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"), [FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

2005) (Sharpe, J.; Peebles, M.J.) (character-
izing defendants' threshold burden on a mo-
tion for summary judgment as "modest")
[citing *Celotex Corp. v. Catrett,* 477 U.S.
317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d
265 (1986) ]; *accord, Saunders v. Ricks,*
03-CV-0598, 2006 WL 3051792, at *9 & n.
60 (N.D.N.Y. Oct.18, 2006) (Hurd, J.,
adopting Report-Recommendation of Lowe,
M.J.), *Smith v. Woods,* 03-CV-0480, 2006
WL 1133247, at *17 & n. 109 (N.D.N.Y.
Apr.24, 2006) (Hurd, J., adopting Re-
port-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of
Defendants' motion, that (1) grievance records at
Great Meadow C.F. indicate that Plaintiff never filed a
timely grievance alleging that he had been assaulted
by corrections officers at Great Meadow C.F. in 2000,
and (2) records maintained by CORC indicate that
Plaintiff never filed an appeal (to CORC) regarding
any grievance alleging that he had been so assaulted.
(*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1
Statement, providing accurate record citations].)
Plaintiff has failed to properly controvert these factual
assertions with specific citations to record evidence
that actually creates a genuine issue of fact. (*See* Dkt.
No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a
result, under the Local Rules of Practice for this Court,
Plaintiff has effectively "admitted" Defendants' ref-
erenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the ref-
erenced factual assertions are basically meaningless
because Great Meadow C.F. did not (during the time
in question) have a grievance "receipt system," that
argument also fails. In support of this argument,
Plaintiff cites unspecified record evidence that, al-
though he sent a letter to Sally Reams (the IGP Su-
pervisor at Great Meadow C.F. in May 2003) at some
point and received a letter back from her on May 5,
2003, she later claimed that she had never received a
letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29

[Plf.'s Memo. of Law].) After examining Plaintiff's
original Affidavit and exhibits, I located and carefully
read the documents in question. (Dkt. No. 85, Part 1, ¶
23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to
Plf.'s Affid.].)

These documents do not constitute sufficient ev-
idence to create a triable question of fact on the issue
of whether, in August and/or September of 2000,
Great Meadow C.F. did not have a grievance "receipt
system." At most, they indicate that (1) at some point,
nearly three years after the events at issue, Plaintiff
(while incarcerated at Attica C.F.) wrote to Ms. Reams
complaining about the alleged assault on August 17,
2000, (2) she responded to Plaintiff, on May 5, 2003,
that he must grieve the issue at Attica C .F., where he
must request permission to file an untimely grievance,
and (3) at some point between April 7, 2003, and June
23, 2003, Ms. Reams informed Mr. Eagen that she did
not "remember" receiving "correspondence" from
Plaintiff. (*Id.*) The fact that Ms. Reams, after the
passing of several weeks and perhaps months, did not
retain an independent memory (not record) of re-
ceiving a piece of "correspondence" (not grievance)
from Plaintiff (who was not an inmate currently in-
carcerated at her facility) bears little if any relevance
on the issue of whether Great Meadow C.F. had, in
April and/or May of 2003, a mechanism by which it
recorded its receipt of *grievances.* Moreover, whether
or not Great Meadow C.F. had a grievance "receipt
system" in April and/or May of 2003 bears little if any
relevance to whether it had a grievance "receipt sys-
tem" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have
adduced record evidence specifically establishing that,
in August and September 2000, Great Meadow C.F.
had a *functioning* grievance-recording process
through which, when a prisoner (and specifically
Plaintiff) filed a grievance, it was "assign[ed] a
number, title and code" and "log[ged] ... into facility
records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.];
Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

**3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement**

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf .'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at \*11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit,

Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

> [FN54]. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
(Cite as: 2008 WL 2522324 (N.D.N.Y.))

grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[FN57]

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evi-

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

dence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid.].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminently [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly before this Court. Plaintiff's characterization

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnham v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

*22 Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims.[FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo. Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopoint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third

Page 29

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") [FN63]

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment. [FN64]

FN64. *See Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
**(Cite as: 2008 WL 2522324 (N.D.N.Y.))**

personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be ***GRANTED* in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and ***DENIED* in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.
Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry; F. Englese; Sergeant Edwards; K. Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
March 31, 2010.

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***
Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court," and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative

Page 2

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[FN1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[FN2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

FN1. *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN2. The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

*2 Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[FN3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respec-

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

tively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[FN4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[FN5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[FN6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

FN3. *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

FN4. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,*

05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

FN5. *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

FN6. *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

§ 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available

and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[FN7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[FN8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[FN9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[FN10] (b) the inmate was specifically informed that the claim in question was grievable,[FN11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[FN12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[FN13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[FN14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[FN15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[FN16]

FN7. The Court recognizes that the Supreme

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

FN8. *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

FN9. *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internal-

ly"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

FN10. *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

FN11. *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

F.Supp.2d at 75-76.

FN12. *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

FN13. *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

FN14. *See, e.g., Benjamin v. Comm'r N.Y.*

*State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

FN15. *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

FN16. *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

*4 Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [FN17]

FN17. *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v.*

*Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[FN18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[FN19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[FN20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [FN21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Pos-

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

ner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied, --- U.S. ----,* 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[FN22]

FN18. *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

FN19. *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that

"[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326741, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

FN20. *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326741, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639,

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

FN21. *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the ad-

ministrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

FN22. *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

*5 New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007)

(internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380 F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [FN23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [FN24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [FN25]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

**FN23.** The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

**FN24.** In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

**FN25.** For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

**B. Estoppel**

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administra-

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

tive remedies based on the actions (or inactions) of other individuals.[FN26]

> FN26. *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16

(N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

own.").

## C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's

cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations,[FN27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order.[FN28]

FN27. *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

FN28. The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
**(Cite as: 2010 WL 1235591 (N.D.N.Y.))**

> such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

N.D.N.Y.,2010.
Murray v. Palmer
Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)

END OF DOCUMENT


Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Southern Division.
Lynn T. PASLEY, Plaintiff,
v.
Vera CONERLY, Defendant.

No. 2:08–cv–13185.
Sept. 10, 2010.

Lynn Pasley, Jackson, MI, pro se.

Allan J. Soros, Michigan Department of Attorney General, Lansing, MI, for Defendant.

PAUL J. KOMIVES, United States Magistrate Judge.
**REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. Ent.15) and PLAINTIFF'S MOTION FOR DISCOVERY (Doc. Ent.25)**
*Table of Contents*

| I. | *RECOMMENDATION* ................. | 2 |
|---|---|---|
| II. | *REPORT* ................... | 2 |
| | A. | On September 29, 2009, the Sixth Circuit Remanded This Case. .......... | 2 |
| | B. | Currently before the Court is Defendant's January 5, 2010 Motion for Summary Judgment. .... | 5 |
| | C. | Fed.R.Civ.P. 56 ............... | 8 |
| | D. | Plaintiff's Factual Allegations Largely Relate to Three Events. .......... | 10 |
| | | 1. | The November 21, 2007 administrative hearing regarding legal property ...... | 10 |
| | | 2. | The November 29, 2007 phone disbursement reques t .......... | 12 |
| | | 3. | The December 10, 2007 mail request & PPD activation ........ | 14 |
| | | 4. | The December 13, 2007 grievance regarding these events ........ | 16 |
| | E. | The Court Should Deny Defendant's Motion for Summary Judgment. ........ | 17 |
| | | 1. | Defendant is not entitled to summary judgment o n plaintiff's First Amend- | 17 |

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

ment retaliation claim. ..................

a.       Plaintiff's Novem-    17
ber 2007 threat to
file a grievance
constitutes pro-
tected conduct.

b.       Plaintiff has de-    19
scribed adverse
actions which fol-
lowed the alleged
protected conduct.

c.       There is enough    44
indirect evidence
to infer a retalia-
tory motive by
defendant.

2.       Defendant is not entitled to qualified    46
immunity on plaintiff's First Amend-
ment retaliation claim. ..................

III.       *NOTICE TO PARTIES REGARDING OBJECTIONS* .............    49

**\*1 I. *RECOMMENDATION:*** The Court should deny defendant Conerly's January 5, 2010 motion for summary judgment. Doc. Ent. 15. Specifically, the Court should conclude that defendant is not entitled to summary judgment or qualified immunity with respect to plaintiff's First Amendment retaliation claim.

Furthermore, the Court should construe plaintiff's March 8, 2010 motion for discovery (Doc. Ent.25) as a sur-reply and defendant's September 1, 2010 filing (Doc. Ent.26) as a response to the sur-reply.

**II. *REPORT:***

**A. On September 29, 2009, the Sixth Circuit Remanded This Case .**[FN1]

    [FN1]. Plaintiff has filed other prisoner civil rights cases. During June 2007, before the instant case was filed, plaintiff filed a prisoner civil rights case (***Pasley v. Oliver,*** **Case No. 2:07–cv 12482–LPZ–PJK (E.D.Mich), Case No. 01:07–Gv–00583–JTN–TPG (W.D.Mich.)),** regarding which judgment was entered on December 14, 2009 and an order to proceed in forma pauperis regarding appeal fee was entered on January 5, 2010. Attached to the instant complaint are disbursement authorizations regarding this case. Doc. Ent. 1 at 17 (March 24, 2008), 18 (March 24, 2008).

    On September 16, 2008, after the instant case was filed, plaintiff filed another prisoner civil rights case (***Pasley v. Does,*** **Case No. 1:08–cv–13988–TLL–VMM (E.D.Mich.)),** regarding which judgment was entered on December 2, 2008. On September 23, 2009, the Sixth Circuit dismissed the case for want of prosecution. *Pasley v. Does,* No. 09–1074. On

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

January 25, 2010, the United States Supreme Court denied the petition for writ of certiorari. *Pasley v. Does,* No. 09–7737, 130 S.Ct. 1293 (2010).

Most recently, plaintiff filed **Case No. 2:10–cv–11805–AJT–MKM,** against Caruso, a doctor and several physicians assistants regarding events which span the period of September 20, 2008–August 27, 2009. Doc. Ent. 1 ¶¶ 12–38. Plaintiff has been given leave to file an amended complaint on or before September 10, 2010. Doc. Ent. 15 at 2.

Plaintiff is currently incarcerated at the G. Robert Cotton Correctional Facility (JCF) in Jackson, Michigan, where he is serving a sentence for a violation of Mich. Comp. Laws § 750.529 ("Use or possession of dangerous weapon; aggravated assault; penalty.").[FN2]

> FN2. Plaintiff appealed his state court conviction. He filed an appeal of the January 30, 1998 order in Case No. 97–001622 (Recorder's Court). On July 11, 2000, the Court of Appeals of Michigan affirmed Pasley's conviction and sentence. *See People v. Pasley,* No. 210712, 2000 WL 33416872, *5 (Mich.App.2000). On February 26, 2001, the Supreme Court of Michigan denied the application for leave to appeal. *People v. Pasley,* No. 117587, 463 Mich. 973, 623 N.W.2d 600 (Mich.2001).
>
> Plaintiff filed an appeal of the April 18, 2002 order in Case No. 97–001622–02 (Wayne County Circuit Court). On September 4, 2003, the Michigan Court of Appeals denied the delayed application for leave. *People v. Pasley,* No. 247593. On January 27, 2004, the Supreme Court of Michigan denied the application for leave to appeal. *People v. Pasley,* No. 124725, 469 Mich. 1003, 675 N.W.2d 594 (Mich.2004).

Then, on April 1, 2004, plaintiff filed a petition for writ of habeas corpus (*Pasley v. Romanowski,* **No. 2:04–cv–71020–JCO–RSW**), regarding which judgment was entered on September 20, 2005. Judgment was affirmed by the Sixth Circuit on July 19, 2007. *Pasley v. Romanowski,* No. 05–2549.

On July 24, 2008, while incarcerated at the Macomb Correctional Facility (MRF), plaintiff filed the instant case. Doc. Ent. 1, Doc. Ent. 15–5 at 2 (Transit List).[FN3] Plaintiff's complaint names as a defendant Vera Conerly, an employee of the Michigan Department of Corrections (MDOC), who is described as an Assistant Resident Unit Supervisor (ARUS) at the Huron Valley Complex–Men's Facility (HVM)[FN4] in Ypsilanti, Michigan.[FN5] Plaintiff's complaint is based upon the First, Eighth and Fourteenth Amendments and defendant's "constant haras[s]ment, intimidation and retaliation against plaintiff[,]" and defendant's "fail[ure] to process plaintiff's paperwork and mail." Doc. Ent. 1 ¶¶ 2, 3 & 59. *See also* Doc. Ent. 1 ¶¶ 60A, 60C.

> FN3. Plaintiff also filed an application to proceed without prepayment of fees. Doc. Ent. 2. It was granted on July 28, 2008. Doc. Ent. 3.
>
> FN4. Apparently, this facility is now the Women's Huron Valley Correctional Facility (WHV). This transition allegedly took place on June 20, 2008. Doc. Ent. 15 at 13.
>
> FN5. Plaintiff sues defendant Conerly in her individual and official capacities. Doc. Ent. 1 at 1 ¶ 3.

Plaintiff seeks nominal damages of $50,000 and punitive damages of $100,000 against defendant Conerly for violation of his First, Eighth and Fourteenth Amendment rights. Doc. Ent. 1 at 8 ¶¶ A–C. He also seeks such other relief to which the Court may deem him entitled. Doc. Ent. 1 at 8 ¶ D.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

On August 5, 2008 Judge Cohn entered an order dismissing the case. Specifically, he provided:

> Plaintiff's complaint fails to state a claim under § 1983. The facts as alleged indicate that, at most, Defendant harassed Plaintiff and treated him disrespectfully. It is well-established that verbal abuse, harassment, and unprofessional conduct do not rise to the level of a constitutional violation for which relief may be granted in a civil rights case. *Johnson v. Unknown Dellatifa,* 357 F.3d 539, 546 (6th Cir.2004) (citing *Ivey v. Wilson,* 832 F.2d 950, 954–55 (6th Cir.1987)). Accordingly, the complaint is DISMISSED as frivolous under 28 U.S.C. §§ 1915(e)(2) (B)(I) and 1915A(b)(1).

Doc. Ent. 4 at 3.

Plaintiff filed an appeal. Doc. Entries 5 and 7.[FN6] On September 29, 2009, the Sixth Circuit affirmed the district court's judgment insofar as it dismissed Pasley's Eighth Amendment claim, vacated it as it dismissed his First Amendment claim, and remanded the case for service on the defendant. *Pasley v. Conerly,* 345 Fed.Appx. 981, 986 (6th Cir.2009).[FN7] Thus, only plaintiff's First Amendment claims are at issue.[FN8]

> FN6. Plaintiff also filed a motion to proceed in forma pauperis on appeal. Doc. Ent. 6. By a notice dated September 16, 2008, plaintiff was informed of his failure to comply with the appeal filing fee requirement. Doc. Ent. 8. On September 19, 2008, Judge Cohn entered an order waiving prepayment of the appellant filing fee and directing payment of the initial partial filing fee and subsequent payments. Doc. Ent. 9.

> FN7. The mandate regarding the Sixth Circuit's September 29, 2009 decision was filed on October 22, 2009. Doc. Ent. 11.

> FN8. The Sixth Circuit noted the following about plaintiff's Fourteenth Amendment claim:

>> Pasley also attempts to raise a claim under the Fourteenth Amendment. Because Pasley's claim is cognizable under the First Amendment, it need not be considered under the more generalized due process provision of Fourteenth Amendment. The Supreme Court held in the context of excessive force claims that, where a specific provision of the Constitution applies, a claim must be analyzed under the specific provision rather than under the Fourteenth Amendment. *Graham v. Conn[o]r,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (19[89] ). In *Thaddeus–X v. Blatter,* we applied Graham's holding to claims cognizable under the First Amendment. 175 F.3d 378, 387–88 (6th Cir.1999) (en banc).

> *Pasley,* 345 Fed.Appx. at 984 n. 1.

**B. Currently before the Court is Defendant's January 5, 2010 Motion for Summary Judgment.**

**\*2** On October 23, 2009, Judge Cohn entered an order directing service of the complaint on the defendant. Doc. Ent. 12. An appearance of counsel was entered on defendant Conerly's behalf, and her answer was due on January 5, 2010. Doc. Entries 13 and 14. Judge Cohn has referred this case to me for pretrial matters. Doc. Ent. 16.

On January 5, 2010, defendant filed a motion for summary judgment by which she seeks dismissal of this lawsuit. Doc. Ent. 15. First, defendant argues that the evidence does not support Plaintiff's claim that "in retaliation for [p]laintiff's threat to file a grievance after ARUS Conerly gave him a U.S. postal bin for temporary storage, she threatened to have him transferred, backdated and wrote 'NSF' on a disbursement request, refused to mail a card and money to a little girl in Detroit who had been shot, and pulled her PPD [Personal Protection Device] pin." In support of this argument, she claims that (A) "[p]laintiff did not engage in prior protected conduct[,]" and (B)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

"[p]laintiff did not suffer any adverse action at the hands of [d]efendant Conerly." Doc. Ent. 15 at 12–15. Second, defendant argues that she is entitled to qualified immunity because she did not violate any of plaintiff's constitutional rights. Doc. Ent. 15 at 15–17.

On January 19, 2010, I entered an order requiring plaintiff to file any response on or before February 22, 2010. Doc. Ent. 17. On January 26, 2010, plaintiff filed a motion to enlarge time. Doc. Ent. 18. In addition to claiming he received defendant's dispositive motion on January 11, 2010, plaintiff specifically disputes the representations that (1) he was never written a misconduct ticket (see Doc. Ent. 15–3 [Vera Conerly Affidavit] ¶ 9); (2) he was transferred from HVM when it was converted to a women's prison on June 20, 2008 (see Doc. Ent. 15 at 13; Doc. Ent. 15–5 [Transit List] ); and (3) the notation on his November 19, 2007 disbursement request was done by Business Office Staff (Doc. Ent. Doc. Ent. 15–3 ¶ 6). Doc. Ent. 18 ¶¶ 1, 4.[FN9] On February 11, 2010, he filed his response. Doc. Ent. 19.

> FN9. Therein, plaintiff claimed that he had to "write a[n] institutional kite to the business office to receive the relevant documents to challenge defendant's false declarations and arguments," and he also has to "contact the hearings division to obtain the necessary documents to support Plaintiff's argument that Defendant declarations are not true [.]" Doc. Ent. 18 ¶ 5. On March 5, 2010, I entered an order deeming moot plaintiff's motion to enlarge time. Doc. Ent. 24.

On February 26, 2010, defendant filed a motion for enlargement of time in which to file a reply brief. Doc. Ent. 20.[FN10] She filed her reply the same day. Doc. Ent. 21. On March 3, 2010, defendant filed the affidavit of Jose Philip (Doc. Ent. 23 at 1–4), to which is attached the affidavit of Karen Whalen (Doc. Ent. 23–2 at 1–3).

> FN10. On March 2, 2010, I entered an order granting this motion. Doc. Ent. 22.

On March 8, 2010, plaintiff filed a "motion for discovery," wherein he notes that defendant "made several argument[s] in her reply brief that call[ ] for this motion for discovery[.]" Doc. Ent. 25 at 1 ¶ 2. Plaintiff argues that "[d]iscovery should be granted so that [he] can obtain [the December 10, 2007] misconduct report and disposition from the hearings division[.]" Doc. Ent. 25 at 7. Furthermore, he seeks discovery "so that he may have an opportunity to dispute [the] [Philip and Whalen] affidavits[,]" both of which challenge his complaint, and "so that an attempt can be made to obtain affidavits from ... Payne, Czata, Cummings, Clark, Hassen and ... Hill[,]" because they "can help prove [his] case, and make a meaningful challenge to the [Philip and Whalen] affidavits and arguments presented by defendant in her reply brief[.]" Doc. Ent. 25 at 8.[FN11]

> FN11. Plaintiff filed this motion pursuant to Fed.R.Civ.P. 26(b) (1). Disclosures and discovery in the federal courts are governed by Fed. Rules Civ. P. 26–37. By way of example, Interrogatories to Parties must comply with Rule 33, Requests for Production of Documents must comply with Rule 34, and Requests for Admission must comply with Rule 36.
>
> Furthermore, discovery in this Court is governed by E.D. Mich. Local Rules 26.1–37.2, among which is the requirement that "[a]ny discovery motion filed pursuant to Fed.R.Civ.P. 26 through 37, shall include, in the motion itself or in an attached memorandum, a verbatim recitation of each interrogatory, request, answer, response, and objection which is the subject of the motion or a copy of the actual discovery document which is the subject of the motion." E.D. Mich. LR 37.2.

*3 Plaintiff's March 8, 2010 filing was not entered on the docket until August 24, 2010. On September 1, 2010, defendant Conerly filed a response. Doc. Ent. 26. Conerly

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

contends that plaintiff "does not need discovery to attempt to obtain these [non-party] affidavits[,]" as "[n]onparties are not subject to Rule 33 interrogatories." Doc. Ent. 26 at 4. Conerly further contends that the "[s]tatements of the other non-party officers are unnecessary for the court to rule on Defendant's pending motion." Doc. Ent. 26 at 5. Furthermore, Conerly provides a second affidavit (Doc. Ent.26–2) and records related to the December 10, 2007 major misconduct report (Doc. Ent.26–3).

**C. Fed.R.Civ.P. 56**

Summary judgment, pursuant to Fed.R.Civ.P. 56, may be granted "if the pleadings, depositions, answers to in-terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties.

*Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (citing *Johnson v. Soulis,* 542 P.2d 867, 872 (Wyo.1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)). "In evaluating a motion for summary judgment we view all evidence in the light most favorable to Plaintiff ... and assess the proof to determine whether there is a genuine need for trial." *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1045 (6th Cir.1998) (citations omitted).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by

'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his pleading, Fed.R.Civ.P. 56(e), a verified complaint ... satisfies the burden of the nonmovant to respond." *Thaddeus–X v. Blatter,* 175 F.3d 378, 385 (6th Cir.1999).[FN12] "[A] verified complaint ... would have the same force and effect as an affidavit and would give rise to genuine issues of material fact." *Williams v. Browman,* 981 F.2d 901, 905 (6th Cir.1992). However, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). *See also Hamilton v. Roberts,* No. 97–1696, 1998 WL 639158, *5 (6th Cir. Sept.10, 1998) (personal knowledge required); *Daniel v. Cox,* No. 96–5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir.1994) (citing *Daily Press, Inc. v. United Press Int'l,* 412 F.2d 126, 133 (6th Cir.1969)) (cannot consider hearsay evidence).

FN12. Plaintiff's complaint was not signed. Doc. Ent. 1 at 8, 31. However, plaintiff's February 11, 2010 response to defendant's motion for summary judgment is signed (Doc. Ent. 19 at 2). Plaintiff's response brief is not signed (Doc. Ent. 19 at 21); however, plaintiff's February 4, 2010 affidavit is signed and notarized (Doc. Ent. 19 at 26).

**\*4** "Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient." *Kand Medical, Inc. v. Freund Medical Products, Inc.,* 963 F.2d 125, 127 (6th Cir.1992), citing *Matsushita Elec. Indus. Co., Ltd. v. Zen-*

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

*ith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 246–250 (citations omitted); *see Celotex Corp.,* 477 U.S. at 322–23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson,* 477 U.S. at 250. Consequently, a non-movant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

**D. Plaintiff's Factual Allegations Largely Relate to Three Events.**

The facts underlying plaintiff's complaint are largely related to the following events: (1) a November 21, 2007 administrative hearing regarding legal property; (2) a November 29, 2007 phone disbursement request; and (3) a December 10, 2007 mail request. Doc. Ent. 1 ¶¶ 4–23, 24–39, 41–54. Thereafter, plaintiff filed a grievance. Doc. Ent. 1 ¶¶ 55–58.

**1. The November 21, 2007 administrative hearing regarding legal property**

Plaintiff claims that Conerly routinely harassed, intimidated and retaliated against plaintiff "in violation of his rights in [a] corrupt, arbitrary and capricious manner[.]" Doc. Ent. 1 ¶ 4. On or about October 24, 2007, Resident Unit Officer (RUO) D. Czata informed plaintiff there would be a legal property hearing. Doc. Ent. 1 at 10. As summarized by the Sixth Circuit and taken as true for purposes of the appeal:

At the times relevant to this appeal, Pasley was housed in the Huron Valley Complex. [On November 21, 2007], the prison conducted an administrative hearing and determined that Pasley possessed a large amount of

law-related material that he was entitled to keep. When Pasley approached Conerly, his Assistant Resident Unit Supervisor, about obtaining additional footlockers, she responded, "I don't know why you are keeping all that bull-shit, you are not going home anyway...." Pasley sought help from [Officer Czata]. After [Officer Czata] talked to Conerly about the incident, Conerly brought Pasley into her office, called him a "rat," and supplied him with a single U.S. Postal Service container. When Pasley objected to taking the container, she told him, "Get out of my face ." Pasley then told Conerly that he would file a grievance against her if she refused to help him obtain the necessary storage containers. According to Pasley, Conerly told him that if he filed a grievance, she would have him transferred out of the unit and he would lose his job. She then stated, "I use[d] to be married to a warden and I will have your ass transferred so far up North [that] your family [won't] recognize you when you get back." At that point, Pasley took the postal container and left.

**\*5** A few days later, [Officer Hassen] searched Pasley's cell and found the postal container, which contained steel rods. [Officer Hassen] told Pasley that he would receive a major misconduct ticket for possessing dangerous contraband. Conerly initially denied giving Pasley the container and encouraged the officer to write the misconduct ticket. However, Conerly recalled giving Pasley the container after Pasley reminded her that she had given him the container in the presence of another officer. Pasley alleges that he later learned that Conerly sent [Officer Hassen] to [plaintiff's] cell to search for the postal container. The day after the search incident, Conerly informed Pasley that she would no longer provide him with services such as processing his mail and disbursing funds from his account.

*Pasley,* 345 Fed.Appx. at 983. *See also* Doc. Ent. 1 ¶¶ 5–20, Doc. Ent. 1 at 10 (Administrative Hearing Report–Formal).

According to plaintiff, the U.S. Postal Service container that Conerly gave plaintiff "could not hold but

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

maybe (4) four books and plaintiff had over (4) footlockers of excessive legal [material] [;] [therefore] [,] it is perfectly clear that Conerly was setting plaintiff up with this dangerous contraband." Doc. Ent. 1 ¶ 21. Plaintiff claims that "[e]ven after being ordered to provide [him] with the necessary bins to store his legal material[,][he] did not receive the bins until (9) nine months later." Doc. Ent. 1 ¶ 22; Doc. Ent. 1 at 12 (Disbursement Authorization).[FN13] In other words, plaintiff claims, Conerly "[d]eliberately failed to provide plaintiff with proper storage to store his excessive legal material after being instructed to do so." Doc. Ent. 1 ¶ 60E. Plaintiff claims that, during the time he waited for his bins, "his room flooded and a great deal of his legal material was destroyed." Doc. Ent. 1 ¶ 23.

> **FN13.** As defendant acknowledges, Doc. Ent. 15 at 8, this exhibit is difficult to read. Still, it appears that the Disbursement Authorization is dated in 2008 for an amount of $246.60. Doc. Ent. 1 at 12.

**2. The November 29, 2007 phone disbursement request**[FN14]

> **FN14.** Copies of the November 29, 2007 Disbursement Authorization are attached to plaintiff's complaint. Doc. Ent. 1 at 14, 19.

By way of background, Paragraph H of MDOC PD 05.03.130, "Prisoner Telephone Use," effective 01/01/2009, provides in part that "A prisoner who wants to purchase prepaid telephone service must submit a completed Disbursement Authorization (CAR–893) to the business office. The minimum amount of telephone service time that may be purchased is $10 with additional amounts purchased in $5 increments. No refunds shall be issued. *Business office staff shall enter the purchase of prepaid telephone service within two business days after receipt of an approved disbursement authorization form.* An electronic notification of all daily purchases will be automatically sent to the appropriate telephone company at the end of each business day; the appropriate telephone company

will make the prepaid service available for use by the prisoner within three business days after it receives notice of the purchase of the prepaid service." *See* Doc. Ent. 19 at 27–30 (emphasis added); Doc. Ent. 1 ¶ 32.

Here, plaintiff claims that Conerly "impeded upon plaintiff's ability to process his disbursements, cat[a]log orders, phone disbursements and mail [.]" Doc. Ent. 1 ¶ 24.[FN15] According to plaintiff, "[a]fter about a month or so of not being able to process [these] papers[,] plaintiff informed Officer Payne about the problems that he was having processing his paperwork." Doc. Ent. 1 ¶ 25. Plaintiff claims that, on Thursday, November 29, 2007, he gave Officer Payne a phone disbursement request which Payne placed in Conerly's mail box. Doc. Ent. 1 ¶ 27. On Friday, November 30, 2007, plaintiff approached Officer Payne to see if the disbursement had been processed. According to plaintiff, "Officer Payne looked in the box and the disbursement was still there." Doc. Ent. 1 ¶ 28.

> **FN15.** At the conclusion of his complaint, plaintiff alleges that Conerly "[d]eliberately failed to process any of plaintiff's important documents." Doc. Ent. 1 ¶ 60C.

**\*6** On Monday, December 3, 2007, plaintiff noticed that the disbursement was still in the box. Plaintiff asked Officer Clark to take it to Conerly's office for processing. Doc. Ent. 1 ¶ 30. Conerly called plaintiff into her office and allegedly said, "I don't know why you are so determined to have this stuff given to me, I've already told you that I will not be processing anything for you[.]" Conerly then told plaintiff, "get out [of] my office please." Doc. Ent. 1 ¶ 31.

Plaintiff claims he "constantly checked for a little over a week to see if his money had been process[ed], and the money was never placed on plaintiff's phone card." Doc. Ent. 1 ¶ 32. Eventually, plaintiff received his disbursement back; however, according to plaintiff, "Conerly had back dated the disbursem[e]nt to reflect that she processed the disbursement on [Friday, November 30, 2007] [,]" and

Page 9

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

Conerly returned it "with a notation indicating that plaintiff had NSF to process the disbursement[.]" Plaintiff claims this was false, because he "had more than enough funds to process the disbursement." Doc. Ent. 1 ¶ 34. It is plaintiff's position that Conerly "[d]eliberately falsified and changed the date on plaintiff's disbursement to further harass and intimidate plaintiff." Doc. Ent. 1 ¶ 60B. Furthermore, plaintiff claims, Officer Clark took the disbursement request into Conerly's office on Monday, December 3, 2007; therefore, it is not possible that Conerly processed it on November 30, 2007. Doc. Ent. 1 ¶ 36.[FN16]

> FN16. Plaintiff has provided copies of trust account statements. *See* Doc. Ent. 1 at 14–15 (Disbursement Authorization dated Nov. 29, 2007 & Trust Account Statement for Nov. 19, 2007–Dec. 3, 2007), 27–28 (Trust Account Statement for Dec. 5, 2007–Jan. 14, 2008).

Plaintiff claims he "was forced ... to go through other ARUSs to process his paperwork[.]" Doc. Ent. 1 ¶ 37.[FN17] When Conerly learned plaintiff was doing so, he claims, Conerly "sent out an e-mail to all the ARUSs informing them not to process plaintiff's paperwork, that it was her job to do so and she would do it." Doc. Ent. 1 ¶ 38. Plaintiff was allegedly informed about this e-mail when he approached ARUS Hill and Holliwill to process some documents. Doc. Ent. 1 ¶ 39.

> FN17. In support of this statement, plaintiff cites to disbursement authorizations showing different signatures to demonstrate that "for months [he] had to go through other staff members to process [his] materials." Doc. Ent. 1 ¶ 37; Doc. Ent. 1 at 16–25 (Disbursement Authorization Forms for Expedited Legal Mail & Several Disbursement Authorization Forms). As defendant acknowledges, Doc. Ent. 15 at 8, some of the disbursement authorizations are difficult to read.

**3. The December 10, 2007 mail request & PPD activation**

On December 10, 2007, plaintiff went to Conerly's office and asked if she would "please send out some mail for [plaintiff] because it was oversized [.]" It was a card plaintiff wanted "to send to a little girl that got shot in the City of Detroit trying to save her mother." Doc. Ent. 1 ¶ 41. When Conerly looked at the card she stated, "I'm not sending this card to that little girl. She [does not] want [a] card from some no good convict[.] Let me get your file and see what you are in here for[.]" Doc. Ent. 1 ¶ 42. Conerly looked at plaintiff's file and stated, "Oh you are here for armed robbery[.] Well, she [does not] want [a] card from [a] robber. I'm not allowing you to send that little girl that card[.]" According to plaintiff, Conerly did not send the card. Doc. Ent. 1 ¶ 43. Plaintiff also asked Conerly if she would send his $25 donation "to the fund that was set up by the girl's family[ .]" However, Conerly "would not send that out either. Doc. Ent. 1 ¶ 44. According to plaintiff, "Conerly stated that the warden said she [could not] send it out [.]" Doc. Ent. 1 ¶ 46.[FN18]

> FN18. Plaintiff claims that he was forced to go to another staff member to send the money and card and that ARUS Hill sent it for plaintiff. Doc. Ent. 1 ¶ 47. This contention is supported by plaintiff's Trust Account Statement, which indicates that on December 20, 2007 a $25 donation was made. *See* Doc. Ent. 1 at 27–28 (Trust Account Statement for Dec. 5, 2007–Jan. 14, 2008); *see also* Doc. Ent. 19 at 32–33; Doc. Ent. 19–2 at 9.

**\*7** During this visit, plaintiff claims, "Conerly started talking very disrespectful[ly] to plaintiff[;] so plaintiff got up to leave because there was no need to stay in the office after she denied [his request] to send out the card and money." Doc. Ent. 1 ¶ 48. According to plaintiff, Conerly stated, "sit back down[.]" Plaintiff kept going and exited Conerly's office, at which time Conerly called plaintiff's name. Plaintiff turned around, and Conerly "got up from her desk and reached into her black bag and pulled out her PPD and looked directly at plaintiff and smiled and then pulled the pin." Doc. Ent. 1 ¶ 49. As summarized by the Sixth Circuit and taken as true for purposes of the appeal:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

Pasley alleges that on December 10, 2007, as he was leaving Conerly's office after trying to process his mail, Conerly intentionally activated her personal protection device. According to Pasley, Conerly removed the device from her bag, looked Pasley in the eye, and pulled the pin to activate the device. Pasley said he feared for his life as officers from all over the unit quickly responded to the call. [Officer Cummings] who was standing outside of Conerly's line of sight intervened because he had seen that Pasley was outside of Conerly's office at the moment of the call. Conerly then stated that she activated the device accidentally.

*Pasley,* 345 Fed.Appx. at 983–984. *See also* Doc. Ent. 1 ¶¶ 49–53.

According to plaintiff, "Conerly then wrote a ticket on plaintiff stating that [he] [would not] leave her office and the ticket was dismissed." Doc. Ent. 1 ¶ 54. According to the December 10, 2007 major misconduct report, plaintiff was placed on bond pending the hearing and he requested as witnesses Officer Cummings, Anspach and Gosicki. Doc. Ent. 26–3 at 2.

On or about December 19, 2007, plaintiff requested Officer Cummings and prisoner Timothy Plair (# 502128) as witnesses; requested that reports of why Conerly pulled the PPD pin and each officer's statement be produced; and provided his own statement. Doc. Ent. 26–3 at 4–6. Plair provided a statement on or about December 27, 2007. Doc. Ent. 26–3 at 8. Gosicki had no statement. Doc. Ent. 26–3 at 7. By a memorandum dated December 28, 2007, H.I. Bragg informed the Hearings Officer that "[u]pon arrival, [Anspach] was told by ARUS Conerly that everything was okay and no further assistance was needed." Doc. Ent. 26–3 at 9.

The hearing was conducted on January 2, 2008, and the charge was dismissed. In reaching this conclusion, Hearing Officer Falkenstein noted:

I note on the misconduct report that the date of review is

not recorded. In addition, the officer whom prisoner describes as being the witness with the most knowledge, Cummings, did not provide a statement. Today is the last day for hearing. CO Cummings was listed at misconduct report review and at hearing investigator interview as a witness. Prisoner makes the case he is a relevant and necessary witness. Due to lack of documented review time and missing witness, the report is dismissed.

**\*8** Doc. Ent. 26–3 at 3.

**4. The December 13, 2007 grievance regarding these events**

On December 13, 2007, plaintiff completed a Step I grievance (HVM–07–12–01316–17z) against Conerly in which he discusses the aforementioned events. Doc. Ent. 1 at 33, 35–36. The January 7, 2008 Step I response is signed by D. Monday and R. Rider. Doc. Ent. 1 at 33, 37.

Plaintiff completed a Step II grievance appeal; A. Walls and L. Schuhmacher responded. Doc. Ent. 1 at 34, 39. Plaintiff completed a Step III grievance appeal, and J. Armstrong's Step III grievance response is dated June 3, 2008. Doc. Ent. 1 at 34, 41.

In his complaint, plaintiff contends that during the investigation of the grievance, plaintiff's witnesses listed therein were not questioned; the only people interviewed were plaintiff and Conerly; and Officers Payne, Cummings, Clark and Hassen were not questioned about plaintiff's allegations. Doc. Ent. 1 ¶¶ 55–58.[FN19]

FN19. Attached to plaintiff's complaint is an assertion that he "has exhausted his administrative remedies[,]" Doc. Ent. 1 at 29–31.

**E. The Court Should Deny Defendant's Motion for Summary Judgment.**

**1. Defendant is not entitled to summary judgment on plaintiff's First Amendment retaliation claim.**

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

A First Amendment retaliation claim requires a showing that: (1) "the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is the adverse action was motivated at least in part by the plaintiff's protected conduct". *Thaddeus–X,* 175 F.3d at 394–395. However, "[i]f the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus–X,* 175 F.3d at 399.

"Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting-whether activity is 'protected' or an action is 'adverse' will depend on context". *Thaddeus–X* at 388.

**a. Plaintiff's November 2007 threat to file a grievance constitutes protected conduct.**

The protected conduct issue is mainly associated with events following the November 21, 2007 administrative hearing which allowed plaintiff to keep and store his legal materials. Plaintiff, after having difficulty obtaining containers from Defendant, told Defendant that if she refused to help him obtain the necessary storage containers, he would file a grievance. *See* Doc. Ent. 1 at 3 ¶ 13.

It is defendant's position that plaintiff "did not engage in prior protected conduct." Doc. Ent. 15 at 13. In this regard, defendant notes that HVM–07–12–01316–17z was filed on December 13, 2007 regarding a December 3, 2007 incident. Doc. Ent. 1 at 33. It is defendant's interpretation that the grievance mostly "concerns Conerly's alleged failure to process [plaintiff's] disbursement request in a timely fashion, and then allegedly backdating it." In other words, defendant contends, "[p]laintiff did not file any grievance against Conerly until after all the events occurred." Doc. Ent. 15 at 13.

**\*9** In response (Doc. Ent. 19 at 14, 19), plaintiff ba-

sically restates the following portion of the Sixth Circuit's September 29, 2009 opinion:

> Pasley's statement that he would file a grievance against Conerly if she did not help him to obtain footlockers might constitute protected conduct under the First Amendment. It is well established that prisoners have a constitutional right to file grievances against correctional employees. *Herron v. Harrison,* 203 F.3d 410, 415 (6th Cir.2000). This circuit appears not to have determined conclusively whether merely threatening to file a grievance constitutes protected activity. In an unpublished order issued shortly after the court decided *Thaddeus–X v. Blatter,* we held that a prisoner who merely threatened to file a federal lawsuit was engaged in protected behavior. *See Dean v. Conley,* No. 98–5906, 1999 WL 1045166, at \*2 (6th Cir. Nov.9, 1999). We based this conclusion on the fact that prisoners have a constitutional right to file civil rights claims. In two other unpublished orders, we held that certain prisoners who had threatened to file grievances were not engaged in protected conduct, but in each case we based our conclusion on the fact that the threatened grievance was frivolous and that prisoners do not have a protected right to file frivolous grievances. *See Scott v. Kilchermann,* No. 99–1711, 2000 WL 1434456, at \*2 (6th Cir. Sept.18, 2000); *Thaddeus–X v. Love,* No. 98–2211, 2000 WL 712354, at \*3 (6th Cir. May 22, 2000). These two orders are consistent with the possibility that, had the prisoners threatened to file legitimate grievances, the conduct would have been protected. Because Pasley's threatened grievance was arguably legitimate, his conduct was arguably protected by the First Amendment.

*Pasley,* 345 Fed.Appx. at 984–985.

Furthermore, I note that shortly before the Sixth Circuit rendered its opinion, this Court in *Carter v. Dolce,* 647 F. Supp .2d 826 (E.D.Mich. Aug.19, 2009) (Lawson, J.), stated, "when it comes to protecting First Amendment rights, including the right to petition the government for redress, there is little difference between retaliating against a person for filing a grievance, and retaliating for threat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

ening to file one." *Carter,* 647 F.Supp.2d at 834. The court referred to the Sixth Circuit's treatment of these cases, in particular to *Jackson v. City ofColumbus,* 194 F.3d 737, 756–57 (6th Cir.1999),[FN20] and concluded that the Sixth Circuit "treats filing and threatening to file as categorically identical outside the prison context." *Carter,* 647 F.Supp.2d at 834.

> FN20. In *Carter,* 647 F.Supp.2d at 834, Judge Lawson relied upon the portion of *Jackson* that stated, "[i]f, on the other hand, [plaintiff's] threat of litigation served to expose matters of public concern, such as the alleged discriminatory practices of the City, such speech would constitute public speech and merit constitutional protection." *Jackson,* 194 F.3d at 756–757.

> Another portion of *Jackson* has been overruled. In *Jackson,* the Sixth Circuit stated that "[t]o survive the City's motion to dismiss, Jackson's complaint must include factual allegations that provide direct evidence of a discriminatory motive or that support each element of a *prima facie* case under the criteria set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668[ ] (1973)." *Id.* at 751. Later, in *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Supreme Court held that "an employment discrimination complaint ... must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Swierkiewicz,* 534 U.S. at 508 (citing Fed.R.Civ.P. 8(a)(2)).

Therefore, guided by the *Carter* decision of this Court and the aforementioned portion of the Sixth Circuit's September 29, 2009 order in this case, the Court should conclude that plaintiff's late November 2007 threat to file a grievance constitutes protected conduct and satisfies the first prong of the three-prong test.

**b. Plaintiff has described adverse actions which followed the alleged protected conduct.**

**\*10** Defendant argues that plaintiff "did not suffer any adverse action at the hands of Defendant Conerly." Doc. Ent. 15 at 13–15. Not every action is an adverse action; *de minimus* slights and inconveniences do not qualify. Furthermore, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is adverse." *Thaddeus–X,* 175 F.3d at 398. What has been held to be adverse action is the charging of an inmate with a misconduct violation. The court in *Thaddeus–X,* in order to determine whether actions of lesser severity merit being deemed "adverse" for purposes of a retaliation claim, adopted the standard suggested by Judge Posner in *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982), that an adverse action is one that would "deter a person of ordinary firmness" from the exercise of the right at stake.

Defendant claims that the fact that a grievance was filed on December 13, 2007 demonstrates that plaintiff was not deterred by Defendant's prior alleged adverse action, including Conerly's alleged but denied November 2007 threat "to send [Pasley] 'up north' after their verbal dispute over the storage bins [,]" noting that Pasley "stayed in Defendant's housing unit the entire time [Conerly] was the ARUS there." Plaintiff was moved from HVM on or about June 20, 2008. Doc. Ent. 15 at 13. In response to this argument, plaintiff relies upon *Gill v. Pidlypchak,* 389 F.3d 379 (2d Cir.2004). Doc. Ent. 19 at 20.[FN21]

> FN21. In *Gill,* the Second Circuit stated that "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. The Court further noted that "while subjective chilling is a general requirement, where a plaintiff alleges that the protected conduct at issue is the prior filing of a grievance or lawsuit against the defendant, it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation. If bringing the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

action demonstrates that the plaintiff has not been chilled-and has failed to meet the subjective test-then such a plaintiff could never seek redress for retaliation." *Id.* at 383. Also, the Court stated, "the fact that a particular plaintiff such as Gill-who, we recognize, is no stranger either to the grievance system or to the federal courts-responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action." *Id.* at 384.

Here, the standard is not whether or not the action in fact deterred the plaintiff from engaging in that conduct. Rather, the standard is whether a "person of ordinary firmness" would be deterred. "The relevant question is whether the Defendant's actions are *capable* of deterring a person of ordinary firmness." *Bell v. Johnson,* 308 F.3d 594, 606 (6th Cir.2002) (quoting *Thaddeus–X,* 175 F.3d at 398 (emphasis added)).

The following analysis of the alleged adverse actions is guided by the following portion of the Sixth Circuit's September 29, 2009 order:

Conerly's actions, as alleged by Pasley, could constitute "adverse action" under the precedent of this court. Pasley alleges that after he mentioned the possibility of filing a grievance, Conerly made two immediate threats: first, to have him moved out of the unit so that he would lose his job and, second, to use her influence with a warden to have him moved to a location where his family would not be able to visit him. These threats could be "capable of deterring a person of ordinary firmness" from exercising protected rights, the standard for adverse action set forth in *Thaddeus–X.* 175 F.3d at 398. We held in *Siggers–El v. Barlow,* 412 F.3d 693, 701–02 (6th Cir.2005), that a retaliatory transfer to another institution was an adverse action if it resulted in foreseeable, negative consequences to the prisoner, such as loss of his high-paying job and reduced ability to meet with his lawyer. This court has also noted that a mere threat is actionable if it otherwise meets the standard that it would deter a person of ordinary firmness from engaging in a

protected activity. *See Smith v. Yarrow,* 78 Fed.Appx. 529, 543 (6th Cir.2003).

**\*11** Additionally, Pasley alleges that Conerly's actions subjected him to the possibility of receiving a major misconduct ticket. Pasley alleges that Conerly pressured him to accept an illegal container and then reported him for possessing contraband. In an appeal from the denial of qualified immunity in a prison retaliation case, we noted that precedent "clearly establishes that the mere potential threat of disciplinary sanctions is sufficiently adverse action to support a claim of retaliation." *Scott v. Churchill,* 377 F.3d 565, 571–72 (6th Cir.2004). In that case, a prison guard retaliated against a prisoner by unsuccessfully framing him for a major misconduct charge. *Id.* Pasley also alleges that Conerly placed him in physical danger by intentionally activating her personal protection device while he was attempting to leave her office. A person of ordinary firmness could arguably be dissuaded from filing a grievance by an action which, if it occurred as Pasley alleges, would have impressed upon Pasley the amount of physical force Conerly could bring to bear on him through a false allegation. This court has noted that, "while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions." *Thaddeus–X,* 175 F.3d at 398.

*Pasley,* 345 Fed.Appx. at 985.

**i. As described by plaintiff, Conerly provided the potentially contraband storage bin before plaintiff engaged in the protected conduct of threatening to file a grievance.**

As a result of the November 21, 2007 hearing, Hearing Officer C. Falkenstein found that plaintiff had "necessary legal material which [he][was] allowed to keep." Doc. Ent. 1 at 10. In his unsigned complaint, plaintiff alleges that Conerly "was ordered to provide Plaintiff with the necessary legal bins for the storage of the excessive legal material[.]" Doc. Ent. 1 at 2 ¶ 5. According to plaintiff, Conerly gave him a U.S. Postal Service container. Doc. Ent. 1 at 2 ¶

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

¶ 10–11. Plaintiff informed Conerly that the box was insufficient. Doc. Ent. 1 at 2 ¶ 12. According to plaintiff's complaint, it was after this that he stated he would be "forced to write a grievance if [Conerly] [didn't] comply with the order to provide sufficient storage for [his] legal material[.]" Doc. Ent. 1 ¶ 13.

Plaintiff claims the container "possessed ste[e]l rods and the possession of this container would result in a major misconduct ticket for dangerous contraband." Doc. Ent. 1 at 3 ¶ 17. Plaintiff claims that Officer Hassen found the container and told plaintiff he would receive a major misconduct ticket. Then, plaintiff explained that he received the container from Conerly. Doc. Ent. 1 at 3 ¶ 18. According to plaintiff, the U.S. Postal Service container was insufficient to hold plaintiff's legal material, so, he alleges, "it is perfectly clear that Conerly was setting Plaintiff up with this dangerous contraband." Doc. Ent. 1 at 3–4 ¶ 21.

***12** In her motion, Conerly contends that the November 21, 2007 administrative hearing report shows no such order as plaintiff alleges in Paragraph 5 of his complaint. Doc. Ent. 15 at 7. Defendant claims that she "did advise [Plaintiff] that he could order a footlocker for storage of his legal documents subsequent to a hearing he had regarding possession of legal materials." In the interim, she attests, she "consulted with [her] supervisor to decide on how those materials could be stored pending receipt of a footlocker." Defendant claims that, based on that consultation, she did authorize plaintiff "to use a U.S. mail bin temporarily for storage of his legal materials until he could secure an appropriate footlocker through the disbursement process." According to Conerly, an RUO "later confiscated that storage bin as it had a metal rod in it, but [Conerly] never ordered that confiscation[.]" Defendant further states that she does not recall Pasley's cell ever flooding. Doc. Ent. 15–3 ¶ 3.

Attached to plaintiff's response to the motion for summary judgment is his February 4, 2010 affidavit (Doc. Ent. 19 at 24–26) in which he swears to circumstances and events which are contradictory to Conerly's January 4, 2010 affidavit (Doc. Ent. 15–3 at 1–5). Plaintiff attests that Conerly "never advised [plaintiff] that [he] could order footlockers, nor did she provide [plaintiff] with the necessary storage until nine months after the hearing was held." Doc. Ent. 19 at 24 ¶ 3. Plaintiff attests that Conerly gave plaintiff the U.S. Postal Service bin knowing that it had steel rods, "because Officer Hassen told [plaintiff] that [Defendant] sent him to [plaintiff's] room to retrieve the container." Doc. Ent. 19 at 24 ¶ 5. Plaintiff further attests that "over 70% of [his] legal material was destroyed because [Conerly] did not provide [plaintiff] with the storage in a timely ma[nn]er," and "Officer Czata provided [plaintiff] with the necessary cleaning material to get up the water after the flood." Doc. Ent. 19 at 24 ¶ 4. Plaintiff also attests that "after Conerly denied giving [plaintiff] the container[,] Officer Czata brought it to her attention that she indeed gave [plaintiff] the container and [Conerly] miraculously remembered that she gave [plaintiff] the container." Doc. Ent. 19 at 25 ¶ 6.

In reply, defendant takes issue with plaintiff's reliance upon *Scott v. Churchill,* 377 F.3d 565 (6th Cir.2004). Doc. Ent. 21 at 5–7.[FN22] Defendant states that "[p]laintiff did not get a ticket over the postal bin matter or the PPD incident. He was not placed in administrative segregation, and he was not subjected to a risk of prolonged incarceration resulting from the loss of good-time or disciplinary credits. To allow a retaliation claim to proceed on the flimsy assertion that he *could have* received a ticket, would allow virtually any and all bare allegations of retaliation to go to trial." Moreover, defendant adds, *Scott* "is clearly distinguishable from the instant case, because in *Scott* the prisoner actually received a misconduct and actually was placed in administrative segregation, and then the ticket was not upheld at a hearing." Doc. Ent. 21 at 7.

FN22. Actually, plaintiff's mention of *Scott* in the "adverse action" section of his response (Doc. Ent. 19 at 15) is basically a quotation of the Sixth Circuit's September 29, 2009 decision in the case at bar. *See Pasley,* 345 Fed.Appx. at 985 (quoting and citing *Scott,* 377 F.3d at 571–572).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

**\*13** In his sur-reply, plaintiff claims that Conerly "set him up to get a ticket for dangerous contraband because later [plaintiff] found out that Conerly sent [Officer Hassen] to [plaintiff's] cell to search for the postal container[.]" Doc. Ent. 25 at 4. Also, plaintiff contends, "the bin that [Conerly] gave plaintiff could only hold four books and [Conerly] knew that plaintiff possessed over four foot-lockers worth of legal material[.]" Doc. Ent. 25 at 4–5. Clearly, plaintiff claims, "this was a set up[.]" Doc. Ent. 25 at 5. Plaintiff seeks to get an affidavit from Czata, perhaps to "confirm that [defendant] gave plaintiff the container[,]" and/or perhaps to buttress plaintiff's statement that Czata provided cleaning material after the flood. Doc. Ent. 25 at 8; Doc. Ent. 1 ¶ 20; Doc. Ent. 19 at 24 ¶ 4. Plaintiff also contends that "[a]n affidavit from Officer Hassen will prove that defendant sent him to plaintiff's cell/room to retrieve the U.S. Postal bin with the steel rods[.]" Doc. Ent. 25 at 8.

However, in this case the Court need not determine whether Conerly's act of giving plaintiff a U.S. Postal Service container was an adverse action. Even if, as plaintiff alleges, defendant was trying to "set up" plaintiff,[FN23] and even this act would have prevented a reasonable person from engaging in the protected conduct of threatening to file a grievance-on the basis that it would subject the person to a misconduct ticket for possession of contraband-the transfer of the bin occurred *prior* to plaintiff's protected conduct of threatening to file a grievance. Therefore, it cannot be said here that Conerly gave him the bin in retaliation for plaintiff threatening to file a grievance. This is so, because plaintiff made his threat *after* Conerly gave plaintiff the container. *See* Doc. Ent. 1 ¶¶ 11–13.

FN23. In his complaint, plaintiff alleges that Conerly "[d]eliberately tried to set plaintiff up with a dangerous contraband ticket to further harass and intimidate plaintiff[.]" Doc. Ent. 1 ¶ 60D. However, it warrants repeating that, consistent with the Sixth Circuit's opinion, this report does not address any Fourteenth Amendment substantive due process claim; rather, it concerns only plaintiff's First Amendment retaliation claim.

**ii. Conerly's alleged threat to transfer plaintiff "up north" and her alleged threat that she would no longer provide plaintiff with certain services constitute adverse actions.**

In his unsigned complaint, plaintiff alleges that Conerly "called plaintiff a 'rat' "[FN24] and threatened to transfer him " 'so far up north [hi]s family [would not] recognize [him[ ] when [he][got] back.' " Doc. Ent. 1 ¶¶ 9, 14.

FN24. This conduct allegedly occurred before plaintiff made his threat to file a grievance. Doc. Ent. 1 ¶¶ 9, 13. Therefore, this report does not assess whether name-calling is an adverse action.

In her affidavit, defendant states that "at no time did [she] ever call Pasley a 'rat,' nor did [she] ever refer to his legal mail as 'bull shit' as he claims." Doc. Ent. 15–3 ¶ 10. She attests that she never told plaintiff she "had been married to a Warden and could have him transferred so far up north that his family wouldn't recognize him when he returned." According to Conerly, "Pasley was somehow made aware that [she] had previously been married to a Warden and stated to [Conerly] that he was starting to see why that Warden had 'divorced your ass.' " Also, she claims, she "never threatened to move Pasley out of the unit if he filed a grievance on [her]." She also states that Pasley filed a grievance on December 13, 2007 and remained in her housing unit until she took a position as an ARUS at Huron Valley Complex–Women's Facility (WHV) in June 2008. Doc. Ent. 15–3 ¶ 11.

**\*14** In his response, plaintiff claims that "[a]fter Plaintiff mentioned filing a grievance, Conerly made two immediate threats[.] First, to have Plaintiff moved out of the unit so that he would lose his job[.] ... Second, to use her influence with a Warden to have him moved to a location where his family would not be able to visit him[.]" Doc. Ent. 19 at 14. Also, plaintiff claims, Conerly made a

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

third threat "the day after the search incident that she would no longer provide him with services such as processing his mail and disbursing funds from his account." Doc. Ent. 19 at 14–15. In his affidavit, plaintiff attests that Conerly "called [him] a 'rat' [and] she [threatened] to send [him] so far up north that [his] family [would not] recognize [him] when [he][got] back." Doc. Ent. 19 at 26 ¶ 14.

In reply, referring to Whalen's affidavit, defendant notes: "It is true that the Women's facility did not open for female prisoners until May 2009, [FN25] but the men had to be moved out gradually—alternate placements had to be found for everyone, and they were moved in small groups because [at] HVM many of the men had mental health issues. In addition, the facility had to be renovated to accommodate women." Doc. Ent. 21 at 4–5. Also, defendant provides the February 24, 2010 affidavit of Karen Whalen, an administrative assistant at WHV/HVM. Doc. Ent. 23–2 at 1–3. Specifically, she attests that "Prisoner Pasley # 166717 was transferred on June 20, 2008. He was moved for placement at his true security level II, rather than the level IV placement at HVM that he was in." Doc. Ent. 23–2 ¶ 6.[FN26] Plaintiff's alleged June 20, 2008 transfer from HVM in Ypsilanti, Michigan to MRF in New Haven, Michigan is confirmed by his MDOC transit list. Doc. Ent. 15–5.

> FN25. WHV opened in 2009. *See* Doc. Ent. 19–2 at 13 (MDOC Website Page).

> FN26. Here, Whalen makes reference to the "attached Transfer Order [ .]" However, it is not attached. Doc. Ent. 23–2.

The Sixth Circuit has "repeatedly held that transfer from one prison to another prison 'cannot rise to the level of an 'adverse action' because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights.' " *Smith v. Yarrow,* 78 Fed.Appx. 529, 543 (6th Cir.2003) (citing cases). However, the Sixth Circuit has since acknowledged that a transfer "would deter a person of ordinary firmness from engaging in pro-

tected conduct [where] the Defendant was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's ability to access the courts. As a result of the transfer, the Plaintiff not only lost his high paying job that he needed in order to pay his attorney, but the transfer also made it more difficult for his attorney to visit with or represent him because he was moved further away from her." *Siggers–El v. Barlow,* 412 F.3d 693, 701–702 (6th Cir.2005). Later, the Sixth Circuit explained that "absent aggravating circumstances of the type present in *Siggers–El,* Hix's allegations pertaining to his transfers failed to allege adverse action that would deter a person of ordinary firmness from engaging in constitutionally protected conduct. Because Hix failed to make out a prima facie case of First Amendment retaliation, we conclude that the District Court properly dismissed his allegations for failure to state a claim." *Hix v. Tennessee Dept. of Corrections,* 196 Fed.Appx. 350, 358 (6th Cir.2006).

**\*15** Guided by *Smith, Siggers–El* and *Hix,* the Court should conclude that plaintiff has alleged aggravating circumstances of the kind found sufficient in *Siggers–El.* The threat to be transferred up north may have been taken seriously given Plaintiff's knowledge that Defendant had been married to a prison warden and was perhaps capable of carrying out Conerly's wishes; the transfer would result in the loss of his prison job; the transfer could result in plaintiff being farther away from his family; and, allegedly, Conerly would not process his mail or disburse funds from his prisoner account, a matter which may have been taken seriously given that plaintiff had recently filed *Pasley v. Oliver,* Case No. 01:07–cv–00583–JTN–TPG (W.D.Mich.).

Therefore, considering facts in the light most favorable to Plaintiff, the Court should conclude that plaintiff's allegations regarding Conerly's alleged threats might constitute an adverse action.

**iii. In this case, plaintiff's allegations that Conerly backdated a disbursement request and wrote "NSF" on it are not adverse actions. However, delay in processing**

Page 17

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

**a disbursement request may be an adverse action.**

In his complaint, plaintiff alleges that he received his November 29, 2007 disbursement authorization back, but "Conerly had back dated the disbursem[e]nt to reflect that she processed the disbursement on [November 30, 2007] [.] She then returned the disbursement back to Plaintiff with a notation indicating that plaintiff had NSF [non-sufficient funds] to process the disbursement which was false because plaintiff had more than enough funds to process the disbursement." Doc. Ent. 1 at 5 ¶ 34. Plaintiff claims this was fraudulent, because he and Officer Payne "know for a fact that the disbursement set in the box until [December 3, 2007][.]" Doc. Ent. 1 at 5 ¶ 35. Plaintiff further claims that on Monday, December 3, 2007, Officer Clerk "took [the disbursement] into her office[.] Therefore, it's impossible for her to have processed it on [November 30, 2007]." Doc. Ent. 1 at 5 ¶ 36. *See also* Doc. Ent. 1 at 14 [Disbursement Authorization].

According to defendant, "[p]laintiff assumes that [d]efendant backdated the disbursement form[,]" and the "evidence shows that the disbursement request was processed in a timely fashion, and refutes Plaintiff's claim that Defendant Conerly delayed the processing, backdated the form, and wrote 'NSF' on the disbursement request." Doc. Ent. 15 at 13–14. Defendant attests that she processes "mail including prisoner disbursements daily and consistently and recall[s] that Pasley did not want to place his requests in [her] housing unit mailbox." According to Conerly, "Pasley seemed to act as if he could bring his request to my office whenever he wanted to, regardless of my unit practice." Conerly "advised him that he would need to follow the same rules as the other prisoners in the housing unit." Doc. Ent. 15–3 ¶ 4. As defendant attests, "the disbursement indicates that [she] processed it on Friday, 11/30/2007[,]" and "[she] never backdate[s] disbursements." Doc. Ent. 15–3 ¶ 5. Defendant also attests that she does not "indicate NSF for non-sufficient funds on disbursement requests. This notation, when documented, is entered by staff in the Business Office upon their processing of received disbursements." Doc. Ent. 15–3 ¶ 6. According to defendant, plaintiff "received the document back the next business day, Monday, December 3, 2007."

Doc. Ent. 15 at 14.

**\*16** In response, plaintiff claims "[t]here were numerous incidents where plaintiff's First Amendment right to send mail out was 'curtailed' wherein plaintiff had to circumvent existing procedure to avoid coming into contact with defendant Conerly which, although admittedly [did not] occur but could have subjected plaintiff to institutional sanctions, ... such as out of place misconducts as a result of plaintiff trying to have his mail and legal mail [ ] processed without interfer[e]nce." Doc. Ent. 19 at 9–10. Plaintiff claims "[t]here were times that [his] mail was given to [Conerly] and it never reached its destination, and times when his legal mail was late getting to its destination[.]" Plaintiff explains that he "chose to isolate and illustrate this particular incident in his complaint because this particular incident was used to bring to the light defendant Conerly's acts of retaliation." Doc. Ent. 19 at 10.

Plaintiff attests that on Thursday, November 29, 2007, he and Officer Payne "decided to set Conerly up so [Officer Payne] could see for himself that [Conerly] was retaliating against [plaintiff] by not processing [his] mail." Doc. Ent. 19 at 25 ¶ 7. On that day, plaintiff attests, he "gave the phone request to Officer Payne and he put it in Conerly's mail box[.]" The next day, on Friday, November 30, 2007, "Officer Payne and [plaintiff] noticed the phone request still on Conerly's mail box unsigned and it had not been processed." Doc. Ent. 19 at 25 ¶ 8. On Monday, December 3, 2007, plaintiff attests, he "asked Officer Clark to check Conerly's mail box and see if the phone request was still there[.]" Allegedly, it was, "so [plaintiff] asked [Officer Clark] to take [it] into [Conerly's] office for [plaintiff] so [Conerly] [could] process it[.]" According to Plaintiff, "Conerly called [plaintiff] into her office and told [him] that she was not going to process anything for [him]." Doc. Ent. 19 at 25 ¶ 9. Plaintiff further attests that when he received the phone request back, it was backdated and had a notation indicating NSF (non-sufficient funds). Plaintiff attests, "it is clear [Conerly did this] [,] because [plaintiff] had available funds in [his] account $53 [.]28 so there would be no reason for the business office to write 'NSF' on the disbursement." Doc. Ent. 19 at 25 ¶ 10.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

Also, apparently referring to Paragraph H of MDOC PD 05.03.130 and claiming that the Business Office is not open during the weekend, plaintiff responds, "[i]f defendant perhaps did sign the disbursement on the 30th of November there still would be no[ ] way for plaintiff to receive the disbursement back on Monday[,] December 3rd[.]" Additionally, plaintiff responds, "[t]here would also be no reason for the Business Office to write 'NSF' on the disbursement being that plaintiff had sufficient funds to process the request." Doc. Ent. 19 at 11.

In reply, defendant notes that plaintiff "has not offered any affidavit evidence from Payne" to support the claim that the form was still in Conerly's mailbox on Friday, November 30, 2007, and defendant contends that "it all depends on when Payne looked in the mailbox, if indeed he did." Defendant points out that the form "could have been in there, and then taken out later and processed by Conerly." Doc. Ent. 21 at 3.

**\*17** Also, defendant supplies the March 1, 2010 affidavit of Jose Philip, Finance Manager of WHV, pertaining to the disbursement issue. Doc. Ent. 23 at 1–4. Philip claims that "the notation 'NSF $28.98' is something an Accounting Assistant in the Business Office would have written[,]" and "[i]t cannot be determined who wrote 'NSF $28.98.' " Doc. Ent. 23 ¶ 5(1). According to Philip, "Pasley's account shows a phone card disbursement for $50 processed on [Thursday, November 29, 2007]." [FN27] Doc. Ent. 23 ¶ 5(2). Philip notes that "[a]lthough the disbursement request from Pasley is dated 11/29/07, it may not have reached the Business Office until 12/7/07 to 12/10/07." Doc. Ent. 23 at 3 ¶ 4. Furthermore, he attests:

> FN27. Pasley submitted the phone request at issue the day a $50 disbursement was processed.

On Thursday, November 29, 2007, "Pasley's account balance was $649.58."

On Monday, December 3, 2007, "Pasley's account bal-

ance was $398 .14."

On Wednesday, December 5, 2007, "Pasley's account balance was $84.58."

From Friday, December 7, 2007 to Monday, December 10, 2007, "Pasley's account balance was $28.98; this was insufficient to process the disbursement request for $30 and thus the disbursement request was noted 'NSF 28.98' and returned to him."

*See* Doc. Ent. 23 ¶ 5(3)(4)(5)(6). Jose Philip further states that "[t]he Account Statement submitted to the court [Doc. 19. at 32], for the period of [December 1, 2007] to [January 22, 2008] shows another phone card disbursement for $30 was processed on [December 7, 2007].[ [FN28] ] The amount of $30 was a debit (taken) from account 2101 Offender Funds, and $30 was a credit (paid to) account 2596 Phone Credit Payable. A $30 phone card debit and credit is shown on [December 11, 2007], and on [December 17, 2007];[ [FN29] ] a $50 phone card debit and credit is shown on [December 14, 2007]." [FN30] Doc. Ent. 23 ¶ 6. According to Philip, "[i]t would not be possible for prisoner Pasley to receive a disbursement with the notation 'NSF $28.98' until at least Friday, [December 7, 2007], which is when his account balance was $28.98." Doc. Ent. 23 ¶ 7. Philip attests that "[t]here would be no reason to write 'NSF $28.98' on the disbursement request if it had reached the Business Office between [December 3, 2007] and [December 5, 2007], because the account had sufficient funds at that time to process the request." Doc. Ent. 23 ¶ 8. In other words, Philip attests, "[t]here would be no reason to refuse to process the requested disbursement if the account did have sufficient funds when the request was received in the Business Office. As is shown by the Account Statement submitted to the Court, other phone card disbursements were processed when funds were available." Doc. Ent. 23 ¶ 9.

> FN28. On December 6, 2007, Hill authorized plaintiff's disbursement request to debit his phone

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

system $30. It was entered on December 7, 2007. Doc. Ent. 1 at 23.

FN29. On December 17, 2007, plaintiff completed a disbursement authorization to debit his phone system $30. It was authorized that day. Doc. Ent. 1 at 20.

FN30. On December 11, 2007, plaintiff completed a disbursement request to debit his phone system $50. It was authorized by Hill that day and was entered on December 14, 2007. Doc. Ent. 1 at 21.

The Court has been able to discern the following time line of plaintiff's trust account:

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 11/29/2007 | | | 649.58 |
| **11/29/2007** | | **Phone Credit–50** | **599.58** |
| 11/30/2007 | | Filing Fee–150 | 449.58 |
| 11/30/2007 | | Legal Postage–1.99 | 447.59 |
| 12/3/2007 | | Commissary–49.45 | 398.14 |
| | Missing information (12/3–12/5 data unclear) | –39.31 | 358.83 |
| | Watch (date of purchase unclear) | –61 | 297.83 |
| 12/5/2007 | | Clothing–70.75 | 227.08 |
| 12/5/2007 | | TV–142.5 | 84.58 |
| 12/7/2007 | | Commissary–25.6 | 58.98 |
| **12/7/2007** | | **Phone Credit–30** | **28.98** |
| 12/11/2007 | | Mail Room Receipt200 | 228.98 |
| **12/11/2007** | | **Phone Credit–30** | **198.98** |

**\*18** Doc. Ent. 1 at 15, 27–28 (Trust Account Statements), Doc. Ent. 23 at 3 ¶ 5 (Affidavit of Jose Philip).

In his sur-reply, plaintiff contends that "[a]n affidavit from Officer Payne can prove that defendant could not have signed and dated the phone request disbursement on the day that she claimed," which would directly challenge Philip's affidavit. Plaintiff further contends that "[a]n affidavit from Officer Clark will prove that he gave defendant Conerly the disbursement in question on Monday [December 3, 2007] making it impossible for her to ... have

signed and date[d] the disbursement in question on [Friday, November 30, 2007]," which would dispute Philip's affidavit. Doc. Ent. 25 at 8.

It seems that there are two issues regarding plaintiff's "Disbursement Authorization (Prisoner)," Form CAR–893, dated November 29, 2007. First, on what date did defendant Conerly **approve and forward** plaintiff's request to debit his phone system $30? FN31 Second, on what date did accounting **receive and process** the approved request?

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

FN31. Under MDOC PD 04.02.105 ("Prisoner Funds"), effective 12/01/2004, funds may be removed from a prisoner's institutional account upon his or her written request. *Id.* ¶ Q2; *see also* "Removal of Funds from Prisoner Institutional Accounts," ¶¶ Q–T. Additionally, with respect to "Prisoner Spending," ¶¶ U–Y, the policy directive sets forth the purposes for which prisoner funds may be spent. *Id.* ¶ V.

The Court should conclude that the events concerning plaintiff's November 29, 2007 request that his phone system be debited $30 may be considered an adverse action. To be sure, even if defendant Conerly backdated the request—in other words dated it as signed on Friday, November 30, 2007 when it was actually signed on Monday, December 3, 2007—it is not clear why this alone would deter a person of ordinary firmness from engaging in a protected activity. Even assuming Conerly was unscrupulous in assigning a date to her approval of plaintiff's disbursement request, Conerly's alleged inaccuracy would also need an alleged adverse effect to be considered an adverse action, such as an allegation that the delay in processing or forwarding the approved disbursement request resulted in the initial "NSF" notation.

Also, it is clear that, regardless of the date on which defendant Conerly approved and forwarded the disbursement authorization request dated November 29, 2007, it was initially received in the accounting office during the time from Friday, December 7, 2007 through Monday, December 10, 2007. This is so, because those are the dates on which plaintiff's trust fund account balance was $28.98, and the form is marked, "NSF bal[ance] 28.98[.]" Doc. Ent. 1 at 14. If there were sufficient funds in the account, then such a notation could not have been justified. Furthermore, Philip attests that, while it cannot be determined who wrote "NSF $28.98" on the form, this is a notation that the Accounting Assistant in the Business Office would have made (Doc. Ent. 23 ¶ 1); therefore, a conclusion that defendant Conerly made such a notation is not reasonably plausible.FN32

FN32. It is worth noting that on December 11, 2007—after a same-day deposit of $200 into plaintiff's prisoner trust fund account—plaintiff's trust account was debited and his phone account was credited $30. Doc. Ent. 19 at 32.

However, to the extent plaintiff's complaint alleges that Conerly impeded plaintiff's ability to process his disbursement requests and mail, Doc. Ent. 1 ¶ 24, and to the extent such impediments interfere with plaintiff's right to send and receive mail, a delay in processing a disbursement request could constitute an adverse action.

**iv. Conerly's denial of plaintiff's December 10, 2007 requests to send oversized mail and a donation are adverse actions.**

**\*19** Plaintiff claims that when he visited Conerly's office on December 10, 2007, he requested to send oversized mail (a card to a little girl) and a donation (to the little girl) but, he alleges, Conerly denied both requests. Doc. Ent. 1 ¶¶ 41–44. Plaintiff claims that no MDOC policy would have been violated by sending the card; yet, Conerly told plaintiff that the Warden said it could not be sent out. Doc. Ent. 1 ¶¶ 45–46. According to plaintiff, he "was forced again to go to another ARU[S] to send the money and card out[.] ARUS Hill stated that it was no problem and sent it out[.]" Doc. Ent. 1 ¶ 47. The $25 donation was apparently processed on December 20, 2007. Doc. Ent. 1 at 27–28; Doc. Ent. 19 at 32–33 (Trust Account Statement); Doc. Ent. 19–2 at 9.

In response, defendant cites the version of MDOC PD 04.02.105 effective December 1, 2004 (Doc. Ent.15–4), contending that it "prohibits prisoners from sending money to non-family." Doc. Ent. 15 at 14. In her affidavit, defendant acknowledges her denial of plaintiff's disbursement request "to send money and a card to a young girl who had been shot by her mother's boyfriend who was on parole." Conerly contends that "the Prisoner Funds policy does not allow money to be sent by prisoners to individuals that are not family members [.]" Therefore, she attests, she

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

"shared this prisoner's request with Deputy Warden Vallie who forwarded it to Warden Susan Davis for further review. Warden Davis agreed that the request was inappropriate which lead to [her] denial of that disbursement." Doc. Ent. 15–3 ¶ 7. Therefore, Conerly contends, "the adverse action, if any, was not caused by [her]." Doc. Ent. 15 at 14. According to Conerly, "Pasley disregarded that denial and requested that another [ARUS] process his disbursement request." Doc. Ent. 15–3 ¶ 7.[FN33] Defendant argues that "Plaintiff has no 'right' to send money to someone he does not know. If he managed to sneak the money out anyway, he suffered no harm. The few days delay in getting the money out is at best a *de minimus* 'harm.'" Doc. Ent. 15 at 15.

> FN33. Defendant Conerly attests that "[t]he only time [she has] denied a disbursement for legal mail is if the item does not Valify as legal mail." Doc. Ent. 15–3 ¶ 8.

Citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) [FN34] and MDOC PD 05.03.118 ("Prisoner Mail"),[FN35] plaintiff claims Conerly's denial of his requests to send the card and money violated his First Amendment right to send and receive mail. Doc. Ent. 19 at 11. Plaintiff contends that Conerly's statement that her supervisors told her plaintiff's request was inappropriate under the policy "was false and fabricated and a good demonstration as to how far Defendant would go to retaliate against Plaintiff." Doc. Ent. 19 at 11–12. In plaintiff's opinion, "[i]t is highly unlikely that the Warden would encourage Defendant to violate the law and MDOC policy." Doc. Ent. 19 at 12. Here, plaintiff specifically cites his rights under *Turner* and the portion of the mail policy which provides with respect to prisoner outgoing mail: "Each facility shall offer prisoners outgoing mail service through the U.S. Postal Service. The facility also may offer outgoing mail service for oversize or overweight mail, including packages, through a legitimate alternate carrier. Except as set forth in Paragraphs I through L, prisoners shall be required to pay the cost of postage for any mail service used." MDOC PD 05.03.118 ¶ N. Therefore, plaintiff claims, "there was no violation of policy to send

out the oversized card." Also, plaintiff cites Paragraph V(5) of MDOC PD 04.02.105 ("Prisoner Funds"),[FN36] which permits donations to charitable organizations. It is plaintiff's position that "sending out the mail and the funds was not against any penological interest as Defendant claims. The mail and card [were] later mailed out by ARUS Hill because of Defendant's denial." Doc. Ent. 19 at 12.

> FN34. In *Turner,* the Supreme Court held that "a prison regulation [that] impinges on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89. "The *Turner* Court reviewed four factors that are relevant in determining the reasonableness of a challenged prison regulation[:]
>
> > 'First there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.' [ *Turner,* 482 U.S. at 89]. If, not the regulation is unconstitutional, and the other factors do not matter. *Id.* at 89–90 [ ]. Unlike the first factor, the remaining factors are considerations that must be balanced together: (2) 'where there are alternative means of exercising the right that remain open to prison inmates'; (3) 'the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally'; and (4) whether there are 'ready alternatives' available 'that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.' *Id.* at 90–91[.]
>
> *Muhammad v. Pitcher,* 35 F.3d 1081, 1084 (6th Cir.1994).

> FN35. MDOC PD 05.03.118, "Prisoner Mail," effective 09/14/2009, is attached to plaintiff's

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

response. Doc. Ent. 19 at 34–46.

> FN36. MDOC PD 04.02.105, "Prisoner Funds,"
> effective December 1, 2004, is attached to plain-
> tiff's response. Doc. Ent. 19 at 47–50, Doc. Ent.
> 19–2 at 1–7.

**\*20** Furthermore, plaintiff attests that he "went into
Conerly's office to send out a card and to send money to
a little girl[']s charitable fund raiser and Conerly would
not send it out for [him][ .] She state[d] that the Warden told
her that it was against policy to send it out[.] [This] is not
true [.] [Conerly] did not call the Warden before she denied
sending the items out." Doc. Ent. 19 at 25 ¶ 11. Plaintiff
attests that "ARUS Hill sent the card and the money out
and [ARUS Hill] is the one [who] informed [plaintiff] that
the Warden did not tell [Conerly] she [could not] sent it
out." Doc. Ent. 19 at 26 ¶ 15. Plaintiff also attests that
"ARUS Hill told [plaintiff] that he had a[n] e-mail telling
him not to process anymore of [plaintiff's] mail and pa-
perwork and that the e-mail was also sent to other
ARUS's[.]" Doc. Ent. 19 at 26 ¶ 16.

In reply, defendant cites a $25 donation on plaintiff's
trust account statement dated December 20, 2007 (Doc.
Ent. 19 at 32–33; Doc. Ent. 19–2 at 9) and MDOC PD
04.02.105(V)(5), which provides that a prisoner's funds
may be contributed to a charitable organization "as ap-
proved by the Warden or designee [,]" (Doc. Ent.15–4).
Defendant contends that plaintiff has offered "no evidence
to support that it was a donation to this little girl, or that the
Warden approved the donation to the little girl[.]" Doc.
Ent. 21 at 4.

In his sur-reply, plaintiff contends that "Conerly lied
to plaintiff telling him that the warden said she could not
send the card and money out[.]" Doc. Ent. 25 at 5. Plaintiff
asserts that "an affidavit from RUM Hill will prove that he
was the one that mailed out the $25 donation to the chari-
table foundation fundraiser set for the little girl and mailed
the card[.]" Doc. Ent. 25 at 8.

As an initial matter, it does not appear that documen-
tation regarding Conerly's rejection of plaintiff's December
10, 2007 requests to send oversized mail and make a do-
nation are part of the record. Nor does it appear that
documentation regarding RUM Hill's alleged approval of
the December 20, 2007 donation is part of the record.
However, defendant Conerly has attested that she denied
this disbursement request, because MDOC PD 04.02.105
("Prisoner Funds") "does not allow money to be sent by
prisoners to individuals that are not family members," and
"Warden Davis agreed that the request was inappropri-
ate[.]" Doc. Ent. 15–3 ¶ 7.FN37 On the other hand, the Court
can only assume that RUM Hill's alleged approval of the
request to send the donation was based upon MDOC Pol-
icy Directive 04.02.105 ("Prisoner Funds"), Paragraphs
U–Y of which address prisoner spending—namely the
provision that a prisoner may "[c]ontribute to charitable
organizations as approved by the Warden or designee."
MDOC PD 04.02.105, effective 12/01/2004, ¶¶ V(1),
V(5).

> FN37. Paragraph V sets forth purposes for which
> prisoners may spend their funds, including the
> provision that a prisoner may "[t]ransfer to family
> members and to a parent or verified legal guard-
> ian of the prisoner's child, stepchild or grand-
> child." *Id.* ¶ V(1).

As for the request to send the card, MDOC PD
05.03.118 ("Prisoner Mail") provides:

> Prisoners shall be permitted to send and receive uncen-
> sored mail to or from any person or organization unless
> the mail violates this policy or Administrative Rule
> 791.6603. Mail shall not be prohibited solely because its
> content is religious, philosophical, political, social,
> sexual, unpopular, or repugnant. However, mail shall be
> prohibited if it is a threat to the security, good order, or
> discipline of the facility, may facilitate or encourage
> criminal activity, or may interfere with the rehabilitation
> of the prisoner.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

**\*21** *Id.,* effective 09/14/2009, ¶ D. Additionally, the prisoner mail policy provides that "[a] prisoner in a CFA facility shall be permitted to send air, certified and foreign mail, and mail that weighs more than two ounces, via disbursement.". *Id.* ¶ O.

At this point, it is not clear whether defendant's refusal to send the oversized mail (the card to the little girl) was justified. It is also not clear why the donation request which Conerly rejected was allegedly approved by RUM Hill. Even though these issues are really germane to the issue of causation, the disparity of the decisions regarding the donation calls into question whether plaintiff's donation was permitted under prison policy. Furthermore, even if Conerly's rejections of the mail and donation requests were justified by policy, her rejections may still be considered adverse actions. In other words, if it is shown that prison policy permitted his requests to send the card and donation, a reasonable jury could conclude that Conerly's rejection of plaintiff's request to send oversized mail or Conerly's rejection of plaintiff's request to send a donation would deter a person of ordinary firmness from exercising his or her right to send mail or donations from the prison.[FN38]

FN38. This report assumes that plaintiff's First Amendment claim is based solely upon defendant's alleged retaliation for plaintiff's exercise of his First Amendment right "to petition the Government for a redress of grievances[,]" and not upon another clause of that same amendment. The analysis of the constitutionality of a prison regulation under *Turner* and the analysis of a free exercise and/or RLUIPA claims, *see Massingill v. Livingston,* 277 Fed.Appx. 491, 493 (5th Cir.2008), *Koger v. Bryan,* 523 F.3d 789, 796 (7th Cir.2008), are distinct from the First Amendment retaliation analysis under *Thaddeus–X.* At most, the Court might consider the "impact" factor in a *Turner* claim or the "substantial burden" factor in a free exercise/RLUIPA claim as analogous when analyzing the "adverse action" factor of a First Amendment retaliation claim.

**v. There is a material dispute regarding why Conerly activated her PPD pin on December 10, 2007, and Conerly issued plaintiff a major misconduct ticket for DDO the same day.**

Plaintiff claims that on the day he was in her office about sending the card to the little girl, defendant talked to plaintiff disrespectfully. Plaintiff claims he "got up to leave because there was no need to stay in the office after she denied [his request to send the card and money to the little girl] [.]" Doc. Ent. 1 ¶ 48. According to plaintiff, "Conerly got up from her desk [,] reached into her black bag[,] pulled out her PPD[,] looked directly at Plaintiff[,] smiled and then pulled the pin." Doc. Ent. 1 ¶ 49. Plaintiff claims that he "feared for his life because these officers came in as though they were going to handle the situation by all means necessary[,]" but "what saved Plaintiff was that Officer Cummings was standing [outside] the entrance of [Conerly's] door and [Conerly] didn't see [Officer Cummings] and he informed the Officers that [plaintiff] was not in [Conerly's] office when [Conerly] pulled her pin." Doc. Ent. 1 ¶¶ 51, 52. Plaintiff states that "[w]hen [Conerly] came out and noticed that Cummings had been standing there all the time she then stated that the pin went off by mistake." Doc. Ent. 1 ¶ 53.

Also, plaintiff alleges that Conerly wrote plaintiff a ticket on or about December 10, 2007 "stating that Plaintiff [would not] leave her office and the ticket was dismissed." Doc. Ent. 1 ¶ 54.

In her motion, defendant argues that "[a]ccidentally pulling a PPD device was not an adverse action." In support of her claim that "[p]laintiff suffered no adversity[,]" defendant points out that plaintiff "did not attach a copy of the ticket to his complaint[,]" and "does not allege that he was put in segregation pending a hearing." Doc. Ent. 15 at 15.

**\*22** The parties' affidavits contradict with respect to events that occurred after the oversize mail request. To begin, defendant attests that "after Pasley refused to leave

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

my office, I removed my [PPD] in an effort to show the prisoner that I was serious about him leaving that area. Although I was willing to pull the pin of that PDD if necessary, I had not intended to do so. However, the pin was loose and was accidentally pulled. I informed the Shift Commander that pulling the pin was done by mistake and that it was not my intention to alert staff or have Pasley sent to segregation. No one wrote Pasley a misconduct ticket as Pasley alleges in ¶ 54." Doc. Ent. 15–3 ¶ 9.

By contrast, plaintiff attests that "when [Conerly] pulled the PPD [plaintiff] was not in [Conerly's] office and Officer Cummings was standing outside her door with eye to eye contact with [plaintiff] when [Conerly] pulled the pin." Doc. Ent. 19 at 25 ¶ 12. Plaintiff attests that Conerly wrote him a ticket for disobeying a direct order (DDO), which was dismissed at the hearing. Doc. Ent. 19 at 25 ¶ 13. When alleging that he was written a major misconduct by Conerly (Doc. Ent. 19 at 20), plaintiff refers to RUM D. Monday's January 7, 2008 Step I grievance response, wherein it states "the prisoner was given a DDO and did not have his bond revoked[,]" (Doc. Ent. 19–2 at 11).

In addition, plaintiff's response claims Conerly's activation of her PPD was not accidental. He asserts that he "was handcuffed and locked in his room." According to plaintiff, "had Officer Cummings not intervened[,] Conerly would have falsely had plaintiff placed in administrative segregation." Doc. Ent. 19 at 13.

In reply, defendant argues that "[p]laintiff has not provided evidence that he got a ticket from Conerly on December [10], 2007." Doc. Ent. 21 at 4. In his sur-reply, plaintiff contends that his copies of "the misconduct and disposition [were] destroyed when [his] cell/room flooded[,]" and he "has made several attempts to obtain the misconduct report and disposition but has failed due to the lack of cooperation by MDOC staff[.]" Although D. Monday's January 7, 2008 grievance response is evidence that a major misconduct ticket for DDO was written, plaintiff contends it "is not as effective as [providing a copy of] the misconduct and disposition itself[.]" Doc. Ent. 25 at 7. Plaintiff contends that "[a]n affidavit from Officer

Cummings will prove that defendant wrote plaintiff a misconduct for DDO on December 10, 2007, and that defendant pulled the PPD pin on purpose and not by accident as she claim[s][.]" Doc. Ent. 25 at 8.

However, defendant Conerly recently provided the Court with her September 1, 2010 affidavit, in which she attests that "[a] considerable time after signing [the January 4, 2010] affidavit, a copy of the [December 10, 2007] ticket and accompanying records were located." According to Conerly, she "was shown a copy of a major misconduct ticket for [DDO] that [she] wrote against [plaintiff] on December 10, 2007.[She] truly did not remember writing this ticket when [she] signed the affidavit on January 4, 2010. However, seeing the ticket did refresh [her] memory." Doc. Ent. 26–2 ¶ 4. Conerly further attests that she "did not write this major misconduct ticket to punish or retaliate or harass prisoner Pasley. [She] gave him an order to leave and he did not comply. As indicated in [her] earlier affidavit, [her] PPD was activated accidentally." Doc. Ent. 26–2 at 3 ¶ 9. Still, in her accompanying brief, she asserts that "[t]he hearing officer did not rule on the merits of the ticket at all. Plaintiff suffered no adversity as a result of this ticket." Doc. Ent. 26 at 4.

**\*23** Conerly's issuance of a major misconduct ticket for DDO [FN39] is an adverse action. *See Brown v. Crowley,* 312 F.3d 782, 789 (6th Cir.2002)* ( "the issuance of the major misconduct charge subjected him to the risk of significant sanctions.") (citing Mich. Admin. Code R. 791.5505(1)).

FN39. Disobeying a direct order (DDO) is a major rule violation which could subject a prisoner to the issuance of a major misconduct. See MDOC PD 03.03.105 ("Prisoner Discipline"), Attachment B. Major misconducts are discussed at ¶¶ K–LL of the Prisoner Discipline policy, and misconduct sanctions are discussed at ¶¶ TT–BBB, which provides in part that "[u]pon a finding of guilt in a minor or major misconduct hearing, the hearing officer shall impose one or more of the sanctions set forth in Attachment D

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

[,]" and "[a] hearing officer may give a prisoner credit for time spent in segregation or on toplock pending a hearing but is not required to do so." MDOC PD 03.03.105 ¶¶ TT, YY. Other actions resulting from a major misconduct, which are described at ¶¶ FFF–KKK, provide in part that "[a] prisoner may be reclassified to administrative segregation based solely on a major misconduct guilty finding as set forth in PD 04.05.120 'Segregation Standards'." MDOC PD 03.03.105 ¶ III. Sanctions for a major misconduct include detention, toplock, loss of privileges, assignment of extra duty and restitution. MDOC PD 03.03.105, Attach. D. The loss of privileges sanctions provides that "[d]irect access to general library (not law library; prisoners in segregation shall continue to have books delivered to them consistent with PD 04.05.120 "Segregation Standards")." MDOC PD 03.03.105, Attach. E.

Furthermore, defendant did not threaten to pull her PDD; she did so, and corrections officers rushed to the location. The parties dispute the reason for which Conerly activated the PPD pin. Still, taking plaintiff's claims to be true, if there had not been another individual who witnessed the incident of defendant pulling the PDD pin when plaintiff was outside her office, plaintiff may have faced serious consequences. The December 10, 2007 incident may have been capable of deterring a reasonable person from filing a grievance. As noted above, the Sixth Circuit recognized: "Pasley also alleges that Conerly placed him in physical danger by intentionally activating her personal protection device while he was attempting to leave her office. A person of ordinary firmness could arguably be dissuaded from filing a grievance by an action which, if it occurred as Pasley alleges, would have impressed upon Pasley the amount of physical force Conerly could bring to bear on him through a false allegation." *Pasley,* 345 Fed.Appx. at 985.

**c. There is enough indirect evidence to infer a retaliatory motive by defendant.**

For a First Amendment claim, the adverse action must

have been in response to the protected conduct. "The relevant showing in such cases must be more than the prisoner's 'personal belief that he is the victim of retaliation.' " *Johnson v. Rodriquez,* 110 F.3d 299, 310 (5th Cir.1997) (quoting *Woods v. Edwards,* 51 F.3d 577, 580 (5th Cir.1995)). However, retaliation "rarely can be supported with direct evidence of intent". *Harbin–Bey v. Rutter,* 420 F.3d 571, 580 (6th Cir.2005) (quoting *Murphy v. Lane,* 833 F.2d 106, 108 (7th Cir.1987)). "But conclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state ... a claim under § 1983.' " *Harbin–Bey,* 420 F.3d at 580 (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1538–39 (6th Cir.1987)). That is why "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate" to consider when determining whether a genuine issue of fact on the third prong has been established. *Thaddeus–X,* 175 F.3d at 399. Furthermore, "temporal proximity alone may be significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive." *Muhammad v. Close,* 379 F.3d 413, 417–18 (6th Cir.2004).

As the Sixth Circuit stated in its September 29, 2009 order:

Finally, Pasley alleges a causal connection between his threat to file a grievance and Conerly's actions. The causal connection hinges on Conerly's subjective motivations for her actions. *See [Thaddeus–X]* at 399. Conerly's alleged threats to have Pasley transferred came in direct response to Pasley's statement about filing a grievance. She gave him the postal container during that same encounter, and the search of Pasley's cell-along with Conerly's initial denial that she had provided the contraband container-occurred shortly thereafter. According to Pasley, Conerly informed him the next day that she would no longer process his mail or disbursement requests, and it was in the context of Pasley's trying to send out mail that Conerly activated her personal protection device. Pasley has sufficiently alleged that Conerly's actions were motivated, at least in part, by his threat to file a grievance against her. *See Thomas v. Eby,*

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

481 F.3d 434, 441 (6th Cir.2007).

**\*24** *Pasley,* 345 Fed.Appx. at 985–986.

In her motion, defendant argues that "[g]iving Plaintiff a U.S. Postal bin [could not] have been retaliatory, because Plaintiff does not allege he engaged in any protected conduct before that occurred." Doc. Ent. 15 at 12. Defendant also claims, with respect to the December 10, 2007 mail denial, that "the adverse action, if any, was not caused by Defendant Conerly." Doc. Ent. 15 at 14. Rather, relying upon *Hines v. Gomez,* 108 F.3d 265, 267 (9th Cir.1997) ( "[Plaintiff's] retaliation claim must rest on proof that [defendant] filed the disciplinary action against him in retaliation for [plaintiff's] exercise of his constitutional rights and that the retaliatory action advanced no legitimate penological interest."), Conerly contends that her "refusal to mail the card and money was based on MDOC policy." Doc. Ent. 15 at 14–15.[FN40]

> FN40. According to Conerly, "[t]he policy that allows money to be sent only to family members advances the legitimate penological interest of ensuring that prisoners do not extort money from other prisoners' families or from members of the public for 'favors.' " Doc. Ent. 15 at 15.

In response, plaintiff contends that "Conerly's threats to have plaintiff transferred came in direct response to plaintiff's statement about filing a grievance[.] She gave him the postal container during that same encounter [,] and the search of plaintiff's cell along with Conerly's initial denial that she had provided the contraband container—occurred shortly thereafter." Also, plaintiff contends, "Conerly informed him the next day that she would no longer process his mail or disbursement request, and it was in the context of plaintiff's trying to send out mail that Conerly activated her personal protection device." Doc. Ent. 19 at 16. Also, plaintiff quotes the aforementioned portion of the Sixth Circuit's opinion. Doc. Ent. 19 at 20.

Having examined the record, I conclude that there is

enough indirect evidence-in both the sequence of events—i.e., events that took place after Plaintiff expressed intent to file a grievance—and their temporal proximity to that expression of intent—to infer a retaliatory motive on the part of the Defendant.

**2. Defendant is not entitled to qualified immunity on plaintiff's First Amendment retaliation claim.**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The failure to so plead precludes a plaintiff from proceeding further, even from engaging in discovery, since the plaintiff has failed to allege acts that are outside the scope of the defendant's immunity." *Kennedy v. City of Cleveland,* 797 F.2d 297, 299 (6th Cir.1986) (external footnote omitted) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)).

"Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). "The privilege is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' " *Saucier,* 533 U.S. at 200–201 (quoting *Mitchell,* 472 U.S. at 526).

**\*25** The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step analysis: (1) has plaintiff alleged a violation of a constitutional right?; (2) if so, was that right clearly established at the time of the alleged conduct?; [FN41] and (3) if the right was clearly established, has plaintiff alleged and sufficiently supported that the official actions were objectively unreasonable in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

light of this clearly established right? *See Dickerson v. McClellan,* 101 F.3d 1151, 1157–58 (6th Cir.1996). [FN42] "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir.2006) (citing *Barrett v. Steubenville City Schs.,* 388 F.3d 967, 970 (6th Cir.2004)).

FN41. Defendant points out that "[t]his inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" Doc. Ent. 15 at 6 (quoting *Saucier,* 533 U.S. at 201).

FN42. *See also Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), wherein the Supreme Court stated, "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier,* 533 U.S. at 201 (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier,* 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *Id.* at 202.

Last year, the Supreme Court stated, "[a]lthough we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that *it is often beneficial." Pearson v. Callahan,* ─── U.S.

───, ───, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (emphasis added).

Defendant argues that she is entitled to qualified immunity, because "she did not violate any of Plaintiff's constitutional rights." Doc. Ent. 15 at 15–17. Specifically, defendant states:

In this case, Plaintiff did not suffer retaliation in violation of his constitutional rights. Plaintiff did not file any grievance until after all of the complained-of acts occurred. Even if the court were to assume that he threatened to file a grievance, and the threat constitutes protected conduct, Plaintiff's retaliation claims fail because he suffered no adversity, and was not "deterred from engaging in protected conduct"—as noted, he filed a grievance afterwards. Plaintiff was able to get appropriate storage bins for his legal property when they became available. [Cplt, ¶ 22]. Defendant Conerly processed the $30 disbursement request in a timely fashion and she did not mark his disbursement request "NSF"—the Business Office did. The Warden is the person who disapproved Plaintiff sending money to a little girl in Detroit, as that would violate policy. Plaintiff was not written a ticket after the PPD incident. Because none of Defendant Conerly's actions meet the standard for a retaliation claim, she did not violate any of Plaintiff's constitutional rights, and she is entitled to qualified immunity.

Doc. Ent. 15 at 17.

Plaintiff argues that Conerly "is not entitled to qualified immunity because she violated plaintiff's constitutional rights[.]" Doc. Ent. 19 at 19–20. Plaintiff contends that he has "alleged facts sufficient to show that his First [Amendment] rights were substantially burdened." Doc. Ent. 19 at 20.

The defense of qualified immunity should only be addressed after determining whether plaintiff has stated a constitutional claim upon which relief can be granted. "[T]he better approach is to resolving cases in which the

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento v. Lewis,* 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

**\*26** Therefore, if the Court agrees with my foregoing recommendations, and in light of the Supreme Court's direction in *County of Sacramento,* the Court need only address the issue of defendant's entitlement to qualified immunity with respect to plaintiff's First Amendment retaliation claim. Furthermore, defendant's qualified immunity argument is limited to the allegation that plaintiff has not met the first test—whether plaintiff has alleged a violation of a constitutional right? In other words, defendant does not argue that the right was not clearly established and/or does not argue that her actions were objectively reasonable in light of that right.

Therefore, the Court should conclude that defendant is not entitled to qualified immunity with respect to plaintiff's First Amendment retaliation claim against Conerly. First, as indicated above, plaintiff's November 2007 threat to file a grievance constituted protected conduct (Section II.E.1.a). Second, the fact that he later filed a grievance is not dispositive of the deterrence issue; as discussed above, plaintiff has alleged some forms of adverse action, and there is a material dispute over why Conerly activated the PPD pin (Section II.E.1.b). Finally, there is enough indirect evidence to support an inference of retaliatory motive (Section II.E.1.c).

**III.** *NOTICE TO PARTIES REGARDING OBJECTIONS:*

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections consti-

tutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of Health & Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Federation of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

E.D.Mich.,2010.
Pasley v. Conerly
Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Southern Division.
Lynn T. PASLEY, Plaintiff,
v.
Vera CONERLY, Defendant.

No. 2:08–cv–13185.
Sept. 10, 2010.

Lynn Pasley, Jackson, MI, pro se.

Allan J. Soros, Michigan Department of Attorney General,
Lansing, MI, for Defendant.

PAUL J. KOMIVES, United States Magistrate Judge.
**REPORT AND RECOMMENDATION REGARDING
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (Doc. Ent.15) and PLAINTIFF'S MO-
TION FOR DISCOVERY (Doc. Ent.25)**
*Table of Contents*

| I. | *RECOMMENDATION* .................. | 2 |
|---|---|---|
| II. | *REPORT* .................... | 2 |
| | A. | On September 29, 2009, the Sixth Circuit Remanded This Case. .......... | 2 |
| | B. | Currently before the Court is Defendant's January 5, 2010 Motion for Summary Judgment. .... | 5 |
| | C. | Fed.R.Civ.P. 56 ................ | 8 |
| | D. | Plaintiff's Factual Allegations Largely Relate to Three Events. .......... | 10 |
| | | 1. | The November 21, 2007 administrative hearing regarding legal property ...... | 10 |
| | | 2. | The November 29, 2007 phone dis- bursement reques t .......... | 12 |
| | | 3. | The December 10, 2007 mail request & PPD activation ........ | 14 |
| | | 4. | The December 13, 2007 grievance re- garding these events ........ | 16 |
| | E. | The Court Should Deny Defendant's Motion for Summary Judgment. ........ | 17 |
| | | 1. | Defendant is not entitled to summary judgment o n plaintiff's First Amend- | 17 |

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

ment retaliation claim. ..................

a.  Plaintiff's November 2007 threat to file a grievance constitutes protected conduct.  17

b.  Plaintiff has described adverse actions which followed the alleged protected conduct.  19

c.  There is enough indirect evidence to infer a retaliatory motive by defendant.  44

2.  Defendant is not entitled to qualified immunity on plaintiff's First Amendment retaliation claim. ..................  46

III.  *NOTICE TO PARTIES REGARDING OBJECTIONS* .............  49

**\*1 I. *RECOMMENDATION:*** The Court should deny defendant Conerly's January 5, 2010 motion for summary judgment. Doc. Ent. 15. Specifically, the Court should conclude that defendant is not entitled to summary judgment or qualified immunity with respect to plaintiff's First Amendment retaliation claim.

Furthermore, the Court should construe plaintiff's March 8, 2010 motion for discovery (Doc. Ent.25) as a sur-reply and defendant's September 1, 2010 filing (Doc. Ent.26) as a response to the sur-reply.

## II. *REPORT:*

**A. On September 29, 2009, the Sixth Circuit Remanded This Case .**[FN1]

FN1. Plaintiff has filed other prisoner civil rights cases. During June 2007, before the instant case

was filed, plaintiff filed a prisoner civil rights case (***Pasley v. Oliver,*** **Case No. 2:07–cv 12482–LPZ–PJK (E.D.Mich), Case No. 01:07–cv–00583–JTN–TPG (W.D.Mich.)**), regarding which judgment was entered on December 14, 2009 and an order to proceed in forma pauperis regarding appeal fee was entered on January 5, 2010. Attached to the instant complaint are disbursement authorizations regarding this case. Doc. Ent. 1 at 17 (March 24, 2008), 18 (March 24, 2008).

On September 16, 2008, after the instant case was filed, plaintiff filed another prisoner civil rights case (***Pasley v. Does,*** **Case No. 1:08–cv–13988–TLL–VMM (E.D.Mich.)**), regarding which judgment was entered on December 2, 2008. On September 23, 2009, the Sixth Circuit dismissed the case for want of prosecution. *Pasley v. Does,* No. 09–1074. On

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

January 25, 2010, the United States Supreme Court denied the petition for writ of certiorari. *Pasley v. Does,* No. 09–7737, 130 S.Ct. 1293 (2010).

Most recently, plaintiff filed **Case No. 2:10–cv–11805–AJT–MKM,** against Caruso, a doctor and several physicians assistants regarding events which span the period of September 20, 2008–August 27, 2009. Doc. Ent. 1 ¶¶ 12–38. Plaintiff has been given leave to file an amended complaint on or before September 10, 2010. Doc. Ent. 15 at 2.

Plaintiff is currently incarcerated at the G. Robert Cotton Correctional Facility (JCF) in Jackson, Michigan, where he is serving a sentence for a violation of Mich. Comp. Laws § 750.529 ("Use or possession of dangerous weapon; aggravated assault; penalty.").[FN2]

FN2. Plaintiff appealed his state court conviction. He filed an appeal of the January 30, 1998 order in Case No. 97–001622 (Recorder's Court). On July 11, 2000, the Court of Appeals of Michigan affirmed Pasley's conviction and sentence. *See People v. Pasley,* No. 210712, 2000 WL 33416872, *5 (Mich.App.2000). On February 26, 2001, the Supreme Court of Michigan denied the application for leave to appeal. *People v. Pasley,* No. 117587, 463 Mich. 973, 623 N.W.2d 600 (Mich.2001).

Plaintiff filed an appeal of the April 18, 2002 order in Case No. 97–001622–02 (Wayne County Circuit Court). On September 4, 2003, the Michigan Court of Appeals denied the delayed application for leave. *People v. Pasley,* No. 247593. On January 27, 2004, the Supreme Court of Michigan denied the application for leave to appeal. *People v. Pasley,* No. 124725, 469 Mich. 1003, 675 N.W.2d 594 (Mich.2004).

Then, on April 1, 2004, plaintiff filed a petition for writ of habeas corpus (***Pasley v. Romanowski,*** No. 2:04–cv–71020–JCO–RSW), regarding which judgment was entered on September 20, 2005. Judgment was affirmed by the Sixth Circuit on July 19, 2007. *Pasley v. Romanowski,* No. 05–2549.

On July 24, 2008, while incarcerated at the Macomb Correctional Facility (MRF), plaintiff filed the instant case. Doc. Ent. 1, Doc. Ent. 15–5 at 2 (Transit List).[FN3] Plaintiff's complaint names as a defendant Vera Conerly, an employee of the Michigan Department of Corrections (MDOC), who is described as an Assistant Resident Unit Supervisor (ARUS) at the Huron Valley Complex–Men's Facility (HVM)[FN4] in Ypsilanti, Michigan.[FN5] Plaintiff's complaint is based upon the First, Eighth and Fourteenth Amendments and defendant's "constant haras[s]ment, intimidation and retaliation against plaintiff[,]" and defendant's "fail[ure] to process plaintiff's paperwork and mail." Doc. Ent. 1 ¶¶ 2, 3 & 59. *See also* Doc. Ent. 1 ¶¶ 60A, 60C.

FN3. Plaintiff also filed an application to proceed without prepayment of fees. Doc. Ent. 2. It was granted on July 28, 2008. Doc. Ent. 3.

FN4. Apparently, this facility is now the Women's Huron Valley Correctional Facility (WHV). This transition allegedly took place on June 20, 2008. Doc. Ent. 15 at 13.

FN5. Plaintiff sues defendant Conerly in her individual and official capacities. Doc. Ent. 1 at 1 ¶ 3.

Plaintiff seeks nominal damages of $50,000 and punitive damages of $100,000 against defendant Conerly for violation of his First, Eighth and Fourteenth Amendment rights. Doc. Ent. 1 at 8 ¶¶ A–C. He also seeks such other relief to which the Court may deem him entitled. Doc. Ent. 1 at 8 ¶ D.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

On August 5, 2008 Judge Cohn entered an order dismissing the case. Specifically, he provided:

> Plaintiff's complaint fails to state a claim under § 1983. The facts as alleged indicate that, at most, Defendant harassed Plaintiff and treated him disrespectfully. It is well-established that verbal abuse, harassment, and unprofessional conduct do not rise to the level of a constitutional violation for which relief may be granted in a civil rights case. *Johnson v. Unknown Dellatifa,* 357 F.3d 539, 546 (6th Cir.2004) (citing *Ivey v. Wilson,* 832 F.2d 950, 954–55 (6th Cir.1987)). Accordingly, the complaint is DISMISSED as frivolous under 28 U.S.C. §§ 1915(e)(2) (B)(I) and 1915A(b)(1).

Doc. Ent. 4 at 3.

Plaintiff filed an appeal. Doc. Entries 5 and 7.[FN6] On September 29, 2009, the Sixth Circuit affirmed the district court's judgment insofar as it dismissed Pasley's Eighth Amendment claim, vacated it as it dismissed his First Amendment claim, and remanded the case for service on the defendant. *Pasley v. Conerly,* 345 Fed.Appx. 981, 986 (6th Cir.2009).[FN7] Thus, only plaintiff's First Amendment claims are at issue.[FN8]

> FN6. Plaintiff also filed a motion to proceed in forma pauperis on appeal. Doc. Ent. 6. By a notice dated September 16, 2008, plaintiff was informed of his failure to comply with the appeal filing fee requirement. Doc. Ent. 8. On September 19, 2008, Judge Cohn entered an order waiving prepayment of the appellant filing fee and directing payment of the initial partial filing fee and subsequent payments. Doc. Ent. 9.

> FN7. The mandate regarding the Sixth Circuit's September 29, 2009 decision was filed on October 22, 2009. Doc. Ent. 11.

> FN8. The Sixth Circuit noted the following about plaintiff's Fourteenth Amendment claim:

>> Pasley also attempts to raise a claim under the Fourteenth Amendment. Because Pasley's claim is cognizable under the First Amendment, it need not be considered under the more generalized due process provision of Fourteenth Amendment. The Supreme Court held in the context of excessive force claims that, where a specific provision of the Constitution applies, a claim must be analyzed under the specific provision rather than under the Fourteenth Amendment. *Graham v. Conn[o]r,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (19[89] ). In *Thaddeus–X v. Blatter,* we applied Graham's holding to claims cognizable under the First Amendment. 175 F.3d 378, 387–88 (6th Cir.1999) (en banc).

> *Pasley,* 345 Fed.Appx. at 984 n. 1.

**B. Currently before the Court is Defendant's January 5, 2010 Motion for Summary Judgment.**
**\*2** On October 23, 2009, Judge Cohn entered an order directing service of the complaint on the defendant. Doc. Ent. 12. An appearance of counsel was entered on defendant Conerly's behalf, and her answer was due on January 5, 2010. Doc. Entries 13 and 14. Judge Cohn has referred this case to me for pretrial matters. Doc. Ent. 16.

On January 5, 2010, defendant filed a motion for summary judgment by which she seeks dismissal of this lawsuit. Doc. Ent. 15. First, defendant argues that the evidence does not support Plaintiff's claim that "in retaliation for [p]laintiff's threat to file a grievance after ARUS Conerly gave him a U.S. postal bin for temporary storage, she threatened to have him transferred, backdated and wrote 'NSF' on a disbursement request, refused to mail a card and money to a little girl in Detroit who had been shot, and pulled her PPD [Personal Protection Device] pin." In support of this argument, she claims that (A) "[p]laintiff did not engage in prior protected conduct[,]" and (B)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

"[p]laintiff did not suffer any adverse action at the hands of [d]efendant Conerly." Doc. Ent. 15 at 12–15. Second, defendant argues that she is entitled to qualified immunity because she did not violate any of plaintiff's constitutional rights. Doc. Ent. 15 at 15–17.

On January 19, 2010, I entered an order requiring plaintiff to file any response on or before February 22, 2010. Doc. Ent. 17. On January 26, 2010, plaintiff filed a motion to enlarge time. Doc. Ent. 18. In addition to claiming he received defendant's dispositive motion on January 11, 2010, plaintiff specifically disputes the representations that (1) he was never written a misconduct ticket (see Doc. Ent. 15–3 [Vera Conerly Affidavit] ¶ 9); (2) he was transferred from HVM when it was converted to a women's prison on June 20, 2008 (see Doc. Ent. 15 at 13; Doc. Ent. 15–5 [Transit List] ); and (3) the notation on his November 19, 2007 disbursement request was done by Business Office Staff (Doc. Ent. Doc. Ent. 15–3 ¶ 6). Doc. Ent. 18 ¶¶ 1, 4.FN9 On February 11, 2010, he filed his response. Doc. Ent. 19.

> FN9. Therein, plaintiff claimed that he had to "write a[n] institutional kite to the business office to receive the relevant documents to challenge defendant's false declarations and arguments," and he also has to "contact the hearings division to obtain the necessary documents to support Plaintiff's argument that Defendant declarations are not true [.]" Doc. Ent. 18 ¶ 5. On March 5, 2010, I entered an order deeming moot plaintiff's motion to enlarge time. Doc. Ent. 24.

On February 26, 2010, defendant filed a motion for enlargement of time in which to file a reply brief. Doc. Ent. 20.FN10 She filed her reply the same day. Doc. Ent. 21. On March 3, 2010, defendant filed the affidavit of Jose Philip (Doc. Ent. 23 at 1–4), to which is attached the affidavit of Karen Whalen (Doc. Ent. 23–2 at 1–3).

> FN10. On March 2, 2010, I entered an order granting this motion. Doc. Ent. 22.

On March 8, 2010, plaintiff filed a "motion for discovery," wherein he notes that defendant "made several argument[s] in her reply brief that call[ ] for this motion for discovery[.]" Doc. Ent. 25 at 1 ¶ 2. Plaintiff argues that "[d]iscovery should be granted so that [he] can obtain [the December 10, 2007] misconduct report and disposition from the hearings division[.]" Doc. Ent. 25 at 7. Furthermore, he seeks discovery "so that he may have an opportunity to dispute [the] [Philip and Whalen] affidavits[,]" both of which challenge his complaint, and "so that an attempt can be made to obtain affidavits from ... Payne, Czata, Cummings, Clark, Hassen and ... Hill[,]" because they "can help prove [his] case, and make a meaningful challenge to the [Philip and Whalen] affidavits and arguments presented by defendant in her reply brief[.]" Doc. Ent. 25 at 8.FN11

> FN11. Plaintiff filed this motion pursuant to Fed.R.Civ.P. 26(b) (1). Disclosures and discovery in the federal courts are governed by Fed. Rules Civ. P. 26–37. By way of example, Interrogatories to Parties must comply with Rule 33, Requests for Production of Documents must comply with Rule 34, and Requests for Admission must comply with Rule 36.
>
> Furthermore, discovery in this Court is governed by E.D. Mich. Local Rules 26.1–37.2, among which is the requirement that "[a]ny discovery motion filed pursuant to Fed.R.Civ.P. 26 through 37, shall include, in the motion itself or in an attached memorandum, a verbatim recitation of each interrogatory, request, answer, response, and objection which is the subject of the motion or a copy of the actual discovery document which is the subject of the motion." E.D. Mich. LR 37.2.

*3 Plaintiff's March 8, 2010 filing was not entered on the docket until August 24, 2010. On September 1, 2010, defendant Conerly filed a response. Doc. Ent. 26. Conerly

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

contends that plaintiff "does not need discovery to attempt to obtain these [non-party] affidavits[,]" as "[n]onparties are not subject to Rule 33 interrogatories." Doc. Ent. 26 at 4. Conerly further contends that the "[s]tatements of the other non-party officers are unnecessary for the court to rule on Defendant's pending motion." Doc. Ent. 26 at 5. Furthermore, Conerly provides a second affidavit (Doc. Ent.26–2) and records related to the December 10, 2007 major misconduct report (Doc. Ent.26–3).

## C. Fed.R.Civ.P. 56

Summary judgment, pursuant to Fed.R.Civ.P. 56, may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties.

*Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (citing *Johnson v. Soulis,* 542 P.2d 867, 872 (Wyo.1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)). "In evaluating a motion for summary judgment we view all evidence in the light most favorable to Plaintiff ... and assess the proof to determine whether there is a genuine need for trial." *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1045 (6th Cir.1998) (citations omitted).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by

'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his pleading, Fed.R.Civ.P. 56(e), a verified complaint ... satisfies the burden of the nonmovant to respond." *Thaddeus–X v. Blatter,* 175 F.3d 378, 385 (6th Cir.1999).[FN12] "[A] verified complaint ... would have the same force and effect as an affidavit and would give rise to genuine issues of material fact." *Williams v. Browman,* 981 F.2d 901, 905 (6th Cir.1992). However, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). *See also Hamilton v. Roberts,* No. 97–1696, 1998 WL 639158, *5 (6th Cir. Sept.10, 1998) (personal knowledge required); *Daniel v. Cox,* No. 96–5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir.1994) (citing *Daily Press, Inc. v. United Press Int'l,* 412 F.2d 126, 133 (6th Cir.1969)) (cannot consider hearsay evidence).

FN12. Plaintiff's complaint was not signed. Doc. Ent. 1 at 8, 31. However, plaintiff's February 11, 2010 response to defendant's motion for summary judgment is signed (Doc. Ent. 19 at 2). Plaintiff's response brief is not signed (Doc. Ent. 19 at 21); however, plaintiff's February 4, 2010 affidavit is signed and notarized (Doc. Ent. 19 at 26).

**\*4** "Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient." *Kand Medical, Inc. v. Freund Medical Products, Inc.,* 963 F.2d 125, 127 (6th Cir.1992), citing *Matsushita Elec. Indus. Co., Ltd. v. Zen-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

*ith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 246–250 (citations omitted); *see Celotex Corp.,* 477 U.S. at 322–23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson,* 477 U.S. at 250. Consequently, a non-movant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

**D. Plaintiff's Factual Allegations Largely Relate to Three Events.**

The facts underlying plaintiff's complaint are largely related to the following events: (1) a November 21, 2007 administrative hearing regarding legal property; (2) a November 29, 2007 phone disbursement request; and (3) a December 10, 2007 mail request. Doc. Ent. 1 ¶¶ 4–23, 24–39, 41–54. Thereafter, plaintiff filed a grievance. Doc. Ent. 1 ¶¶ 55–58.

**1. The November 21, 2007 administrative hearing regarding legal property**

Plaintiff claims that Conerly routinely harassed, intimidated and retaliated against plaintiff "in violation of his rights in [a] corrupt, arbitrary and capricious manner[.]" Doc. Ent. 1 ¶ 4. On or about October 24, 2007, Resident Unit Officer (RUO) D. Czata informed plaintiff there would be a legal property hearing. Doc. Ent. 1 at 10. As summarized by the Sixth Circuit and taken as true for purposes of the appeal:

At the times relevant to this appeal, Pasley was housed in the Huron Valley Complex. [On November 21, 2007], the prison conducted an administrative hearing and determined that Pasley possessed a large amount of

law-related material that he was entitled to keep. When Pasley approached Conerly, his Assistant Resident Unit Supervisor, about obtaining additional footlockers, she responded, "I don't know why you are keeping all that bull-shit, you are not going home anyway...." Pasley sought help from [Officer Czata]. After [Officer Czata] talked to Conerly about the incident, Conerly brought Pasley into her office, called him a "rat," and supplied him with a single U.S. Postal Service container. When Pasley objected to taking the container, she told him, "Get out of my face ." Pasley then told Conerly that he would file a grievance against her if she refused to help him obtain the necessary storage containers. According to Pasley, Conerly told him that if he filed a grievance, she would have him transferred out of the unit and he would lose his job. She then stated, "I use[d] to be married to a warden and I will have your ass transferred so far up North [that] your family [won't] recognize you when you get back." At that point, Pasley took the postal container and left.

**\*5** A few days later, [Officer Hassen] searched Pasley's cell and found the postal container, which contained steel rods. [Officer Hassen] told Pasley that he would receive a major misconduct ticket for possessing dangerous contraband. Conerly initially denied giving Pasley the container and encouraged the officer to write the misconduct ticket. However, Conerly recalled giving Pasley the container after Pasley reminded her that she had given him the container in the presence of another officer. Pasley alleges that he later learned that Conerly sent [Officer Hassen] to [plaintiff's] cell to search for the postal container. The day after the search incident, Conerly informed Pasley that she would no longer provide him with services such as processing his mail and disbursing funds from his account.

*Pasley,* 345 Fed.Appx. at 983. *See also* Doc. Ent. 1 ¶¶ 5–20, Doc. Ent. 1 at 10 (Administrative Hearing Report–Formal).

According to plaintiff, the U.S. Postal Service container that Conerly gave plaintiff "could not hold but

Page 8

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

maybe (4) four books and plaintiff had over (4) footlockers of excessive legal [material] [;] [therefore] [,] it is perfectly clear that Conerly was setting plaintiff up with this dangerous contraband." Doc. Ent. 1 ¶ 21. Plaintiff claims that "[e]ven after being ordered to provide [him] with the necessary bins to store his legal material[,][he] did not receive the bins until (9) nine months later." Doc. Ent. 1 ¶ 22; Doc. Ent. 1 at 12 (Disbursement Authorization).[FN13] In other words, plaintiff claims, Conerly "[d]eliberately failed to provide plaintiff with proper storage to store his excessive legal material after being instructed to do so." Doc. Ent. 1 ¶ 60E. Plaintiff claims that, during the time he waited for his bins, "his room flooded and a great deal of his legal material was destroyed." Doc. Ent. 1 ¶ 23.

> FN13. As defendant acknowledges, Doc. Ent. 15 at 8, this exhibit is difficult to read. Still, it appears that the Disbursement Authorization is dated in 2008 for an amount of $246.60. Doc. Ent. 1 at 12.

**2. The November 29, 2007 phone disbursement request**[FN14]

> FN14. Copies of the November 29, 2007 Disbursement Authorization are attached to plaintiff's complaint. Doc. Ent. 1 at 14, 19.

By way of background, Paragraph H of MDOC PD 05.03.130, "Prisoner Telephone Use," effective 01/01/2009, provides in part that "A prisoner who wants to purchase prepaid telephone service must submit a completed Disbursement Authorization (CAR–893) to the business office. The minimum amount of telephone service time that may be purchased is $10 with additional amounts purchased in $5 increments. No refunds shall be issued. *Business office staff shall enter the purchase of prepaid telephone service within two business days after receipt of an approved disbursement authorization form.* An electronic notification of all daily purchases will be automatically sent to the appropriate telephone company at the end of each business day; the appropriate telephone company

will make the prepaid service available for use by the prisoner within three business days after it receives notice of the purchase of the prepaid service." *See* Doc. Ent. 19 at 27–30 (emphasis added); Doc. Ent. 1 ¶ 32.

Here, plaintiff claims that Conerly "impeded upon plaintiff's ability to process his disbursements, cat[a]log orders, phone disbursements and mail [.]" Doc. Ent. 1 ¶ 24.[FN15] According to plaintiff, "[a]fter about a month or so of not being able to process [these] papers[,] plaintiff informed Officer Payne about the problems that he was having processing his paperwork." Doc. Ent. 1 ¶ 25. Plaintiff claims that, on Thursday, November 29, 2007, he gave Officer Payne a phone disbursement request which Payne placed in Conerly's mail box. Doc. Ent. 1 ¶ 27. On Friday, November 30, 2007, plaintiff approached Officer Payne to see if the disbursement had been processed. According to plaintiff, "Officer Payne looked in the box and the disbursement was still there." Doc. Ent. 1 ¶ 28.

> FN15. At the conclusion of his complaint, plaintiff alleges that Conerly "[d]eliberately failed to process any of plaintiff's important documents." Doc. Ent. 1 ¶ 60C.

**\*6** On Monday, December 3, 2007, plaintiff noticed that the disbursement was still in the box. Plaintiff asked Officer Clark to take it to Conerly's office for processing. Doc. Ent. 1 ¶ 30. Conerly called plaintiff into her office and allegedly said, "I don't know why you are so determined to have this stuff given to me, I've already told you that I will not be processing anything for you[.]" Conerly then told plaintiff, "get out [of] my office please." Doc. Ent. 1 ¶ 31.

Plaintiff claims he "constantly checked for a little over a week to see if his money had been process[ed], and the money was never placed on plaintiff's phone card." Doc. Ent. 1 ¶ 32. Eventually, plaintiff received his disbursement back; however, according to plaintiff, "Conerly had back dated the disbursem[e]nt to reflect that she processed the disbursement on [Friday, November 30, 2007] [,]" and

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

Conerly returned it "with a notation indicating that plaintiff had NSF to process the disbursement[.]" Plaintiff claims this was false, because he "had more than enough funds to process the disbursement." Doc. Ent. 1 ¶ 34. It is plaintiff's position that Conerly "[d]eliberately falsified and changed the date on plaintiff's disbursement to further harass and intimidate plaintiff." Doc. Ent. 1 ¶ 60B. Furthermore, plaintiff claims, Officer Clark took the disbursement request into Conerly's office on Monday, December 3, 2007; therefore, it is not possible that Conerly processed it on November 30, 2007. Doc. Ent. 1 ¶ 36.[FN16]

FN16. Plaintiff has provided copies of trust account statements. *See* Doc. Ent. 1 at 14–15 (Disbursement Authorization dated Nov. 29, 2007 & Trust Account Statement for Nov. 19, 2007–Dec. 3, 2007), 27–28 (Trust Account Statement for Dec. 5, 2007–Jan. 14, 2008).

Plaintiff claims he "was forced ... to go through other ARUSs to process his paperwork[.]" Doc. Ent. 1 ¶ 37.[FN17] When Conerly learned plaintiff was doing so, he claims, Conerly "sent out an e-mail to all the ARUSs informing them not to process plaintiff's paperwork, that it was her job to do so and she would do it." Doc. Ent. 1 ¶ 38. Plaintiff was allegedly informed about this e-mail when he approached ARUS Hill and Holliwill to process some documents. Doc. Ent. 1 ¶ 39.

FN17. In support of this statement, plaintiff cites to disbursement authorizations showing different signatures to demonstrate that "for months [he] had to go through other staff members to process [his] materials." Doc. Ent. 1 ¶ 37; Doc. Ent. 1 at 16–25 (Disbursement Authorization Forms for Expedited Legal Mail & Several Disbursement Authorization Forms). As defendant acknowledges, Doc. Ent. 15 at 8, some of the disbursement authorizations are difficult to read.

**3. The December 10, 2007 mail request & PPD activation**

On December 10, 2007, plaintiff went to Conerly's office and asked if she would "please send out some mail for [plaintiff] because it was oversized [.]" It was a card plaintiff wanted "to send to a little girl that got shot in the City of Detroit trying to save her mother." Doc. Ent. 1 ¶ 41. When Conerly looked at the card she stated, "I'm not sending this card to that little girl. She [does not] want [a] card from some no good convict[.] Let me get your file and see what you are in here for[.]" Doc. Ent. 1 ¶ 42. Conerly looked at plaintiff's file and stated, "Oh you are here for armed robbery[.] Well, she [does not] want [a] card from [a] robber. I'm not allowing you to send that little girl that card[.]" According to plaintiff, Conerly did not send the card. Doc. Ent. 1 ¶ 43. Plaintiff also asked Conerly if she would send his $25 donation "to the fund that was set up by the girl's family[ .]" However, Conerly "would not send that out either. Doc. Ent. 1 ¶ 44. According to plaintiff, "Conerly stated that the warden said she [could not] send it out [.]" Doc. Ent. 1 ¶ 46.[FN18]

FN18. Plaintiff claims that he was forced to go to another staff member to send the money and card and that ARUS Hill sent it for plaintiff. Doc. Ent. 1 ¶ 47. This contention is supported by plaintiff's Trust Account Statement, which indicates that on December 20, 2007 a $25 donation was made. *See* Doc. Ent. 1 at 27–28 (Trust Account Statement for Dec. 5, 2007–Jan. 14, 2008); *see also* Doc. Ent. 19 at 32–33; Doc. Ent. 19–2 at 9.

**\*7** During this visit, plaintiff claims, "Conerly started talking very disrespectful[ly] to plaintiff[;] so plaintiff got up to leave because there was no need to stay in the office after she denied [his request] to send out the card and money." Doc. Ent. 1 ¶ 48. According to plaintiff, Conerly stated, "sit back down[.]" Plaintiff kept going and exited Conerly's office, at which time Conerly called plaintiff's name. Plaintiff turned around, and Conerly "got up from her desk and reached into her black bag and pulled out her PPD and looked directly at plaintiff and smiled and then pulled the pin." Doc. Ent. 1 ¶ 49. As summarized by the Sixth Circuit and taken as true for purposes of the appeal:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

Pasley alleges that on December 10, 2007, as he was leaving Conerly's office after trying to process his mail, Conerly intentionally activated her personal protection device. According to Pasley, Conerly removed the device from her bag, looked Pasley in the eye, and pulled the pin to activate the device. Pasley said he feared for his life as officers from all over the unit quickly responded to the call. [Officer Cummings] who was standing outside of Conerly's line of sight intervened because he had seen that Pasley was outside of Conerly's office at the moment of the call. Conerly then stated that she activated the device accidentally.

*Pasley,* 345 Fed.Appx. at 983–984. *See also* Doc. Ent. 1 ¶¶ 49–53.

According to plaintiff, "Conerly then wrote a ticket on plaintiff stating that [he] [would not] leave her office and the ticket was dismissed." Doc. Ent. 1 ¶ 54. According to the December 10, 2007 major misconduct report, plaintiff was placed on bond pending the hearing and he requested as witnesses Officer Cummings, Anspach and Gosicki. Doc. Ent. 26–3 at 2.

On or about December 19, 2007, plaintiff requested Officer Cummings and prisoner Timothy Plair (# 502128) as witnesses; requested that reports of why Conerly pulled the PPD pin and each officer's statement be produced; and provided his own statement. Doc. Ent. 26–3 at 4–6. Plair provided a statement on or about December 27, 2007. Doc. Ent. 26–3 at 8. Gosicki had no statement. Doc. Ent. 26–3 at 7. By a memorandum dated December 28, 2007, H.I. Bragg informed the Hearings Officer that "[u]pon arrival, [Anspach] was told by ARUS Conerly that everything was okay and no further assistance was needed." Doc. Ent. 26–3 at 9.

The hearing was conducted on January 2, 2008, and the charge was dismissed. In reaching this conclusion, Hearing Officer Falkenstein noted:

I note on the misconduct report that the date of review is not recorded. In addition, the officer whom prisoner describes as being the witness with the most knowledge, Cummings, did not provide a statement. Today is the last day for hearing. CO Cummings was listed at misconduct report review and at hearing investigator interview as a witness. Prisoner makes the case he is a relevant and necessary witness. Due to lack of documented review time and missing witness, the report is dismissed.

**\*8** Doc. Ent. 26–3 at 3.

**4. The December 13, 2007 grievance regarding these events**

On December 13, 2007, plaintiff completed a Step I grievance (HVM–07–12–01316–17z) against Conerly in which he discusses the aforementioned events. Doc. Ent. 1 at 33, 35–36. The January 7, 2008 Step I response is signed by D. Monday and R. Rider. Doc. Ent. 1 at 33, 37.

Plaintiff completed a Step II grievance appeal; A. Walls and L. Schuhmacher responded. Doc. Ent. 1 at 34, 39. Plaintiff completed a Step III grievance appeal, and J. Armstrong's Step III grievance response is dated June 3, 2008. Doc. Ent. 1 at 34, 41.

In his complaint, plaintiff contends that during the investigation of the grievance, plaintiff's witnesses listed therein were not questioned; the only people interviewed were plaintiff and Conerly; and Officers Payne, Cummings, Clark and Hassen were not questioned about plaintiff's allegations. Doc. Ent. 1 ¶¶ 55–58.[FN19]

> FN19. Attached to plaintiff's complaint is an assertion that he "has exhausted his administrative remedies[,]" Doc. Ent. 1 at 29–31.

**E. The Court Should Deny Defendant's Motion for Summary Judgment.**

**1. Defendant is not entitled to summary judgment on plaintiff's First Amendment retaliation claim.**

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

A First Amendment retaliation claim requires a showing that: (1) "the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is the adverse action was motivated at least in part by the plaintiff's protected conduct". *Thaddeus–X,* 175 F.3d at 394–395. However, "[i]f the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus–X,* 175 F.3d at 399.

"Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting-whether activity is 'protected' or an action is 'adverse' will depend on context". *Thaddeus–X* at 388.

**a. Plaintiff's November 2007 threat to file a grievance constitutes protected conduct.**

The protected conduct issue is mainly associated with events following the November 21, 2007 administrative hearing which allowed plaintiff to keep and store his legal materials. Plaintiff, after having difficulty obtaining containers from Defendant, told Defendant that if she refused to help him obtain the necessary storage containers, he would file a grievance. *See* Doc. Ent. 1 at 3 ¶ 13.

It is defendant's position that plaintiff "did not engage in prior protected conduct." Doc. Ent. 15 at 13. In this regard, defendant notes that HVM–07–12–01316–17z was filed on December 13, 2007 regarding a December 3, 2007 incident. Doc. Ent. 1 at 33. It is defendant's interpretation that the grievance mostly "concerns Conerly's alleged failure to process [plaintiff's] disbursement request in a timely fashion, and then allegedly backdating it." In other words, defendant contends, "[p]laintiff did not file any grievance against Conerly until after all the events occurred." Doc. Ent. 15 at 13.

**\*9** In response (Doc. Ent. 19 at 14, 19), plaintiff basically restates the following portion of the Sixth Circuit's September 29, 2009 opinion:

Pasley's statement that he would file a grievance against Conerly if she did not help him to obtain footlockers might constitute protected conduct under the First Amendment. It is well established that prisoners have a constitutional right to file grievances against correctional employees. *Herron v. Harrison,* 203 F.3d 410, 415 (6th Cir.2000). This circuit appears not to have determined conclusively whether merely threatening to file a grievance constitutes protected activity. In an unpublished order issued shortly after the court decided *Thaddeus–X v. Blatter,* we held that a prisoner who merely threatened to file a federal lawsuit was engaged in protected behavior. *See Dean v. Conley,* No. 98–5906, 1999 WL 1045166, at \*2 (6th Cir. Nov.9, 1999). We based this conclusion on the fact that prisoners have a constitutional right to file civil rights claims. In two other unpublished orders, we held that certain prisoners who had threatened to file grievances were not engaged in protected conduct, but in each case we based our conclusion on the fact that the threatened grievance was frivolous and that prisoners do not have a protected right to file frivolous grievances. *See Scott v. Kilchermann,* No. 99–1711, 2000 WL 1434456, at \*2 (6th Cir. Sept.18, 2000); *Thaddeus–X v. Love,* No. 98–2211, 2000 WL 712354, at \*3 (6th Cir. May 22, 2000). These two orders are consistent with the possibility that, had the prisoners threatened to file legitimate grievances, the conduct would have been protected. Because Pasley's threatened grievance was arguably legitimate, his conduct was arguably protected by the First Amendment.

*Pasley,* 345 Fed.Appx. at 984–985.

Furthermore, I note that shortly before the Sixth Circuit rendered its opinion, this Court in *Carter v. Dolce,* 647 F. Supp .2d 826 (E.D.Mich. Aug.19, 2009) (Lawson, J.), stated, "when it comes to protecting First Amendment rights, including the right to petition the government for redress, there is little difference between retaliating against a person for filing a grievance, and retaliating for threat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

ening to file one." *Carter,* 647 F.Supp.2d at 834. The court referred to the Sixth Circuit's treatment of these cases, in particular to *Jackson v. City ofColumbus,* 194 F.3d 737, 756–57 (6th Cir.1999),[FN20] and concluded that the Sixth Circuit "treats filing and threatening to file as categorically identical outside the prison context." *Carter,* 647 F.Supp.2d at 834.

> FN20. In *Carter,* 647 F.Supp.2d at 834, Judge Lawson relied upon the portion of *Jackson* that stated, "[i]f, on the other hand, [plaintiff's] threat of litigation served to expose matters of public concern, such as the alleged discriminatory practices of the City, such speech would constitute public speech and merit constitutional protection." *Jackson,* 194 F.3d at 756–757.

> Another portion of *Jackson* has been overruled. In *Jackson,* the Sixth Circuit stated that "[t]o survive the City's motion to dismiss, Jackson's complaint must include factual allegations that provide direct evidence of a discriminatory motive or that support each element of a *prima facie* case under the criteria set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668[ ] (1973)." *Id.* at 751. Later, in *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Supreme Court held that "an employment discrimination complaint ... must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Swierkiewicz,* 534 U.S. at 508 (citing Fed.R.Civ.P. 8(a)(2)).

Therefore, guided by the *Carter* decision of this Court and the aforementioned portion of the Sixth Circuit's September 29, 2009 order in this case, the Court should conclude that plaintiff's late November 2007 threat to file a grievance constitutes protected conduct and satisfies the first prong of the three-prong test.

**b. Plaintiff has described adverse actions which followed the alleged protected conduct.**

**\*10** Defendant argues that plaintiff "did not suffer any adverse action at the hands of Defendant Conerly." Doc. Ent. 15 at 13–15. Not every action is an adverse action; *de minimus* slights and inconveniences do not qualify. Furthermore, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is adverse." *Thaddeus–X,* 175 F.3d at 398. What has been held to be adverse action is the charging of an inmate with a misconduct violation. The court in *Thaddeus–X,* in order to determine whether actions of lesser severity merit being deemed "adverse" for purposes of a retaliation claim, adopted the standard suggested by Judge Posner in *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982), that an adverse action is one that would "deter a person of ordinary firmness" from the exercise of the right at stake.

Defendant claims that the fact that a grievance was filed on December 13, 2007 demonstrates that plaintiff was not deterred by Defendant's prior alleged adverse action, including Conerly's alleged but denied November 2007 threat "to send [Pasley] 'up north' after their verbal dispute over the storage bins [,]" noting that Pasley "stayed in Defendant's housing unit the entire time [Conerly] was the ARUS there." Plaintiff was moved from HVM on or about June 20, 2008. Doc. Ent. 15 at 13. In response to this argument, plaintiff relies upon *Gill v. Pidlypchak,* 389 F.3d 379 (2d Cir.2004). Doc. Ent. 19 at 20.[FN21]

> FN21. In *Gill,* the Second Circuit stated that "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. The Court further noted that "while subjective chilling is a general requirement, where a plaintiff alleges that the protected conduct at issue is the prior filing of a grievance or lawsuit against the defendant, it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation. If bringing the

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

action demonstrates that the plaintiff has not been chilled-and has failed to meet the subjective test-then such a plaintiff could never seek redress for retaliation." *Id.* at 383. Also, the Court stated, "the fact that a particular plaintiff such as Gill-who, we recognize, is no stranger either to the grievance system or to the federal courts-responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action." *Id.* at 384.

Here, the standard is not whether or not the action in fact deterred the plaintiff from engaging in that conduct. Rather, the standard is whether a "person of ordinary firmness" would be deterred. "The relevant question is whether the Defendant's actions are *capable* of deterring a person of ordinary firmness." *Bell v. Johnson,* 308 F.3d 594, 606 (6th Cir.2002) (quoting *Thaddeus–X,* 175 F.3d at 398 (emphasis added)).

The following analysis of the alleged adverse actions is guided by the following portion of the Sixth Circuit's September 29, 2009 order:

Conerly's actions, as alleged by Pasley, could constitute "adverse action" under the precedent of this court. Pasley alleges that after he mentioned the possibility of filing a grievance, Conerly made two immediate threats: first, to have him moved out of the unit so that he would lose his job and, second, to use her influence with a warden to have him moved to a location where his family would not be able to visit him. These threats could be "capable of deterring a person of ordinary firmness" from exercising protected rights, the standard for adverse action set forth in *Thaddeus–X.* 175 F.3d at 398. We held in *Siggers–El v. Barlow,* 412 F.3d 693, 701–02 (6th Cir.2005), that a retaliatory transfer to another institution was an adverse action if it resulted in foreseeable, negative consequences to the prisoner, such as loss of his high-paying job and reduced ability to meet with his lawyer. This court has also noted that a mere threat is actionable if it otherwise meets the standard that it would deter a person of ordinary firmness from engaging in a

protected activity. *See Smith v. Yarrow,* 78 Fed.Appx. 529, 543 (6th Cir.2003).

**\*11** Additionally, Pasley alleges that Conerly's actions subjected him to the possibility of receiving a major misconduct ticket. Pasley alleges that Conerly pressured him to accept an illegal container and then reported him for possessing contraband. In an appeal from the denial of qualified immunity in a prison retaliation case, we noted that precedent "clearly establishes that the mere potential threat of disciplinary sanctions is sufficiently adverse action to support a claim of retaliation." *Scott v. Churchill,* 377 F.3d 565, 571–72 (6th Cir.2004). In that case, a prison guard retaliated against a prisoner by unsuccessfully framing him for a major misconduct charge. *Id.* Pasley also alleges that Conerly placed him in physical danger by intentionally activating her personal protection device while he was attempting to leave her office. A person of ordinary firmness could arguably be dissuaded from filing a grievance by an action which, if it occurred as Pasley alleges, would have impressed upon Pasley the amount of physical force Conerly could bring to bear on him through a false allegation. This court has noted that, "while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions." *Thaddeus–X,* 175 F.3d at 398.

*Pasley,* 345 Fed.Appx. at 985.

**i. As described by plaintiff, Conerly provided the potentially contraband storage bin before plaintiff engaged in the protected conduct of threatening to file a grievance.**

As a result of the November 21, 2007 hearing, Hearing Officer C. Falkenstein found that plaintiff had "necessary legal material which [he][was] allowed to keep." Doc. Ent. 1 at 10. In his unsigned complaint, plaintiff alleges that Conerly "was ordered to provide Plaintiff with the necessary legal bins for the storage of the excessive legal material[.]" Doc. Ent. 1 at 2 ¶ 5. According to plaintiff, Conerly gave him a U.S. Postal Service container. Doc. Ent. 1 at 2 ¶

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

¶ 10–11. Plaintiff informed Conerly that the box was insufficient. Doc. Ent. 1 at 2 ¶ 12. According to plaintiff's complaint, it was after this that he stated he would be "forced to write a grievance if [Conerly] [didn't] comply with the order to provide sufficient storage for [his] legal material[.]" Doc. Ent. 1 ¶ 13.

Plaintiff claims the container "possessed ste[e]l rods and the possession of this container would result in a major misconduct ticket for dangerous contraband." Doc. Ent. 1 at 3 ¶ 17. Plaintiff claims that Officer Hassen found the container and told plaintiff he would receive a major misconduct ticket. Then, plaintiff explained that he received the container from Conerly. Doc. Ent. 1 at 3 ¶ 18. According to plaintiff, the U.S. Postal Service container was insufficient to hold plaintiff's legal material, so, he alleges, "it is perfectly clear that Conerly was setting Plaintiff up with this dangerous contraband." Doc. Ent. 1 at 3–4 ¶ 21.

**\*12** In her motion, Conerly contends that the November 21, 2007 administrative hearing report shows no such order as plaintiff alleges in Paragraph 5 of his complaint. Doc. Ent. 15 at 7. Defendant claims that she "did advise [Plaintiff] that he could order a footlocker for storage of his legal documents subsequent to a hearing he had regarding possession of legal materials." In the interim, she attests, she "consulted with [her] supervisor to decide on how those materials could be stored pending receipt of a footlocker." Defendant claims that, based on that consultation, she did authorize plaintiff "to use a U.S. mail bin temporarily for storage of his legal materials until he could secure an appropriate footlocker through the disbursement process." According to Conerly, an RUO "later confiscated that storage bin as it had a metal rod in it, but [Conerly] never ordered that confiscation[.]" Defendant further states that she does not recall Pasley's cell ever flooding. Doc. Ent. 15–3 ¶ 3.

Attached to plaintiff's response to the motion for summary judgment is his February 4, 2010 affidavit (Doc. Ent. 19 at 24–26) in which he swears to circumstances and events which are contradictory to Conerly's January 4, 2010 affidavit (Doc. Ent. 15–3 at 1–5). Plaintiff attests that Conerly "never advised [plaintiff] that [he] could order footlockers, nor did she provide [plaintiff] with the necessary storage until nine months after the hearing was held." Doc. Ent. 19 at 24 ¶ 3. Plaintiff attests that Conerly gave plaintiff the U.S. Postal Service bin knowing that it had steel rods, "because Officer Hassen told [plaintiff] that [Defendant] sent him to [plaintiff's] room to retrieve the container." Doc. Ent. 19 at 24 ¶ 5. Plaintiff further attests that "over 70% of [his] legal material was destroyed because [Conerly] did not provide [plaintiff] with the storage in a timely ma[nn]er," and "Officer Czata provided [plaintiff] with the necessary cleaning material to get up the water after the flood." Doc. Ent. 19 at 24 ¶ 4. Plaintiff also attests that "after Conerly denied giving [plaintiff] the container[,] Officer Czata brought it to her attention that she indeed gave [plaintiff] the container and [Conerly] miraculously remembered that she gave [plaintiff] the container." Doc. Ent. 19 at 25 ¶ 6.

In reply, defendant takes issue with plaintiff's reliance upon *Scott v. Churchill,* 377 F.3d 565 (6th Cir.2004). Doc. Ent. 21 at 5–7.[FN22] Defendant states that "[p]laintiff did not get a ticket over the postal bin matter or the PPD incident. He was not placed in administrative segregation, and he was not subjected to a risk of prolonged incarceration resulting from the loss of good-time or disciplinary credits. To allow a retaliation claim to proceed on the flimsy assertion that he *could have* received a ticket, would allow virtually any and all bare allegations of retaliation to go to trial." Moreover, defendant adds, *Scott* "is clearly distinguishable from the instant case, because in *Scott* the prisoner actually received a misconduct and actually was placed in administrative segregation, and then the ticket was not upheld at a hearing." Doc. Ent. 21 at 7.

FN22. Actually, plaintiff's mention of *Scott* in the "adverse action" section of his response (Doc. Ent. 19 at 15) is basically a quotation of the Sixth Circuit's September 29, 2009 decision in the case at bar. *See Pasley,* 345 Fed.Appx. at 985 (quoting and citing *Scott,* 377 F.3d at 571–572).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

**\*13** In his sur-reply, plaintiff claims that Conerly "set him up to get a ticket for dangerous contraband because later [plaintiff] found out that Conerly sent [Officer Hassen] to [plaintiff's] cell to search for the postal container[.]" Doc. Ent. 25 at 4. Also, plaintiff contends, "the bin that [Conerly] gave plaintiff could only hold four books and [Conerly] knew that plaintiff possessed over four foot-lockers worth of legal material[.]" Doc. Ent. 25 at 4–5. Clearly, plaintiff claims, "this was a set up[.]" Doc. Ent. 25 at 5. Plaintiff seeks to get an affidavit from Czata, perhaps to "confirm that [defendant] gave plaintiff the container[,]" and/or perhaps to buttress plaintiff's statement that Czata provided cleaning material after the flood. Doc. Ent. 25 at 8; Doc. Ent. 1 ¶ 20; Doc. Ent. 19 at 24 ¶ 4. Plaintiff also contends that "[a]n affidavit from Officer Hassen will prove that defendant sent him to plaintiff's cell/room to retrieve the U.S. Postal bin with the steel rods[.]" Doc. Ent. 25 at 8.

However, in this case the Court need not determine whether Conerly's act of giving plaintiff a U.S. Postal Service container was an adverse action. Even if, as plaintiff alleges, defendant was trying to "set up" plaintiff,[FN23] and even this act would have prevented a reasonable person from engaging in the protected conduct of threatening to file a grievance-on the basis that it would subject the person to a misconduct ticket for possession of contraband-the transfer of the bin occurred *prior* to plaintiff's protected conduct of threatening to file a grievance. Therefore, it cannot be said here that Conerly gave him the bin in retaliation for plaintiff threatening to file a grievance. This is so, because plaintiff made his threat *after* Conerly gave plaintiff the container. *See* Doc. Ent. 1 ¶¶ 11–13.

FN23. In his complaint, plaintiff alleges that Conerly "[d]eliberately tried to set plaintiff up with a dangerous contraband ticket to further harass and intimidate plaintiff[.]" Doc. Ent. 1 ¶ 60D. However, it warrants repeating that, consistent with the Sixth Circuit's opinion, this report does not address any Fourteenth Amendment substantive due process claim; rather, it concerns

only plaintiff's First Amendment retaliation claim.

**ii. Conerly's alleged threat to transfer plaintiff "up north" and her alleged threat that she would no longer provide plaintiff with certain services constitute adverse actions.**

In his unsigned complaint, plaintiff alleges that Conerly "called plaintiff a 'rat' "[FN24] and threatened to transfer him " 'so far up north [hi]s family [would not] recognize [him[ ] when [he][got] back.' " Doc. Ent. 1 ¶¶ 9, 14.

FN24. This conduct allegedly occurred before plaintiff made his threat to file a grievance. Doc. Ent. 1 ¶¶ 9, 13. Therefore, this report does not assess whether name-calling is an adverse action.

In her affidavit, defendant states that "at no time did [she] ever call Pasley a 'rat,' nor did [she] ever refer to his legal mail as 'bull shit' as he claims." Doc. Ent. 15–3 ¶ 10. She attests that she never told plaintiff she "had been married to a Warden and could have him transferred so far up north that his family wouldn't recognize him when he returned." According to Conerly, "Pasley was somehow made aware that [she] had previously been married to a Warden and stated to [Conerly] that he was starting to see why that Warden had 'divorced your ass.' " Also, she claims, she "never threatened to move Pasley out of the unit if he filed a grievance on [her]." She also states that Pasley filed a grievance on December 13, 2007 and remained in her housing unit until she took a position as an ARUS at Huron Valley Complex–Women's Facility (WHV) in June 2008. Doc. Ent. 15–3 ¶ 11.

**\*14** In his response, plaintiff claims that "[a]fter Plaintiff mentioned filing a grievance, Conerly made two immediate threats[.] First, to have Plaintiff moved out of the unit so that he would lose his job[.] ... Second, to use her influence with a Warden to have him moved to a location where his family would not be able to visit him[.]" Doc. Ent. 19 at 14. Also, plaintiff claims, Conerly made a

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

third threat "the day after the search incident that she would no longer provide him with services such as processing his mail and disbursing funds from his account." Doc. Ent. 19 at 14–15. In his affidavit, plaintiff attests that Conerly "called [him] a 'rat' [and] she [threatened] to send [him] so far up north that [his] family [would not] recognize [him] when [he][got] back." Doc. Ent. 19 at 26 ¶ 14.

In reply, referring to Whalen's affidavit, defendant notes: "It is true that the Women's facility did not open for female prisoners until May 2009, [ FN25] but the men had to be moved out gradually—alternate placements had to be found for everyone, and they were moved in small groups because [at] HVM many of the men had mental health issues. In addition, the facility had to be renovated to accommodate women." Doc. Ent. 21 at 4–5. Also, defendant provides the February 24, 2010 affidavit of Karen Whalen, an administrative assistant at WHV/HVM. Doc. Ent. 23–2 at 1–3. Specifically, she attests that "Prisoner Pasley # 166717 was transferred on June 20, 2008. He was moved for placement at his true security level II, rather than the level IV placement at HVM that he was in." Doc. Ent. 23–2 ¶ 6.FN26 Plaintiff's alleged June 20, 2008 transfer from HVM in Ypsilanti, Michigan to MRF in New Haven, Michigan is confirmed by his MDOC transit list. Doc. Ent. 15–5.

> FN25. WHV opened in 2009. *See* Doc. Ent. 19–2 at 13 (MDOC Website Page).

> FN26. Here, Whalen makes reference to the "attached Transfer Order [ .]" However, it is not attached. Doc. Ent. 23–2.

The Sixth Circuit has "repeatedly held that transfer from one prison to another prison 'cannot rise to the level of an 'adverse action' because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights.' " *Smith v. Yarrow,* 78 Fed.Appx. 529, 543 (6th Cir.2003) (citing cases). However, the Sixth Circuit has since acknowledged that a transfer "would deter a person of ordinary firmness from engaging in pro-

tected conduct [where] the Defendant was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's ability to access the courts. As a result of the transfer, the Plaintiff not only lost his high paying job that he needed in order to pay his attorney, but the transfer also made it more difficult for his attorney to visit with or represent him because he was moved further away from her." *Siggers–El v. Barlow,* 412 F.3d 693, 701–702 (6th Cir.2005). Later, the Sixth Circuit explained that "absent aggravating circumstances of the type present in *Siggers–El,* Hix's allegations pertaining to his transfers failed to allege adverse action that would deter a person of ordinary firmness from engaging in constitutionally protected conduct. Because Hix failed to make out a prima facie case of First Amendment retaliation, we conclude that the District Court properly dismissed his allegations for failure to state a claim." *Hix v. Tennessee Dept. of Corrections,* 196 Fed.Appx. 350, 358 (6th Cir.2006).

**\*15** Guided by *Smith, Siggers–El* and *Hix,* the Court should conclude that plaintiff has alleged aggravating circumstances of the kind found sufficient in *Siggers–El.* The threat to be transferred up north may have been taken seriously given Plaintiff's knowledge that Defendant had been married to a prison warden and was perhaps capable of carrying out Conerly's wishes; the transfer would result in the loss of his prison job; the transfer could result in plaintiff being farther away from his family; and, allegedly, Conerly would not process his mail or disburse funds from his prisoner account, a matter which may have been taken seriously given that plaintiff had recently filed *Pasley v. Oliver,* Case No. 01:07–cv–00583–JTN–TPG (W.D.Mich.).

Therefore, considering facts in the light most favorable to Plaintiff, the Court should conclude that plaintiff's allegations regarding Conerly's alleged threats might constitute an adverse action.

**iii. In this case, plaintiff's allegations that Conerly backdated a disbursement request and wrote "NSF" on it are not adverse actions. However, delay in processing**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

**a disbursement request may be an adverse action.**

In his complaint, plaintiff alleges that he received his November 29, 2007 disbursement authorization back, but "Conerly had back dated the disbursem[e]nt to reflect that she processed the disbursement on [November 30, 2007] [.] She then returned the disbursement back to Plaintiff with a notation indicating that plaintiff had NSF [non-sufficient funds] to process the disbursement which was false because plaintiff had more than enough funds to process the disbursement." Doc. Ent. 1 at 5 ¶ 34. Plaintiff claims this was fraudulent, because he and Officer Payne "know for a fact that the disbursement set in the box until [December 3, 2007][.]" Doc. Ent. 1 at 5 ¶ 35. Plaintiff further claims that on Monday, December 3, 2007, Officer Clerk "took [the disbursement] into her office[.] Therefore, it's impossible for her to have processed it on [November 30, 2007]." Doc. Ent. 1 at 5 ¶ 36. *See also* Doc. Ent. 1 at 14 [Disbursement Authorization].

According to defendant, "[p]laintiff assumes that [d]efendant backdated the disbursement form[,]" and the "evidence shows that the disbursement request was processed in a timely fashion, and refutes Plaintiff's claim that Defendant Conerly delayed the processing, backdated the form, and wrote 'NSF' on the disbursement request." Doc. Ent. 15 at 13–14. Defendant attests that she processes "mail including prisoner disbursements daily and consistently and recall[s] that Pasley did not want to place his requests in [her] housing unit mailbox." According to Conerly, "Pasley seemed to act as if he could bring his request to my office whenever he wanted to, regardless of my unit practice." Conerly "advised him that he would need to follow the same rules as the other prisoners in the housing unit." Doc. Ent. 15–3 ¶ 4. As defendant attests, "the disbursement indicates that [she] processed it on Friday, 11/30/2007[,]" and "[she] never backdate[s] disbursements." Doc. Ent. 15–3 ¶ 5. Defendant also attests that she does not "indicate NSF for non-sufficient funds on disbursement requests. This notation, when documented, is entered by staff in the Business Office upon their processing of received disbursements." Doc. Ent. 15–3 ¶ 6. According to defendant, plaintiff "received the document back the next business day, Monday, December 3, 2007."

Doc. Ent. 15 at 14.

**\*16** In response, plaintiff claims "[t]here were numerous incidents where plaintiff's First Amendment right to send mail out was 'curtailed' wherein plaintiff had to circumvent existing procedure to avoid coming into contact with defendant Conerly which, although admittedly [did not] occur but could have subjected plaintiff to institutional sanctions, ... such as out of place misconducts as a result of plaintiff trying to have his mail and legal mail [ ] processed without interfer[e]nce." Doc. Ent. 19 at 9–10. Plaintiff claims "[t]here were times that [his] mail was given to [Conerly] and it never reached its destination, and times when his legal mail was late getting to its destination[.]" Plaintiff explains that he "chose to isolate and illustrate this particular incident in his complaint because this particular incident was used to bring to the light defendant Conerly's acts of retaliation." Doc. Ent. 19 at 10.

Plaintiff attests that on Thursday, November 29, 2007, he and Officer Payne "decided to set Conerly up so [Officer Payne] could see for himself that [Conerly] was retaliating against [plaintiff] by not processing [his] mail." Doc. Ent. 19 at 25 ¶ 7. On that day, plaintiff attests, he "gave the phone request to Officer Payne and he put it in Conerly's mail box[.]" The next day, on Friday, November 30, 2007, "Officer Payne and [plaintiff] noticed the phone request still on Conerly's mail box unsigned and it had not been processed." Doc. Ent. 19 at 25 ¶ 8. On Monday, December 3, 2007, plaintiff attests, he "asked Officer Clark to check Conerly's mail box and see if the phone request was still there[.]" Allegedly, it was, "so [plaintiff] asked [Officer Clark] to take [it] into [Conerly's] office for [plaintiff] so [Conerly] [could] process it[.]" According to Plaintiff, "Conerly called [plaintiff] into her office and told [him] that she was not going to process anything for [him]." Doc. Ent. 19 at 25 ¶ 9. Plaintiff further attests that when he received the phone request back, it was backdated and had a notation indicating NSF (non-sufficient funds). Plaintiff attests, "it is clear [Conerly did this] [,] because [plaintiff] had available funds in [his] account $53 [.]28 so there would be no reason for the business office to write 'NSF' on the disbursement." Doc. Ent. 19 at 25 ¶ 10.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

Also, apparently referring to Paragraph H of MDOC PD 05.03.130 and claiming that the Business Office is not open during the weekend, plaintiff responds, "[i]f defendant perhaps did sign the disbursement on the 30th of November there still would be no[ ] way for plaintiff to receive the disbursement back on Monday[,] December 3rd[.]" Additionally, plaintiff responds, "[t]here would also be no reason for the Business Office to write 'NSF' on the disbursement being that plaintiff had sufficient funds to process the request." Doc. Ent. 19 at 11.

In reply, defendant notes that plaintiff "has not offered any affidavit evidence from Payne" to support the claim that the form was still in Conerly's mailbox on Friday, November 30, 2007, and defendant contends that "it all depends on when Payne looked in the mailbox, if indeed he did." Defendant points out that the form "could have been in there, and then taken out later and processed by Conerly." Doc. Ent. 21 at 3.

**\*17** Also, defendant supplies the March 1, 2010 affidavit of Jose Philip, Finance Manager of WHV, pertaining to the disbursement issue. Doc. Ent. 23 at 1–4. Philip claims that "the notation 'NSF $28.98' is something an Accounting Assistant in the Business Office would have written[,]" and "[i]t cannot be determined who wrote 'NSF $28.98.' " Doc. Ent. 23 ¶ 5(1). According to Philip, "Pasley's account shows a phone card disbursement for $50 processed on [Thursday, November 29, 2007]." FN27 Doc. Ent. 23 ¶ 5(2). Philip notes that "[a]lthough the disbursement request from Pasley is dated 11/29/07, it may not have reached the Business Office until 12/7/07 to 12/10/07." Doc. Ent. 23 at 3 ¶ 4. Furthermore, he attests:

FN27. Pasley submitted the phone request at issue the day a $50 disbursement was processed.

On Thursday, November 29, 2007, "Pasley's account balance was $649.58."

On Monday, December 3, 2007, "Pasley's account bal-

ance was $398 .14."

On Wednesday, December 5, 2007, "Pasley's account balance was $84.58."

From Friday, December 7, 2007 to Monday, December 10, 2007, "Pasley's account balance was $28.98; this was insufficient to process the disbursement request for $30 and thus the disbursement request was noted 'NSF 28.98' and returned to him."

*See* Doc. Ent. 23 ¶ 5(3)(4)(5)(6). Jose Philip further states that "[t]he Account Statement submitted to the court [Doc. 19. at 32], for the period of [December 1, 2007] to [January 22, 2008] shows another phone card disbursement for $30 was processed on [December 7, 2007].[ FN28 ] The amount of $30 was a debit (taken) from account 2101 Offender Funds, and $30 was a credit (paid to) account 2596 Phone Credit Payable. A $30 phone card debit and credit is shown on [December 11, 2007], and on [December 17, 2007];[ FN29 ] a $50 phone card debit and credit is shown on [December 14, 2007]." FN30 Doc. Ent. 23 ¶ 6. According to Philip, "[i]t would not be possible for prisoner Pasley to receive a disbursement with the notation 'NSF $28.98' until at least Friday, [December 7, 2007], which is when his account balance was $28.98." Doc. Ent. 23 ¶ 7. Philip attests that "[t]here would be no reason to write 'NSF $28.98' on the disbursement request if it had reached the Business Office between [December 3, 2007] and [December 5, 2007], because the account had sufficient funds at that time to process the request." Doc. Ent. 23 ¶ 8. In other words, Philip attests, "[t]here would be no reason to refuse to process the requested disbursement if the account did have sufficient funds when the request was received in the Business Office. As is shown by the Account Statement submitted to the Court, other phone card disbursements were processed when funds were available." Doc. Ent. 23 ¶ 9.

FN28. On December 6, 2007, Hill authorized plaintiff's disbursement request to debit his phone

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

system $30. It was entered on December 7, 2007. Doc. Ent. 1 at 23.

**FN29.** On December 17, 2007, plaintiff completed a disbursement authorization to debit his phone system $30. It was authorized that day. Doc. Ent. 1 at 20.

**FN30.** On December 11, 2007, plaintiff completed a disbursement request to debit his phone system $50. It was authorized by Hill that day and was entered on December 14, 2007. Doc. Ent. 1 at 21.

The Court has been able to discern the following time line of plaintiff's trust account:

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 11/29/2007 | | | 649.58 |
| **11/29/2007** | | **Phone Credit–50** | **599.58** |
| 11/30/2007 | | Filing Fee–150 | 449.58 |
| 11/30/2007 | | Legal Postage–1.99 | 447.59 |
| 12/3/2007 | | Commissary–49.45 | 398.14 |
| | Missing information (12/3–12/5 data unclear) | –39.31 | 358.83 |
| | Watch (date of purchase unclear) | –61 | 297.83 |
| 12/5/2007 | | Clothing–70.75 | 227.08 |
| 12/5/2007 | | TV–142.5 | 84.58 |
| 12/7/2007 | | Commissary–25.6 | 58.98 |
| **12/7/2007** | | **Phone Credit–30** | **28.98** |
| 12/11/2007 | | Mail Room Receipt200 | 228.98 |
| **12/11/2007** | | **Phone Credit–30** | **198.98** |

**\*18** Doc. Ent. 1 at 15, 27–28 (Trust Account Statements), Doc. Ent. 23 at 3 ¶ 5 (Affidavit of Jose Philip).

In his sur-reply, plaintiff contends that "[a]n affidavit from Officer Payne can prove that defendant could not have signed and dated the phone request disbursement on the day that she claimed," which would directly challenge Philip's affidavit. Plaintiff further contends that "[a]n affidavit from Officer Clark will prove that he gave defendant Conerly the disbursement in question on Monday [December 3, 2007] making it impossible for her to ... have signed and date[d] the disbursement in question on [Friday, November 30, 2007]," which would dispute Philip's affidavit. Doc. Ent. 25 at 8.

It seems that there are two issues regarding plaintiff's "Disbursement Authorization (Prisoner)," Form CAR–893, dated November 29, 2007. First, on what date did defendant Conerly **approve and forward** plaintiff's request to debit his phone system $30? [FN31] Second, on what date did accounting **receive and process** the approved request?

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

FN31. Under MDOC PD 04.02.105 ("Prisoner Funds"), effective 12/01/2004, funds may be removed from a prisoner's institutional account upon his or her written request. *Id.* ¶ Q2; *see also* "Removal of Funds from Prisoner Institutional Accounts," ¶¶ Q–T. Additionally, with respect to "Prisoner Spending," ¶¶ U–Y, the policy directive sets forth the purposes for which prisoner funds may be spent. *Id.* ¶ V.

The Court should conclude that the events concerning plaintiff's November 29, 2007 request that his phone system be debited $30 may be considered an adverse action. To be sure, even if defendant Conerly backdated the request—in other words dated it as signed on Friday, November 30, 2007 when it was actually signed on Monday, December 3, 2007—it is not clear why this alone would deter a person of ordinary firmness from engaging in a protected activity. Even assuming Conerly was unscrupulous in assigning a date to her approval of plaintiff's disbursement request, Conerly's alleged inaccuracy would also need an alleged adverse effect to be considered an adverse action, such as an allegation that the delay in processing or forwarding the approved disbursement request resulted in the initial "NSF" notation.

Also, it is clear that, regardless of the date on which defendant Conerly approved and forwarded the disbursement authorization request dated November 29, 2007, it was initially received in the accounting office during the time from Friday, December 7, 2007 through Monday, December 10, 2007. This is so, because those are the dates on which plaintiff's trust fund account balance was $28.98, and the form is marked, "NSF bal[ance] 28.98[.]" Doc. Ent. 1 at 14. If there were sufficient funds in the account, then such a notation could not have been justified. Furthermore, Philip attests that, while it cannot be determined who wrote "NSF $28.98" on the form, this is a notation that the Accounting Assistant in the Business Office would have made (Doc. Ent. 23 ¶ 1); therefore, a conclusion that defendant Conerly made such a notation is not reasonably plausible.[FN32]

FN32. It is worth noting that on December 11, 2007—after a same-day deposit of $200 into plaintiff's prisoner trust fund account—plaintiff's trust account was debited and his phone account was credited $30. Doc. Ent. 19 at 32.

However, to the extent plaintiff's complaint alleges that Conerly impeded plaintiff's ability to process his disbursement requests and mail, Doc. Ent. 1 ¶ 24, and to the extent such impediments interfere with plaintiff's right to send and receive mail, a delay in processing a disbursement request could constitute an adverse action.

### iv. Conerly's denial of plaintiff's December 10, 2007 requests to send oversized mail and a donation are adverse actions.

**\*19** Plaintiff claims that when he visited Conerly's office on December 10, 2007, he requested to send oversized mail (a card to a little girl) and a donation (to the little girl) but, he alleges, Conerly denied both requests. Doc. Ent. 1 ¶¶ 41–44. Plaintiff claims that no MDOC policy would have been violated by sending the card; yet, Conerly told plaintiff that the Warden said it could not be sent out. Doc. Ent. 1 ¶¶ 45–46. According to plaintiff, he "was forced again to go to another ARU[S] to send the money and card out[.] ARUS Hill stated that it was no problem and sent it out[.]" Doc. Ent. 1 ¶ 47. The $25 donation was apparently processed on December 20, 2007. Doc. Ent. 1 at 27–28; Doc. Ent. 19 at 32–33 (Trust Account Statement); Doc. Ent. 19–2 at 9.

In response, defendant cites the version of MDOC PD 04.02.105 effective December 1, 2004 (Doc. Ent.15–4), contending that it "prohibits prisoners from sending money to non-family." Doc. Ent. 15 at 14. In her affidavit, defendant acknowledges her denial of plaintiff's disbursement request "to send money and a card to a young girl who had been shot by her mother's boyfriend who was on parole." Conerly contends that "the Prisoner Funds policy does not allow money to be sent by prisoners to individuals that are not family members [.]" Therefore, she attests, she

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

"shared this prisoner's request with Deputy Warden Vallie who forwarded it to Warden Susan Davis for further review. Warden Davis agreed that the request was inappropriate which lead to [her] denial of that disbursement." Doc. Ent. 15–3 ¶ 7. Therefore, Conerly contends, "the adverse action, if any, was not caused by [her]." Doc. Ent. 15 at 14. According to Conerly, "Pasley disregarded that denial and requested that another [ARUS] process his disbursement request." Doc. Ent. 15–3 ¶ 7.[FN33] Defendant argues that "Plaintiff has no 'right' to send money to someone he does not know. If he managed to sneak the money out anyway, he suffered no harm. The few days delay in getting the money out is at best a *de minimus* 'harm.' " Doc. Ent. 15 at 15.

> FN33. Defendant Conerly attests that "[t]he only time [she has] denied a disbursement for legal mail is if the item does not Valify as legal mail." Doc. Ent. 15–3 ¶ 8.

Citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)[FN34] and MDOC PD 05.03.118 ("Prisoner Mail"),[FN35] plaintiff claims Conerly's denial of his requests to send the card and money violated his First Amendment right to send and receive mail. Doc. Ent. 19 at 11. Plaintiff contends that Conerly's statement that her supervisors told her plaintiff's request was inappropriate under the policy "was false and fabricated and a good demonstration as to how far Defendant would go to retaliate against Plaintiff." Doc. Ent. 19 at 11–12. In plaintiff's opinion, "[i]t is highly unlikely that the Warden would encourage Defendant to violate the law and MDOC policy." Doc. Ent. 19 at 12. Here, plaintiff specifically cites his rights under *Turner* and the portion of the mail policy which provides with respect to prisoner outgoing mail: "Each facility shall offer prisoners outgoing mail service through the U.S. Postal Service. The facility also may offer outgoing mail service for oversize or overweight mail, including packages, through a legitimate alternate carrier. Except as set forth in Paragraphs I through L, prisoners shall be required to pay the cost of postage for any mail service used." MDOC PD 05.03.118 ¶ N. Therefore, plaintiff claims, "there was no violation of policy to send

out the oversized card." Also, plaintiff cites Paragraph V(5) of MDOC PD 04.02.105 ("Prisoner Funds"),[FN36] which permits donations to charitable organizations. It is plaintiff's position that "sending out the mail and the funds was not against any penological interest as Defendant claims. The mail and card [were] later mailed out by ARUS Hill because of Defendant's denial." Doc. Ent. 19 at 12.

> FN34. In *Turner,* the Supreme Court held that "a prison regulation [that] impinges on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89. "The *Turner* Court reviewed four factors that are relevant in determining the reasonableness of a challenged prison regulation[:]
>
> > 'First there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.' [ *Turner,* 482 U.S. at 89]. If, not the regulation is unconstitutional, and the other factors do not matter. *Id.* at 89–90 [ ]. Unlike the first factor, the remaining factors are considerations that must be balanced together: (2) 'where there are alternative means of exercising the right that remain open to prison inmates'; (3) 'the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally'; and (4) whether there are 'ready alternatives' available 'that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.' *Id.* at 90–91[.]
>
> *Muhammad v. Pitcher,* 35 F.3d 1081, 1084 (6th Cir.1994).

> FN35. MDOC PD 05.03.118, "Prisoner Mail," effective 09/14/2009, is attached to plaintiff's

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

response. Doc. Ent. 19 at 34–46.

FN36. MDOC PD 04.02.105, "Prisoner Funds," effective December 1, 2004, is attached to plaintiff's response. Doc. Ent. 19 at 47–50, Doc. Ent. 19–2 at 1–7.

**\*20** Furthermore, plaintiff attests that he "went into Conerly's office to send out a card and to send money to a little girl[']s charitable fund raiser and Conerly would not send it out for [him][ .] She state[d] that the Warden told her that it was against policy to send it out[.] [This] is not true [.] [Conerly] did not call the Warden before she denied sending the items out." Doc. Ent. 19 at 25 ¶ 11. Plaintiff attests that "ARUS Hill sent the card and the money out and [ARUS Hill] is the one [who] informed [plaintiff] that the Warden did not tell [Conerly] she [could not] sent it out." Doc. Ent. 19 at 26 ¶ 15. Plaintiff also attests that "ARUS Hill told [plaintiff] that he had a[n] e-mail telling him not to process anymore of [plaintiff's] mail and paperwork and that the e-mail was also sent to other ARUS's[.]" Doc. Ent. 19 at 26 ¶ 16.

In reply, defendant cites a $25 donation on plaintiff's trust account statement dated December 20, 2007 (Doc. Ent. 19 at 32–33; Doc. Ent. 19–2 at 9) and MDOC PD 04.02.105(V)(5), which provides that a prisoner's funds may be contributed to a charitable organization "as approved by the Warden or designee [,]" (Doc. Ent.15–4). Defendant contends that plaintiff has offered "no evidence to support that it was a donation to this little girl, or that the Warden approved the donation to the little girl[.]" Doc. Ent. 21 at 4.

In his sur-reply, plaintiff contends that "Conerly lied to plaintiff telling him that the warden said she could not send the card and money out[.]" Doc. Ent. 25 at 5. Plaintiff asserts that "an affidavit from RUM Hill will prove that he was the one that mailed out the $25 donation to the charitable foundation fundraiser set for the little girl and mailed the card[.]" Doc. Ent. 25 at 8.

As an initial matter, it does not appear that documentation regarding Conerly's rejection of plaintiff's December 10, 2007 requests to send oversized mail and make a donation are part of the record. Nor does it appear that documentation regarding RUM Hill's alleged approval of the December 20, 2007 donation is part of the record. However, defendant Conerly has attested that she denied this disbursement request, because MDOC PD 04.02.105 ("Prisoner Funds") "does not allow money to be sent by prisoners to individuals that are not family members," and "Warden Davis agreed that the request was inappropriate[.]" Doc. Ent. 15–3 ¶ 7.FN37 On the other hand, the Court can only assume that RUM Hill's alleged approval of the request to send the donation was based upon MDOC Policy Directive 04.02.105 ("Prisoner Funds"), Paragraphs U–Y of which address prisoner spending—namely the provision that a prisoner may "[c]ontribute to charitable organizations as approved by the Warden or designee." MDOC PD 04.02.105, effective 12/01/2004, ¶¶ V(1), V(5).

FN37. Paragraph V sets forth purposes for which prisoners may spend their funds, including the provision that a prisoner may "[t]ransfer to family members and to a parent or verified legal guardian of the prisoner's child, stepchild or grandchild." *Id.* ¶ V(1).

As for the request to send the card, MDOC PD 05.03.118 ("Prisoner Mail") provides:

Prisoners shall be permitted to send and receive uncensored mail to or from any person or organization unless the mail violates this policy or Administrative Rule 791.6603. Mail shall not be prohibited solely because its content is religious, philosophical, political, social, sexual, unpopular, or repugnant. However, mail shall be prohibited if it is a threat to the security, good order, or discipline of the facility, may facilitate or encourage criminal activity, or may interfere with the rehabilitation of the prisoner.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

**\*21** *Id.,* effective 09/14/2009, ¶ D. Additionally, the prisoner mail policy provides that "[a] prisoner in a CFA facility shall be permitted to send air, certified and foreign mail, and mail that weighs more than two ounces, via disbursement.". *Id.* ¶ O.

At this point, it is not clear whether defendant's refusal to send the oversized mail (the card to the little girl) was justified. It is also not clear why the donation request which Conerly rejected was allegedly approved by RUM Hill. Even though these issues are really germane to the issue of causation, the disparity of the decisions regarding the donation calls into question whether plaintiff's donation was permitted under prison policy. Furthermore, even if Conerly's rejections of the mail and donation requests were justified by policy, her rejections may still be considered adverse actions. In other words, if it is shown that prison policy permitted his requests to send the card and donation, a reasonable jury could conclude that Conerly's rejection of plaintiff's request to send oversized mail or Conerly's rejection of plaintiff's request to send a donation would deter a person of ordinary firmness from exercising his or her right to send mail or donations from the prison.[FN38]

> **FN38.** This report assumes that plaintiff's First Amendment claim is based solely upon defendant's alleged retaliation for plaintiff's exercise of his First Amendment right "to petition the Government for a redress of grievances[,]" and not upon another clause of that same amendment. The analysis of the constitutionality of a prison regulation under *Turner* and the analysis of a free exercise and/or RLUIPA claims, *see Massingill v. Livingston,* 277 Fed.Appx. 491, 493 (5th Cir.2008), *Koger v. Bryan,* 523 F.3d 789, 796 (7th Cir.2008), are distinct from the First Amendment retaliation analysis under *Thaddeus–X*. At most, the Court might consider the "impact" factor in a *Turner* claim or the "substantial burden" factor in a free exercise/RLUIPA claim as analogous when analyzing the "adverse action" factor of a First Amendment retaliation claim.

**v. There is a material dispute regarding why Conerly activated her PPD pin on December 10, 2007, and Conerly issued plaintiff a major misconduct ticket for DDO the same day.**

Plaintiff claims that on the day he was in her office about sending the card to the little girl, defendant talked to plaintiff disrespectfully. Plaintiff claims he "got up to leave because there was no need to stay in the office after she denied [his request to send the card and money to the little girl] [.]" Doc. Ent. 1 ¶ 48. According to plaintiff, "Conerly got up from her desk [,] reached into her black bag[,] pulled out her PPD[,] looked directly at Plaintiff[,] smiled and then pulled the pin." Doc. Ent. 1 ¶ 49. Plaintiff claims that he "feared for his life because these officers came in as though they were going to handle the situation by all means necessary[,]" but "what saved Plaintiff was that Officer Cummings was standing [outside] the entrance of [Conerly's] door and [Conerly] didn't see [Officer Cummings] and he informed the Officers that [plaintiff] was not in [Conerly's] office when [Conerly] pulled her pin." Doc. Ent. 1 ¶¶ 51, 52. Plaintiff states that "[w]hen [Conerly] came out and noticed that Cummings had been standing there all the time she then stated that the pin went off by mistake." Doc. Ent. 1 ¶ 53.

Also, plaintiff alleges that Conerly wrote plaintiff a ticket on or about December 10, 2007 "stating that Plaintiff [would not] leave her office and the ticket was dismissed." Doc. Ent. 1 ¶ 54.

In her motion, defendant argues that "[a]ccidentally pulling a PPD device was not an adverse action." In support of her claim that "[p]laintiff suffered no adversity[,]" defendant points out that plaintiff "did not attach a copy of the ticket to his complaint[,]" and "does not allege that he was put in segregation pending a hearing." Doc. Ent. 15 at 15.

**\*22** The parties' affidavits contradict with respect to events that occurred after the oversize mail request. To begin, defendant attests that "after Pasley refused to leave

my office, I removed my [PPD] in an effort to show the prisoner that I was serious about him leaving that area. Although I was willing to pull the pin of that PDD if necessary, I had not intended to do so. However, the pin was loose and was accidentally pulled. I informed the Shift Commander that pulling the pin was done by mistake and that it was not my intention to alert staff or have Pasley sent to segregation. No one wrote Pasley a misconduct ticket as Pasley alleges in ¶ 54." Doc. Ent. 15–3 ¶ 9.

By contrast, plaintiff attests that "when [Conerly] pulled the PPD [plaintiff] was not in [Conerly's] office and Officer Cummings was standing outside her door with eye to eye contact with [plaintiff] when [Conerly] pulled the pin." Doc. Ent. 19 at 25 ¶ 12. Plaintiff attests that Conerly wrote him a ticket for disobeying a direct order (DDO), which was dismissed at the hearing. Doc. Ent. 19 at 25 ¶ 13. When alleging that he was written a major misconduct by Conerly (Doc. Ent. 19 at 20), plaintiff refers to RUM D. Monday's January 7, 2008 Step I grievance response, wherein it states "the prisoner was given a DDO and did not have his bond revoked[,]" (Doc. Ent. 19–2 at 11).

In addition, plaintiff's response claims Conerly's activation of her PPD was not accidental. He asserts that he "was handcuffed and locked in his room." According to plaintiff, "had Officer Cummings not intervened[,] Conerly would have falsely had plaintiff placed in administrative segregation." Doc. Ent. 19 at 13.

In reply, defendant argues that "[p]laintiff has not provided evidence that he got a ticket from Conerly on December [10], 2007." Doc. Ent. 21 at 4. In his sur-reply, plaintiff contends that his copies of "the misconduct and disposition [were] destroyed when [his] cell/room flooded[,]" and he "has made several attempts to obtain the misconduct report and disposition but has failed due to the lack of cooperation by MDOC staff[.]" Although D. Monday's January 7, 2008 grievance response is evidence that a major misconduct ticket for DDO was written, plaintiff contends it "is not as effective as [providing a copy of] the misconduct and disposition itself[.]" Doc. Ent. 25 at 7. Plaintiff contends that "[a]n affidavit from Officer Cummings will prove that defendant wrote plaintiff a misconduct for DDO on December 10, 2007, and that defendant pulled the PPD pin on purpose and not by accident as she claim[s][.]" Doc. Ent. 25 at 8.

However, defendant Conerly recently provided the Court with her September 1, 2010 affidavit, in which she attests that "[a] considerable time after signing [the January 4, 2010] affidavit, a copy of the [December 10, 2007] ticket and accompanying records were located." According to Conerly, she "was shown a copy of a major misconduct ticket for [DDO] that [she] wrote against [plaintiff] on December 10, 2007.[She] truly did not remember writing this ticket when [she] signed the affidavit on January 4, 2010. However, seeing the ticket did refresh [her] memory." Doc. Ent. 26–2 ¶ 4. Conerly further attests that she "did not write this major misconduct ticket to punish or retaliate or harass prisoner Pasley. [She] gave him an order to leave and he did not comply. As indicated in [her] earlier affidavit, [her] PPD was activated accidentally." Doc. Ent. 26–2 at 3 ¶ 9. Still, in her accompanying brief, she asserts that "[t]he hearing officer did not rule on the merits of the ticket at all. Plaintiff suffered no adversity as a result of this ticket." Doc. Ent. 26 at 4.

***23** Conerly's issuance of a major misconduct ticket for DDO [FN39] is an adverse action. *See Brown v. Crowley,* 312 F.3d 782, 789 (6th Cir.2002) ( "the issuance of the major misconduct charge subjected him to the risk of significant sanctions.") (citing Mich. Admin. Code R. 791.5505(1)).

FN39. Disobeying a direct order (DDO) is a major rule violation which could subject a prisoner to the issuance of a major misconduct. See MDOC PD 03.03.105 ("Prisoner Discipline"), Attachment B. Major misconducts are discussed at ¶¶ K–LL of the Prisoner Discipline policy, and misconduct sanctions are discussed at ¶¶ TT–BBB, which provides in part that "[u]pon a finding of guilt in a minor or major misconduct hearing, the hearing officer shall impose one or more of the sanctions set forth in Attachment D

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
(Cite as: 2010 WL 3906120 (E.D.Mich.))

[,]" and "[a] hearing officer may give a prisoner credit for time spent in segregation or on toplock pending a hearing but is not required to do so." MDOC PD 03.03.105 ¶¶ TT, YY. Other actions resulting from a major misconduct, which are described at ¶¶ FFF–KKK, provide in part that "[a] prisoner may be reclassified to administrative segregation based solely on a major misconduct guilty finding as set forth in PD 04.05.120 'Segregation Standards'." MDOC PD 03.03.105 ¶ III. Sanctions for a major misconduct include detention, toplock, loss of privileges, assignment of extra duty and restitution. MDOC PD 03.03.105, Attach. D. The loss of privileges sanctions provides that "[d]irect access to general library (not law library; prisoners in segregation shall continue to have books delivered to them consistent with PD 04.05.120 'Segregation Standards')." MDOC PD 03.03.105, Attach. E.

Furthermore, defendant did not threaten to pull her PDD; she did so, and corrections officers rushed to the location. The parties dispute the reason for which Conerly activated the PPD pin. Still, taking plaintiff's claims to be true, if there had not been another individual who witnessed the incident of defendant pulling the PDD pin when plaintiff was outside her office, plaintiff may have faced serious consequences. The December 10, 2007 incident may have been capable of deterring a reasonable person from filing a grievance. As noted above, the Sixth Circuit recognized: "Pasley also alleges that Conerly placed him in physical danger by intentionally activating her personal protection device while he was attempting to leave her office. A person of ordinary firmness could arguably be dissuaded from filing a grievance by an action which, if it occurred as Pasley alleges, would have impressed upon Pasley the amount of physical force Conerly could bring to bear on him through a false allegation." *Pasley,* 345 Fed.Appx. at 985.

**c. There is enough indirect evidence to infer a retaliatory motive by defendant.**

    For a First Amendment claim, the adverse action must

have been in response to the protected conduct. "The relevant showing in such cases must be more than the prisoner's 'personal belief that he is the victim of retaliation.' " *Johnson v. Rodriquez,* 110 F.3d 299, 310 (5th Cir.1997) (quoting *Woods v. Edwards,* 51 F.3d 577, 580 (5th Cir.1995)). However, retaliation "rarely can be supported with direct evidence of intent". *Harbin–Bey v. Rutter,* 420 F.3d 571, 580 (6th Cir.2005) (quoting *Murphy v. Lane,* 833 F.2d 106, 108 (7th Cir.1987)). "But conclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state ... a claim under § 1983.' " *Harbin–Bey,* 420 F.3d at 580 (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1538–39 (6th Cir.1987)). That is why "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate" to consider when determining whether a genuine issue of fact on the third prong has been established. *Thaddeus–X,* 175 F.3d at 399. Furthermore, "temporal proximity alone may be significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive." *Muhammad v. Close,* 379 F.3d 413, 417–18 (6th Cir.2004).

    As the Sixth Circuit stated in its September 29, 2009 order:

> Finally, Pasley alleges a causal connection between his threat to file a grievance and Conerly's actions. The causal connection hinges on Conerly's subjective motivations for her actions. *See [Thaddeus–X]* at 399. Conerly's alleged threats to have Pasley transferred came in direct response to Pasley's statement about filing a grievance. She gave him the postal container during that same encounter, and the search of Pasley's cell-along with Conerly's initial denial that she had provided the contraband container-occurred shortly thereafter. According to Pasley, Conerly informed him the next day that she would no longer process his mail or disbursement requests, and it was in the context of Pasley's trying to send out mail that Conerly activated her personal protection device. Pasley has sufficiently alleged that Conerly's actions were motivated, at least in part, by his threat to file a grievance against her. *See Thomas v. Eby,*

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

481 F.3d 434, 441 (6th Cir.2007).

**\*24** *Pasley,* 345 Fed.Appx. at 985–986.

In her motion, defendant argues that "[g]iving Plaintiff a U.S. Postal bin [could not] have been retaliatory, because Plaintiff does not allege he engaged in any protected conduct before that occurred." Doc. Ent. 15 at 12. Defendant also claims, with respect to the December 10, 2007 mail denial, that "the adverse action, if any, was not caused by Defendant Conerly." Doc. Ent. 15 at 14. Rather, relying upon *Hines v. Gomez,* 108 F.3d 265, 267 (9th Cir.1997) ( "[Plaintiff's] retaliation claim must rest on proof that [defendant] filed the disciplinary action against him in retaliation for [plaintiff's] exercise of his constitutional rights and that the retaliatory action advanced no legitimate penological interest."), Conerly contends that her "refusal to mail the card and money was based on MDOC policy." Doc. Ent. 15 at 14–15.[FN40]

> FN40. According to Conerly, "[t]he policy that allows money to be sent only to family members advances the legitimate penological interest of ensuring that prisoners do not extort money from other prisoners' families or from members of the public for 'favors.' " Doc. Ent. 15 at 15.

In response, plaintiff contends that "Conerly's threats to have plaintiff transferred came in direct response to plaintiff's statement about filing a grievance[.] She gave him the postal container during that same encounter [,] and the search of plaintiff's cell along with Conerly's initial denial that she had provided the contraband container—occurred shortly thereafter." Also, plaintiff contends, "Conerly informed him the next day that she would no longer process his mail or disbursement request, and it was in the context of plaintiff's trying to send out mail that Conerly activated her personal protection device." Doc. Ent. 19 at 16. Also, plaintiff quotes the aforementioned portion of the Sixth Circuit's opinion. Doc. Ent. 19 at 20.

Having examined the record, I conclude that there is enough indirect evidence-in both the sequence of events—i.e., events that took place after Plaintiff expressed intent to file a grievance—and their temporal proximity to that expression of intent—to infer a retaliatory motive on the part of the Defendant.

## 2. Defendant is not entitled to qualified immunity on plaintiff's First Amendment retaliation claim.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The failure to so plead precludes a plaintiff from proceeding further, even from engaging in discovery, since the plaintiff has failed to allege acts that are outside the scope of the defendant's immunity." *Kennedy v. City of Cleveland,* 797 F.2d 297, 299 (6th Cir.1986) (external footnote omitted) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)).

"Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). "The privilege is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' " *Saucier,* 533 U.S. at 200–201 (quoting *Mitchell,* 472 U.S. at 526).

**\*25** The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step analysis: (1) has plaintiff alleged a violation of a constitutional right?; (2) if so, was that right clearly established at the time of the alleged conduct?; [FN41] and (3) if the right was clearly established, has plaintiff alleged and sufficiently supported that the official actions were objectively unreasonable in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

light of this clearly established right? *See Dickerson v. McClellan,* 101 F.3d 1151, 1157–58 (6th Cir.1996). [FN42] "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir.2006) (citing *Barrett v. Steubenville City Schs.,* 388 F.3d 967, 970 (6th Cir.2004)).

FN41. Defendant points out that "[t]his inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" Doc. Ent. 15 at 6 (quoting *Saucier,* 533 U.S. at 201).

FN42. *See also Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), wherein the Supreme Court stated, "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier,* 533 U.S. at 201 (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier,* 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *Id.* at 202.

Last year, the Supreme Court stated, "[a]lthough we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that *it is often beneficial." Pearson v. Callahan,* —— U.S.

——, ——, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (emphasis added).

Defendant argues that she is entitled to qualified immunity, because "she did not violate any of Plaintiff's constitutional rights." Doc. Ent. 15 at 15–17. Specifically, defendant states:

In this case, Plaintiff did not suffer retaliation in violation of his constitutional rights. Plaintiff did not file any grievance until after all of the complained-of acts occurred. Even if the court were to assume that he threatened to file a grievance, and the threat constitutes protected conduct, Plaintiff's retaliation claims fail because he suffered no adversity, and was not "deterred from engaging in protected conduct"—as noted, he filed a grievance afterwards. Plaintiff was able to get appropriate storage bins for his legal property when they became available. [Cplt, ¶ 22]. Defendant Conerly processed the $30 disbursement request in a timely fashion and she did not mark his disbursement request "NSF"—the Business Office did. The Warden is the person who disapproved Plaintiff sending money to a little girl in Detroit, as that would violate policy. Plaintiff was not written a ticket after the PPD incident. Because none of Defendant Conerly's actions meet the standard for a retaliation claim, she did not violate any of Plaintiff's constitutional rights, and she is entitled to qualified immunity.

Doc. Ent. 15 at 17.

Plaintiff argues that Conerly "is not entitled to qualified immunity because she violated plaintiff's constitutional rights[.]" Doc. Ent. 19 at 19–20. Plaintiff contends that he has "alleged facts sufficient to show that his First [Amendment] rights were substantially burdened." Doc. Ent. 19 at 20.

The defense of qualified immunity should only be addressed after determining whether plaintiff has stated a constitutional claim upon which relief can be granted. "[T]he better approach is to resolving cases in which the

Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)
**(Cite as: 2010 WL 3906120 (E.D.Mich.))**

defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento v. Lewis,* 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

**\*26** Therefore, if the Court agrees with my foregoing recommendations, and in light of the Supreme Court's direction in *County of Sacramento,* the Court need only address the issue of defendant's entitlement to qualified immunity with respect to plaintiff's First Amendment retaliation claim. Furthermore, defendant's qualified immunity argument is limited to the allegation that plaintiff has not met the first test—whether plaintiff has alleged a violation of a constitutional right? In other words, defendant does not argue that the right was not clearly established and/or does not argue that her actions were objectively reasonable in light of that right.

Therefore, the Court should conclude that defendant is not entitled to qualified immunity with respect to plaintiff's First Amendment retaliation claim against Conerly. First, as indicated above, plaintiff's November 2007 threat to file a grievance constituted protected conduct (Section II.E.1.a). Second, the fact that he later filed a grievance is not dispositive of the deterrence issue; as discussed above, plaintiff has alleged some forms of adverse action, and there is a material dispute over why Conerly activated the PPD pin (Section II.E.1.b). Finally, there is enough indirect evidence to support an inference of retaliatory motive (Section II.E.1.c).

### III. *NOTICE TO PARTIES REGARDING OBJECTIONS:*

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections consti-

tutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of Health & Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Federation of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

E.D.Mich.,2010.
Pasley v. Conerly
Not Reported in F.Supp.2d, 2010 WL 3906120 (E.D.Mich.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2002 WL 727025 (S.D.N.Y.)
**(Cite as: 2002 WL 727025 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Jerry WATERS, Plaintiff,
v.
SGT. SCHNEIDER, C.O. L. Featherston, Lt. Glass,
C.O. Joseph Kowalski, C.O. Kevin Walker, C.O. M.
Perez, C.O. G. Talone, C.O. J. McGue, and Elaine
Booth, R.N., Defendants.

No. 01 CIV. 5217(SHS).
April 23, 2002.

OPINION & ORDER

STEIN, District J.

**\*1** Jerry Waters, a prison inmate, brings this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that defendants—all corrections officers or other employees of the New York State Department of Correctional Services ("DOCS")—violated his Eighth Amendment right to be free from cruel and unusual punishment by using excessive force against him and denying him adequate medical attention. Defendants have moved to dismiss the complaint on the grounds that plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"). Both parties have submitted supplemental memoranda to the Court regarding the exhaustion issue in light of the U.S. Supreme Court's recent decision in *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983 (Feb. 26, 2002). Because plaintiff did not exhaust the available administrative remedies prior to commencing this action, the complaint must be dismissed.

I. BACKGROUND

The following facts, alleged in the complaint, are assumed to be true for purposes of the present motion.

On January 6, 1999, Waters was in Side Room 1 of New York Downstate Correctional Facility when a fight broke out between two other inmates. As Waters grabbed one inmate in an attempt to stop the fight, several defendants and another inmate threw him against the wall. Defendants removed Waters from Side Room 1 to another room where they allegedly subjected him to physical abuse. They then dragged Waters from the receiving room to the hospital while beating him. Upon arrival, defendant Booth refused to give Waters medical attention. (Compl., Sect.IV.) Plaintiff subsequently suffered back pain, headaches, loss of stability in his legs and abrasions upon his wrists. (Compl., Section IV–A.)

Plaintiff brought suit pursuant to 42 U.S.C. § 1983 in May 2001, seeking monetary relief on the grounds that defendants' actions violated his constitutional rights. Defendants moved to dismiss the complaint in September 2001, claiming that 1) Waters had failed to exhaust his administrative remedies within DOCS as mandated by the PLRA and 2) Waters' complaint failed to state a claim of medical indifference. In December 2001, Waters submitted additional material to the Court indicating that he had filed an administrative grievance in October 2001—after the commencement of this lawsuit—and claiming that he had thereafter exhausted all available administrative remedies.

II. DISCUSSION

Pursuant to the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In *Nussle,* the Supreme Court held this exhaustion requirement to apply to "all inmate suits about prison life, whether they involve general circumstances or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 727025 (S.D.N.Y.)
**(Cite as: 2002 WL 727025 (S.D.N.Y.))**

particular episodes, and whether they allege excessive force or some other wrong." 122 S.Ct. at 992. Waters may therefore only bring suit in federal court after he has exhausted "any available administrative remedies, including all appellate remedies provided within the system." *Fletcher v. Haase,* No. 99 Civ. 9549, 2002 WL 313799, at *1 (S.D.N.Y. Feb. 27, 2002) (citing *Booth v. Churner,* 532 U.S. 731, 735 (2001)). *See also Diezcabeza v. Lynch,* 75 F.Supp.2d 250, 255 (S.D.N.Y.1999).

**\*2** In his submissions to the Court, Waters alleges that he attempted to file a grievance with the Inmate Grievance Resolution Committee ("IGRC") in April 2001 but never received a response. Defendants maintain that no such grievance was ever filed, and Waters' complaint states that he did not file an administrative grievance. (Compl., Sect.II.) In either case, it is undisputed that Waters did not pursue the available appeals within the prison grievance system. Specifically, if the IGRC denies an inmate grievance, the inmate may appeal to the superintendent of the facility and further appeal to the Central Office Review Committee ("CORC") for reconsideration of the decision. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7. The IGRC is required to review an inmate's grievance and either resolve it informally or hold a hearing within seven days of receipt. *See id.* If the committee fails to respond to the grievance, the inmate may appeal to the next level without awaiting administrative action. *See id.* § 701.8. Waters does not allege that he filed any appeals after the IGRC allegedly failed to respond to his grievance. He therefore did not exhaust the available administrative remedies prior to filing this lawsuit.

Nor can Waters' subsequent efforts to fulfill the exhaustion requirement prevent dismissal of this action. The U.S. Court of Appeals for the Second Circuit has held that a plaintiff must have met the exhaustion requirement at the time the complaint is filed. *Neal v. Goord,* 267 F.3d 116, 117–18 (2d Cir.2001). Thus, although Waters claims that he has now exhausted all

available administrative remedies, "the acknowledged fact that he had not done so before filing this complaint requires that the case be dismissed." *Fletcher,* 2002 WL 313799 at *1. The Court recognizes that if Waters has in fact already received a final determination in the internal grievance procedure, he may refile the same complaint "with the addition of paragraphs explaining how administrative remedies have been exhausted." *Mendez v. Artuz,* No. 01 Civ 4157, 2002 WL 313796, at *2 (S.D.N.Y. Feb. 27, 2002). While hardly the most efficient solution in the case at hand, such procedure is the law of this Circuit and need be followed.

III. CONCLUSION

Because plaintiff had not exhausted "such administrative remedies as are available" prior to commencing this litigation, defendants' motion to dismiss the complaint is granted and the complaint is dismissed without prejudice.

SO ORDERED.

S.D.N.Y.,2002.
Waters v. Schneider
Not Reported in F.Supp.2d, 2002 WL 727025 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.